# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **SHEILA DAVALLOO** | : | **PRISONER** |
| *Petitioner* | : | **CASE NO. 3:17-cv-01257 (VAB)** |
| **v.** | : | |
| | : | |
| **SUPERINTENDENT** | : | |
| **SABINA KAPLAN, ET AL** | : | |
| *Respondents* | : | **NOVEMBER 8, 2017** |

## RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, an inmate presently confined at the Bedford Hills Correctional Facility in Bedford Hills, New York, brings this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Petitioner is challenging her 2012 judgment of conviction of murder in violation of Connecticut General Statutes § 53a-54a, rendered after a jury trial in the Connecticut Superior Court for the Judicial District of Stamford-Norwalk. See State v. Davalloo, 153 Conn. App. 419, 101 A.3d 355, affirmed, 320 Conn. 123, 128 A.3d 492 (2016) (Appendices A and I).   On April 27, 2012, the trial court (*Comerford, J.*) sentenced the petitioner to fifty years to serve, consecutive to a New York sentence she was already serving. See Record on direct appeal at 44-45 (Appendix B); see also Trial Transcript (hereafter "TT") 04/27/12 at 36-40 (Appendix M).

---

[1] Although petitioner brings this action to challenge a Connecticut conviction, petitioner is currently a sentenced prisoner in New York, serving a twenty-five year prison sentence arising from a 2004 conviction for the attempted murder of her then husband, Paul Christos, in March of 2003. See People v. Davalloo, 39 A.D.3d 559, 833 N.Y.S.2d 576 (2007). Petitioner's fifty year Connecticut sentence for the 2012 murder conviction she challenges herein, stemming from the petitioner's killing of her paramour's girlfriend, Anna Lisa Raymundo, in November of 2002, is set to run consecutive to that New York sentence.

The petitioner presents three grounds upon which she claims she is in custody in violation of the Constitution, laws or treaties of the United States, to wit: (1) in violation of the marital communications privilege, the trial court improperly permitted Paul Christos, petitioner's husband at the time of the events in question, to testify as to conversations she had had with him; (2) the trial court improperly permitted the state to present evidence of uncharged misconduct; and (3) the trial court improperly found that petitioner validly waived her right to trial counsel. See Petitioner's Petition at ¶ 12, Grounds One, Two and Three [ECF No. 1]; see also State v. Davalloo, supra, 153 Conn. App. at 420.

In response to the Court's November 1, 2017 Order to Show Cause [ECF No. 23], the respondent, George Jepsen, the Attorney General of the State of Connecticut, submits this memorandum in opposition to the petitioner's petition because the petitioner's claims identified as Claims One and Two are purely state law evidentiary claims which are nonconstitutional in nature and do not provide a basis for federal habeas corpus relief under 28 U.S.C. § 2254. See Estelle v. McGuire, 502 U.S. 62, 68 (1991)(A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court.).  Further, the Connecticut Appellate Court, the last court to provide a reasoned decision on the issue, reasonably applied clearly established Federal law, as determined by the Supreme Court of the United States, in rejecting the petitioner's claim that she did not validly waive her right to counsel (Ground Three).  See 28 U.S.C. § 2254(d)(1); Harrington v. Richter, 562 U.S. 86, 103 (2011).

Therefore, as will be explained in further detail hereafter, the petitioner is not entitled to federal habeas corpus relief and the respondent respectfully asserts that her petition should be denied accordingly.

2

## I.   NATURE OF THE CASE

### A.   Factual Background

On direct appeal of her conviction, the Connecticut Appellate Court[2] found the

petitioner's jury reasonably could have found the following facts:

> This case involves a love triangle between the [petitioner] and two of her coworkers at Purdue Pharma, a pharmaceutical company in Stamford. The [petitioner] became obsessed with Nelson Sessler, one of her coworkers. The victim was Anna Lisa Raymundo, the second coworker, who ultimately lived with and became the girlfriend of Sessler. In late 2000, Sessler met Raymundo at an after-work happy hour that other coworkers also attended. In the summer of 2001, the [petitioner] met Sessler for the first time at another after-work happy hour. Although the [petitioner] was married to [Paul] Christos at the time, she told Sessler that she was divorced.[3] At some point, Sessler began sexual relationships with both the [petitioner] and Raymundo.
>
> During the tenure of the [petitioner]'s relationship with Sessler, the two met periodically at the condominium unit in Pleasantville, New York, where the [petitioner] lived with Christos. Before Sessler would meet the [petitioner] at the Pleasantville condominium unit, the [petitioner] would tell Christos that her mentally ill brother was coming to visit and Christos had to leave the house and take his personal belongings with him. The [petitioner] told Christos that her brother might react badly if he discovered that she was married. Christos believed this story at first. He knew from the [petitioner]'s parents that the [petitioner], in fact, had a mentally ill brother. According to Sessler, he and the [petitioner] did not see each other often because the [petitioner] was "busy" with other obligations and interests, including volleyball and taking care of her mentally ill brother.
>
> By the summer of 2002, Sessler's attentions focused on Raymundo and he suspended his sexual relationship with the [petitioner]. According to Sessler, the [petitioner] "seemed okay" with their relationship just being a

---

[2] Upon granting limited certification, the Connecticut Supreme Court later adopted the Appellate Court's recitation of these facts in their entirety when passing upon petitioner's marital communication privilege claim.  See State v. Davalloo, supra, 320 Conn. at 126-135 (Appendix I).

3 [footnote 1 in original] The [petitioner] and Christos were divorced in 2004.

"summer fling...." Raymundo became Sessler's girlfriend and, although he continued to maintain his separate apartment in Stamford, he spent "the majority of [his] time" at Raymundo's apartment, located at 123 Harbor Drive, apartment 105, in Stamford. The [petitioner] was aware that Sessler was living with Raymundo. Sessler's relationship with Raymundo continued after Raymundo left Purdue Pharma in 2002 and began a new job at another pharmaceutical company, Pharmacia, in New Jersey. Despite working in New Jersey, Raymundo continued to live at her apartment in Stamford.

In 2002, the [petitioner] concocted an imaginary story about a love triangle among three fictional "coworkers" at Purdue Pharma: "Melissa," "Jack," and "Anna Lisa." The [petitioner] related the ongoing saga, which she presented as true, from the perspective of her "friend" Melissa, who supposedly was confiding in the [petitioner]. The [petitioner] said that Melissa, who was in a relationship with Jack, was sad and depressed because Jack was also in a relationship with another woman, Anna Lisa. "Melissa," quite clearly in retrospect, was the [petitioner]. "Jack" was Sessler, and "Anna Lisa" was Raymundo.

The [petitioner] related information to [her husband] Christos about the love triangle nearly every day. She included intimate details about Melissa and Jack. She told Christos that Melissa was upset when Jack rebuffed her sexual advances. She once said that Melissa had discovered Jack's travel plans and had flown to Jack's destination. She then "conveniently" ran into him at the airport as he was boarding a plane home and sat next to him on the return flight.[4] The [petitioner] constantly asked Christos for advice "on behalf" of Melissa with questions such as why Jack was in a relationship with two women and why Jack was cheating on one woman with the other. Christos listened to these stories to "humor" the [petitioner].

Eventually, the [petitioner] told Christos that she "wanted to go on a stakeout" with Melissa in order to "spy on Jack." Although Christos thought the proposed surveillance was "a little odd," he did not believe it would actually occur; he gave the [petitioner] a pair of night vision binoculars. The [petitioner] told Christos that she had purchased a lock pick set for Melissa because Melissa wanted to break into Anna Lisa's apartment to look at photographs in order to "get a sense of the relationship between Jack and

---

4  [footnote 2 in original] Sessler testified that on the return flight from a bachelor party in Las Vegas, he was seated next to the [petitioner], who explained that she was returning from California.

4

Anna Lisa." The [petitioner] practiced with the lock pick set on the front door of their Pleasantville condominium unit. The [petitioner] also asked Christos for an eavesdropping device that she knew he owned in order to assist Melissa in planting the device in Jack's office so they could listen in on his conversations. Early one morning, the [petitioner] telephoned Christos to inform him that she and Melissa were outside Anna Lisa's apartment and asked Christos if Melissa should confront Anna Lisa. Christos told the [petitioner] that Anna Lisa had a "right to know her boyfriend is cheating on her...." In time, Christos became "sick" of the stories of the love triangle and "kind of got angry" with the [petitioner]."

The [petitioner] also related the story of the love triangle to Emilio Mei and Tammy Mei, friends of the [petitioner] and Christos, to Christos' parents and to "one or two other friends as well." The [petitioner] told Tammy Mei about Melissa "[a]lmost every time [they] spoke" and would ask her questions such as whether she thought Jack would break up with Anna Lisa and date Melissa. The [petitioner] told Tammy Mei that Melissa had access to Jack's voice mail and would listen to it on a daily basis to see if he was still seeing Anna Lisa or any other woman. She also told Tammy Mei that Jack "tried to set Melissa up with one of his friends," but that it did not go well because "Melissa just wanted to be with Jack."[5] The [petitioner] "quite a few times" asked Tammy Mei if Melissa should confront Anna Lisa to "let her know that she [Melissa] was also seeing Jack." Tammy Mei advised against this confrontation, but sensed that the [petitioner] wanted her to say that Melissa should confront Anna Lisa.

A few minutes after noon on November 8, 2002, the Stamford Police Department received a 911 call in which the caller reported that a man was assaulting someone at 123 Harborview, apartment 105; the caller claimed to be a neighbor.[6] The dispatcher knew that Harborview was a commercial area without apartments and knew the given address had to be incorrect. After the caller ended the call, the dispatcher called back the number and discovered that the call had come from a pay phone at a Dutchess restaurant on Shippan Avenue in Stamford. The dispatcher telephoned the Dutchess restaurant and spoke to a manager, who had not noticed anyone at the pay phone. The dispatcher sent officers to 123 Harbor Drive,

---

5 [footnote 3 in original] Sessler testified that he attempted to arrange a date between a friend of his and the [petitioner].

6 [footnote 4 in original] At trial, a voice identification examiner testified to a reasonable degree of scientific certainty that the voice on the 911 call was that of the [petitioner].

apartment 105, which she knew was a residential facility near the Dutchess restaurant.

An officer knocked on the door of apartment 105 and received no answer. He pushed the door open and saw the deceased victim, Raymundo, on the floor of the front foyer. The officers saw no signs of forced entry, burglary, or ransacking. The victim had died from multiple stab wounds and her injuries indicated a violent struggle.

In the course of investigation, officers found details whose relevance later became apparent. At 11:57 a.m., the victim's home telephone had been used to place a call to Sessler's office; Sessler had not answered the call and no voice message had been left. Officers discovered a bloodstain on the handle of a bathroom sink, which suggested that the assailant had tried to clean up after the crime. The bloodstain much later was determined to contain "all of the different genetic elements that [were] present" in the DNA profiles of both the [petitioner] and the victim. The state's expert testified that due to the fact that the victim cleaned her apartment regularly, as testified to by Sessler and the victim's parents, and the fact that the sink handle was nonporous, it was "extremely, extraordinarily unlikely" that any DNA left by the [petitioner] on the sink handle prior to November 8, 2002, would have lasted or remained "very long...."

When Sessler returned after work to the victim's apartment, where he frequently stayed, police officers questioned him. Sessler gave officers the names of two other women he dated who suffered from mental illnesses. He did not at that time tell police officers about his overlapping sexual relationships with the victim and the [petitioner]. After several hours of questioning, the police released Sessler. The police were unaware, at this point, of any connection between the [petitioner] and the crime.

After the victim's death, the [petitioner] pursued Sessler. She sent him a care package, consoled him, and was one of the few people willing to talk to Sessler about Raymundo at a time when most people "sort of shunned" him. In January, 2003, the [petitioner] invited Sessler to go on a group ski trip. The "group" turned out to be only Sessler and the [petitioner]. Sessler again entered into a sexual relationship with the [petitioner]. The [petitioner] would invite Sessler to her residence, but, again, only after having first told Christos that her mentally ill brother was visiting.

In late November, 2002, Christos noticed that the [petitioner] came home from work with a "nasty cut" on her thumb. The [petitioner] explained that she had cut her thumb opening a dog food can; she had two dogs at the time. As part of his work, on November 13, 2002, Christos had a meeting with representatives from Pharmacia, where Anna Lisa had worked. The

representatives mentioned that a colleague of theirs had been recently murdered. Although a name was not mentioned, Christos began to wonder if Melissa "did something" to Anna Lisa. Christos mentioned to the [petitioner] that an employee at Pharmacia had been killed and asked whether Melissa was involved and if Anna Lisa was "okay...." The [petitioner] did not seem shocked or surprised and responded, without elaboration, that Anna Lisa was "fine." Christos testified at trial that he believed that, at that point, the [petitioner] thought that he had made that connection. In late 2002, the [petitioner] reported to Christos that Jack and Anna Lisa had "broken up" and that Melissa and Jack were together exclusively. But also in late 2002, the [petitioner] asked Christos for information about fingerprints and DNA.

On December 8, 2002, during dinner, the [petitioner] also asked Emilio Mei and Tammy Mei about DNA and fingerprints, and questioned whether "they have everybody's DNA on file." In early 2003, Tammy Mei noticed that, although the [petitioner] continued to talk about Jack and Melissa, she had not spoken about Anna Lisa in a while. Tammy Mei asked the [petitioner] about Anna Lisa, and the [petitioner] responded that Jack and Melissa were a happy couple; Anna Lisa had moved to New Jersey because she had obtained a job there.

In 2003, the frequency of trysts at the Pleasantville condominium - under the guise, so far as the [petitioner] told Christos, of her mentally ill brother's visiting - increased. Christos was "getting tired of leaving" when the [petitioner]'s "brother" visited and told the [petitioner] that her brother "ha[d] to be told that we're married."

On March 22, 2003, the [petitioner] described a guessing game to Christos. The game involved one person's being handcuffed and blindfolded while the other placed objects against the bound person's skin; the bound person was to guess the identity of the object. The following day, the [petitioner] asked Christos if he wanted to play the guessing game. The [petitioner] was the first to be bound and blindfolded. She guessed various household items.

Then it was Christos' turn. He lay on the floor, blind-folded and handcuffed to a chair. Christos guessed various common household items. The [petitioner] then went to the kitchen to retrieve "one last item, one more thing to guess." She sat on Christos' midsection and touched the item to his face; Christos guessed the item was a candle. The item was a knife. The [petitioner] thrust the knife into Christos' chest, paused and then again thrust the knife into Christos' chest. The [petitioner] said, "Oh, my God, I think I hurt you. You're bleeding." Still blind-folded and handcuffed, Christos asked the [petitioner] what had happened. She explained that "something

7

fell on you. I think the candle hurt you." Christos asked the [petitioner] to remove the blindfold, and she did. But when he asked her to remove the handcuffs, she stated that she could not find the key. At Christos' request, the [petitioner] helped him break the chair to which the handcuffs were attached.

