# Appendix A

153 Conn.App. 419
Appellate Court of Connecticut.

STATE of Connecticut
v.
Sheila DAVALLOO.

No. 36405.
|
Argued May 27, 2014.
|
Decided Oct. 7, 2014.

**Synopsis**
**Background:** Defendant was convicted in the Superior Court, Judicial District of Stamford–Norwalk, Comerford, J., of murder of her paramour's girlfriend. Defendant appealed.

**Holdings:** The Appellate Court, Beach, J., held that:

[1] statements made to husband to further defendant's obsessive relationship with her paramour were not protected by marital communications privilege;

[2] evidence that defendant attempted to murder her husband and that she possessed items to spy on paramour and his girlfriend was admissible as a common scheme;

[3] probative value of evidence outweighed any prejudicial effect;

[4] superior court's canvass of defendant, who sought to represent herself, was adequate to ensure that waiver of right to counsel was knowing, intelligent, and voluntary; and

[5] canvass adequately apprised defendant of the period of incarceration she would face if convicted.

Affirmed.

**Attorneys and Law Firms**

**\*\*360** Mark Rademacher, assistant public defender, for the appellant (defendant).

Timothy J. Sugrue, assistant state's attorney, with whom, on the brief, were David I. Cohen, state's attorney, James M. Bernardi, supervisory assistant state's attorney, and Maureen Ornousky, senior assistant state's attorney, for the appellee (state).

BEACH, SHELDON and BORDEN, Js.

**Opinion**

BEACH, J.

**\*420** The defendant, Sheila Davalloo, appeals from the judgment of conviction, rendered after a jury **\*421** trial, of murder in violation of General Statutes § 53a–54a. The defendant claims that (1) in violation of the marital communications privilege, the court improperly permitted Paul Christos, her husband at the time of the events in question, to testify as to conversations she had had with him, (2) the court improperly permitted the state to present evidence of uncharged misconduct, and (3) the court improperly found that she validly waived her right to trial counsel. We disagree and affirm the judgment of the trial court.

The following facts, as reasonably could have been found by the jury, and procedural history are relevant. This case involves a love triangle between the defendant and two of her coworkers at Purdue Pharma, a pharmaceutical company in Stamford. The defendant became obsessed with Nelson Sessler, one of her coworkers. The victim was Anna Lisa Raymundo, the second coworker, who ultimately lived with and became the girlfriend of Sessler. In late 2000, Sessler met Raymundo at an after-work happy hour that other coworkers also attended. In the summer of 2001, the defendant met Sessler for the first time at another after-work happy hour. Although the defendant was married to Christos at the time, she told Sessler that she was divorced.[1] At some point, Sessler began sexual relationships with both the defendant and Raymundo.

During the tenure of the defendant's relationship with Sessler, the two met periodically at the condominium unit in Pleasantville, New York, where the defendant lived with Christos. Before Sessler would meet the defendant at the Pleasantville condominium unit, the defendant would tell Christos that her mentally ill brother was coming to visit and Christos had to leave the house and take his personal

belongings with him. The defendant told Christos that her brother might react *422 badly if he discovered that she was married. Christos believed this story at first. He knew from **361 the defendant's parents that the defendant, in fact, had a mentally ill brother. According to Sessler, he and the defendant did not see each other often because the defendant was "busy" with other obligations and interests, including volleyball and taking care of her mentally ill brother.

By the summer of 2002, Sessler's attentions focused on Raymundo and he suspended his sexual relationship with the defendant. According to Sessler, the defendant "seemed okay" with their relationship just being a "summer fling...." Raymundo became Sessler's girlfriend and, although he continued to maintain his separate apartment in Stamford, he spent "the majority of [his] time" at Raymundo's apartment, located at 123 Harbor Drive, apartment 105, in Stamford. The defendant was aware that Sessler was living with Raymundo. Sessler's relationship with Raymundo continued after Raymundo left Purdue Pharma in 2002 and began a new job at another pharmaceutical company, Pharmacia, in New Jersey. Despite working in New Jersey, Raymundo continued to live at her apartment in Stamford.

In 2002, the defendant concocted an imaginary story about a love triangle among three fictional "coworkers" at Purdue Pharma: "Melissa," "Jack," and "Anna Lisa." The defendant related the ongoing saga, which she presented as true, from the perspective of her "friend" Melissa, who supposedly was confiding in the defendant. The defendant said that Melissa, who was in a relationship with Jack, was sad and depressed because Jack was also in a relationship with another woman, Anna Lisa. "Melissa," quite clearly in retrospect, was the defendant. "Jack" was Sessler, and "Anna Lisa" was Raymundo.

The defendant related information to Christos about the love triangle nearly every day. She included intimate *423 details about Melissa and Jack. She told Christos that Melissa was upset when Jack rebuffed her sexual advances. She once said that Melissa had discovered Jack's travel plans and had flown to Jack's destination. She then "conveniently" ran into him at the airport as he was boarding a plane home and sat next to him on the return flight.[2] The defendant constantly asked Christos for advice "on behalf" of Melissa with questions such as why Jack was in a relationship with two women and why Jack was cheating on one woman with the other. Christos listened to these stories to "humor" the defendant.