Christos asked the [petitioner] to call 911. He heard the [petitioner] seem to make a 911 call, but, after a significant amount of time had passed, no ambulance arrived. Christos asked the [petitioner] to call 911 again and he asked to talk to the operator. The [petitioner] told Christos that the operator did not want to talk to him, but rather wanted him to lie on the floor. The [petitioner] at this point instead telephoned Sessler and invited him over to the condominium for dinner.

Eventually, Christos, still conscious, asked the [petitioner] to take him to a nearby hospital, and the [petitioner] obliged. She drove slowly, according to Christos, and parked in the rear of the Behavioral Health Center of Westchester Medical Center in Valhalla, New York. The [petitioner] got out of the car and opened the rear driver's side door. Christos thought the [petitioner] was going to help him out of the car until he saw an angry expression on her face and saw her lunge at him with the knife. Christos managed to get out of the car and attempted to wrestle the knife out of the [petitioner]'s hands. The melee moved to a grassy spot in the parking lot, while Christos visibly was bleeding through his shirt. The [petitioner] begged Christos to "stay with me, talk to me...." Christos broke free, ran about 200 feet, and yelled to a medical resident and another person, who were near the entrance to the Behavioral Health Center. The resident called 911. The [petitioner] asked the resident to let her take Christos to the emergency room. The resident refused. The [petitioner] was arrested, in New York, for attempted murder in connection with this incident.

When Sessler arrived at the [petitioner]'s condominium for dinner, he found police officers searching the residence. Police officers informed him that there had been a domestic dispute and that Christos was in a hospital. Later, after reading an article in a newspaper about the stabbing, Sessler contacted the Stamford police and informed them that they should consider the [petitioner] to be a suspect in the death of Raymundo. Eventually, Sessler told officers about his concurrent affairs with the [petitioner] and Raymundo. Days after Christos' stabbing, the Stamford police contacted Christos about the death of Raymundo. Christos gave the officers several written statements and the [petitioner]'s phone records.

Christos lived to testify in the jury trial of the [petitioner] for the murder of Raymundo.

State v. Davalloo, 153 Conn. App. 419, 421- 29, 101 A.3d 355, affirmed, 320 Conn. 123, 128 A.3d 492 (2016) (Appendices A and I).

### B.    Procedural Background

This procedural history is compiled from documents forwarded as appendices hereto as follows:

| | |
|---|---|
| Appendix A | Decision of the Connecticut Appellate Court on direct appeal, State v. Davalloo, 153 Conn. App. 419, 101 A.3d 355 (2014); |
| Appendix B | Record on direct appeal to the Connecticut Appellate Court; |
| Appendix C | [Petitioner]'s Brief and Appendix on direct appeal to the Connecticut Appellate Court; |
| Appendix D | State's Brief on direct appeal to the Connecticut Appellate Court; |
| Appendix E | [Petitioner]'s Reply Brief on direct appeal to the Connecticut Appellate Court; |
| Appendix F | [Petitioner]'s Petition for Certification to the Connecticut Supreme Court seeking discretionary review; |
| Appendix G | State's Opposition to Petition for Certification; |
| Appendix H | Connecticut Supreme Court's decision granting limited review of the Appellate Court's decision, State v. Davalloo, 314 Conn. 949, 103 A.3d 977 (2014); |
| Appendix I | Connecticut Supreme Court's decision on direct appeal, State v. Davalloo, 320 Conn. 123, 128 A.3d 492 (2016); |
| Appendix J | [Petitioner]'s Brief and Appendix on direct appeal to the Connecticut Supreme Court; |
| Appendix K | State's Brief on direct appeal to the Connecticut Supreme Court; |

Appendix L          [Petitioner]'s Reply Brief on direct appeal to the Connecticut Supreme Court;

Appendix M          Trial transcript of the petitioner's underlying criminal trial <u>State of Connecticut v. Sheila Davalloo</u>, Doc. No. CR08-0165602, Connecticut Superior Court, Judicial District of Stamford-Norwalk:

- **December 30, 2008** (arraignment - *Comerford, J.*, presiding);
- **January 14, 2009** (waiver of probable cause hearing; not guilty plea - *Comerford, J.*, presiding);
- **June 30, 2011** (oral argument on motions in limine re: marital communications - *Comerford, J.*, presiding);
- **August 18, 2011** (oral argument on motions in limine re: misconduct evidence - *Comerford, J.*, presiding);
- **September 1, 2011** (oral ruling on motions re: misconduct evidence - *Comerford, J.*, presiding);
- **September 16, 2011** (C.G.S. § 54-56d competency exam ordered - *White, J.*, presiding);
- **November 21, 2011** pages 1-28 (C.G.S. § 54-56d competency hearing; waiver of right to counsel canvass *White, J.*, presiding); pages 28-53 (discussions re: motions, discovery and time frames - *Comerford, J.*, presiding);
- **January 24-27, 31, 2012** (trial - *Comerford, J.*, presiding);
- **February 1-3, 6-7, 2012** (trial - *Comerford, J.*, presiding);
- **February 8, 2012** (closing arguments - *Comerford, J.*, presiding);
- **February 9, 2012** (jury charge - *Comerford, J.*, presiding);
- **February 10, 2012** (jury verdict - *Comerford, J.*, presiding);
- **April 27, 2012** (sentencing - *Comerford, J.*, presiding);

Appendix N          Trial transcript of petitioner's testimony in her New York attempted murder case, <u>People v. Sheila Davalloo</u>, Ind. No. 478D/03, Superior Court of the State of New York, County of Westchester, dated February 9, 2004 (redacted and entered as Exhibit 42 in petitioner's Connecticut trial on 1/26/12 at 114-15).

### 1.    petitioner's underlying criminal trial

Based upon the facts set forth above, on December 29, 2008 the petitioner was arrested on the charge of Murder in violation of Connecticut General Statutes § 53a-54a and became the defendant in a criminal case in the Judicial District of Stamford-Norwalk bearing docket number CR08-0165602. See Record on direct appeal at 44 (Appendix B). The petitioner was arraigned before the Honorable Judge Richard Comerford, a public defender was appointed, and bail was set at one million dollars. Id. On January 14, 2009 petitioner waived a probable cause hearing and entered a pro forma not guilty plea. Id.

Prior to trial, in anticipation of its intention to call the petitioner's former husband Paul Christos as a witness, the State filed a trial brief regarding marital communications dated January 15, 2011. See Appendix to [Petitioner]'s Brief on direct appeal to the Connecticut Appellate Court at A3-A20 (Appendix C). On May 26, 2011, the petitioner, through her public defender Barry Butler, filed a motion in limine to exclude testimony concerning what she claimed were *confidential* marital communications. Id. at A25-A29. Subsequently, on May 31, 2011, the petitioner's counsel filed a second motion in limine to exclude testimony concerning these alleged confidential marital communications.   Id. at A33-A47.   On June 1, 2011, the state filed its own motion in limine regarding the admissibility of these marital communications.   Id. at A51-A52.   On June 21, 2011, the state filed a supplemental brief to its June 1, 2011 motion in limine regarding marital communications.   Id. at A53-A55.   On June 30, 2011, the trial court (*Comerford, J.*) heard oral argument on the motions in limine regarding marital communications and issued its ruling thereon, granting the state's motion and denying the petitioner's. Id. at A59-A111 (also contained in Appendix M, TT 06/30/11 at 1-55).

11

On January 15, 2011, the state also filed a brief in support of its proposed use of other misconduct evidence in petitioner's upcoming trial.   See Appendix to [Petitioner]'s Brief on direct appeal to the Connecticut Appellate Court at A259-A285 (Appendix C). On August 16, 2011, the petitioner, through counsel, filed a motion in limine regarding misconduct evidence.   Id. at A299-A314.   On August 18, 2011, the trial court (*Comerford, J.*) heard argument on the state's motion to admit evidence of petitioner's misconduct, the principle act being the petitioner's attempted killing of her husband in New York. Id. at A317-A379 (also contained in Appendix M, TT 08/18/11 at 1-64).   On September 1, 2011, the trial court pronounced its ruling granting the state's motion to admit such evidence, which the court indicated would be followed by a written decision. Id. at A383-A384 (also contained in Appendix M, TT 09/01/11 at 1-2); see also Memorandum of Decision contained in the Appendix to [Petitioner]'s Brief on direct appeal to the Connecticut Appellate Court at A387-A390 (Appendix C).

On September 16, 2011, the Honorable Judge Gary White ordered a competency examination of the petitioner pursuant to Connecticut General Statutes § 54-56d.   See Record on direct appeal at 44 (Appendix B); see also TT 09/16/11 at 1 (Appendix M). On November 21, 2011, after hearing testimony from a licensed clinical social worker who was a member of the competency evaluation team, Judge White found the petitioner competent.   See Record on direct appeal at 44 (Appendix B);   see also TT 11/21/11 at 1-15 (Appendix M).   Thereafter, the petitioner expressed her desire to represent herself in the case.   TT 11/21/11 at 15-16. Following a complete canvass of the petitioner, Judge White made a finding that the petitioner knowingly, intelligently and voluntarily waived her right to counsel and decided to represent herself, and granted her motion to do so. Id. at

25-26.   Petitioner's counsel of record, Public Defender Barry Butler, was then appointed as standby counsel. Id. at 26; see also Record on direct appeal at 44 (Appendix B).

On January 4, 2012, jury selection began before the Honorable Judge Richard Comerford.   See Record on direct appeal at 44 (Appendix B).   Petitioner's case was later presented to the jury over a twelve day period beginning on January 24, 2012, with Judge Comerford presiding. See generally Trial Transcripts (Appendix M). On February 10, 2012, the jury delivered a verdict of guilty.   TT 02/10/12 at 3-5 (Appendix M).   On April 27, 2012, the Court (Comerford, J.) sentenced the petitioner to fifty years to serve, consecutive to her New York sentence she was already serving for the attempted murder of her husband. TT 04/27/12 at 36-40 (Appendix M).

### 2.    petitioner's direct appeal

The petitioner, through Assistant Public Defender Mark Rademacher, filed a direct appeal of her conviction to the Connecticut Appellate Court asserting three issues, which she framed as follows:

> (1)    "Are [petitioner]'s conversations with her husband while they are married privileged marital communications that the state cannot use at her trial?";
>
> (2)    "Is [petitioner]'s misconduct concerning her plan to surveil the victim and her assault of her husband admissible to prove that she murdered the victim?"; and
>
> (3)    "Did [petitioner] waive her right to counsel?"

See Statement of the Issues, Petitioner's Brief and Appendix on direct appeal at v. (Appendix C).   In a decision released on October 7, 2014, the Appellate Court disagreed with the petitioner's assertions and affirmed the judgment of the trial court.   State v. Davalloo, supra, 153 Conn. App. at 421 (Appendix A).

13

With respect to petitioner's first claim, the Appellate Court determined that the trial court did not err in concluding that, on the unusual facts of this case, the "induced by affection" requirement of Connecticut's statutory marital communications privilege was not satisfied, given the court's conclusion that the petitioner's statements at issue were not made to her husband in a manner "induced by the affection, confidence, loyalty, and integrity of the marital relationship" as required, but rather were made to further her obsessive relationship with her paramour Sessler.   Id. at 435-36. As such, the Appellate Court concluded that the privilege did not shelter the various communications. Id. at 436.

As to petitioner's second claim, the Appellate Court determined that the challenged misconduct evidence pertaining to the petitioner's attempted murder of her husband Christos was properly admitted under Connecticut's prior misconduct evidentiary doctrine to prove the existence of a large plan or scheme involving reuniting and being with her paramour Sessler, of which the murder of Raymundo was a part. State v. Davalloo, 153 Conn. App. at 436-42.   The evidence thus plainly had a tendency to show motive and thus identity. Id. at 442 & n.7.   For purposes of admissibility, the Appellate Court determined that a sufficient logical connection existed between the murder of Raymundo and the attempted murder of Christos such that the trial court did not abuse its discretion in finding that the misconduct evidence was relevant to a material issue in the case. Id. at 440-41.

Lastly, the Appellate Court determined that the trial court's canvass of the petitioner regarding her desire to waive her right to counsel was adequate to establish that the petitioner's decision to proceed without the benefit of counsel was competently made, and knowing, intelligent and voluntary. Id. at 440-41.

14

Thereafter, the petitioner sought discretionary review of the decision of the Appellate Court by the Connecticut Supreme Court, framing the questions presented for review as follows:

(1)   "Did the Appellate Court wrongly read the statutory marital privilege in Conn. Gen. Stat. § 54-84b in a way that conflicts with the common law marital privilege recognized in State v. Christian, 267 Conn. 710 (2004)?"

(2)   "In allowing the state to use the [petitioner]'s assault of her husband to prove her motive to murder the victim, did the Appellate Court wrongly apply the common scheme or plan exception to the rule against use of misconduct in a way that conflicts with this Court's decision in State v. Randolph, 284 Conn. 328 (2007)?"

(3)   "Is the Appellate Court's finding that the [petitioner] waived her right to counsel in conflict with decisions of this Court?"

Petitioner's Petition for Certification for Review by the Supreme Court at 1 (Appendix F).

The petitioner's petition for certification for appeal from the Appellate Court was granted in part, limited to the following issue:

"Did the Appellate Court properly construe General Statutes § 54-84b in concluding that the statements made by the [petitioner] were not subject to the marital communication privilege?"

State v. Davalloo, 314 Conn. 949, 103 A.3d 977 (2014) (Appendix H).   On January 12, 2016, the Connecticut Supreme Court released its decision affirming the judgment of the Appellate Court.   State v. Davalloo, 320 Conn. 123, 126, 128 A.3d 492 (2016) (Appendix I).   In doing so, the Connecticut Supreme Court held that the statements in question were not protected by the marital communications privilege because the petitioner's statements were not "induced by the affection, confidence, loyalty and integrity of the marital relationship," as Connecticut General Statutes § 54-84b(a) requires.   Id.