Eventually, the defendant told Christos that she "wanted to go on a stakeout" with Melissa in order to "spy on Jack." Although Christos thought the proposed surveillance was "a little odd," he did not believe it would actually occur; he gave the defendant a pair of night vision binoculars. The defendant told Christos that she had purchased a lock pick set for Melissa because Melissa wanted to break into Anna Lisa's apartment to look at photographs in order to "get a sense of the relationship between Jack and Anna Lisa." The defendant practiced with the lock pick set on the front door of their Pleasantville condominium unit. The defendant also asked Christos for an eavesdropping device that she knew he owned in order to assist Melissa in planting the device in Jack's office so they could listen in on his conversations. Early one morning, the defendant telephoned Christos to inform him that she and Melissa were outside Anna Lisa's apartment and asked Christos if Melissa should confront Anna Lisa. Christos told the defendant that Anna Lisa had **362 a "right to know her boyfriend is cheating on her...." In *424 time, Christos became "sick" of the stories of the love triangle and "kind of got angry" with the defendant.

The defendant also related the story of the love triangle to Emilio Mei and Tammy Mei, friends of the defendant and Christos, to Christos' parents and to "one or two other friends as well." The defendant told Tammy Mei about Melissa "[a]lmost every time [they] spoke" and would ask her questions such as whether she thought Jack would break up with Anna Lisa and date Melissa. The defendant told Tammy Mei that Melissa had access to Jack's voice mail and would listen to it on a daily basis to see if he was still seeing Anna Lisa or any other woman. She also told Tammy Mei that Jack "tried to set Melissa up with one of his friends," but that it did not go well because "Melissa just wanted to be with Jack."[3] The defendant "quite a few times" asked Tammy Mei if Melissa should confront Anna Lisa to "let her know that she [Melissa] was also seeing Jack." Tammy Mei advised against this confrontation, but sensed that the defendant wanted her to say that Melissa should confront Anna Lisa.

A few minutes after noon on November 8, 2002, the Stamford Police Department received a 911 call in which the caller reported that a man was assaulting someone

at 123 Harborview, apartment 105; the caller claimed to be a neighbor.[4] The dispatcher knew that Harborview was a commercial area without apartments and knew the given address had to be incorrect. After the caller ended the call, the dispatcher called back the number and discovered that the call had come from a pay phone at a Dutchess restaurant on Shippan Avenue in Stamford. The dispatcher telephoned the Dutchess restaurant and spoke to a manager, who had not noticed *425 anyone at the pay phone. The dispatcher sent officers to 123 Harbor Drive, apartment 105, which she knew was a residential facility near the Dutchess restaurant.

An officer knocked on the door of apartment 105 and received no answer. He pushed the door open and saw the deceased victim, Raymundo, on the floor of the front foyer. The officers saw no signs of forced entry, burglary, or ransacking. The victim had died from multiple stab wounds and her injuries indicated a violent struggle.

In the course of investigation, officers found details whose relevance later became apparent. At 11:57 a.m., the victim's home telephone had been used to place a call to Sessler's office; Sessler had not answered the call and no voice message had been left. Officers discovered a bloodstain on the handle of a bathroom sink, which suggested that the assailant had tried to clean up after the crime. The bloodstain much later was determined to contain "all of the different genetic elements that [were] present" in the DNA profiles of both the defendant and the victim. The state's expert testified that due to the fact that the victim cleaned her apartment regularly, as testified to by Sessler and the victim's parents, and the fact that the sink handle was nonporous, it was "extremely, extraordinarily unlikely" that any DNA left by the defendant on the sink handle prior to November 8, 2002, would have lasted or remained "very long...."

**363 When Sessler returned after work to the victim's apartment, where he frequently stayed, police officers questioned him. Sessler gave officers the names of two other women he dated who suffered from mental illnesses. He did not at that time tell police officers about his overlapping sexual relationships with the victim and the defendant. After several hours of questioning, the police released Sessler. The police were unaware, at *426 this point, of any connection between the defendant and the crime.

After the victim's death, the defendant pursued Sessler. She sent him a care package, consoled him, and was one of the few people willing to talk to Sessler about Raymundo at a time when most people "sort of shunned" him. In January, 2003, the defendant invited Sessler to go on a group ski trip. The "group" turned out to be only Sessler and the defendant. Sessler again entered into a sexual relationship with the defendant. The defendant would invite Sessler to her residence, but, again, only after having first told Christos that her mentally ill brother was visiting.

In late November, 2002, Christos noticed that the defendant came home from work with a "nasty cut" on her thumb. The defendant explained that she had cut her thumb opening a dog food can; she had two dogs at the time. As part of his work, on November 13, 2002, Christos had a meeting with representatives from Pharmacia, where Anna Lisa had worked. The representatives mentioned that a colleague of theirs had been recently murdered. Although a name was not mentioned, Christos began to wonder if Melissa "did something" to Anna Lisa. Christos mentioned to the defendant that an employee at Pharmacia had been killed and asked whether Melissa was involved and if Anna Lisa was "okay...." The defendant did not seem shocked or surprised and responded, without elaboration, that Anna Lisa was "fine." Christos testified at trial that he believed that, at that point, the defendant thought that he had made that connection. In late 2002, the defendant reported to Christos that Jack and Anna Lisa had "broken up" and that Melissa and Jack were together exclusively. But also in late 2002, the defendant asked Christos for information about fingerprints and DNA.