15

### 3.      the petitioner's federal petition for writ of habeas corpus

The petitioner initiated this federal habeas corpus proceeding in the District Court for the Southern District of New York on February 28, 2017 by filing her *pro se* application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging her Connecticut state conviction.   <u>See</u> ECF No. 1.   The case in that district was captioned <u>Davalloo v. Kaplan, et al</u>, and assigned docket number 1:17-cv-01484 (GBD) (GWG).   On June 1, 2017, the Court *sua sponte* ordered that the case caption be amended to add George Jepsen, the Attorney General of the State of Connecticut, as a respondent and ordered service of a copy of the petition upon same.   <u>See</u> ECF No. 10.   On June 22, 2017, the Court (*Gorenstein, U.S.M.J.*) granted the respondent Sabrina Kaplan's motion to transfer the case to the District of Connecticut, the state in which the underlying murder and the challenged conviction took place.   <u>See</u> ECF No. 15. By order dated July 18, 2017, the Court directed the Clerk of the Court to effectuate the transfer.   <u>See</u> ECF No. 17.

In her petition, the petitioner presents three grounds upon which she claims she is in custody in violation of the Constitution, laws or treaties of the United States.

In **Ground One** of her petition, the petitioner claims:

"The [petitioner]'s conversations with her husband, while married, were privileged and inadmissible at trial."

In factual support of this claim the petitioner asserts:

"The conversations used by the state during trial were extensive.   They were divided into conversations before the murder, after the murder and those related to the assault of her husband.   (Her N.Y. case).   The [petitioner] was clearly confiding in her husband and seeking his advise. The trial court rejected this notion because some of the conversations were intended to deceive her husband and because she spoke about some of the conversations to others.   The statements were utilized by the state to prove their first murder theory:   the [petitioner] was obsessed with her paramour,

16

which drove her to murder his girlfriend. The states alternate murder theory was that Davalloo attempted to murder her husband after he told her he will contact the police regarding their conversations surrounding a love triangle where one of the participants had the same name as the murder victim. The state stated that the husband's 'fate was sealed' after he told the [petitioner] that he would call the police. The marital communication privilege encompasses both conversations from the [petitioner] to her husband and vice versa, from her husband to the [petitioner]."

See Petitioner's Application at ¶ 12, Ground One.

In **Ground Two** of her petition, the petitioner claims:

"The [petitioner]'s other misconduct including her statements to her husband about surveilling the victim and her assault of her husband in New York is not admissible to prove she murdered the victim."

In the supporting facts section with respect to this claim, petitioner states:

"The other misconduct that the state used during trial were extensive. The [petitioner]'s use of her husband's night vision goggles, a lock-pick set, a recording device and her possible purchase of a taser and her attempt to surveil the victim were all admitted in the form of conversations she had with her husband. None were related to the murder. Along with the details of her husband's stabbing in N.Y., the state introduced into evidence the picture of the [petitioner]'s husband after the stabbing. Other than the [petitioner]'s own testimony in N.Y. admitting to the stabbing, the state called five other witnesses including three N.Y. officers to detail the [petitioner]'s lies to the police about stabbing her husband, her failure to call 911 and her call to her paramour after the N.Y. crime."

See Petitioner's Application at ¶ 12, Ground Two.

In **Ground Three** of her petition, the petitioner claims:

"The [petitioner] did not voluntarily and knowingly waive her right to counsel."

In the supporting facts section with respect to this claim, petitioner states:

"Following her arrest in N.Y., the [petitioner] was treated at an in-patient psychiatric hospital for a few months. She was diagnosed with schizoaffective disorder, bipolar disorder (hypomanic), moderate adjustment disorder with mixed anxiety and depressed mood. The [petitioner] grew up in a war-zone in the middle east and suffers from PTSD. A competency reviewed these psychiatric records and found her 'mildly or

moderately impaired with a latent or chronic mental illness' but did not opine on her competency to waive counsel and represent herself.   The court told the [petitioner] that the maximum penalty was 60 years but not that the court may impose it consecutive to her 25 Yr. New York sentence.   The court did not explain to the [petitioner] the technical problems she may face and the importance of counsel.   Despite evidence of a mental state defense, the court did not explain that the [petitioner] was giving up a defense of E.E.D. and an instruction on a lesser included offense or probe her dissatisfaction with counsel."

See Petitioner's Application at ¶ 12, Ground Three.

## II.   STANDARD OF REVIEW

The federal court will entertain a petition for a writ of habeas corpus challenging a state court conviction only if the petitioner claims that his custody violates the Constitution or federal laws. 28 U.S.C. § 2254(a).   A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court.   See Swarthout v. Cooke, 562 U.S. 216, 219 (2011); Estelle v. McGuire, supra, 502 U.S. at 68; Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998).

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the federal court cannot grant a petition for a writ of habeas corpus filed by a person in state custody with regard to any claim that was rejected on the merits by the state court unless the adjudication of the claim in state court either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

18

AEDPA's standard is intentionally " 'difficult to meet.' " White v. Woodall, 134 S.Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 133 S.Ct. 1781, 1786 (2013)). In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court recognized that when Congress enacted AEDPA, it "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." Id. at 399.   The Court stated that § 2254(d)(1) "prohibits a federal court from granting a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id.; see also Yarborough v. Alvarado, 541 U.S. 652, 655 (2004)(same); Portalatin v. Graham, 624 F.3d 69, 79 (2d Cir. 2010) (en banc); Christie v. Hollins, 409 F.3d 120, 124-25 (2d Cir. 2005).

Thus, when considering an application for a writ of habeas corpus by a state prisoner, federal courts must ask three questions to determine whether habeas relief should be granted: "(1) Was the principle of the Supreme Court case law relied upon by the petitioner 'clearly established' when the state court ruled? (2) If so, was the state court's decision 'contrary to' that established Supreme Court precedent? (3) If not, did the state court decision constitute an 'unreasonable application' of that principle?"   Williams v. Artuz, 237 F.3d 147, 152 (2d Cir. 2000), cert. denied, 534 U.S. 924 (2001).   "When applying these standards, the federal court should review the 'last reasoned decision' by a state court...." Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

Accordingly, when considering a state petitioner's application, federal courts must first determine whether the petitioner's claim "is based on a principle of Supreme Court

19

case law that was 'clearly established' when the state court ruled." Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943 (2001); accord Williams v. Taylor, supra, 529 U.S. at 390 ("The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time the state-court conviction became final.").   The federal law defined by the Supreme Court "may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909 (2002). Clearly established federal law is found in holdings, not dicta, of the Supreme Court at the time of the state court decision. See White v. Woodall, supra, 134 S.Ct. at 1702 ("[C]learly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions.") (internal quotation marks and citations omitted). Second Circuit law which does not have a counterpart in Supreme Court jurisprudence cannot provide a basis for federal habeas relief. See Renico v. Lett, 559 U.S. 766, 778 (2010) (holding that court of appeals erred in relying on its own decision in a federal habeas action); see also Kane v. Garcia Espitia, 546 U.S. 9, 10 (2005) (absent a Supreme Court case establishing a particular right, federal court inference of right does not warrant federal habeas relief).

A decision is "contrary to" clearly established federal law where the state court applies a rule different from that set forth by the Supreme Court or if it decides a case differently than the Supreme Court on essentially the same facts. Bell v. Cone, 535 U.S. 685, 694 (2002). A state court unreasonably applies Supreme Court law when the court has correctly identified the governing law, but unreasonably applies that law to the facts of the case.   "Unreasonable" does not mean "erroneous" or "incorrect." See Williams,

supra, 529 U.S. at 411.   The state court decision must be more than incorrect; it must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington v. Richter, supra, 562 U.S. at 103; see also Burt v. Titlow, 134 S. Ct. 10, 15 (2013) (federal habeas relief warranted only where the state criminal justice system has experienced an "extreme malfunction"); Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (objective unreasonableness is "a substantially higher threshold" than incorrectness). "Unreasonable" also does not mean "unarticulated." See Harrington, supra, 562 U.S. at 98. The state court does not need to provide a statement of reasons, much less "cite or even be aware of" the Supreme Court's cases under § 2254. Id. Thus, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 101 (quoting Yarborough v. Alvarado, 541 U.S. at 664).

When reviewing a habeas petition, the federal court presumes that the factual determinations of the state court are correct. The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (standard for evaluating state-court rulings where constitutional claims have been considered on the merits and which affords state-court rulings the benefit of the doubt is highly deferential and difficult for petitioner to meet). The presumption of correctness, which applies to "historical facts, that is, recitals of external events and the credibility of the witnesses narrating them[,]" will be overturned only if the material facts were not adequately developed by the state court or if the factual

determination is not adequately supported by the record. Smith v. Mann, 173 F.3d 73, 76 (2d Cir. 1999) (internal quotation marks and citation omitted).

In addition, the federal court's review under section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Pinholster, supra, 563 U.S. at 181-82. Because collateral review of a conviction applies a different standard than the direct appeal, an error that may have supported reversal on direct appeal will not necessarily be sufficient to grant a habeas petition. Brecht v. Abrahamson, 507 U.S. 619, 634 (1993).

Finally, the provisions of § 2254(d)(1) require the federal courts to give great respect to the process provided by state courts, which are equally empowered to interpret and enforce the federal constitution, when determining whether to grant habeas corpus relief.   See Sawyer v. Smith, 497 U.S. 227, 241, rehearing denied, 497 U.S. 1051 (1990) ("State courts are coequal parts of our national judicial system and give serious attention to their responsibilities for enforcing the commands of the Constitution.").   Adherence to these principles serves important interests of federalism and comity. AEDPA's requirements reflect a "presumption that state courts know and follow the law." Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam).   When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.   Woods v. Donald, 135 S.Ct. 1372, 1376 (2015).   Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. citing Harrington, 562 U.S. at 102-103 (internal quotation marks omitted).

III.    **ARGUMENT**

A.    **Federal Habeas Corpus Relief Is Not Warranted On The Petitioner's Claims In Grounds One And Two Because They Are Purely State Law Evidentiary Claims**

1.    **State Law Evidentiary Issues Which Are Not Of Constitutional Magnitude Cannot Form The Basis For Federal Habeas Corpus Relief**

As noted, in conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. See 28 U.S.C. § 2254(a). Thus, federal habeas relief is not available to remedy a violation of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010)(per curiam)("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." (emphasis in original)); Estelle v. McGuire, supra, 502 at 67-68 ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law." (internal quotation marks omitted)); Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

In general, a state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable in a habeas corpus petition. See Crane v. Kentucky, 476 U.S. 683, 689 (1986) ("[w]e. . . acknowledge our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts"). Further, with respect to the allegedly erroneous admission of evidence, it is well settled that state evidentiary rulings generally do not implicate the federal constitution. See Ohio v. Roberts, 448 U.S. 56, 66 (1979); Vega v. Walsh, 699 F.3d 123, 126 (2d Cir. 2012); Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006).   Thus, "[a] federal court may issue

23

a writ of habeas corpus based upon a state evidentiary error only if the petitioner [alleges and] demonstrates both that the alleged error violated an identifiable constitutional right and that the error was not harmless. To show that the error was of constitutional magnitude, the petitioner must establish *both* that the ruling was erroneous under state law and that the error denied the petitioner his constitutional right to a fundamentally fair trial." (Emphasis added) Stepney v. Semple, No. 3:11-cv-1782 (VAB), 2015 WL 5601841 at *4 (D. Conn. Sept. 23, 2015), citing Perez v. Phillips, 210 Fed. Appx. 55, 57 (2d Cir. 2006); cf. McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 Fed. Appx. 69, 73 (2d Cir. 2011) (erroneously admitted evidence "must have been crucial, critical, [and] highly significant") (quoting Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985)); see also DiGuglielmo v. Smith, 366 F.3d 130, 137 (2d Cir. 2004) (per curiam).

That is a "heavy burden, for 'generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation.'" Bonet v. McGinnis, No. 98 Civ. 6529, 2001 WL 849454 at *2 (S.D.N.Y. July 27, 2001); Aponte v. Scully, 740 F. Supp. 153, 158 (E.D.N.Y. 1990) (petitioner seeking habeas corpus relief based on a claim of erroneous admission of evidence "bears a heavy burden; mere evidentiary errors generally do not rise to constitutional magnitude"); see also Swarthout v. Cooke, supra, 562 U.S. at 222 ("[W]e have long recognized that 'a "mere error of state law" is not a denial of due process.'" (quoting Engle v. Isaac, 456 U.S. 107, 121 n.21 (1982))).

Given the above, the first step in reviewing petitioner's claim is to determine whether the petitioner has alleged that the claimed state evidentiary error violated an identifiable constitutional right. This necessarily eliminates consideration of purely state

24

evidentiary errors not cognizable in the federal system. See, e.g., Landy v. Costello, No. 97-2433, 141 F.3d 1151 (table), 1998 WL 105768 at *1 (2d Cir. Mar. 9, 1998) ("To the extent [petitioner's] claim is based on a Rosario violation, it must fail, because a habeas petition can only be granted to remedy some violation of federal law; the obligation to turn over Rosario material arises under [New York] state law. Thus, the only question is whether the prosecution violated Brady."); Stepney, supra, 2015 WL 5601841 *5 (petitioner unsuccessfully attempted to bring his state law evidentiary claim within the purview of the federal court by asserting a violation of his rights under the Confrontation Clause); Peay, supra, 2014 WL 4437716 at *5-6 (federal habeas denied where claim presented on appeal in state court as a violation of state evidentiary law, *not* as a violation of a constitutionally protected right); Arocho v. Walker, 01 Civ. 1367, 2001 WL 856608 at *3 (S.D.N.Y. July 27, 2001); Ayala v. Hernandez, 712 F. Supp. 1069, 1074 (E.D.N.Y.1989); see also Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) ("The [habeas] court must determine whether the exclusion [of testimony] was an error of constitutional dimension....").

If petitioner has alleged a constitutional violation, the next step in this analysis is for the Court to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule cannot be unconstitutional.   See Peay v. Warden, No. 3:10-cv-00085 (CSH), 2014 WL 4437716 at *6 (D. Conn. Sept. 9, 2014), citing Brooks v. Artuz, No. 97 Civ. 3300 (JGK), 2009 WL 1532918, at *6 (S.D.N.Y. Oct. 17, 2000) (noting that petitioner failed to demonstrate an error under state evidentiary law, "much less" any constitutional error); Jones v. Stinson, 94 F.Supp.2d 370, 391-92 (E.D.N.Y.) (federal court did not reach

constitutional analysis because state court evidentiary ruling was not reversible error under state law), rev'd on other grounds, 229 F.3d 112 (2d Cir. 2000).   Therefore, if this Court concludes that the state court decision was a proper application of state evidentiary rules, the petition must be denied on this ground. Peay, supra, 2014 WL 4437716 at *6.

Finally, an erroneous state evidentiary ruling that is asserted to be a constitutional violation will merit habeas relief only "'where [the] petitioner can show that the error deprived [her] of a fundamentally fair trial.'" Rosario, id., 839 F.2d at 925. The test for "'fundamental fairness'" is whether the excluded or improperly admitted evidence, "'evaluated in the context of the entire record,'" "'create[d] a reasonable doubt [regarding petitioner's guilt] that did not otherwise exist.'" Taylor v. Curry, 708 F.2d 886, 891 (1983) (quoting the materiality standard defined in United States v. Agurs, 427 U.S. 97, 112-13 (1976)).