*427 On December 8, 2002, during dinner, the defendant also asked Emilio Mei and Tammy Mei about DNA and fingerprints, and questioned whether "they have everybody's DNA on file." In early 2003, Tammy Mei noticed that, although the defendant continued to talk about Jack and Melissa, she had not spoken about Anna Lisa in a while. Tammy Mei asked the defendant about Anna Lisa, and the defendant responded that Jack and Melissa were a happy couple; Anna Lisa had moved to New Jersey because she had obtained a job there.

In 2003, the frequency of trysts at the Pleasantville condominium—under the guise, so far as the defendant told Christos, of her mentally ill brother's visiting—increased. Christos was "getting tired of leaving" when the

defendant's "brother" visited and told the defendant that her brother "ha[d] to be told that we're married."

On March 22, 2003, the defendant described a guessing game to Christos. The game involved one person's being handcuffed and blindfolded while the other placed objects against the bound person's skin; the bound person was to guess the identity of the object. The following day, the defendant asked Christos if he wanted to play the guessing game. The defendant was the first to be bound and blindfolded. She guessed various household items.

Then it was Christos' turn. He lay on the floor, blindfolded and handcuffed to a **364 chair. Christos guessed various common household items. The defendant then went to the kitchen to retrieve "one last item, one more thing to guess." She sat on Christos' midsection and touched the item to his face; Christos guessed the item was a candle. The item was a knife. The defendant thrust the knife into Christos' chest, paused and then again thrust the knife into Christos' chest. The defendant said, "Oh, my God, I think I hurt you. You're bleeding." Still blindfolded and handcuffed, Christos asked the defendant *428 what had happened. She explained that "something fell on you. I think the candle hurt you." Christos asked the defendant to remove the blindfold, and she did. But when he asked her to remove the handcuffs, she stated that she could not find the key. At Christos' request, the defendant helped him break the chair to which the handcuffs were attached.

Christos asked the defendant to call 911. He heard the defendant seem to make a 911 call, but, after a significant amount of time had passed, no ambulance arrived. Christos asked the defendant to call 911 again and he asked to talk to the operator. The defendant told Christos that the operator did not want to talk to him, but rather wanted him to lie on the floor. The defendant at this point instead telephoned Sessler and invited him over to the condominium for dinner.

Eventually, Christos, still conscious, asked the defendant to take him to a nearby hospital, and the defendant obliged. She drove slowly, according to Christos, and parked in the rear of the Behavioral Health Center of Westchester Medical Center in Valhalla, New York. The defendant got out of the car and opened the rear driver's side door. Christos thought the defendant was going to help him out of the car until he saw an angry expression on her face and saw her lunge at him with the knife. Christos managed to get out of the car and attempted to wrestle the knife out of the defendant's hands. The melee moved to a grassy spot in the parking lot, while Christos visibly was bleeding through his shirt. The defendant begged Christos to "stay with me, talk to me...." Christos broke free, ran about 200 feet, and yelled to a medical resident and another person, who were near the entrance to the Behavioral Health Center. The resident called 911. The defendant asked the resident to let her take Christos to the emergency room. The resident refused. The defendant was arrested, in *429 New York, for attempted murder in connection with this incident.

When Sessler arrived at the defendant's condominium for dinner, he found police officers searching the residence. Police officers informed him that there had been a domestic dispute and that Christos was in a hospital. Later, after reading an article in a newspaper about the stabbing, Sessler contacted the Stamford police and informed them that they should consider the defendant to be a suspect in the death of Raymundo. Eventually, Sessler told officers about his concurrent affairs with the defendant and Raymundo. Days after Christos' stabbing, the Stamford police contacted Christos about the death of Raymundo. Christos gave the officers several written statements and the defendant's phone records.

Christos lived to testify in the jury trial of the defendant for the murder of Raymundo. The defendant was convicted of murder in violation of § 53a–54a. She was sentenced to fifty years imprisonment consecutive to her sentence in the New York case for the attempted murder of Christos. This appeal followed.

I

The defendant first claims that the court improperly admitted evidence of Christos' **365 conversations with her, in violation of the marital communications privilege. We disagree.

Prior to trial, the defendant, by counsel, filed a motion in limine for an order to exclude from evidence certain communications between the defendant and Christos. She asserted the marital communications privilege. The state also filed a motion in limine for a determination that certain statements made by the defendant to Christos

were admissible. On June 3, 2011, prior to trial, the court heard arguments relating to the motions in ***430** limine. The court ruled that "these statements [by the defendant to Christos] were not made in furtherance or induced by affection, confidence, loyalty, and integrity of the relationship; quite the contrary. It is just the opposite. The statements made to the run-up of the murder of Anna Lisa Raymundo, the description of a faux triangle, again, for lack of a better word, it would be bizarre to classify those as in furtherance of the sanctity of the marital relationship. The plan here was to do in a potential third party suitor of Mr. Sessler or a third party suitor of Mr. Sessler and, ultimately, Mr. Christos, have him removed from the scene either by way of divorce and/or physically remove him from the scene. And, in fact, this defendant was convicted of the attempted murder of her husband in those [New York] proceedings. So, those statements leading up to the run-up in this triangle and whatnot for various reasons don't fall within the purview of the marital privilege. To rule that way would be, to be, bizarre. Statements after the death of Raymundo to accommodate the relationship with Sessler fall in the same category, as well as the statements leading up to and relative to the attack and attempted murder of Mr. Christos. To argue that these were in furtherance of the marital relationship defies common sense...." The court granted the state's motion and denied the defendant's motion.