The "'fundamental fairness'" standard applies to the erroneous exclusion or admission of evidence. See, e.g., Dowling v. United States, 493 U.S. 342, 352 (1990) (The introduction of improper evidence does not violate due process unless the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'"); McKinnon v. Superintendent, Great Meadow Corr. Facility, supra, 422 Fed. Appx. at 73 ("[U]nless the challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those proceedings, the claims are not properly reviewable ...."); Young v. McGinnis, 319 Fed. Appx. 12, 13 (2d Cir. 2009) ("Improperly admitted evidence can constitute a due process violation where it 'is so extremely unfair that its admission violates fundamental conceptions of justice.'"); Cordon v. Greiner, 225 Fed. Appx. 13, 15 (2d Cir. 2007); Vega v. Portuondo, 120 Fed. Appx. 380, 382 (2d Cir.) ("[T]he admission

even of unfairly prejudicial evidence does not violate due process unless, taken in light of the record as a whole, it was sufficiently material to have removed a reasonable doubt that would otherwise have existed as to defendant's guilt."), cert. denied, 546 U.S. 836 (2005); Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) ("For the erroneous admission of ... unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'"(quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992))).

### 2. Ground One, Challenging The Trial Court's Admission Of Conversations Between The Petitioner And Her Husband, Is A Purely State Law Claim Not Cognizable In A Federal Habeas Proceeding

#### a. petitioner's claim as crafted in federal court

As her Claim One for relief, the petitioner asserts that "the [petitioner]'s conversations with her husband, while married, were privileged and inadmissible at trial." See Petitioner's Application at ¶ 12, Ground One.

#### b. petitioner's claim as presented in state court

On direct appeal to the Connecticut Appellate Court, the petitioner framed her claim precisely as she presents it in this federal action. See Petitioner's Brief and Appendix to the Connecticut Appellate Court on direct appeal at v. [Statement of the Issues], 7-22 [Argument] (Appendix C). Petitioner's brief to the Appellate Court makes clear that the petitioner is presenting a nonconstitutional, purely state law, evidentiary claim based upon Connecticut's common law marital communications privilege under

State v. Christian, 267 Conn. 710, 841 A.2d 1158 (2004) and the statutory marital communications privilege as codified in Connecticut General Statutes § 54-84b. Id.

After the Connecticut Appellate Court rejected the petitioner's claim as a matter of purely state evidentiary law, the petitioner was granted certification to further appeal the issue before the Connecticut Supreme Court. See State v. Davalloo, supra, 314 Conn. at 949 (Appendix H). In seeking certification, the petitioner again framed her issue as a purely state law evidentiary claim, asking "Did the Appellate Court wrongly read the statutory marital privilege in Conn. Gen. Stat. § 54-84b in a way that conflicts with the common law marital privilege recognized in State v. Christian, 267 Conn. 710 (2004)?" See Petitioner's Petition for Certification for Review by the Supreme Court at 1 (Appendix F).   In briefing her issue to the Connecticut Supreme Court, the petitioner acknowledges the nonconstitutional nature of her claim.   See Petitioner's Brief to the Connecticut Appellate Court at 30 (Appendix J).

### c.  additional facts and procedural history related to this claim

The Connecticut Supreme Court concluded that the following additional facts and procedural history were relevant to its consideration of this claim:

> [The petitioner's husband Paul] Christos survived his injuries and testified in the Connecticut jury trial of the [petitioner] for the murder of Raymundo. Prior to trial, however, the [petitioner] filed a motion in limine seeking to prevent Christos' testimony on the basis of the marital communications privilege. The state also filed a motion in limine, requesting a determination that certain statements between the former spouses were admissible. The testimony at issue dealt with the [petitioner]'s statements and actions during the course of the marriage pertaining to the relevant events.
>
> On June 3, 2011, the [trial] court heard arguments relating to the motions in limine and ruled that "'these statements ... were not made in furtherance or induced by affection, confidence, loyalty, and integrity of the relationship; quite the contrary. It is just the opposite. The statements made to the run-up

28

of the murder of [Raymundo], the description of a faux triangle, again, for lack of a better word, it would be bizarre to classify those as in furtherance of the sanctity of the marital relationship. The plan here was to do in a potential third party suitor of [Sessler] ... and, ultimately, [Christos], have him removed from the scene either by way of divorce and/or physically remove him from the scene. And, in fact, this [petitioner] was convicted of the attempted murder of her husband in those [New York] proceedings. So, those statements leading up to the run-up in this triangle and whatnot for various reasons don't fall within the purview of the marital privilege. To rule that way would be ... bizarre. Statements after the death of Raymundo to accommodate the relationship with Sessler fall in the same category, as well as the statements leading up to and relative to the attack and attempted murder of [Christos].'" The trial court further stated that, "[t]o argue that these [statements] were in furtherance of the marital relationship defies common sense, are in fact bizarre, and could only be applicable to some parallel universe ... with which I am not acquainted." The court then granted the state's motion and denied the [petitioner]'s motion.

After a jury trial, the [petitioner] was convicted of murder in violation of [Connecticut General Statutes] § 53a-54a. She was sentenced to fifty years imprisonment to be served consecutively to a sentence she received in New York for her conviction based on the attempted murder of Christos.

On appeal to the Appellate Court, the [petitioner] argued that her statements to Christos were improperly admitted by the trial court in violation of the marital communications privilege[7] because the trial court had inquired into the quality of the marriage, contrary to this court's holding

---

7 [footnote 6 in original] Specifically, the [petitioner] argued that admission of testimony regarding the following topics was improper: "(1) stories about Melissa, Jack and Anna Lisa, (2) fictional visits from the [petitioner]'s brother, (3) the [petitioner]'s informing Christos that she bought a lock pick set to get into [Raymundo's] house to look for photographs, and her attempts to use the lock pick set on the front doors of their [own] condominium, (4) conversations about an eavesdropping device that the [petitioner] wanted to place in Jack's office to listen to his conversations, (5) the [petitioner]'s questioning of Christos in late 2002 about DNA and fingerprints, (6) stories about Melissa's becoming upset when Jack rebuffed her sexual advances and Melissa's arranging to run into Jack at an airport and fly back home in the seat next to him, (7) in November, 2002, Christos' asking the [petitioner] about Anna Lisa, and the [petitioner]'s reporting that Jack had ended his relationship with Anna Lisa and was dating Melissa exclusively, (8) in late November, 2002, the [petitioner]'s explaining that she had cut her thumb on a can of dog food, and (9) the events of the stabbing on March 23, 2003." State v. Davalloo, supra, 153 Conn. App. at 430-31, 101 A.3d 355.

in <u>State v. Christian</u>, 267 Conn. 710, 841 A.2d 1158 (2004), and because the communications at issue, which pertained to personal matters, fell within the statutory parameters of the privilege. The Appellate Court disagreed, concluding that the trial court properly had focused on the nature of the communications, and not the quality of the marriage. According to the Appellate Court, "[t]he [[petitioner]'s] statements quite clearly were meant to deceive Christos, so that he would leave the marital home and her affair with Sessler would be enabled, would give advice and assistance to her so that she could further her affair with Sessler, [and] would assist in his own demise by submitting to being restrained and by accepting the [petitioner]'s false assurances that she was trying to secure medical assistance." Thus, the Appellate Court concluded that the [petitioner]'s statements were not "induced by the affection" of the marital relationship. This appeal followed.

The [petitioner] claims that the Appellate Court, in holding that the marital communications privilege was inapplicable, misconstrued § 54-84b to require that the privileged statement must strengthen a marital relationship, thereby necessitating an improper examination of the state of that relationship. The [petitioner] argues that the language in § 54-84b (a), which requires that the communication must be "induced by the affection, confidence, loyalty and integrity of the marital relationship," simply reflects the common-law requirement that the confidential statements must relate to the marital relationship and not to everyday conversations incidental to marriage. According to the [petitioner], the statements at issue were thinly veiled confessions of adultery and, therefore, fell squarely within the privilege. The state argues that the legislature, by including the language at issue, plainly and unambiguously intended to add an additional element, and thereby narrow, the common-law privilege as articulated in <u>Christian</u>, and that the Appellate Court, like the trial court, correctly concluded that the [petitioner]'s statements fell far short of satisfying that element. We agree with the state that the language does plainly and unambiguously add an element to the marital privilege.

(Citations and footnotes omitted) <u>State v. Davalloo</u>, <u>supra</u>, 320 Conn. at 134-37.

### d.  the Connecticut Supreme Court's analysis of this claim

As noted previously, the Connecticut Supreme Court is the last court to provide a reasoned decision on petitioner's marital communications privilege claim, and it is, therefore, the Connecticut Supreme Court's decision which is reviewed by this federal

court when addressing this particular issue. See Ylst v. Nunnemaker, 501 U.S. 797, 804

(1991); Robinson v. Ignacio, supra, 360 F.3d at 1055.

The Connecticut Supreme Court analyzed petitioner's marital communications

privilege claim as follows:

> As a preliminary matter, we address the proper standard of review. "The scope of an evidentiary privilege is a question of law, which we review de novo.... The application of the privilege presents a mixed question of law and fact." (Citation omitted.) State v. Mark R., 300 Conn. 590, 597, 17 A.3d 1 (2011). Thus, "[t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) State v. Christian, supra, 267 Conn. at 732-33, 841 A.2d 1158. "[B]ecause testimonial privileges prevent full disclosure of the truth, they are to be strictly construed." State v. Mark R., supra, at 598, 17 A.3d 1.

> To the extent that our review requires us to interpret § 54-84b, the statute codifying the marital communications privilege, our review is plenary. See State v. Adams, 308 Conn. 263, 269-70, 63 A.3d 934 (2013). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) State v. Fernando A., 294 Conn. 1, 13-14, 981 A.2d 427 (2009).

> On appeal, the parties do not dispute the underlying facts regarding what the [petitioner] told Christos, but only the question of whether, given those facts, the marital communications privilege should have applied. Because our review concerns the scope of the privilege based on an interpretation of § 54-84b and its application to undisputed facts, our review is plenary.

> We begin our analysis with a review of the development of the marital communications privilege under Connecticut law. In State v. Christian, supra, 267 Conn. at 730, 841 A.2d 1158, this court recognized, for the first

time, the existence of the marital communications privilege as part of Connecticut's common law. In that case, the defendant was involved in a fatal automobile accident that killed an occupant of a car in which the defendant was riding. Thereafter, while in the hospital, the defendant quietly confided in his wife, when no others were present, that he, rather than the deceased individual, had been the driver of the car. Id., at 722, 841 A.2d 1158. At trial, the defendant sought to prevent his wife from testifying about this communication. During voir dire, the defendant's wife conveyed that she and the defendant were separated and in the process of divorcing, that the marriage " 'was very rocky' " at the time of the accident, and that, because the marriage was "over," preserving the confidentiality of the defendant's statement would not repair it. Id. Relying on this testimony, the trial court ruled that the privilege, to the extent it existed, did not apply, even though the communications were private and occurred during a valid marriage, because that "marriage irretrievably had broken down." Id., at 723, 841 A.2d 1158.

On appeal, this court confirmed that the marital communications privilege, which we previously had alluded to, was in fact "a fixture of our common law." Id., at 730, 841 A.2d 1158. We determined that a marital communication is privileged if (1) the communication was made to a spouse during a valid marriage and (2) the communication was confidential. Id., at 731-32, 841 A.2d 1158. We ultimately concluded that the trial court improperly had refused application of the privilege on the basis of the acrimonious state of the parties' marriage because that marriage, at the time of the communications, nevertheless was intact. Id., at 735, 841 A.2d 1158. Accordingly the first requirement was satisfied.

In formally adopting the privilege, we explained the well recognized principles underlying it: "The basis of the immunity given to communications between [spouses] is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails." (Internal quotation marks omitted.) Id., at 728, 841 A.2d 1158. "The marital communications privilege protects information privately disclosed between [spouses] in the confidence of the marital relationship - once described ... as the best solace of human existence.... [T]he primary purpose of the confidential marital communication privilege is to foster marital relationships by encouraging confidential communication between spouses.... The privilege permit[s] [spouses] to communicate freely with one another without fear that their communications will be used against them at some future date.... We encourage married people to confide in each other by protecting their statements from later scrutiny in court." (Citations omitted;

internal quotation marks omitted.) Id., at 728-29, 841 A.2d 1158. The marital communications privilege "exists to [e]nsure that spouses ... feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law." (Internal quotation marks omitted.) Id., at 729, 841 A.2d 1158.

After Christian was decided, the legislature codified the privilege by enacting § 54-84b. That provision defines "confidential communications" as "any oral or written communication made between spouses during a marriage that is intended to be confidential and is induced by the affection, confidence, loyalty and integrity of the marital relationship." General Statutes § 54–84b (a). Accordingly, we agree with the state that the legislature adopted the elements stated in Christian, but also added a third element, effectively narrowing the scope of the privilege.

"We ordinarily do not read statutes so as to render parts of them superfluous or meaningless." (Internal quotation marks omitted.) Lostritto v. Community Action Agency of New Haven, Inc., 269 Conn. 10, 37, 848 A.2d 418 (2004); see State v. Drupals, 306 Conn. 149, 159, 49 A.3d 962 (2012) ( "[s]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" [internal quotation marks omitted] ). Section 54-84b (a) provides the common-law elements that the communication must be made between spouses during a marriage and be intended to be confidential;[8] see State v. Christian, supra, 267 Conn. 710, 841 A.2d 1158; but then adds the "induced by the affection" language, which is not found in the Connecticut common law, in the conjunctive. See State v. Davalloo, supra, 153 Conn. App. at 433, 101 A.3d 355. Thus, the plain language of the statute compels us to view the "induced by the affection" requirement as a separate element that limits the privilege to those confidential communications made between spouses in a valid marriage that are "induced by the affection, confidence, loyalty and integrity

---

8 [footnote 10 in original] As the Appellate Court stated, the codified marital communications privilege does not entirely displace the common-law privilege. See State v. Davalloo, supra, 153 Conn. App. at 433 n. 5, 101 A.3d 355; Conn. Code Evid. § 5-1 ("[e]xcept as otherwise required by the constitution of the United States, the constitution of this state, the General Statutes or the Practice Book, privileges shall be governed by the principles of the common law").

of the marital relationship."[9] General Statutes § 54-84b (a). Consequently, in order for a communication to be privileged under § 54-84b, the communication must be: (1) made to a spouse during a marriage; (2) confidential; and (3) induced by the affection, confidence, loyalty and integrity of the marital relationship.