On appeal, the defendant argues that it was improper for the court to have permitted Christos to testify as to the following conversations between him and the defendant: (1) stories about Melissa, Jack and Anna Lisa, (2) fictional visits from the defendant's brother, (3) the defendant's informing Christos that she bought a lock pick set to get into the victim's house to look for photographs, and her attempts to use the lock pick set on the front doors of their condominium, (4) conversations about an eavesdropping device that the defendant wanted to place in Jack's office to listen to his ***431** conversations, (5) the defendant's questioning of Christos in late 2002 about DNA and fingerprints, (6) stories about Melissa's becoming upset when Jack rebuffed her sexual advances and Melissa's arranging to run into Jack at an airport and fly back home in the seat next to him, (7) in November, 2002, Christos' asking the defendant about Anna Lisa, and the defendant's reporting that Jack had ended his relationship with Anna Lisa and was dating Melissa exclusively, (8) in late November, 2002, the defendant's explaining that she had cut her thumb on a can of dog food, and (9) the events of the stabbing on March 23, 2003.

[1] [2] [3] [4] "The scope of an evidentiary privilege is a question of law, which we review de novo.... To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record.... [B]ecause testimonial privileges prevent full disclosure of the truth, they are to be strictly construed.... Moreover, the party **\*\*366** asserting the privilege has the burden of establishing its factual foundation." (Citations omitted; internal quotation marks omitted.) *State v. Mark R.*, 300 Conn. 590, 597–98, 17 A.3d 1 (2011).

[5] [6] [7] To the extent that our review requires us to examine General Statutes § 54–84b (b), the statute codifying the marital communications privilege, our review is plenary. See *State v. Adams*, 308 Conn. 263, 269, 63 A.3d 934 (2013). "The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In seeking to determine [the] meaning [of the statute we] ... first ... consider the text of the statute itself and its relationship to other statutes. If, after examining **\*432** such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *State v. Thompson*, 305 Conn. 806, 818–19, 48 A.3d 640 (2012).

In *State v. Christian*, 267 Conn. 710, 728–29, 841 A.2d 1158 (2004), our Supreme Court explicitly recognized the existence, under the common law, of the marital communications privilege. The court held that a communication is protected by the privilege if (1) the communication was made to a spouse during a valid marriage and (2) the communication was confidential. Id., at 728–29, 841 A.2d 1158. The defendant in *Christian* filed a motion in limine to preclude statements he had made to his wife, following a car crash in which the defendant had been intoxicated and a female companion had been killed, that he had been driving the car at the time. Id., at 722, 841 A.2d 1158. The wife testified during a voir dire that,

at the time of trial, she and her husband were divorced and that, at the time of the incident, their marriage " 'was very rocky.' " Id. The trial court denied the defendant's motion in limine, reasoning that the privilege did not apply because the marriage irretrievably had broken down. Id., at 723, 841 A.2d 1158. Our Supreme Court determined that "the reasons justifying the marital communications privilege—encourag [ing] marital partners to share their most closely guarded secrets and thoughts, thus adding an additional measure of intimacy and mutual support to the marriage—apply with equal force to married couples who, despite the appearance to outsiders of an irretrievably broken marriage, may still share hopes of reconciliation.... Although the defendant's marriage may have been acrimonious at the time that he had made the communications to his wife, the marital communications privilege nonetheless was valid [and] the defendant's communications to his wife, made while *433 the couple was living together as husband and wife, were subject to the marital communications privilege insofar as those communications were confidential." (Citation omitted; internal quotation marks omitted.) Id., at 734–35, 841 A.2d 1158.

Section 54–84b(b), enacted after *Christian,* codified the marital privilege, with some exceptions not relevant to this case, as follows: "in any criminal proceeding, a spouse shall not be ... allowed to testify to a confidential communication made by one spouse to the other during the marriage, over the objection of the other spouse." Subsection (a) defines "confidential communication" as "any oral or written communication made between spouses during a marriage that is intended to be confidential and is induced by the affection, confidence, loyalty and integrity of the marital relationship." **367 General Statutes § 54–84b (a). Section 54–84b (a), then, added a third component to the marital privilege not found in the common law:[5] in addition to the common-law requirements that the communication be made to a spouse during marriage, § 54–84b (a) added the requirement that the communication also be induced by the affection, confidence, loyalty and integrity of the marital relationship.

[8] The defendant, citing *Christian,* contends that the trial court erred in observing that the marriage of Christos and the defendant was bad "because [such a determination] depends on a judge's subjective conclusion that in the case before him, the marriage is already so wrecked that there is nothing to save." The defendant argues that the phrase "during the marriage," as used *434 in § 54–84b, does not distinguish between "good" and "bad" marriages. The defendant is correct in suggesting that the "during marriage" component does not draw such a distinction. The nature of the marriage, whether acrimonious or harmonious, is not a factor in determining whether the privilege applies. *State v. Christian,* supra, 267 Conn. at 728–29, 841 A.2d 1158.

The nature of the marriage is not at issue in this case, however. The state does not dispute that the communications were made during a valid marriage. In ruling that the marital communications privilege did not apply, the trial court did not focus on the quality of the marriage—good or bad—but rather focused on the nature of the communication. In doing so, the court highlighted the element added by § 54–84b: that the communication be "made in furtherance or induced by the affection, confidence, loyalty, and integrity of the relationship."