To aid in our analysis we look to the language of the statute. The word "induce" means "to bring on or bring about" or, alternatively, to "cause...." Webster's Third New International Dictionary (2002). Accordingly, the statements must be "brought about" or "caused" by the affection, confidence, loyalty and integrity of the marital relationship. It therefore follows that if the statements are instead influenced by precisely the opposite, they would not qualify. The language of the statute, read as a whole, clearly contemplates one spouse confiding personal information

---

9 [footnote 11 in original] Although the "induced by" language does not appear in any other state's codification of the marital communications privilege, some courts have invoked it in determining whether particular statements constitute a "confidential communication," subject to that privilege. See, e.g., People v. Fediuk, 66 N.Y.2d 881, 883, 489 N.E.2d 732, 498 N.Y.S.2d 763 (1985) ("[n]ot protective of all communications, the privilege attaches only to those statements made in confidence and that are induced by the marital relation and prompted by the affection, confidence and loyalty engendered by such relationship" [internal quotation marks omitted] ). Frequently, the "induced by" language is used to refine what kind of communications between married spouses are confidential. See, e.g., People v. Melski, 10 N.Y.2d 78, 80, 176 N.E.2d 81, 217 N.Y.S.2d 65 (1961) (finding that New York's marital privilege was "designed to protect not all the daily and ordinary exchanges between the spouses, but merely those which would not have been made but for the absolute confidence in, and induced by, the marital relationship"); State v. Freeman, 302 N.C. 591, 597-98, 276 S.E.2d 450 (1981) (in determining "[w]hether a particular segment of testimony includes a 'confidential communication' ... the question is whether the communication, whatever it contains, was induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship"); State v. Richards, 182 W.Va. 664, 668, 391 S.E.2d 354 (1990) ("[t]he test of whether the acts of the spouse come within the privilege against disclosure of confidential marital communications is whether the act or conduct was induced by or done in reliance on the confidence of the marital relation, i.e., whether there was an expectation of confidentiality" [internal quotation marks omitted] ). Nevertheless, our legislature chose to add the language as a distinct element and thus, while related, the language must mean something more than communications made during a marriage that are confidential. See State v. Davalloo, supra, 153 Conn. App. at 434, 101 A.3d 355 ("[i]f, as the defendant contends, the 'induced by affection' language merely describes the nature of marital relationships in general and is intended to protect 'personal feelings,' the language adds nothing to the 'during marriage' and confidentiality requirements").

truthfully in the other due to the special trust existing between the two, and not to the active concealment of a secret, nefarious undertaking designed to destroy the marriage.

In the present case, there are three categories of statements the trial court identified: (1) "'statements made to the run-up of the murder of [Raymundo],'" including the "'description of a faux triangle'"; (2) "'[s]tatements after the death of Raymundo to accommodate the relationship with Sessler'"; and (3) "'statements leading up to and relative to the attack and attempted murder of [Christos].'" State v. Davalloo, supra, 153 Conn. App. at 430, 101 A.3d 355. As for the statements made during the period immediately preceding the murder of Raymundo, all of them were meant to deceive the [petitioner]'s spouse by being dishonest about her "brother's visits," the real actors in the faux love triangle, and the reasons she requested items from Christos. The statements after the death of Raymundo were meant not only to deceive and further her obsessive relationship with Sessler, but also to conceal her involvement in Raymundo's death. Finally, with regard to the statements leading up to the [petitioner]'s attempted murder of Christos, it is self-evident that her violence against her spouse vitiates any reasonable argument that these statements were "induced by ... affection"[10] as required by § 54-84b (a).

Because the [petitioner]'s purpose in making the statements at issue was to further her extramarital affair with Sessler and to ultimately eliminate, by murdering, both Raymundo and Christos, whom she perceived as obstacles to that affair,[11] we agree with the determination by the trial court and the Appellate Court that the statements at issue here do not fall within

---

10 [footnote 13 in original] The legislature has indicated its disapproval of spousal violence. It expressly excluded from the privilege's protection the testimony of a spouse regarding a confidential communication in a criminal proceeding against the other spouse for "bodily injury, sexual assault or other violence attempted, committed or threatened upon the spouse...." General Statutes § 54-84b (c)(2); see also People v. Trzeciak, 2013 IL 114491, paras. 50-52, 378 Ill. Dec. 761, 5 N.E.3d 141, 152-53 (2013) (holding that defendant's spousal abuse and statements made during that abuse could not have been "made in reliance on the confidences of his marriage" and citing cases in accord from multiple jurisdictions).

11 [footnote 14 in original] We reject the [petitioner]'s characterization of her statements, on appeal, as thinly veiled confessions of adultery. The trial court did not so find, and nothing about their content or the overall circumstances remotely suggests that they were confessional in nature.

the language of § 54-84b (a) because we simply cannot conceive of any scenario whereby the statements could have been "induced by the affection, confidence, loyalty and integrity" of the [petitioner]'s marital relationship as required under that statute.[12] In short, the [petitioner] made statements to Christos that were indisputably not induced by affection or loyalty and, in the end, engaged in the ultimate betrayal of the spousal relationship, attempting to murder her husband. We, therefore, agree with the trial court that application of the marital communications privilege, in the particular facts and circumstances of this case, would be nothing short of bizarre.

The [petitioner] argues that the trial court and the Appellate Court wrongfully looked at the state of the [petitioner]'s marriage, contrary to our holding in Christian.[13] We make short work of this argument because the Appellate Court explicitly stated that the nature of the marriage was not the focus of its analysis. State v. Davalloo, supra, 153 Conn. App. at 434, 101 A.3d 355. Consistent with Christian, the Appellate Court agreed with the [petitioner] that the nature of the marriage, whether acrimonious or harmonious, is not a

---

12 [footnote 15 in original] Because the applicability of the marital communications privilege necessarily depends on the facts and circumstances of a particular matter, we do not endeavor to articulate an all-encompassing explanation of what types of statements are "induced by the affection, confidence, loyalty and integrity of the marital relationship." General Statutes § 54-84b (a); see People v. Fediuk, 66 N.Y.2d 881, 883, 489 N.E.2d 732, 498 N.Y.S.2d 763 (1985) (under particular circumstances of case, presumption that communication between spouses was made under "mantle of confidentiality" not rebutted by fact that parties were not living together at time of communication or that marriage had deteriorated); People v. Melski, 10 N.Y.2d 78, 80, 176 N.E.2d 81, 217 N.Y.S.2d 65 (1961) ("since each case contains peculiar circumstances it is, as a practical matter, impossible to formulate an all-embracing definition or an infallible guide" [internal quotation marks omitted] ).

13 [footnote 16 in original] Additionally, the [petitioner] seems to argue that the Appellate Court's interpretation only protects statements that further a harmonious marital relationship. The [petitioner] mischaracterizes the Appellate Court's interpretation. The Appellate Court found, as do we, that the statements made simply cannot be said to be "induced by ... affection," not that, in order for any statement to be protected by the privilege, it must further a harmonious marriage. The state concedes that it is not necessary that the information communicated has to be positive vis-á-vis the likely effect on the marriage for the communication to be protected. For example, in State v. Christian, supra, 267 Conn. at 722, 841 A.2d 1158, the admission of drunk driving may not have been positive for the marriage but could have been induced by the perceived loyalty in the marriage.

36

> factor in determining whether the privilege applies.[14] Id. Similarly, the trial court did not attempt to evaluate the quality of the [petitioner]'s marriage at the time she made the statements at issue, but rather, focused on the characteristics of the statements themselves. Indeed, the only fair reading of the trial court's and the Appellate Court's decisions is that they focused on the nature of the communication. Id. On the basis of the undisputed facts presented in this case, we conclude that the [petitioner]'s communications fall well outside the marital communications privilege.

(Citations and footnotes omitted) State v. Davalloo, supra, 320 Conn. at 137-45.

**e. the Connecticut Supreme Court reasonably and properly found that the trial court did not err in admitting this evidence under Connecticut law**

The United States Supreme Court has made clear that a federal court may not grant habeas relief on the basis that a state court erred in applying state law. See Wilson, supra, 562 U.S. at 5; Estelle, supra, 502 U.S. at 67-68; Vega, supra, 669 F.3d at 126. Petitioner's claim one as drafted in her pending federal petition has not stated a claim that is cognizable in a federal habeas corpus proceeding because petitioner presents a purely state law evidentiary claim regarding marital communications which cannot form the basis for federal habeas relief. See Estelle, supra, 502 U.S. at 68-69.

---

14 [footnote 17 in original] As we explained in State v. Christian, supra, 267 Conn. at 734-35, 841 A.2d 1158, "the reasons justifying the marital communications privilege ... apply with equal force to married couples who, despite the appearance to outsiders of an irretrievably broken marriage, may still share hopes of reconciliation.... Although the defendant's marriage may have been acrimonious at the time that he had made the communications to his wife, the marital communications privilege nonetheless was valid." (Citation omitted; internal quotation marks omitted.) Despite the statutory addition of the "induced by" element in § 54-84b (a), we reaffirm this principle today. See, e.g., People v. Fediuk, 66 N.Y.2d 881, 883, 489 N.E.2d 732, 498 N.Y.S.2d 763 (1985) ("Communication between spouses is presumed to have been conducted under the mantle of confidentiality.... This presumption is not rebutted by the fact ... that [the parties'] marriage has deteriorated, for even in a stormy separation disclosures to a spouse may be induced by absolute confidence in the marital relationship...." [Citations omitted; emphasis added; internal quotation marks omitted.] ).

Petitioner does not challenge the constitutionality of the state evidentiary law. Rather, she argues that the trial court abused its discretion and misapplied the state law. Federal courts do not review whether the admission of evidence in a state criminal trial conformed with state law requirements.   See Peay, supra, 2014 WL 4437716 at *6; see also Pemberton v. Collins, 991 F.2d 1218, 1223 (5th Cir. 1993) ("[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.   State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution.").

Therefore, to the extent that the petitioner challenges the trial court's interpretation and application of state law in admitting what petitioner alleged were confidential marital communications, this federal court cannot review petitioner's claim.   See Estelle, supra, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")   As such, petitioner's Ground One should be denied because it is a purely state law evidentiary claim which is not of constitutional magnitude and cannot form the basis for federal habeas relief under § 2254.

Simply put, petitioner's claim does not implicate federal law – a reality which is reflected in petitioner's state court briefs.   A review of the petitioner's briefs to both the Connecticut Appellate and Supreme Courts, as well as the petitioner's petition for certification to the Connecticut Supreme Court, reflects that the petitioner has only *ever* presented her claim as a purely state law evidentiary claim.   See Petitioner's Brief to the Appellate Court at 31-35 (Appendix C); Petitioner's Petition for Certification at 8-10

38

(Appendix F); and Petitioner's Brief to the Supreme Court (Appendix J).   Petitioner *never* asserted on direct appeal that the trial court's rulings with respect to her claim of a marital communications privilege violated her right to due process of law.   Nowhere in the allegations or argument concerning this claim does the petitioner cite any federal constitutional case or statute.   Nor does she invoke the United States Constitution or even refer to "due process" or other constitutional rights.   Thus, given that the petitioner's claim on direct appeal was couched only in terms of a challenge to the trial court's interpretation of a state statute codifying the marital communications privilege, petitioner's brief would not have put the Appellate Court on notice of the constitutional dimensions of any such claim.

While the petitioner does cite federal cases in her brief, those cases involve the application of federal evidentiary rules related to marital communications and were not decided on constitutional grounds.   See e.g. Hawkins v. United States, 358 U.S. 74 (1958) and Trammel v. United States, 445 U.S. 40 (1980).   Petitioner cites these federal cases as persuasive authority for how she believes the Connecticut Supreme Court should interpret the marital communications privilege as codified by the legislature in Connecticut General Statutes § 54-84b. It is axiomatic that citing federal cases which involve the interpretation of federal evidentiary rules, and which were not decided on constitutional grounds, is not the equivalent of presenting a claim of constitutional magnitude.

As the Second Circuit has observed, "not 'every error of state law can be transmogrified by artful argumentation into a constitutional violation.'"   Ponnapula v. Spitzer, 297 F.3d 172 (2d Cir. 2002), quoting Sanna v. Dipaolo, 265 F.3d 1, 12 (1st Cir.

2001).   Indeed, in this instance the petitioner has not even attempted to do so, instead presenting her state evidentiary claims in the same *nonconstitutional* manner in which she presented them to the state court.[15]

Even if the petitioner alleged that the admission of these communications with her husband rose to the level of a constitutional violation, which as noted she does not, such a claim would be meritless. The Connecticut Supreme Court's ruling represents an objectively reasonable application of Connecticut evidentiary law.   As the Court's decision demonstrates, there was nothing improper, let alone constitutionally infirm, about the admission of this evidence.   Asked to opine as to whether the Appellate Court appropriately interpreted Connecticut's statutory marital communications privilege (codified in Conn. Gen. Stat. § 54-84b) in light of the Connecticut common law that preceded it, the Connecticut Supreme Court concluded that indeed the Appellate Court had.   Paramount to this conclusion was the Connecticut Supreme Court's agreement with both the trial court and the Appellate Court that the legislature, in enacting § 54-84b, added an element to the common law privilege which effectively narrowed the scope of the privilege.   See State v. Davalloo, supra, 320 Conn. at 140.   That additional element, namely that, in order to be covered by the privilege, the statement must be "made in furtherance or induced by the affection, confidence, loyalty, and integrity of the relationship[,]" was the cornerstone of the Court's decision.   Id. at 142-44.

---

[15] Were the petitioner to seek to amend her petition at this late date to now couch her claims in constitutional terms, it would subject the petition to immediate dismissal for failure to exhaust. See Galdamez v. Keane, 394 F.3d 68, 73-74 (2d Cir. 2005).

Having appropriately applied the standard for statutory construction, and having identified the statutory elements of the marital communications privilege under Connecticut law, the Connecticut Supreme Court thereafter reasonably concluded that the petitioner's communications at issue were not covered by the privilege.   It was clear to the Supreme Court, as it had been to both the trial court and Appellate Court, that the petitioner's purpose in making the statements to her husband was to further her extramarital affair with Sessler and to ultimately eliminate perceived obstacles to that affair, the victim Raymundo and her own husband Christos, by murder if necessary. Indisputably, those statements were not induced by affection or loyalty.   As the Court observed, it could not "conceive of any scenario whereby the statements could have been 'induced by the affection, confidence, loyalty and integrity' of the [petitioner]'s marital relationship as required under that statute." State v. Davalloo, supra, 320 Conn. at 143-44.