[9] In addressing the "induced by the affection" requirement, the defendant argues that it "speaks to the marital relationship in general and not to the specific marriage before the trial court.... A communication is induced by the affection, confidence, loyalty and integrity of the marital relationship if it might not be spoken in public because it might expose the personal feelings and relationships or cause embarrassment to the spouses if done outside the privacy of the marital relationship." (Citation omitted; internal quotation marks omitted.)

[10] If, as the defendant contends, the "induced by affection" language merely describes the nature of marital relationships in general and is intended to protect "personal feelings," the language adds nothing to the "during marriage" and confidentiality requirements. The defendant's interpretation would render the "induced by affection" requirement meaningless. In construing a statute, we avoid, if possible, constructions *435 that render words meaningless. See *State v. Menditto,* 147 Conn.App. 232, 243, 80 A.3d 923 (2013), cert. granted on other grounds, 311 Conn. 911, 84 A.3d 880 (2014). Section 54–84b (a) defines "confidential communication" in the conjunctive: the term "means any oral or written communication made between spouses during a marriage that is intended to be confidential *and* is induced by the affection, confidence, loyalty and

integrity of the marital relationship." (Emphasis added.) This statutory definition includes the during marriage and confidentiality elements **368 of the common law as set forth in *State v. Christian,* supra, 267 Conn. at 710, 841 A.2d 1158, and then provides the "induced by the affection" language. If we give meaning to all words and phrases, we interpret this language to have meaning additional to the other two elements. According to the plain language of the statute, the "induced by the affection" requirement further limits the privilege to the subset of those confidential statements made between spouses in a valid marriage which are "induced by the affection, confidence, loyalty and integrity of the marital relationship." General Statutes § 54–84b (a).

[11] [12] The remaining question is whether the trial court properly determined that the requirement was not satisfied by the facts presented. The trial court concluded that the defendant's statements at issue were not made to Christos a manner induced by the affection, confidence, loyalty, and integrity of the marital relationship, but rather were made to further her obsessive relationship with Sessler. This goal was advanced by removing Christos, first through deception and dissemblance and later, less subtly, by attempting to murder him. The court did not err in concluding that the defendant's statements at issue to Christos, throughout the course of the relevant time frame, were not "induced by the affection" of the marital relationship. The statements quite clearly were meant to deceive Christos, so that *436 he would leave the marital home and her affair with Sessler would be enabled, would give advice and assistance to her so that she could further her affair with Sessler, would assist in his own demise by submitting to being restrained and by accepting the defendant's false assurances that she was trying to secure medical assistance. The facts found as predicate to the application of the evidentiary standard are subject to the clearly erroneous standard of review. *State v. Mark R.,* supra, 300 Conn. at 597, 17 A.3d 1. The court did not err in concluding that, on the unusual facts of this case, the "induced by affection" requirement was not satisfied and the privilege, therefore, did not shelter the various communications.

II

The defendant next claims that the court improperly permitted the state to present evidence of misconduct. We disagree.

Prior to trial, the state filed a motion in limine to admit evidence about the defendant's attempted murder of Christos and her mentioning and possession of night vision binoculars, eavesdropping devices and lock pick tools to spy on the victim and/or Sessler. The defendant filed a motion in limine to preclude the evidence on the ground that it was inflammatory and prejudicial and not relevant to identity. At a hearing on the motion, the state argued that it proffered the evidence to show common scheme or plan, motive, identity and intent on the ground that murdering the victim and attempting to murder Christos were part of the same plan—to further a romantic relationship with Sessler. Defense counsel argued that: the liberal rule applicable to sex crimes cases did not apply; evidence of the attempted murder of Christos was inadmissible because it showed a propensity toward violence; the victim's murder lacked sufficient similarity to Christos' murder to make *437 evidence of the latter admissible as part of a common scheme or plan; the prejudicial effect of the misconduct evidence outweighed its probative value; and a curative instruction was insufficient.

In its memorandum of decision, the court granted the state's motion and explained its reasoning for so ruling: "the **369 evidence is critical and does not unduly arouse the jury's emotions of prejudice, sympathy or hostility. The defendant's attempt to murder her husband is not gruesome or heinous. The fact that she engaged in an affair with a coworker is ... commonplace.... Deceptive manipulation of a husband in such a situation is normally attendant to such an affair. The degree of manipulation is unusual, but to the extent that it is, it is extremely relevant to motive, common scheme, identity and intent. Its probative value clearly outweighs any minimal prejudice." The court further explained that the evidence did not show a general propensity toward violence but rather suggested that the two assaults arose from animus toward two particular individuals. The court noted that a limiting instruction would help to ensure that the jury would not construe the evidence to show a general propensity toward violence. The court further noted that in this "highly unusual case" the proffered evidence resembled misconduct testimony in sex crime cases where the defendant is driven by a motive

that is aberrant and compulsive. The court stated that "[w]hile a sex crime is not charged in this matter, the aberrant compulsivity of the defendant's conduct makes the admission of the evidence that much more critical in an otherwise circumstantial case where there is no witness to the crime."

The court gave limiting instructions either before or after the testimony of the witnesses who testified about the misconduct. The court instructed the jury, at the time of the misconduct testimony and again in the *438 course of its final instructions, that the misconduct evidence had not been admitted to show bad character or propensity toward violence, but only to show motive, common plan or scheme, to corroborate prosecution testimony and to complete the story of the crime.