To the contrary, the statements were utter fictions and deceptions that kept her husband Christos in the dark and were designed to undermine the marital relationship by facilitating the petitioner's extramarital affair, or to bring about its end entirely by facilitating her attempt to kill her husband.   As such, the petitioner's statements to her husband were properly determined by the trial court, and by Connecticut's appellate courts on appeal therefrom, to fall outside the realm of the statutory marital communication privilege codified in Conn. Gen. Stat. § 54-84b.   Because these communications were not protected from disclosure by the statutory marital communication privilege, their admission in petitioner's trial did not render her trial fundamentally unfair.

### 3. Ground Two, Challenging The Trial Court's Admission Of Other Misconduct Evidence, Is Likewise A Purely State Law Claim Not Cognizable In A Federal Habeas Proceeding

#### a. petitioner's claim as crafted in federal court

As her Claim Two for relief, the petitioner asserts that: "The [petitioner]'s other misconduct including her statements to her husband about surveilling the victim and her assault of her husband in New York is not admissible to prove she murdered the victim." See Petitioner's Application at ¶ 12, Ground Two.

#### b. petitioner's claim as presented and exhausted in state court

On direct appeal to the Connecticut Appellate Court, the petitioner framed her issue as "Is [petitioner]'s misconduct concerning her plan to surveil the victim and her assault of her husband admissible to prove that she murdered the victim?"   See Petitioner's Brief and Appendix to the Connecticut Appellate Court on direct appeal at v. [Statement of the Issues], 22-31 [Argument] (Appendix C).   Petitioner's brief to the Appellate Court makes clear that the petitioner is presenting a nonconstitutional, purely state law, evidentiary claim asserting that the trial court abused its discretion in allowing the challenged misconduct evidence.   Id. at 29.   The petitioner, in acknowledging her burden to prove that the alleged error was harmful, emphasizes that she is asserting nonconstitutional error.   Id. at 30.

When the petitioner later sought certification from the Connecticut Supreme Court to further appeal the issue surrounding the trial court's admission of other misconduct evidence, the petitioner limited her claim to the evidence regarding her assault of her husband, and thus only exhausted her claim in state court with respect to that issue.   See

42

Petition for Certification (Appendix F).    Because she framed her argument in her petition for certification as follows, the petitioner abandoned, and thus failed to exhaust, any claim related to misconduct evidence surrounding her plan to surveil the victim:

> The Appellate Court wrongly applied the common scheme or plan exception to the rule against use of misconduct in State v. Randolph, 284 Conn. 328 (2007) *when it admitted the [petitioner]'s assault of her husband* to prove her motive to kill the victim and thereby, her identity as the killer.

(Emphasis added) Id. at 8.   The Connecticut Supreme Court did not grant certification on this issue.   State v. Davalloo, supra, 314 Conn. at 949.

Like petitioner's appellate brief before it, petitioner's petition for certification makes no mention of asserting a due process violation invoking constitutional analysis.   See Petition for Certification at 8-10 (Appendix F).   Rather, petitioner clearly articulates a purely state law evidentiary claim in which no question of a constitutional nature is involved.   Id.

### c.  additional facts related to this claim

The Connecticut Appellate Court concluded that the following additional facts and procedural history were relevant to its consideration of this evidentiary claim:

> Prior to trial, the state filed a motion in limine to admit evidence about the [petitioner]'s attempted murder of Christos and her mentioning and possession of night vision binoculars, eavesdropping devices and lock pick tools to spy on the victim and/or Sessler. [See Appendix to [Petitioner]'s Brief on direct appeal at A259-A285 (Appendix C)] The [petitioner] filed a motion in limine to preclude the evidence on the ground that it was inflammatory and prejudicial and not relevant to identity. [Id. at A299-A314] At a hearing on the motion, the state argued that it proffered the evidence to show common scheme or plan, motive, identity and intent on the ground that murdering the victim and attempting to murder Christos were part of the same plan - to further a romantic relationship with Sessler. Defense counsel argued that: the liberal rule applicable to sex crimes cases did not apply; evidence of the attempted murder of Christos was inadmissible because it showed a propensity toward violence; the victim's murder lacked sufficient

43

similarity to Christos' murder to make evidence of the latter admissible as part of a common scheme or plan; the prejudicial effect of the misconduct evidence outweighed its probative value; and a curative instruction was insufficient. [See TT 08/18/11 at 1-64 (Appendix M)]

In its memorandum of decision, the court granted the state's motion and explained its reasoning for so ruling: "the evidence is critical and does not unduly arouse the jury's emotions of prejudice, sympathy or hostility. The [petitioner]'s attempt to murder her husband is not gruesome or heinous. The fact that she engaged in an affair with a coworker is ... commonplace.... Deceptive manipulation of a husband in such a situation is normally attendant to such an affair. The degree of manipulation is unusual, but to the extent that it is, it is extremely relevant to motive, common scheme, identity and intent. Its probative value clearly outweighs any minimal prejudice." The court further explained that the evidence did not show a general propensity toward violence but rather suggested that the two assaults arose from animus toward two particular individuals. The court noted that a limiting instruction would help to ensure that the jury would not construe the evidence to show a general propensity toward violence. The court further noted that in this "highly unusual case" the proffered evidence resembled misconduct testimony in sex crime cases where the [petitioner] is driven by a motive that is aberrant and compulsive. The court stated that "[w]hile a sex crime is not charged in this matter, the aberrant compulsivity of the [petitioner]'s conduct makes the admission of the evidence that much more critical in an otherwise circumstantial case where there is no witness to the crime."

The court gave limiting instructions either before or after the testimony of the witnesses who testified about the misconduct. The court instructed the jury, at the time of the misconduct testimony and again in the course of its final instructions, that the misconduct evidence had not been admitted to show bad character or propensity toward violence, but only to show motive, common plan or scheme, to corroborate prosecution testimony and to complete the story of the crime.

The [petitioner] argues that the court improperly admitted misconduct evidence of efforts to surveil the victim and to stab Christos. She argues that the uncharged misconduct evidence does not fall within the common scheme or plan exception, as properly limited, because there was no evidence, nor any logical inference, that the [petitioner] had a plan to kill Christos at the time she murdered Raymundo. The state's theory of a common scheme or plan, then, amounted to a mere propensity, or " 'once a murderer, always a murderer.' " The [petitioner] further argues that the prejudicial effect of the misconduct evidence outweighed its minimal probative value - "[t]he picture of [the [petitioner]] stabbing her husband as

44

he lay bound and gagged, delaying medical treatment and stabbing him again in the hospital parking lot overwhelmed the jury."

We assume for the purpose of analysis that all of the evidence in dispute was indeed misconduct. Some of the evidence, such as the attempted murder of Christos, quite plainly was, at a minimum, misconduct. Evidence of the procurement and use of night vision goggles, for example, is not quite so clearly misconduct. But if the evidence was properly admitted under the misconduct rubric, it would pass muster under any theory.

State v. Davalloo, supra, 153 Conn. App. at 436-38.

### d.  the Connecticut Appellate Court's analysis of this claim

The Connecticut Appellate Court is the last court to provide a reasoned decision on petitioner's misconduct evidence claim because the Connecticut Supreme Court denied certification on this issue without comment. It is, therefore, the Connecticut Appellate Court's decision which is reviewed by this federal court when addressing this particular issue. See Ylst v. Nunnemaker, supra, 501 U.S. at 804; Robinson v. Ignacio, supra, 360 F.3d at 1055.   The Connecticut Appellate Court analyzed petitioner's state law misconduct evidence claim as follows:

Evidence of "uncharged misconduct ... generally is inadmissible, unless it falls within a well established evidentiary exception. See Conn. Code Evid. § 4-5(b) ([e]vidence of other crimes, wrongs or acts of a person is admissible ... to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony). As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused.... Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior.... On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial.... We have developed a two part test to determine the admissibility of such evidence. First, the

evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions.... Second, the probative value of the evidence must outweigh its prejudicial effect.... Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done.... On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; footnote omitted; internal quotation marks omitted.) State v. Randolph, 284 Conn. 328, 339-40, 933 A.2d 1158 (2007).

In nonsex crime cases involving a "true" common scheme or plan, "[e]vidence of uncharged misconduct, although inadmissible to prove a defendant's bad character or propensity to engage in criminal behavior, is admissible [t]o prove the existence of a larger plan, scheme, or conspiracy, of which the crime on trial is a part.... To prove the existence of a common scheme or plan, each crime must be an integral part of an overarching plan explicitly conceived and executed by the defendant.... Evidence of such a plan is relevant to the charged crime because it bears on the defendant's motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute.... In ... true common scheme or plan cases, the nature of the charged and uncharged crimes combined with connecting evidence, if any, gives rise to a permissive inference that an overall scheme or plan existed in the defendant's mind, and that the crimes were executed in furtherance of that plan." (Citations omitted; internal quotation marks omitted.) Id., at 343-44, 933 A.2d 1158.

The [petitioner] is correct in arguing that the misconduct evidence - especially that portion of the evidence relating to the attempted murder of Christos - was not part of a common scheme as narrowly defined. That is, there was no evidence that the [petitioner] had the murder of Christos in mind when she killed Raymundo. In the broader sense, however, the connection between the two crimes - and the procurement of the night vision goggles and a lock pick - is palpably inferable, such that the trial court quite clearly did not abuse its discretion. The underlying and overwhelming motive suggested by the trial court was the [petitioner]'s obsession.[16] Having eliminated her rival, she continued in her quest for satisfaction of the

---

16 [footnote 6 in original]   The court hinted that the misconduct evidence might fall under the more liberal standard for sex crimes cases, but it is unclear from its decision whether the court employed the standard for sex crimes or nonsex crimes. At any rate, we conclude that the more stringent standard for nonsex crime cases applies and that under that standard, the court did not abuse its discretion.

obsession to eliminate the next threat to her liaison with Sessler, both in terms of access to the condominium and Christos' nascent suspicion that something was not quite right with the "Anna Lisa" imbroglio.[17]

The gravamen of the evidentiary standard regarding uncharged misconduct is relevance to a material issue. Propensity to commit crimes is not material. Identity is, of course, material, and identity may be inferred by intent and motive. Closely related is the common scheme or pattern, admissible ultimately to show identity.[18] In this case, the broader "common scheme" was analytically more a common, unique motive, most probative on the issue of identity. State v. Randolph, supra, 284 Conn. at 340, 933 A.2d 1158, requires only a "connect[ion] with the principal crime by circumstance, motive, design, or innate peculiarity ...." (Emphasis added; internal quotation marks omitted.) Here, the court properly found such a connection.

We also disagree with the [petitioner]'s assertion that the introduction of this evidence at trial was more prejudicial than probative. "The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury.... [W]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact ... we have found no abuse of discretion.... Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct.... Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." (Citations omitted; internal quotation marks omitted.) State v. Franko, 142 Conn. App. 451, 465, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013).

---

17 [footnote 7 in original] The disputed evidence quite plainly had a tendency to show motive and, as a result, identity. We note, however, that although both substantive crimes were committed with a knife, they do not appear to share sufficient characteristics to qualify as "signature crimes."

18 [footnote 8 in original] We note that § 4-5 of the Connecticut Code of Evidence states merely that misconduct evidence is not admissible to show bad character or criminal tendencies but is admissible for other purposes. The list of admissible purposes is specifically nonexhaustive.

The court reasonably could have concluded that misconduct evidence was probative of the [petitioner]'s overarching motive to win Sessler's affections and to eliminate those who stood in her way. In light the violent nature of the stabbing of the victim herself, the attempted murder of Christos was not likely to arouse the emotions of the jury to a different degree. Furthermore, the court gave limiting instructions that presumptively lessened any prejudice. Accordingly, the court did not abuse its discretion in determining that the evidence was more probative than prejudicial.

State v. Davalloo, supra, 153 Con. App. at 438-42.

### e. the Connecticut Appellate Court reasonably and properly found that the trial court did not err in admitting this evidence under Connecticut law

Like petitioner's previous claim, the petitioner cannot obtain federal habeas corpus relief on this ground either because it too asserts a purely state law evidentiary claim. See Estelle, supra, 502 U.S. at 68-69.   Petitioner likewise does not allege a violation of a constitutional right, instead relying again on the same state law claim which she asserted in state court.[19]   Petitioner's Appellate Court brief clearly reflects that, in state court, the petitioner was presenting a *nonconstitutional*, purely state law, evidentiary claim which asserted that the trial court abused its discretion in allowing the challenged misconduct evidence. See Petitioner's Brief and Appendix to the Connecticut Appellate Court on direct appeal at 29 (Appendix C).   In fact, in arguing her claim, the petitioner acknowledged her burden to prove that the alleged error was harmful, and emphasized that she was asserting nonconstitutional error.   Id. at 30.

---

[19]   It bears noting that when she sought certification for discretionary review of the Appellate Court's decision by the Connecticut Supreme Court, the petitioner abandoned that portion of her claim which related to her statements to her husband about surveilling the victim.   As such, the only misconduct evidence claim which petitioner exhausted by presenting it to the state's highest court was the claim related to evidence of her assault of her husband in New York.   See Petition for Certification on direct appeal (Appendix F).

As with her marital communications privilege claim, nowhere in the allegations or argument concerning her misconduct evidence claim does the petitioner cite any federal constitutional case or statute, relying instead strictly on Connecticut state cases. Likewise, she does not invoke the United States Constitution or even refer to "due process" or other constitutional rights at any point in her state appellate brief while presenting this claim. See Petitioner's Brief and Appendix to the Connecticut Appellate Court on direct appeal at 22-31 (Appendix C).   Again, were the petitioner to attempt at this late juncture to present her claim as one of constitutional magnitude, it would subject petitioner's claim to immediate dismissal for failure to exhaust the claim by fairly presenting it to the state's highest court as such. See Galdamez v. Keane, supra, 394 F.3d at 73-74.

Clearly, the petitioner does not allege that the admission of this misconduct evidence rose to the level of a constitutional violation.   Nonetheless, even if she did, the claim would be wholly without merit. The Connecticut Appellate Court's decision is an objectively reasonable application of Connecticut evidentiary law holding that the admission of this evidence by the trial court was entirely proper.   Because the Connecticut Appellate Court determined that the trial court's decision admitting this evidence did not violate a state evidentiary rule, petitioner cannot obtain relief upon this claim.   The proper application of a presumptively constitutional state evidentiary rule cannot be unconstitutional.   See Peay v. Warden, supra, 2014 WL 4437716 at *6.

The Appellate Court held that the trial court did not abuse its discretion when it determined that the other crimes evidence was probative of the underlying and overwhelming motive which the trial court found – the petitioner's obsession with Sessler.