The defendant argues that the court improperly admitted misconduct evidence of efforts to surveil the victim and to stab Christos. She argues that the uncharged misconduct evidence does not fall within the common scheme or plan exception, as properly limited, because there was no evidence, nor any logical inference, that the defendant had a plan to kill Christos at the time she murdered Raymundo. The state's theory of a common scheme or plan, then, amounted to a mere propensity, or " 'once a murderer, always a murderer.' " The defendant further argues that the prejudicial effect of the misconduct evidence outweighed its minimal probative value—"[t]he picture of [the defendant] stabbing her husband as he lay bound and gagged, delaying medical treatment and stabbing him again in the hospital parking lot overwhelmed the jury."

We assume for the purpose of analysis that all of the evidence in dispute was indeed misconduct. Some of the evidence, such as the attempted murder of Christos, quite plainly was, at a minimum, misconduct. Evidence of the procurement and use of night vision goggles, for example, is not quite so clearly misconduct. But if the evidence was properly admitted under the misconduct rubric, it would pass muster under any theory.

[13] [14] [15] [16] [17] Evidence of "uncharged misconduct ... generally is inadmissible, unless it falls within a well established evidentiary exception. See Conn.Code Evid. § 4–5(b) ( [e]vidence of other crimes, wrongs or acts of a person is admissible ... to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, *439 or an element of the crime, or to corroborate crucial prosecution testimony). As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty **370 of the crime of which the defendant is accused.... Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior.... On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial.... We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions.... Second, the probative value of the evidence must outweigh its prejudicial effect.... Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done.... On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State v. Randolph*, 284 Conn. 328, 339–40, 933 A.2d 1158 (2007).

[18] [19] [20] [21] In nonsex crime cases involving a "true" common scheme or plan, "[e]vidence of uncharged misconduct, although inadmissible to prove a defendant's bad character or propensity to engage in criminal behavior, is admissible [t]o prove the existence of a larger plan, scheme, or conspiracy, of which the crime on trial is a part.... To prove the existence of a common scheme or plan, each crime must be an integral part of *440 an overarching plan explicitly conceived and executed by the defendant.... Evidence of such a plan is relevant to the charged crime because it bears on the defendant's motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute.... In ... true common scheme or plan cases, the nature of the charged and uncharged crimes combined with connecting evidence, if any, gives rise to a permissive inference that an overall scheme or plan existed in the defendant's mind, and that the crimes were executed in

furtherance of that plan." (Citations omitted; internal quotation marks omitted.) Id., at 343–44, 933 A.2d 1158.

[22] The defendant is correct in arguing that the misconduct evidence—especially that portion of the evidence relating to the attempted murder of Christos—was not part of a common scheme as narrowly defined. That is, there was no evidence that the defendant had the murder of Christos in mind when she killed Raymundo. In the broader sense, however, the connection between the two crimes—and the procurement of the night vision goggles and a lock pick—is palpably inferable, such that the trial court quite clearly did not abuse its discretion. The underlying and overwhelming motive suggested by the trial court was the defendant's obsession.[6] Having eliminated her rival, she continued in her quest for satisfaction of the obsession to eliminate the next threat to her liaison with Sessler, both in terms of access to the condominium and Christos' nascent suspicion that something was not **371 quite right with the "Anna Lisa" imbroglio.[7]

[23] *441 The gravamen of the evidentiary standard regarding uncharged misconduct is relevance to a material issue. Propensity to commit crimes is not material. Identity is, of course, material, and identity may be inferred by intent and motive. Closely related is the common scheme or pattern, admissible ultimately to show identity.[8] In this case, the broader "common scheme" was analytically more a common, unique motive, most probative on the issue of identity. State v. Randolph, supra, 284 Conn. at 340, 933 A.2d 1158, requires only a "connect[ion] with the principal crime by circumstance, motive, design, or *innate peculiarity* ...." (Emphasis added; internal quotation marks omitted.) Here, the court properly found such a connection.

[24] We also disagree with the defendant's assertion that the introduction of this evidence at trial was more prejudicial than probative. "The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury.... [W]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact ... we have found no abuse of discretion.... Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct.... Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves *442 to lessen any prejudice resulting from the admission of such evidence." (Citations omitted; internal quotation marks omitted.) State v. Franko, 142 Conn.App. 451, 465, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013).

The court reasonably could have concluded that misconduct evidence was probative of the defendant's overarching motive to win Sessler's affections and to eliminate those who stood in her way. In light the violent nature of the stabbing of the victim herself, the attempted murder of Christos was not likely to arouse the emotions of the jury to a different degree. Furthermore, the court gave limiting instructions that presumptively lessened any prejudice. Accordingly, the court did not abuse its discretion in determining that the evidence was more probative than prejudicial.

III

The defendant last claims that she did not validly waive her right to counsel. We disagree.

[25] [26] [27] [28] [29] The defendant concedes that this claim is unpreserved and seeks to prevail pursuant to State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[9] **372 The claim merits appellate review because the record is adequate for review. We conclude, however, that the defendant's claim fails under the third prong of Golding because the trial court's thorough canvass of the defendant protected her sixth and fourteenth amendment right to counsel.[10]

[30] *443 "We review the trial court's determination with respect to whether the defendant knowingly and voluntarily elected to proceed pro se for abuse of discretion.... Recognizing the constitutional implications attendant to Golding review, we do not review the proceedings for strict compliance with the prophylactic rule of Practice Book § 44–3, but rather for evidence that the waiver of counsel was made knowledgeably and voluntarily....