49

In particular, the Appellate Court correctly determined that the challenged misconduct evidence pertaining to the petitioner's attempted murder of Christos was properly admitted under Connecticut's prior misconduct evidentiary doctrine to prove the existence of a large plan or scheme involving reuniting and being with Sessler, of which the murder of Raymundo was a part.   State v. Davalloo, 153 Conn. App. at 436-42.   The Appellate Court reasonably found that the evidence thus plainly had a tendency to show motive and therefore identity.   Id. at 442 & n.7.   Specifically, for purposes of admissibility, the Appellate Court reasonably determined that a sufficient logical connection existed between the murder of Raymundo and the attempted murder of Christos such that the trial court did not abuse its discretion in finding that the misconduct evidence was relevant to a material issue in the case.   Id. at 440-41.

Based on the evidence before it, the trial court and jury could reasonably have concluded that the overarching plan conceived and executed by the petitioner was to eliminate any impediments to her resuming a sustained romantic relationship with Sessler. The victim, of course, having won Sessler's apparently monogamous affections (see TT 01/25/12 at 122-24 (Sessler)), posed an immediate impediment to this plan, and the jury might reasonably have inferred that the petitioner effectuated this first part of her plan by intentionally killing the victim.

As the state argued on appeal, sustaining her romantic relationship with Sessler was far more complicated, however, than the petitioner simply eliminating the victim and wooing Sessler anew. The petitioner's prior romantic relationship with Sessler had been predicated upon her lie that she was not married, an elaborate deception that hinged, in large part, on her bringing Sessler home to a residence that she had carefully staged to

make it appear that she was a single woman who lived alone. See TT 01/25/12 at 121, 125, 145, 147 (Sessler). Christos threatened the petitioner's ability to perpetuate this deception by demanding an end to the practice of him leaving home whenever the petitioner wanted to clear the way for a romantic rendezvous with Sessler. See TT 01/24/12 at 98-100, 105-08 (Christos). Had Christos made good on his demand, the petitioner would have been placed in the untenable position of having to explain to Sessler why her home - their principal rendezvous point - no longer was available and now off-limits. Christos also threatened the petitioner's relationship with Sessler when he learned that a Pharmacia employee had been murdered and inquired of the petitioner regarding Anna Lisa's well-being. Id. at 92-96. Based on the foregoing, the jury might reasonably have inferred that the petitioner's unyielding desire to sustain a romantic relationship with Sessler motivated her to both the kill the victim and attempt to kill Christos. Under Connecticut evidentiary law, proof that the petitioner entertained the above plan was, therefore, logically relevant "because it bears on [her] 'motive, and hence the doing of the [charged] criminal act, the identity of the actor, and h[er] intention, where [as here] any of these is in dispute.'" State v. Randolph, supra, 284 Conn. at 342.

Lastly, as the Appellate Court noted, "the [trial] court gave limiting instructions that presumptively lessened any prejudice." State v. Davalloo, supra, 153 Conn. App. at 442. Prior to petitioner's ex-husband Christos' testimony, the court explained that the evidence was inadmissible to prove bad character or criminal tendencies, and limited to proving motive, common plan or scheme, an element of the crime of murder, the absence of mistake or accident, or to corroborate crucial prosecution testimony or complete the story of the crime on trial. TT 01/24/12 at 61-62. Following Mount Pleasant Police Officer Marco

51

Mendoza's brief testimony regarding events at the Westchester Medical Center, the court instructed the jury that his testimony was inadmissible to prove a person's bad character or criminal tendencies, and limited to proving motive and to corroborate crucial prosecution testimony. TT 02/02/12 at 3. Following Pleasantville Police Dispatcher Anthony Prete's very brief testimony regarding the absence of a 9-1-1 call on March 23, 2003, the court instructed the jury that his testimony was inadmissible to prove bad character or criminal propensity and was limited to proving motive and intent, and to corroborate crucial prosecution testimony. Id. at 56. Following Westchester County Police Detective James Clarke's testimony regarding the petitioner's statements to him, the court instructed the jury that his testimony was inadmissible to prove bad character or criminal propensity and was limited to proving motive and intent, to complete the story of the crime on trial, and to corroborate crucial prosecution testimony.[20] TT 02/03/12 at 13-14.

In sum, the petitioner has only *ever* presented the issue raised as her Claim Two for relief as a *nonconstitutional*, purely state law, evidentiary claim which asserted that the trial court abused its discretion in allowing into evidence the challenged misconduct evidence related to her attempt to kill her husband.  Indeed, the petitioner has not alleged a constitutional violation in her pending pleading.  As such, federal habeas corpus relief cannot be granted on this purely state law evidentiary claim.

---

[20]  Having been led to believe that her husband was dead, the petitioner first told the police that he had been stabbed during the course of a carjacking. TT 02/03/12 at 8-10. When told that Christos was not dead, the petitioner changed her tune and told the police about the blindfold/handcuff guessing game. Id.

**B.    Federal Habeas Corpus Relief Is Not Warranted On The Petitioner's Claim Three Because The Connecticut Appellate Court Properly Identified And Reasonably Applied Clearly Established Federal Law In Analyzing And Rejecting The Petitioner's Claim That She Did Not Voluntarily And Knowingly Waive Her Right To Counsel**

### 1.   petitioner's claim as crafted in federal court

As her Claim Three for relief, the petitioner asserts that: "The [petitioner] did not voluntarily and knowingly waive her right to counsel."   See Petitioner's Application at ¶ 12, Ground Three.

### 2.   petitioner's claim as presented in state court

On direct appeal to the Connecticut Appellate Court, the petitioner framed her issue as "Did [petitioner] waive her right to counsel?" See Petitioner's Brief and Appendix to the Connecticut Appellate Court on direct appeal at v. [Statement of the Issues], 31-35 [Argument] (Appendix C).   Petitioner thus presented a constitutional claim which involves her sixth and fourteenth amendment right to counsel.[21]

---

[21]  The petitioner conceded that this claim was unpreserved and sought review pursuant to State v. Golding, 213 Conn. 233, 239-40, 567 A.2d 823 (1989), which provides "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) Although the Appellate Court determined that the claim was of constitutional magnitude, and that the record was adequate for review, the Court ultimately concluded that the petitioner's claim failed under the third prong of Golding because the trial court's thorough canvass of the petitioner protected her sixth and fourteenth amendment right to counsel.   State v. Davalloo, supra, 153 Conn. App. at 442.

### 3. the relevant federal caselaw addressing a valid waiver of counsel and the choice to proceed as a pro se litigant assisted by standby counsel

The Sixth Amendment guarantees a criminal defendant counsel at all critical stages of a prosecution. See Gideon v. Wainwright, 372 U.S. 335 (1963) (incorporating Sixth Amendment against states); Dallio v. Spitzer, 343 F.3d 553, 560 (2d Cir. 2003), cert. denied, 541 U.S. 961 (2004).   A defendant in a criminal trial, however, also has a constitutional right to proceed without counsel when she knowingly, voluntarily, and intelligently elects to do so. Faretta v. California, 422 U.S. 806, 833-36 (1975) (allowing defendant to elect self-representation consistent with framers' belief in "the inestimable worth of free choice"); see also McKaskle v. Wiggins, 465 U.S. 168, 176-77 (1984) ("The right to appear pro se exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense.").   A defendant "need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation ...." Faretta, supra, 422 U.S. at 835. Rather, a record that affirmatively shows that "[he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will" sufficiently supports a waiver. Id.

In Faretta, the Court acknowledged that, before being allowed to waive the benefit of counsel, an accused "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his decision is made with open eyes.' " Id. at 835 (citation omitted). However, the Supreme Court has not "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." Iowa v. Tovar, 541 U.S. 77, 88 (2004);

see, e.g., Dallio v. Spitzer, supra, 343 F.3d at 561 ("The issue on this appeal is whether clearly established federal law dictates as a minimum constitutional prerequisite to a knowing and intelligent waiver of counsel that a court explicitly warn a defendant of the dangers and disadvantages of proceeding pro se. We conclude that it does not."). A "range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding" will instead dictate the type of colloquy in which the trial court must engage with the defendant before he is allowed to proceed pro se. Iowa v. Tovar, supra, 541 U.S. at 88.

Whether there has been an adequate waiver of the constitutional right to counsel depends upon the particular facts and circumstances of each case, including the background, experience, and conduct of the accused. Johnson v. Zerbst, 304 U.S. 458, 464 (1938); see also United States v. Hurtado, 47 F.3d 577, 583 (2d Cir.) cert. denied, 516 U.S. 903 (1995). (factors determining valid waiver include whether defendant understood that he had choice between proceeding pro se and with assigned counsel, understood advantages of having trained counsel, and had capacity to make intelligent choice).

### 4. the Connecticut Appellate Court's identification of the applicable law

In addressing the petitioner's waiver of counsel claim on direct appeal, the Connecticut Appellate Court provided the following recitation of the applicable standard of review and law governing the waiver of a defendant's right to counsel:

> "We review the trial court's determination with respect to whether the [petitioner] knowingly and voluntarily elected to proceed pro se for abuse of discretion.... Recognizing the constitutional implications attendant to Golding review [see footnote [15]], we do not review the proceedings for

strict compliance with the prophylactic rule of [Connecticut] Practice Book §
44-3, but rather for evidence that the waiver of counsel was made
knowledgeably and voluntarily....

"The right to counsel and the right to self-representation present mutually
exclusive alternatives. A criminal defendant has a constitutionally protected
interest in each, but since the two rights cannot be exercised
simultaneously, a defendant must choose between them. When the right to
have competent counsel ceases as the result of a sufficient waiver, the right
of self-representation begins.... Put another way, a defendant properly
exercises [her] right to self-representation by knowingly and intelligently
waiving [her] right to representation by counsel....

"Practice Book § [44-3] was adopted in order to implement the right of a
defendant in a criminal case to act as [her] own attorney.... Before a trial
court may accept a defendant's waiver of counsel, it must conduct an
inquiry in accordance with § [44-3], in order to satisfy itself that the
defendant's decision to waive counsel is knowingly and intelligently made....
Because the § [44-3] inquiry simultaneously triggers the constitutional right
of a defendant to represent [herself] and enables the waiver of the
constitutional right of a defendant to counsel, the provisions of § [44-3]
cannot be construed to require anything more than is constitutionally
mandated....

"[A] defendant need not [herself] have the skill and experience of a lawyer in
order competently and intelligently to choose self-representation.... Rather,
a record that affirmatively shows that [she] was literate, competent, and
understanding, and that [she] was voluntarily exercising [her] informed free
will sufficiently supports a waiver.... The nature of the inquiry that must be
conducted to substantiate an effective waiver has been explicitly articulated
in decisions by various federal courts of appeals....

"The multifactor analysis of [Practice Book § 44-3], therefore, is designed to
assist the court in answering two fundamental questions: first, whether a
criminal defendant is minimally competent to make the decision to waive
counsel, and second, whether the defendant actually made that decision in
a knowing, voluntary and intelligent fashion.... As the United States
Supreme Court recently recognized, these two questions are separate, with
the former logically antecedent to the latter.... Inasmuch as the defendant's
competence is uncontested, we proceed to whether the trial court abused
its discretion in concluding that the defendant made the waiver decision in a
knowing, voluntary, and intelligent fashion." (Citations omitted; internal

quotation marks omitted.) State v. Collins, 299 Conn. 567, 610-12, 10 A.3d 1005, cert. denied, ___ U.S. ___, 132 S.Ct. 314, 181 L.Ed.2d 193 (2011).

State v. Davalloo, supra, 153 Conn. App. at 443-44. (Appendix A).

### 5.  additional facts related to this claim

The following additional facts, which are supported by the underlying record,

were cited by the Appellate Court in addressing the petitioner's waiver of counsel claim:

> Prior to trial, the [petitioner] filed a motion to represent herself. [TT 11/21/11 at 15-16 (Appendix M)]   During the court's canvass of the [petitioner] on this matter, the [petitioner] indicated that she was forty-two years old, had graduated from high school, had a graduate degree, and had been through a criminal trial in New York. [Id. at 16-17, 22]   She further indicated that she was not forced or threatened to request to represent herself; that she had not ingested any drugs, alcohol or medicine that would affect her ability to make decisions; and that she was confident in her ability to proceed. [Id. at 24]   When asked by the court, she stated that she understood: that she had a constitutional right to be represented by a lawyer [id. at 18]; that she was charged with murder [id. at 17]; that she knew the elements of the offense of murder [id. at 17-18, 24]; that the maximum penalty for murder was sixty years [id. at 17, 25], with a mandatory minimum of twenty-five years incarceration [id. at 17, 25]; that although the court "in all likelihood" would give her "some leeway" in the trial process, she would have to follow the rules of evidence "just like a lawyer has to"[id. at 18]; that she would have to select a jury [id. at 18, 25]; "that there are great dangers involved in self-representation," including the difficulty in maintaining objectivity [Id. at 19]. She further indicated that she had educated herself regarding the elements of murder and the law of evidence and that she was familiar with courtroom roles and other participants within the court system. [Id. at 24, 25] The court asked if she was "absolutely sure" that she wanted to represent herself, and she answered, "I am certain." [Id. at 23] The court indicated that she would have standby counsel and the [petitioner] said that she understood that the role of a standby counsel was to "sit there mute" unless she asked questions and sought help from him. [Id.] Following its thorough canvass, the court granted the [petitioner]'s motion to represent herself, finding that the [petitioner] had knowingly, intelligently and voluntarily decided to represent herself. [Id. at 25-26]

State v. Davalloo, supra, 153 Conn. App. at 444-45.

### 6.  the Connecticut Appellate Court's analysis of this claim

The Appellate Court addressed the merits of the petitioner's claim as follows:

The [petitioner] argues that the court's canvass was invalid in a number of ways. She argues that the court did not explain to her: the technical problems she faced in "proving herself innocent"; the importance of counsel for an effective defense; "that by representing herself she substantially increased the risk that although she may be innocent, the jury may find her guilty because she does not know how to establish her innocence"; that she was giving up, as a practical matter, a defense of extreme emotional disturbance and an instruction on lesser included offenses; and that the sentencing court could impose a sentence consecutive to her New York sentence. She also argues that the court misled her to believe that the trial judge would not rigorously enforce the rules of evidence if she represented herself and did not probe her regarding the dissatisfaction with counsel that led to her determination to represent herself.