[31] "The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins.... Put another way, a defendant properly exercises [her] right to self-representation by knowingly and intelligently waiving [her] right to representation by counsel....

[32]  [33] "Practice Book § [44–3] was adopted in order to implement the right of a defendant in a criminal case to act as [her] own attorney.... Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with § [44–3], in order **\*444** to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made.... Because the § [44–3] inquiry simultaneously triggers the constitutional right of a defendant to represent [herself] and enables the waiver of the constitutional right of a defendant to counsel, the provisions of § [44–3] cannot be construed to require anything more than is constitutionally mandated....

[34] "[A] defendant need not [herself] have the skill and experience of a lawyer in order competently and intelligently to choose self-representation.... Rather, a **\*\*373** record that affirmatively shows that [she] was literate, competent, and understanding, and that [she] was voluntarily exercising [her] informed free will sufficiently supports a waiver.... The nature of the inquiry that must be conducted to substantiate an effective waiver has been explicitly articulated in decisions by various federal courts of appeals....

[35] "The multifactor analysis of [Practice Book § 44–3], therefore, is designed to assist the court in answering two fundamental questions: first, whether a criminal defendant is minimally competent to make the decision to waive counsel, and second, whether the defendant actually made that decision in a knowing, voluntary and intelligent fashion.... As the United States Supreme Court recently recognized, these two questions are separate, with the former logically antecedent to the latter.... Inasmuch as the defendant's competence is uncontested, we proceed to whether the trial court abused its discretion in concluding that the defendant made the waiver decision in a knowing, voluntary, and intelligent fashion." (Citations omitted; internal quotation marks omitted.) *State v. Collins*, 299 Conn. 567, 610–12, 10 A.3d 1005, cert. denied, —— U.S. ——, 132 S.Ct. 314, 181 L.Ed.2d 193 (2011).

[36] Prior to trial, the defendant filed a motion to represent herself. During the court's canvass of the defendant **\*445** on this matter, the defendant indicated that she was forty-two years old, had graduated from high school, had a graduate degree, and had been through a criminal trial in New York. She further indicated that she was not forced or threatened to request to represent herself; that she had not ingested any drugs, alcohol or medicine that would affect her ability to make decisions; and that she was confident in her ability to proceed. When asked by the court, she stated that she understood: that she had a constitutional right to be represented by a lawyer; that she was charged with murder; that she knew the elements of the offense of murder; that the maximum penalty for murder was sixty years, with a mandatory minimum of twenty-five years incarceration; that although the court "in all likelihood" would give her "some leeway" in the trial process, she would have to follow the rules of evidence "just like a lawyer has to"; that she would have to select a jury; "that there are great dangers involved in self-representation," including the difficulty in maintaining objectivity. She further indicated that she had educated herself regarding the elements of murder and the law of evidence and that she was familiar with courtroom roles and other participants within the court system. The court asked if she was "absolutely sure" that she wanted to represent herself, and she answered, "I am certain." The court indicated that she would have standby counsel and the defendant said that she understood that the role of a standby counsel was to "sit there mute" unless she asked questions and sought help from him. Following its thorough canvass, the court granted the defendant's motion to represent herself, finding that the defendant had knowingly, intelligently and voluntarily decided to represent herself.

The defendant argues that the court's canvass was invalid in a number of ways. She argues that the court did not explain to her: the technical problems she faced **\*446** in "proving herself innocent"; the importance of counsel for an effective defense; "that by representing herself she substantially increased the risk that although she may be innocent, the jury may find her guilty because she does not know how to establish her innocence"; that she was giving

up, as a practical matter, a defense of extreme emotional disturbance and an instruction on lesser included offenses; **374 and that the sentencing court could impose a sentence consecutive to her New York sentence. She also argues that the court misled her to believe that the trial judge would not rigorously enforce the rules of evidence if she represented herself and did not probe her regarding the dissatisfaction with counsel that led to her determination to represent herself.

[37] Contrary to the defendant's assertion, the court was not required to inform the defendant of any technical problems in "proving herself innocent" or inform the defendant "that by representing herself she substantially increased the risk that although she may be innocent, the jury may find her guilty because she does not know how to establish her innocence." In a criminal trial, a defendant is not required to prove her innocence, rather the state has the burden of proving guilt beyond a reasonable doubt. See, e.g., *State v. Valinski,* 254 Conn. 107, 120, 756 A.2d 1250 (2000); *State v. Carmon,* 47 Conn.App. 813, 827 n. 7, 709 A.2d 7, cert. denied, 244 Conn. 918, 714 A.2d 7 (1998). The court adequately warned the defendant, that "there are great dangers involved in self-representation" and that she would carry the burden of proof if she wanted to assert an affirmative defense.

The court did not mislead her to believe that the trial judge would not rigorously enforce the rules of evidence if she represented herself. During the canvass, the court inquired of the defendant whether she understood that if she represented herself "the court in all likelihood *447 would give you some leeway in the trial process, but you're going to have to follow the rules of evidence just like a lawyer has to and have to follow the proper courtroom procedures." The defendant stated that she understood and that "[t]he only leeway I would hope for is just maybe a little time to ... confer with standby counsel." The court did not mislead the defendant, but rather informed her that she would have to follow the rules of evidence "just like a lawyer" and the defendant indicated that she understood.