Contrary to the [petitioner]'s assertion, the court was not required to inform the [petitioner] of any technical problems in "proving herself innocent" or inform the [petitioner] "that by representing herself she substantially increased the risk that although she may be innocent, the jury may find her guilty because she does not know how to establish her innocence." In a criminal trial, a defendant is not required to prove her innocence, rather the state has the burden of proving guilt beyond a reasonable doubt. See, e.g., State v. Valinski, 254 Conn. 107, 120, 756 A.2d 1250 (2000); State v. Carmon, 47 Conn. App. 813, 827 n. 7, 709 A.2d 7, cert. denied, 244 Conn. 918, 714 A.2d 7 (1998). The court adequately warned the [petitioner], that "there are great dangers involved in self-representation" and that she would carry the burden of proof if she wanted to assert an affirmative defense.

The court did not mislead her to believe that the trial judge would not rigorously enforce the rules of evidence if she represented herself. During the canvass, the court inquired of the [petitioner] whether she understood that if she represented herself "the court in all likelihood would give you some leeway in the trial process, but you're going to have to follow the rules of evidence just like a lawyer has to and have to follow the proper courtroom procedures." The [petitioner] stated that she understood and that "[t]he only leeway I would hope for is just maybe a little time to ... confer with standby counsel." The court did not mislead the [petitioner], but rather informed her that she would have to follow the rules of evidence "just like a lawyer" and the [petitioner] indicated that she understood.

The [petitioner] further argues that the court erred in not delving into her dissatisfaction with counsel that led to her determination to represent herself. This assertion is not entirely accurate, because the court did inquire about her dissatisfaction with counsel. The [petitioner] responded that she had a good rapport with counsel, but that she wanted to represent herself so that she could have more control over the decision-making process.[22]

The [petitioner] also argues that the court did not explain the importance of counsel for an effective defense or that she was giving up, as a practical matter, a defense of extreme emotional disturbance and an instruction on lesser included offenses. A self-represented defendant is not precluded from raising defenses or asking for instructions on lesser included offenses. To the extent that navigating a criminal trial is more difficult for a self-represented defendant, the court adequately explained and warned of the dangers of self-representation. Specifically, regarding the issue of affirmative defenses, the court inquired: "I don't know whether you're planning on or you're thinking [of] raising a defense about lack of capacity due to mental disease or defect or [an] ... extreme emotional defense; both of those are something called affirmative defenses.... And that would mean that you have to prove that defense by a preponderance of the evidence. Do you understand that?" The [petitioner] responded that she understood, but "that's not the avenue I'm pursuing." The court further inquired: "I know you're saying you're not planning to raise them. I don't know ... maybe you'll change your mind.... But do you understand, in those areas, you'd have to educate yourself on what the law is and you'd have a burden of proof going forward, and you might be better off having an attorney helping you with that, although you sound like you've researched these issues. Is that right?" The [petitioner] stated: "I have done a great deal of research, I'm not a neophyte, I'm not completely ... in the dark with regard to those issues. I've been in prison almost eight years and have a little experience, jailhouse lawyer experience."

---

22 [footnote 11 in original] The court inquired: "[Y]ou indicated ... that you wanted to represent yourself because you had ideological differences with your lawyer in this case. I don't want to know about your private discussions with your lawyer, but ... [m]aybe you could explain that to me." The [petitioner] explained that her counsel has "done a phenomenal job and we have a good rapport. However, I wanted a little bit more control over some of the decision-making process and just that, you know ... the order of ... which witnesses to call within the letter of the law; I wanted a little control of that.... I just think that there's only minimal rights that I had as a represented individual, and I want a little bit more leeway in the decision-making process."

The [petitioner] last argues that her decision to represent herself imposed a greater risk of a sentence consecutive to her New York sentence. The court informed the [petitioner] of the maximum penalty of sixty years and the mandatory minimum of twenty-five years. "It is well settled that, in canvassing a defendant seeking to exercise [her] right of self-representation, a trial court must apprise [her] of the possible range of criminal penalties or punishments to which [she] is exposed.... Put differently, a constitutionally valid canvass is one that leaves the defendant with a meaningful appreciation of the period of incarceration [she] face[s] if convicted of the charges [she] face[s].... That explanation need not be made with mathematical exactitude, so long as it leaves the defendant with a realistic picture of [her] sentencing exposure." (Citations omitted; internal quotation marks omitted.) State v. Collins, supra, 299 Conn. at 614, 10 A.3d 1005. The court apprised the forty-two year old defendant that she faced a possibility of a sixty year sentence, which effectively was a life sentence regardless of whether it was imposed consecutive or concurrent to the New York sentence of twenty-five years. The [petitioner] was left with a realistic view of her exposure for the crime charged, which was effectively a life sentence.

We conclude that the court's canvass established that the [petitioner]'s decision to proceed without the benefit of counsel was competently made, and knowing, intelligent and voluntary.

State v. Davalloo, supra, 153 Conn. App. at 445-49.

### 7.  the decision of the Connecticut Appellate Court is not contrary to clearly established federal law

In addressing the petitioner's claim, the Connecticut Appellate Court did not cite directly to United States Supreme Court precedent.  Instead, the court cited to the Connecticut Supreme Court's decision in State v. Collins, supra, for the prevailing law governing the waiver of a defendant's right to counsel. See State v. Davalloo, supra, 153 Conn. App. at 443-44.   Review of that Connecticut Supreme Court case reveals that the Court quotes extensively from its own decision in State v. D'Antonio, 274 Conn. 658, 877 A.2d 696 (2005), which cites explicitly to the United States Supreme Court's decision in Faretta, supra.   Thus, it is clear from a review of the Connecticut Appellate Court's

60

decision that it properly identified the United States Supreme Court's decision in <u>Faretta</u> as the controlling legal principle to be applied in analyzing the petitioner's claim.   <u>See Early v. Packer</u>, 537 U.S. 3, 8 (2002) (state court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them"). Given that the Connecticut Appellate Court properly identified the <u>Faretta</u> holding as controlling and thereafter analyzed petitioner's claim within that framework, the state court's decision cannot be said to be "contrary to" clearly established federal law.   <u>See Bell v. Cone</u>, 535 U.S. at 694.

### 8. The Connecticut Appellate Court reasonably applied clearly established federal law in determining petitioner's waiver of counsel satisfied constitutional requirements

Because the state court decision is not "contrary to" clearly established federal law, the federal court must examine whether the Connecticut Appellate Court applied the decision in <u>Faretta</u>, <u>supra</u>, unreasonably in rejecting petitioner's waiver of counsel claim. <u>See</u> <u>Williams v. Taylor</u>, <u>supra</u>, 529 U.S. at 413.

Initially, the petitioner was represented by appointed counsel, Barry Butler. In the midst of pretrial proceedings, the petitioner moved to waive counsel and represent herself.   TT 11/21/11 at 15 (Appendix M).   The court (*White, J.*) canvassed the petitioner, determined that her waiver of counsel was knowing, voluntary and intelligent, and appointed Butler to serve as standby counsel. <u>Id</u>. at 15-27.

Based upon its independent review of that canvass, the Connecticut Appellate Court reasonably determined that the petitioner's waiver of counsel satisfied

61

constitutional requirements.    State v. Davalloo, 153 Conn. App. at 449. The reasonableness of that conclusion is supported by the underlying record which amply establishes that the petitioner knew "what [s]he [was] doing and h[er] choice [was] made with eyes open."    Faretta, supra, 422 U.S. at 835.

Two months before the petitioner expressed her desire to proceed *pro se*, the parties jointly and summarily requested that the petitioner be examined pursuant to § 54-56d for competency to stand trial. TT 9/1/11 at 1. Just prior to entertaining the petitioner's motion to represent herself, Judge White heard testimony from Joann Holmes, a licensed clinical social worker who was a member of the competency evaluation team. TT 11/21/11 at 3-14. Ms. Holmes testified that three evaluators affiliated with the Department of Mental Health and Addiction Services conducted the review and unanimously concluded that the petitioner was competent to stand trial.    Id. at 5. Although the petitioner did have some mental health issues, she was then stable and not on any psychiatric medications. Id. at 8-9. Petitioner was highly educated, trilingual and of high average intelligence, and exhibited no abnormal speech or conduct to the evaluators. Id. at 9. The evaluators were aware that the petitioner was contemplating self-representation reportedly due to "ideological differences with her attorney." Id. at 11. The petitioner shared (in limited fashion) her strategic plan for defending herself with the evaluators. Id. at 11-12. The evaluators considered this information not for purposes of opining on the petitioner's capacity for self-representation, which was beyond their charge, but in order to appreciate her thought processes and raw decision-making capacity. Id. at 12-13. In the evaluators' estimation, the petitioner's strategic plan appeared to be rational and somewhat sophisticated. Id. at 11-12.

In canvassing the petitioner, Judge White adequately warned the petitioner "that there are great dangers involved in self-representation[,]" including it being very difficult to be objective, thus running the risk that jury and judge "would not see things from your own perspective...." TT 11/21/11 at 19. The petitioner assured the court that she was "very well aware of the pitfalls of self[-representation]." Id.

The court never suggested to the petitioner that the trial judge would not rigorously enforce the rules of evidence and procedure if she represented herself. The court told the petitioner that, while the trial judge would in all likelihood afford a *pro se* litigant "some leeway in the trial process[,]" she was "*going to have to follow the rules of evidence just like a lawyer has to and [she would] have to follow the proper courtroom procedures*...." (Emphasis added.) TT 11/21/11 at 18. The petitioner informed the court that she understood this, that she had educated herself regarding the laws of evidence, and that the "only leeway [she] would hope for is just maybe a little time to ... confer with standby counsel." Id. This particular leeway was afforded in abundance.

The court adequately probed the petitioner's dissatisfaction with counsel. Referring specifically to the petitioner's claimed ideological differences with counsel, the court inquired: "*Maybe you could explain that to me*." (Emphasis added.) TT 11/21/11 at 20. The petitioner did so, explaining that, despite being pleased with counsel and sharing a good rapport, she believed that her hands were tied in terms of the decision-making process related to her defense, and she wanted control of this. Id. at 20. She also disagreed with defense counsel to the extent that he was wisely "leaning [in favor of] a plea situation...." Id. The court assured the petitioner that strategic disagreements were not uncommon and did not mean that counsel was not effective. Id. at 20-21. The

petitioner accepted this proposition, but held fast to her desire to have "more leeway in the decision-making process." Id. at 21; see Hurtado, supra, 47 F.3d at 583.

The trial court adequately informed the petitioner regarding the permissible penalty range by informing her that a murder conviction carried a mandatory minimum sentence of twenty-five years and a maximum sentence of sixty years. TT 11/21/11 at 17. A constitutionally valid canvass is one that leaves the petitioner with a meaningful appreciation of the period of incarceration she faces upon conviction of the charged crime. The petitioner need not have had a *precise* understanding of the maximum sentence. As the Appellate Court reasonably observed, knowledge by the then forty-two year old petitioner that she faced a maximum potential sentence in Connecticut of sixty years, alone afforded her the required meaningful appreciation of the effective life sentence that she was in jeopardy of receiving upon a conviction of murder, regardless of the potential for consecutive sentencing with New York. See United States v. Fore, 169 F.3d 104, 108-09 (2d Cir.) (no mention of consecutive sentencing), cert. denied, 527 U.S. 1028 (1999). Based on the horrendous nature of the charged crime, and her experience in New York of having received a twenty-five year sentence for a failed and milder by comparison attempt to kill her husband, the petitioner surely appreciated as a matter of common sense that a sentence in the upper portion of the permissible range was a virtual certainty upon conviction.   In short, the petitioner plainly understood the dire and effectively life-long consequences of a murder conviction.

The court did effectively warn the petitioner of the difficulty of asserting a mental health defense. Noting the petitioner's history of mental health issues, the court explained that mental health defenses, such as lack of capacity and extreme emotional disturbance,

were available; it explained that the petitioner bore the burden of proving an affirmative defense by a preponderance of the evidence; and it warned the petitioner that she "might be better off having an attorney helping [her] with that." TT 11/21/11 at 21-22. The petitioner understood this, dismissed her mental issues as in the past, and told the court "that's not the avenue I'm pursuing." Id. at 21-22.

In a nutshell, review of the competency hearing and plea canvass transcripts reveals a petitioner who is highly educated, trilingual and of high average intelligence. Although petitioner did have some mental health issues, at the time evaluators found she was then stable, not on any psychiatric medications, and competent to stand trial.   Her exchanges with the canvassing judge demonstrate not only that she was aware of her right to counsel and the advantages of having counsel, but that she had thoughtful reasons for electing to proceed *pro se*.   Petitioner clearly demonstrated she knew and understood the charges against her, the penalties she potentially faced and what would be required of her were she to represent herself.

In light of the fact that the court's thorough canvass satisfied constitutional requirements, the Appellate Court's conclusion that the petitioner's decision to proceed without the benefit of counsel was competently made, and knowing, intelligent and voluntary, was a reasonable application of the Supreme Court's holding in Faretta, supra. As the Second Circuit has previously noted with regard to a similarly situated defendant, in retrospect, the "fact that [petitioner's] decision to represent [herself] was ultimately unwise does not render it involuntary."   Hurtado, supra, 47 F.3d at 583.

**IV.     CONCLUSION**

Based upon the foregoing, the respondent respectfully requests that this Court deny the petition attacking the petitioner's state conviction because the petitioner's claims identified as Claims One and Two are purely state law evidentiary claims which are nonconstitutional in nature and do not provide a basis for federal habeas corpus relief under 28 U.S.C. § 2254.   Further, the Connecticut Appellate Court reasonably applied clearly established federal law, as determined by the Supreme Court of the United States, in determining that petitioner's waiver of counsel satisfied constitutional requirements, and thus rejecting the petitioner's Claim Three in state court.

Respectfully submitted,

GEORGE JEPSEN, ATTORNEY GENERAL
STATE OF CONNECTICUT, RESPONDENT


By   /s/ DAVID M. KUTZNER
DAVID M. KUTZNER
Senior Assistant State's Attorney
Civil Litigation Bureau
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, Connecticut 06067
E-mail: david.kutzner@ct.gov
Tel. No. (860) 258-5887
Fax No. (860) 258-5968
Federal Bar No. ct   08123

66

## **CERTIFICATION**

I hereby certify that on November 8, 2017, a copy of the foregoing Memorandum In Opposition To Petition For Writ Of Habeas Corpus was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

I hereby certify that a copy of the foregoing document was mailed, first class postage prepaid to: Sheila Davalloo, Inmate No. 04-G-0449, Bedford Hills Correctional Facility, P.O. Box 1000, Bedford Hills, NY 10507-0999 and Michelle Elaine Maerov, Office of New York State Attorney General, 120 Broadway, New York NY 10271 on this 8th day of November, 2017.

  /s/ DAVID M. KUTZNER
DAVID M. KUTZNER
Senior Assistant State's Attorney