The defendant further argues that the court erred in not delving into her dissatisfaction with counsel that led to her determination to represent herself. This assertion is not entirely accurate, because the court did inquire about her dissatisfaction with counsel. The defendant responded that she had a good rapport with counsel, but that she wanted to represent herself so that she could have more control over the decision-making process.[11]

[38] The defendant also argues that the court did not explain the importance of counsel for an effective defense or that she was giving up, as a practical matter, a defense of extreme emotional disturbance and an instruction on lesser included offenses. A self-represented defendant is not precluded from raising defenses or asking for instructions on lesser included offenses. To the extent that navigating a criminal trial is more *448 difficult for a self-represented defendant, the court adequately explained and warned of the dangers **375 of self-representation. Specifically, regarding the issue of affirmative defenses, the court inquired: "I don't know whether you're planning on or you're thinking [of] raising a defense about lack of capacity due to mental disease or defect or [an] ... extreme emotional defense; both of those are something called affirmative defenses.... And that would mean that you have to prove that defense by a preponderance of the evidence. Do you understand that?" The defendant responded that she understood, but "that's not the avenue I'm pursuing." The court further inquired: "I know you're saying you're not planning to raise them. I don't know ... maybe you'll charge your mind.... But do you understand, in those areas, you'd have to educate yourself on what the law is and you'd have a burden of proof going forward, and you might be better off having an attorney helping you with that, although you sound like you've researched these issues. Is that right?" The defendant stated: "I have done a great deal of research, I'm not a neophyte, I'm not completely ... in the dark with regard to those issues. I've been in prison almost eight years and have a little experience, jailhouse lawyer experience."

[39] [40] The defendant last argues that her decision to represent herself imposed a greater risk of a sentence consecutive to her New York sentence. The court informed the defendant of the maximum penalty of sixty years and the mandatory minimum of twenty-five years. "It is well settled that, in canvassing a defendant seeking to exercise [her] right of self-representation, a trial court must apprise [her] of the possible range of criminal penalties or punishments to which [she] is exposed.... Put differently, a constitutionally valid canvass is one that leaves the defendant with a meaningful appreciation of the period of incarceration [she] face[s] *449 if convicted of the charges [she] face[s].... That explanation need not be made with mathematical exactitude, so long as it leaves

the defendant with a realistic picture of [her] sentencing exposure." (Citations omitted; internal quotation marks omitted.) *State v. Collins,* supra, 299 Conn. at 614, 10 A.3d 1005. The court apprised the forty-two year old defendant that she faced a possibility of a sixty year sentence, which effectively was a life sentence regardless of whether it was imposed consecutive or concurrent to the New York sentence of twenty-five years. The defendant was left with a realistic view of her exposure for the crime charged, which was effectively a life sentence.

We conclude that the court's canvass established that the defendant's decision to proceed without the benefit of counsel was competently made, and knowing, intelligent and voluntary.

The judgment is affirmed.

In this opinion the other judges concurred.

**All Citations**

153 Conn.App. 419, 101 A.3d 355

Footnotes

1      The defendant and Christos were divorced in 2004.
2      Sessler testified that on the return flight from a bachelor party in Las Vegas, he was seated next to the defendant, who explained that she was returning from California.
3      Sessler testified that he attempted to arrange a date between a friend of his and the defendant.
4      At trial, a voice identification examiner testified to a reasonable degree of scientific certainty that the voice on the 911 call was that of the defendant.
5      Section 5–1 of the Connecticut Code of Evidence provides: "Except as otherwise required by the constitution of the United States, the constitution of this state, the General Statutes or the Practice Book, privileges shall be governed by the principles of the common law."
       The codified marital communications privilege does not entirely displace the common law, but rather adds an additional element.
6      The court hinted that the misconduct evidence might fall under the more liberal standard for sex crimes cases, but it is unclear from its decision whether the court employed the standard for sex crimes or nonsex crimes. At any rate, we conclude that the more stringent standard for nonsex crime cases applies and that under that standard, the court did not abuse its discretion.
7      The disputed evidence quite plainly had a tendency to show motive and, as a result, identity. We note, however, that although both substantive crimes were committed with a knife, they do not appear to share sufficient characteristics to qualify as "signature crimes."
8      We note that § 4–5 of the Connecticut Code of Evidence states merely that misconduct evidence is not admissible to show bad character or criminal tendencies but is admissible for other purposes. The list of admissible purposes is specifically nonexhaustive.
9      "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) *State v. Golding,* supra, 213 Conn. at 239–40, 567 A.2d 823.
10     The defendant also seeks to prevail pursuant to the plain error doctrine. "[The plain error] doctrine, codified at Practice Book § 60–5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine ... is not ... a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy.... In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings....

State v. Davalloo, 153 Conn.App. 419 (2014)
101 A.3d 355

Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *State v. Sanchez,* 308 Conn. 64, 76–77, 60 A.3d 271 (2013). We determine that there was no error at all, much less plain error.

11      The court inquired: "[Y]ou indicated ... that you wanted to represent yourself because you had ideological differences with your lawyer in this case. I don't want to know about your private discussions with your lawyer, but ... [m]aybe you could explain that to me." The defendant explained that her counsel has "done a phenomenal job and we have a good rapport. However, I wanted a little bit more control over some of the decision-making process and just that, you know ... the order of ... which witnesses to call within the letter of the law; I wanted a little control of that.... I just think that there's only minimal rights that I had as a represented individual, and I want a little bit more leeway in the decision-making process."

End of Document                                                       © 2017 Thomson Reuters. No claim to original U.S. Government Works.