# Appendix   C

## *1  of  2*

# SUPREME COURT

OF THE

# STATE OF CONNECTICUT

Judicial District of Stamford/Norwalk at Stamford

## ~~S.C. 19032~~ A.C. 36405

# STATE OF CONNECTICUT

v.

# SHEILA DAVALLOO

## DEFENDANT'S BRIEF WITH SEPARATELY BOUND APPENDIX

MARK RADEMACHER
ASSISTANT PUBLIC DEFENDER
JURIS 416157
OFFICE OF THE CHIEF PUBLIC DEFENDER
2911 DIXWELL AVE, 4TH FLOOR
HAMDEN, CONNECTICUT 06518
TEL. (203) 867-6150; FAX: (203) 867-6157

COUNSEL OF RECORD
AND
ARGUING ATTORNEY

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES ............................................................. v

TABLE OF AUTHORITIES ................................................................ vi

NATURE OF THE PROCEEDINGS ...................................................... 1

FACTS OF THE CASE ...................................................................... 1

    A. Davalloo and the Victim Compete for Sessler's Affection .................. 1

    B. The Murder ......................................................................... 2

    C. The 911 Call ........................................................................ 3

    D. Davalloo's DNA on the Victim's Bathroom Sink .......................... 4

    E. Weeks after the Victim's Death, Sessler Resumes His
       Affair with Davalloo ............................................................. 5

    F. Davalloo Tries to Kill Her Husband ......................................... 5

ARGUMENT ................................................................................. 7

Arg. 1: Davalloo's Conversations with Her Husband While They Are
       Married Are Privileged Martial Communications that the State
       Cannot Use at Her Trial ...................................................... 7

    A. The Relevant Facts ............................................................. 8

        a. The conversations before the murder ................................. 8

        b. The conversations after the murder ................................... 8

        c. The conversations about the stabbing of Christos ................. 9

        d. The state's arguments later adopted by the court were: ......... 9

            *(1) & (2) The "bad marriage" and betrayal exceptions* ............. 9

            *(3) Davalloo statements are not confidential* .......................... 9

            *(4) The waiver claim* ...................................................... 9

            *(5) The crime exception* .................................................. 10

i

(6) The domestic violence exception ................................................... 10

e. The defense exception .......................................................... 10

f. The trial court's ruling ........................................................ 10

(1) The privilege does not apply to a "bad marriage" ............................ 10

(2) Davalloo's statements are not confidential because
she once talked to friends about the affair ........................................... 11

(3) Davalloo and Christos are partners in crime .................................... 11

(4) Davalloo's testimony in her New York trial waived
the privilege ....................................................................... 11

B. The Issue Is Preserved ........................................................... 11

C. The Standard of Review ........................................................... 12

D. Davalloo's Conversations with Christos Are Confidential
Martial Communications that Were Inadmissible at Her Trial ......................... 12

1. "What's love got to do with it."
Tina Turner (Capital Records 1984) ...................................... 12

2. Davalloo and Cristos' statements are induced
by their marital relationship ...................................................... 15

3. Davalloo had a reasonable expectation that their
statements were confidential ................................................... 17

4. Davalloo was not on trial for assaulting Christos ..................................... 18

5. Davalloo and Christos were not partners in crime ................................. 18

6. Davalloo's New York testimony did not waive
the privilege ........................................................................ 18

E. Davalloo's Statements to Christos Proved That Davalloo Had a
Pathological Obsession with Sessler That Drove Her to Murder
Sessler's Girlfriend, the Victim, and to Later Try to Kill Christos
And Were Certainly Harmful .......................................................... 19

Arg. 2: Davalloo's Misconduct Concerning Her Plan to Surveil the Victim And Her Assault of Her Husband Is Not Admissible to Prove She Murdered the Victim ................................................................................. 22

    A. The Relevant Facts ..................................................................... 22

        1. The State's Argument ........................................................... 22

        2. The Defense Objection ......................................................... 23

        3. The Trial Court's Ruling ....................................................... 23

        4. The Defense Preserved the Issue in the Trial Court ............... 24

    B. The Standard of Review ............................................................. 24

    C. Davalloo's Efforts to Surveil the Victim and Her Stabbing of Christos Were Excessively Prejudicial Evidence Used to Prove Her Propensity to Commit Murder ..................................... 24

        a. The misconduct showed only a propensity to commit murder ............... 25

            (1) Motive and common plan or scheme to show identity ..................... 25

                i. Common Plan and Motive ............................................. 26

                ii. Signature Crimes .................................................... 27

            (2) Intent and lack of accident, mistake or self-defense ...................... 28

            (3) Knowledge of the scene of the murder ................................. 28

            (4) Completion of the prosecutions story ................................. 29

            (5) Corroboration of prosecution testimony ............................... 29

        b. The misconduct evidence was overly prejudicial ..................... 29

    D. The Wrongful Use of Davalloo's Pre-Murder Misconduct and Her Stabbing of Christos to Prove Her Propensity to Commit Murder Was Certainly Harmful .......................................... 30

Arg. 3: Davalloo Did Not Waive Her Right to Counsel .................................... 31

    A. The Relevant Facts ................................................................... 31

        a. Davalloo's intelligence and capacity to represent herself ........................ 31

      b. Davalloo's understanding of the possible punishment ............................ 31

      c. The court's explanation of the dangers and
         disadvantages of representing oneself ................................................... 32

      d. Davalloo reasons for representing herself ............................................... 32

      e. The trial court's ruling ............................................................................. 33

   B. The Issue Is Reviewable on Appeal ................................................................. 33

   C. The Standard of Review ................................................................................. 33

   D. Davalloo Did Not Voluntarily and Knowingly Waive Counsel ........................... 33

   E. Denial of Counsel Is Structural Error and Can Never Be Harmless ................. 35

CONCLUSION ................................................................................................. 35

**STATEMENT OF THE ISSUES**

Arg. 1: Are Davalloo's Conversations with Her Husband While They Are

Married Privileged Martial Communications that the State Cannot

Use at Her Trial?  ........................................................................... 8-22


Arg. 2: Is Davalloo's Misconduct Concerning Her Plan to Surveil the

Victim and Her Assault of Her Husband Admissible to Prove

That She Murdered the Victim?  ..................................................... 22-31


Arg. 3: Did Davalloo Waive Her Right to Counsel?  ................................... 31-35

# TABLE OF AUTHORITIES

## CONSTITUTIONAL PROVISIONS

U.S. Const., Sixth Amendment........................................................................... 34

## UNITED SUPREME COURT CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .................................. 4

*Farettav. California*, 422 U.S. 806 (1975)......................................................... 33

*Hawkins v. United States*, 358 U.S. 74 (1958) ...........................................................14, 16

*Iowa v. Tovar*, 541 U.S. 77 (2004) ................................................................. 34

*Johnson v. Zerbst*, 304 U.S. 458 (1938)........................................................... 34

*Patterson v. Illinois*, 487 U.S. 285 (1987) ........................................................ 34

*Pereira v. United States*, 347 U.S. 1 (1954) ...................................................... 17

*Trammel v. United States*, 445 U.S. 40 (1980).......................................................12, 14, 16

*Von Molke v. Gillies*, 332 U.S. 708 (1948).......................................................... 34

*Wolfle v. United States*, 291 U.S. 7 (1934)......................................................... 15

*Wyatt v. United States*, 362 U.S. 525 (1960)....................................................... 18

## FEDERAL CASES

*Government of Virgin Islands v. James*, 934 F.2d 468 (3d Cir. 1991)............................... 35

*In re Witness before Grand Jury*, 791 F.2d 234 (2d. Cir. 1986)......................................... 13

*Pazden v. Maurer*, 424 F.3d 303 (3d Cir. 2005) .................................................... 35

*SEC v. Lavin*, 111 F.3d 921 (D.C.Cir. 1997) ...................................................... 19

*Shafer v. Bowersox*, 329 F.3d 637 (8th Cir. 2003) ............................................... 34

United States v. Ant, 882 F.2d 1389 (9th Cir. 1989)........................................... 35

*United States v. Bailey*, 675 F.2d 1292 (D.C. Cir.) ........................................... 35

*United States v. Davis*, 286 Fed. Appx. 353 (9th Cir. 2008) ............................... 19

*United States v. Lilley*, 581 F.2d 182 (8th Cir. 1978)......................................... 14

*United States v. McDowell*, 814 F.2d 245 (6th Cir. 1987).................................. 35

*United States v. Mitchell*, 2009 U.S. Dist. LEXIS 2978,
    2009 WL 103610 (N.D. Iowa Jan. 15, 2009) ................................................. 19

*United States v. Sandles*, 23 F.3d 1121 (7th Cir. 1994) .................................... 34

*United States v. Silkwood*, 893 F.2d 245 (10th Cir. 1989).................................. 35

*United States v. Sims*, 755 F.2d 1239 (8th Cir. 1985) ...................................... 14

*United States v. Singleton*, 260 F.3d 1295 (11th Cir. 2001) .............................. 13

*United States v. Taylor*, 113 F.3d 1136 (10th Cir. 1997) ................................... 34

*United States v. Welty*, 674 F.2d 185 (3d Cir. 1982) ........................................ 34

## CONNECTICUT CASES

*State v. Baldwin*, 224 Conn. 347, 618 A.2d 513 (1993).................................... 28

*State v. Beavers*, 290 Conn. 386, 963 A.2d 956 (2009)..............................28, 30

*State v. Brown*, 199 Conn. 47, 505 A.2d 1225 (1986)....................................... 29

*State v. Carter*, 200 Conn. 607, 513 A.2d 47 (1986) ........................................ 35

*State v. Christian*, 267 Conn. 710, 841 A.2d 1158 (2004).........10, 12, 13, 14, 15, 16, 17, 19

*State v. Collins*, 299 Conn. 567, 10 A.3d 1005 (2011) ..................................... 33

*State v. Damon*, 214 Conn. 146, 570 A.2d 700 (1990)..................................... 33

*State v. Favoccia*, 306 Conn. 770, 51 A.3d 1002 (2012)................................... 19

*State v. Figueroa*, 235 Conn. 145, 665 A.2d 63 (1995).................................... 27

*State v. Gethers*, 193 Conn. 526, 480 A.2d 435 (1984) ..................................... 33

*State v. Gethers*, 197 Conn. 369, 497 A.2d 408 (1985) .................................... 35

*State v. Golding*, 213 Conn. 233, 567 A.2d 823 (1989) ...................................... 33

*State v. Hill*, 307 Conn. 689, 59 A.3d 196 (2013) ............................................ 30

*State v. James G.*, 268 Conn. 382, 844 A.2d 810 (2004)................................... 30

*State v. Jorge*, 308 Conn. 740, 66 A.3d 869 (2013) ......................................... 11

*State v. Mark R.*, 300 Conn. 590, 17 A.3d 1 (2011) ......................................... 12

*State v. Meehan*, 260 Conn. 372, 796 A.2d 1191 (2002) ................................... 28

*State v. Merriam*, 264 Conn. 617, 835 A.2d 895 (2003)..................................... 31

*State v. Miguel C.*, 305 Conn. 562, 46 A.3d 126 (2012) .................................... 17

*State v. Mooney*, 218 Conn. 85, 588 A.2d 145 (1985) ...................................... 29

*State v. Pena*, 301 Conn. 669, 22 A.3d 611 (2011)......................................24, 25

*State v. Porter*, 241 Conn. 57, 698 A.2d 739 (1997) .......................................... 4

*State v. Randolph*, 284 Conn. 328, 933 A.2d 1158 (2007).........................23, 25, 26, 27, 28

*State v. Saucier*, 283 Conn. 207, 926 A.2d 633 (2007)..................................... 24

*State v. Shindell*, 195 Conn. 128, 486 A.2d 637 (1985) .................................... 25

*State v. T.R.D.*, 286 Conn. 191, 942 A.2d 1000 (2008).................................... 33

*State v. Velasco*, 253 Conn. 210, 751 A.2d 800 (2000) .................................... 12

## CASES FROM OTHER STATES

*People v. Davalloo*, 39 A.D.3d 559, 833 N.Y.S.2d 576 ( 2007)................................7, 31, 32

*People v. Fediuk*, 66 N.Y.2d 881, 489 N.E.2d 732, 498 N.Y.S.2d 763 (1985) .................. 14

*People v. Trzeciak*, , 361 Ill. Dec. 72, 972 N.E.2d 205, 212 (2012),
   appeal granted *People v. Trzeciak*, 979 N.E.2d 887 (Sept. 26, 2012) .......................... 18

*People v. Vermeulen*, 432 Mich. 32,438 N.W.2d 36 (1989) ............................................... 14

*State v. Pelletier*, 149 N.H. 243, 818 A.2d 292 (2003)........................................................ 16

*State v. Serrano*, 346 Ore. 311, 210 P.3d 892 (2009)...........................................14, 16, 17

## CONNECTICUT STATUTES

Conn. Gen. Stat. §53a-54a .............................................................................................. 1

Conn. Gen. Stat. §54-84b ...........................................................................12, 16, 17, 18

Conn. Gen. Stat. §54-86a ............................................................................................ 12

## CONNECTICUT PRACTICE BOOK

Conn. Prac. Bk. §44-3 .................................................................................................. 33

Conn. Prac. Bk. §60-5..............................................................................................11, 33

## CONNECTICUT CODE OF EVIDENCE

Conn. Code of Evid. §4-1 ............................................................................................ 24

Conn. Code of Evid. §4-3 ............................................................................................ 24

Conn. Code of Evid. §4-5 (a)....................................................................................... 25

Conn. Code of Evid. §4-5 (b)....................................................................................... 24

## MISCELLANEOUS

CJIS Division, US Government Interagency Symposium for
    Investigatory Voice Biometrics Use Case Committee Report
    Version 1.010/5/2009 available at http://www.biometriccoe.gov/_
    doc/Use-Case_Committee_Report_FBI-VBS_Final_for_
    internet12202011.pdf ............................................................................................. 4

FBI Uniform Crime Reports for 2002 & 2003, Murder, Table 2.9 -
    Types of Weapon Used, Percent Distribution by Region, 2002, 2003........................... 27

http://legalinsurrection.com/2013/06/zimmerman-prosecutions-voice-
   expert-admits-this-is-not-really-good-evidence/ ............................................................ 4

McCormick on Evidence (7th ed.) ...............................................................14, 15

McCormick, *Evidence* (3d Ed. 1984) ................................................................. 29

*"What's love got to do with it." Tina Turner (Capital Records 1984).* .................................. 12

# INDEX TO APPENDIX

**Issue 1**

1. State's Trial Brief Regarding Marital Communications,
   Dated January 15, 2011 ............................................................................ A1

2. Defendant's Motion in Limine to Exclude Testimony
   Concerning Confidential Marital Communications,
   Dated May 26, 2011 ................................................................................. A23

3. Defendant's Motion in Limine to Exclude Testimony
   Concerning Martial Communications,
   Dated May 31, 2011 ................................................................................. A31

4. State's Motion in Limine Regarding the Admissibility
   Of Martial Communications dated June 1, 2011, and
   State's Supplemental Brief to Motion in Limine Dated
   June 1, 2011 Regarding Marital Communications,
   Filed June 22, 2011 ................................................................................. A49

5. Excerpt of June 30, 2011 Transcript, pp. 1-50,
   (oral argument on motions in limine regarding
   martial communications and trial court's ruling
   thereon) ................................................................................................... A57

6. Excerpt of January 24, 2012 Transcript, pp. 64-177;
   Excerpt of January 25, 2012 Transcript, pp. 87-110
   (entire testimony of state's witness, Paul Christos) ............................... A113

   6A Excerpt of January 24, 2012 Transcript, pp. 64-177
      (testimony of state's witness, Paul Christos) .................................... A115

   6B Excerpt of January 25, 2012 Transcript, pp. 87-110
      (testimony of state's witness, Paul Christos) .................................... A 231

**Issue 2**

7. State's Brief in Support of State's Use of Other
   Misconduct Evidence, dated January 15, 2011 .................................... A257

8. Defendant's Motion in Limine Re Subsequent
   Misconduct Evidence, filed August 16, 2011 ....................................... A297

9. Excerpt of August 18, 2011 pp. 1-63
   (argument on state's motion to admit evidence
   of defendant's misconduct) ...................................................................... A315

10. Excerpt of Transcript of September 1, 2011, pp. 1-2
    (court announces its ruling on motion to admit evidence
    of defendant's misconduct) ...................................................................... A381

11. Court's Memorandum of Decision on State's Motion
    To Admit Defendant's Misconduct, filed September 1, 2011 ............................ A385

**Issue 3**

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
    (competency hearing and defendant's waiver of
    counsel before Judge Gary White) ........................................................ A391


Constitutional and Statutory Provisions Relied Upon ................................... A421

## WITNESS INDEX

1. Excerpt of January 24, 2012 Transcript, pp. 64-177;
   Excerpt of January 25, 2012 Transcript, pp. 87-110
   (entire testimony of state's witness, Paul Christos) ................................................. A113

## NATURE OF THE PROCEEDING

On November 8, 2002, police found the body of Anna Lisa Raymundo inside her condominium at 123 Harbor Drive, Unite 105, in Stamford, Connecticut. Rec., ___ (warrant affidavit). Almost five years later on November 6, 2007, the state charged Sheila Davalloo with Murder, Conn. Gen. Stat. §53a-54a. Id., ___ (information). On November 21, 2011, Davalloo waived counsel and represented herself at trial. Id., ___ (docket entries). On January 4, 2012, jury selection began before the Honorable Richard F. Comerford, Jr., Judge. Id. On January 20, 2012, trial began before a jury of twelve and ended on February 10, 2012 with a verdict of guilty of murder. Id. On April 27, 2012, Judge Comerford sentenced Davalloo to fifty years to serve, consecutive to a twenty-five year sentence she was serving in New York State. On August 31, 2012, she appealed to this Court. Id.

## FACTS OF THE CASE

### A. Davalloo and the Victim Compete for Sessler's Affection.

In 2000, Davalloo, the victim and the victim's boyfriend, Nelson Sessler, work at Purdue Pharma, a pharmaceutical company, in Stamford. 1/25 Tr., 111-14. All have advanced degrees and are doing biostatical analysis of drug trials. 1/24 Tr., 64-67; 1/25 Tr., 112, 120. At the time, Davalloo is married to Paul Christos. 1/24 Tr., 65-66. Davalloo supports Christos as he pursues a graduate degree. Id., 67. In the summer of 2001, Sessler begins sleeping with Davalloo, and the affair continues off and on for the next year or so. 1/25 Tr., 117, 121-22, 147; 1/26 Tr., 57, 73-78. Sessler does not know that Davalloo is married and believes she is divorced. 1/25 Tr., 121. While sleeping with Davalloo, Sessler begins having sex with the victim, and that relationship continues after the victim leaves Purdue Pharma for a new job in New Jersey in 2002. Id., 116, 120, 122. By the time of the murder, Sessler regularly spends the night at the victim's condo, but keeps his belongings in a rented house, which he shares with three men. Id., 117-120; 1/26 Tr., 73.

By the summer of 2002, Sessler's sexual relationship with Davalloo has run its course, and their affair ends amicably. 1/25 Tr., 122-23, 127, 137; 1/26 Tr., 78, 81. Sessler

is unhappy with Davalloo because she does not have much time to spend with him; she is too busy to see him on weekends and sees him only on weekdays. Id., 122; 1/26 Tr., 78-80, 85. Although Davalloo is "fine with it," Sessler is not. 1/26 Tr., 78, 79-80. Sessler also tells Davalloo he is more interested in the victim anyway. Id., 124. Sessler says Davalloo does not have a problem with their break up. 1/26 Tr., 76, 78, 87. He says they have never fought about anything. 1/25 Tr., 127; 1/26 Tr., 87-88. After they stop sleeping together, Sessler and Davalloo remain friends, and he would still often travel to her home in Pleasantville, New York to walk her dogs. 1/25 Tr., 123, 126-27; 1/26 Tr., 74, 80-84. During this time, Sessler sets up Davalloo on a blind date with his best friend from college; Davalloo is interested, but his friend is not. 1/25 Tr., 123-25; 1/26 Tr., 23, 95-97.

**B. The Murder**

Sessler spends the night before the murder with the victim at her condo and leaves for work at 9 am. 1/25 Tr., 128-29. Perdue Pharma security records show that Sessler swipes his employee ID at 9:37 am and again at 5:10 pm, although it is possible to leave and enter the building without swiping a card. 1/25 Tr., 129-132; 1/27 Tr., 87, 120-22.

At 10:34 am on November 8, 2002, the victim calls her mother in Florida and leaves a message. 2/1 Tr., 52-55; 2/2 Tr., 81-83. At 11:57 am, the victim calls Sessler at work, but he does not pick up. 1/25 Tr., 132-33; 2/2 Tr., 77-81, 105. At about 12:30 pm, Stamford police receive a 911 call from a woman with a Spanish accent, who sounds mentally challenged, reporting that a man is assaulting her neighbor on Harbor Drive where the victim lives. 1/24 Tr., 15-18, 33-34, 43-44, 49-55; State's exh. 4, 6. Police trace the 911 call to a pay phone at a Duchess restaurant about a mile from the victim's home. 1/24 Tr., 41, 43-46. Police immediately call the restaurant and ask employees if anyone is at the payphone but no one is there. Id. Meanwhile, police arrive at the victim's home to find the front door unlocked, the victim's body in the foyer, and signs of a violent struggle. Id., 18, 20-29; 1/31 Tr., 80-81, 100, 149-156.

That evening Sessler arrives at the victim's home while police are still collecting

evidence.1/25 Tr., 113-16, 133. When police tell Sessler the victim is dead, "He didn't seem all that upset," an officer says. 1/31 Tr., 29. Two officers detain him for questioning in the bathroom of a nearby clubhouse for four or five hours and latter take him to the police station. 1/25 Tr., 134-35; 1/26 Tr., 62-63. When police accuse Sessler of killing the victim, he asks for a lawyer and refuses to give a statement. Id., 137. After police get Sesser to change his mind, he misleads them by keeping quiet about his overlapping sexual relationship with Davalloo and the victim. 1/25 Tr., 135-38; 1/26 Tr., 55, 59. Sessler gives up the names of some of his other girlfriends who he believes have "mental issues" and might have done this, but he "didn't think [Davalloo] did it . . . [because he] had never seen any anger or anything from her." 1/25 Tr., 137; 1/26 Tr., 56-59. That night police photographed scratches on Sessler's back, neck and shoulders. Id., 68; 2/7 Tr., 134.

The victim dies from nine stab wounds to her face, neck and upper chest consistent with a knife with a single edged blade. 1/25 Tr., 16, 23-25, 44, 78-79, 82-83.[1] Her assailant inflicts the wounds in three groups while the victim struggles. Id., 34. She has defensive cuts on both hands and her right elbow. 1/25 Tr., 31-34; State's exh. 20, 21, 25. As she lay motionless on the floor, her assailant delivers four blunt force blows to the top and back of her head consistent with barbells lying near her body that have her blood on them. 1/25 Tr., 16, 34; 1/31 Tr., 90-91, 118-19, 122, 146-47. A blue contact lens is in the victim's hair, and it does not belong to her or Davalloo. 2/1 Tr., 30. Fingerprints on the front screen door come from Sessler and an unidentified person, not Davalloo. Id., 89-93. Calls made on Davalloo's cell phone occur at 12:15, 12:23 and 12:27pm that day. 1/24 Tr., 143; 2/2 Tr., 86-89.

### C. The 911 Call

Davalloo's husband and several coworkers listen to the voice on the 911 tape and

_____

[1] The victim's nine wounds: a stab wound on her left cheek, two on the left side of her neck, two underneath the right side of her chin, a laceration across her neck, a stab wound in the center of her neck where the neck meets the chest, one on the right side of her neck, one above her left breast. 1/25 Tr., 22-29; Def.'s exh. B. This last wound penetrated her lung and was the likely cause of her death. 1/25 Tr., 30.

say it is Davalloo's; only Sessler says otherwise. 1/24 Tr., 166-67; 1/26 Tr., 113; 2/7 Tr., 83-86, 93-94,125-26. In 2003-04, a voice identification expert,[2] Tom Owens,[3] says he cannot match Davalloo's voice to that on the tape of the 911 call because of the poor quality of the tape, and so at trial, the state initially seeks to exclude the tape. State's exh. 56; 1/27 Tr., 43-44, 60, 62; Rec., ___ (state's motion in limine filed 21/1/11). However, just prior to the start of jury selection, the state asks Owens to reconsider his opinion. 1/27 Tr., 32-33. The second time around, Owens comes up with a "likelihood ratio of 68%" that Davalloo's voice matches the one on the 911 tape, with a "37.2% chance of a false rejection' and 1% chance of a false "acceptance. State's exh. 56, 57; 1/27 Tr., 62-66, 73. He again attributes these low probability numbers to the "very poor quality [of the 911] call." Id., 57, 73.

**D. Davalloo's DNA on the Victim's Bathroom Sink.**

A diluted blood-like stain on the faucet handle of the sink in the victim's bathroom located near her body strongly suggests that the killer washes up after the assault. 2/2 Tr., 8-11; 2/3 Tr., 79; Def.'s exh. E at 5. A DNA sample from the stain contains a mixture of DNA from at least two people, including the victim and Davalloo. 2/3 Tr., 25-26. The DNA

---

[2] The state hires Owens because neither the state police nor the FBI does voice analysis. 1/31 Tr., 24; they do not think voice identification is admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). See *State v. Porter*, 241 Conn. 57 (1997) (adopting *Daubert*). The FBI does not allow their voice identification experts to provide courtroom testimony. CJIS Division, US Government Interagency Symposium for Investigatory Voice Biometrics Use Case Committee Report Version 1.010/5/2009 available at http://www.biometriccoe.gov/ doc/Use-Case Committee Report FBI-VBS Final for internet12202011.pdf at page 4 ("automatic speaker recognition technology has not yet reached the maturity to satisfy the Daubert Criteria"), 15 ("Currently automated [voice] comparisons is performed in criminal cases solely for research purposes").

[3] Owens seriously overstates his expertise. He is a self-taught "forensic voice identification expert" with a BA in History who previously worked as an archivist at the Rogers and Hammerstein Archive of Recorded Sound. 1/27 Tr., 21-26, 31-32, 67-68. Owens uses his own homemade computer program, "EasyVoice Biometrics," to identify Davalloo's voice on the tape. He commits a serious ethical lapse when he does not disclose that he has a propriety interest in the EasyVoice program, which he sells for $5000 over his website. http://legalinsurrection.com/2013/06/zimmerman-prosecutions-voice-expert-admits-this-is-not-really-good-evidence/ (blog by William A. Jacobson, Clinical Professor of Law, Cornell Law School) (cross of Owens during unsuccessful *Daubert* hearing in the Zimmerman/ Trayvon Martin trial).

analyst cannot determine when Davalloo may have deposited her DNA on the faucet. Id.,
38, 52, 61. For example, the analysis cannot say if Davalloo's DNA came from the blood on
the faucet handle or she put it there when she touched it and someone else later deposited
the victim's blood over it. Id. Thus, the DNA evidence cannot rule out that Davalloo could
have deposited her DNA on the faucet handle when she had been to a party at the victim's
condo before the murder. 1/26 Tr., 41; State's exh. 38, 40. With respect to the "match"
between Davalloo's DNA and that on the faucet handle," approximately, one out of every
28 million African-Americans, one out of every 8.5 million Caucasians and one out of every
25 million Hispanic individuals could have contributed to the sample. Id., 27. The population
statistics used by the analyst to calculate the probably of a random match groups North
Africans and Middle Eastern people in the Caucasian category, but the analyst does not
mention how Davalloo's race, Iranian, is classified. 4/27 Tr., 24-25; 2/3 Tr., 28. The analyst
eliminated her as the source of all the other DNA samples from the murder scene, including
those taken from the handles of the dumbbells used by the assailant. Id., 41-43, 59. The
DNA expert finds the DNA of eight other unidentified people on various objects at the
murder scene, including the dumbbells. Id., 62-69.

**E. Weeks after the Victim's Death, Sessler Resumes His Affair with Davalloo.**

During the weeks following the murder, Davalloo reaches out to Sessler. She brings
friends from work to his house to visit, consoles him, writes him a letter and sends him a
"care package" of food. 1/25 Tr., 144. Sessler says, "Sheila was one of the few people that
I knew in Stamford that actually . . . was willing to talk about [the victim's death with me]."
Id., 145. In January, on a ski trip to Maine, they began sleeping together again. Id., 145-46.
That all changes on March 23, 2003, when Sessler arrives at Davalloo's apartment to find
police searching it for evidence that she has stabbed her husband. 1/25 Tr., 150.

**D. Davalloo Tries to Kill Her Husband**

On March 23, 2003, three and a half months after the murder, Davalloo stabs her
husband in the chest nearly killing him. 1/24 Tr., 108-136, 172-77. At about 3 pm that day,

Davalloo asked Christos to play a game in which one person would blindfold and handcuff the other, rubbed an object on the other person's skin and asked that person to identify it. Id., 109-113, 171-72. When it was Christos' turn, Davalloo blindfolded him and handcuffed him to a chair. Id., 115-17. "All of the sudden," Christos says, "I felt, like a large thrust on my chest like a heavy weight was dropped on my chest." Id., 117. Seconds later, he feels it again. Id. "[O]h my God, I think I hurt you[, y]ou're bleeding," Davalloo says. Id., 117-18. Unable to find the handcuff key, Davalloo breaks the chair to free Christos' hands, and he slips off his handcuffs. Id., 118-19, 123, 174-75. Christos feels pain in his chest, winded and light headed. Id., 118-19. Davalloo is holding Christos telling him, "I love you . . . you're brave," id., 126, and Christos replies: "[T]hings have been bad between us. We need to work on things. . . . There hasn't been any real affection between us," id. Davalloo tells him she calls 911 but neither the police nor an ambulance show up. Id., 119-125, 175-76. Davalloo then runs outside but she says she cannot get anyone to help them. Id., 124.

Davalloo drives Christos to the Westchester Medical Hospital, a place she knows well because she met Christos there while in graduate school. 1/24 Tr., 127. Davalloo stops the car at the far end of a parking lot away from the hospital's emergency room. Id., 126-130. As Christos tries to get out of the car, Davalloo lunges at him with a knife, stabbing him again in the chest. Id., 130-31. Christos yells, "[Y]ou're trying to kill me," id., 132, and grabs her wrists. Id. Davalloo responds, "[Y]ou're taking me away from my brother," and "[Y]ou've been pressuring me a lot about having to leave the condo." Id. Christos threatens to kill her, and she backs up. Id., 133. Christos takes the knife and hides it in a pile of bricks. Id. Davalloo grabs onto him and says, "[P]lease, stay with me, talk to me[.]" Id. 133-34. Christos breaks free from Davalloo and runs for help towards some strangers standing two hundred feet away. Id., 134. Davalloo approaches them and claims Christos stabbed her. Id., 134-35. Davalloo retrieves the car and tries to get Christos into it, but the strangers stop her. Id., 135. She tells Christos not to tell anyone what has happened. Id., 136. He suffers three stab wounds and has heart surgery to repair a "nicked" artery near his heart.

Id., 136. At trial, Christos blames himself for what happen that day and for their later divorce because he is spending all his time at school. 1/25 Tr., 65, 67, 170. Id., 65. Davalloo has consistently tells him she had nothing to do with the victim's murder.[4] Id., 146.

During the assault, Davalloo calls Sessler at 4:59 pm because he was coming to her condo for dinner. 1/25 Tr., 142-43, 149; State's exh. 188. When Sessler arrives at Davalloo's house, the police are there searching it, and tell him there has been a domestic dispute and Davalloo and Christos have gone to the hospital. Id., 150. Later, Sessler calls Stamford police and tells them he believes Davalloo killed the victim. Id., 151-52. Next, Sessler calls a lawyer who tells him not to speak to police because he has lied to them about his relationship with Davalloo. Id., 152. Eventually, "by stages," he comes clean to police about his affair with Davalloo. Id., 153. Police then recruit Sessler to elicit unsuccessfully a confession from Davalloo. He calls her on a recorded line at the police station while she is in prison in New York. Id.,154-55.  Upon her release, he "wear[s] a wire and visit[s] [Davalloo] so [police] could record her." 1/26 Tr., 18; state's exh. 38, 41. Sessler also elicits a series of letters from her. State's exh. 33, 34, 35, 39. When speaking to him, she steadfastly maintains her innocence, and politely refuses to discuss Christos' stabbing.[5]

## ARGUMENT

### Arg. 1: Davalloo's Conversations with Her Husband While They Are Married Are Privileged Martial Communications that the State Cannot Use at Her Trial.

---

[4] At Davalloo's later trial in New York for stabbing Christos, she presents psychiatric evidence that she lacked the intent to kill. *People v. Davalloo*, 833 N.Y.S.2d 576 (NY 2d Dept. 2007). She testifies she does not remember stabbing Christos but recalls a "dark figure," near her who picks up a knife and stabs Christos. 1/26 Tr., 143-45. State's exh. 42.

[5] In order to encourage Davalloo to talk, police tell Sessler not to argue with Davalloo but to agree with whatever she says, and if she becomes upset during his questioning, to redirect the conversation back to the murder. 1/26 Tr., 37. However, nothing comes of it. Curiously, the state introduces a few recorded conversations and letters which show Davalloo has a great deal of empathy for what Sessler is going through, has apologized to him for causing him such embarrassment by not telling him she is married has recognized that as a result of what she has done their relationship is over, and has denied any involvement in the murder, and that after Sessler arranges a meeting with her at the Duchess Restaurant ostensibly to connect with her, he claims to be afraid of her when she reciprocates. 1/26 Tr., 7-10, 14, 15-18, 27, 38-39, 40, 44-47; State's exh. 33-41.

**A. The Relevant Facts**

**a. The conversations before the murder**: The following nine groups of statements are privilege: (1) Davalloo incessantly talks to Christos about her friend, "Melissa," who is competing with "Anna Lisa" for "Jack's" affections. 6/30/11 Tr., 5; App., A57; 1/24 Tr., 73-75, 77-78, 101-03, 137-38; App., A113. Specifically, Davalloo asks Christos if Melissa should confront Anna Lisa about Jack seeing both of them. Id., 74-76. She tells him she is going to help Melissa surveil Jack and Anna Lisa. 1/24 Tr., 79-86. Christos offers Davalloo the use of his night vision binoculars. Id., 79-80. On an unspecified date, Davalloo calls Christos to say she and Melissa are in a parking lot outside Anna Lisa's apartment building and thought Jack has seen them. Id., 85-86. (2) To get Christos out of their apartment on weekends so Sessler could come over, Davalloo tells him that her mentally ill brother will be visiting and her brother will be upset if he finds out she is married to Christos. 6/30 Tr., 6-7. (3) Davalloo tells Christos she has bought a lock pick to get into the victim's house to look for photos of Sessler and the victim. Id., 79-86, 147-48,153. And with Christos' help, she practices using the lock pick on their apartment doors but cannot get it to work. Id., 81-82. (4) Davalloo wants to record Sessler's phone calls and Christos gives her a tape-recorded, he calls a "bugging device," but it too does not work. Id., 82-83. She then buys a tape recorder to attach to Sessler's phone to record his calls, but again cannot get it to work. Id., 83. She also says Melissa has access to Jack's voicemail at work and listens to it. Id., 84-85. (5) In late 2002, Christos says Davalloo, who has a degree in biochemistry, asks some unspecified questions about DNA and fingerprints. Id., 97-98, 162-63. (6) Davalloo tells Christos that while Melissa is on a business trip with Jack, she becomes upset when he will not sleep with her. Id., 87-88. Melissa also arranges to run into Jack at the airport and to fly back home with him in the seat next to him. Id., 88-89.

**b. The conversations after the murders**: (7) In November 2002, Christos says Davalloo stops talking about Melissa's affair. 6/30/11 Tr., 5. He hears of the murder of a Purdue Pharma employee and asks Davalloo about it. 1/24 Tr., 92-96, 139-140. Davalloo

8

tells him that Anna Lisa has broken up with Jack and now Melissa has Jack to herself. Id., 95-96, 140. (8) In late November, Davalloo said she cut her thumb on a dog food can. Id., 96-97, 162; see State's exh. 187 (hospital record 11/25/02).

**c. The conversations about the stabbing of Christos**: (9) Davalloo and Christos played a game in which she handcuffs and blindfolds him, and then stabs him. Christos says Davalloo pretends to call 911 to delay medical treatment and finally drives him to the hospital, but parks away from the emergency room. She tells him she is upset over his reluctance to leave their apartment and stabs him again. 6/30/11 Tr., 7-9; 1/24, 126-36.

**d. The state's arguments later adopted by the court were**: *1. & 2. The "bad marriage" and "betrayal" exceptions*: The state says the policy behind the privilege—fostering marital harmony—makes the privilege generally inapplicable to a bad marriage and in particular, to a spouse's lies about an affair. App., A13-14, A19-20; 6/30/11 Tr., 11-12, 42-44. Moreover, it says, Davalloo's statements are not "confidential communications" because they are not *induced* by the marital relationship but made to further her affair with Sessler and so are not "inspired by the affection, competence, loyalty, and integrity of the marital relationship." Id., 42-47; App., A13-14. Defending marriage, it proclaims the privilege is inapplicable to infidelity "in any world but bizzaro [ ] world," "[ ] not in the country that we live in," "not under the Common Law . . . not under the Code of Hammurabi[.]" Id., 43.

*3. Davalloo statements are not confidential*: The state says, "While [Davalloo] may have hoped that [Christos] would not soon discover her secret [affair with Sessler], she had no reasonable expectation that [Christos] would remain ignorant forever." App., A13. It continues, "A reasonable person would expect to be found out at some point and expect that the husband would disclose the betrayal to [others]." Id. Moreover, it claims, she had no reasonable expectation of privacy in the "faux triangle" because she spoke about it to third parties. 6/30/11 Tr., 11, 43.

*4. The waiver claim*: Davalloo, the state says, waives the privilege when she testifies in New York. Id., 13, 16-17 48; App., A18-19. Incredibly, the state invites the court to

commit harmless error because any error in admitting her statements under this exception would be de minimis. 6/30/11 Tr., 17, 48-49.

5. *The crime exception*: The "crime fraud exception" applies, the state claims because Davalloo and Sessler conspire to commit, or "aid and abet" the commission of, the crimes of, "surveillance, trespass, and burglary," and "eavesdropping." App., A15-16.

6. *The domestic violence exception*: The state reads the privilege to allow use of Davalloo's statements in any "criminal proceeding against a spouse who was subject to bodily injury in the same criminal scheme and transaction." App., A17-18; App., A55. This is so, it says, even where a spouse is not on trial for a domestic violence offense or a crime in which the spouse is the victim. 6/30/11 Tr., 14, 16-17. Here, it believes her statements are admissible because they relate to and culminate in the stabbing. Id., 17, 47-48.

### e. The defense objection

The defense argues that the privilege applies whenever there is a valid marriage and that a presumption of confidentiality applies to any statements made during the marriage, 6/30/11 Tr., 20-22, 25-29 (citing *State v. Christian*, 267 Conn. 710 (2004)); App., A23, that the state did not rebutted this presumption by showing that a third party was present during a marital conversation or that the speaking spouse told the other to repeat the statement to others, id.; 6/30/11 Tr., 28-31, that Davalloo's statements to third parties did not waive the privilege as to statements she made to Christos, id., 30-32, 36, that her New York testimony is not a waiver because the domestic violence exception applied to that trial and not here and any waiver applied only to the specific statement made during her testimony, id., 33-38, and that she and Christos did not agree to commit any crime. Id., 39-42.

### f. The trial court's ruling

The trial court ruled: (1) *The privilege does not apply to a "bad marriage."* The court concluded that none of Davalloo's statements "fall within the purview of the marital privilege," because they were not made "[i]n furtherance of the [marital] relationship," 6/30/11 Tr., 26, 52, and were not "induced by the affection, confidence, loyalty, and integrity

of the [marital] relationship," id., 51. The court felt "it would be bizarre to classify [her statements] as in furtherance of the sanctity of the marital relationship," when they were made to further her pursuit of another man, kill her rival and ultimately, to end her marriage by divorce or by killing her husband. Id., 51. To rule otherwise, it said, would defy "common sense," would be "bizarre" and could happen only in "some parallel universe . . . with which I am not acquainted." Id., 53.

*(2) Davalloo's statements are not confidential because she once talked to friends about the affair*: The court concludes Davalloo did not have "a reasonable expectation of confidentiality" in the statements she "shared with [third parties]," 6/30/11 Tr., 30, 51, and the lack of confidentiality extended to the entire subject matter of the affair. Id. Repeating its belief that bad marriages are not privilege-worthy, the court says, "[N]one of the statements were induced by the affection, confidence, loyalty, and integrity of the martial relationship," and so cannot be confidential marital communications. Id., 52

*(3) Davalloo and Christos are partners in crime*: The privilege does not apply, the court says, because Davalloo and Christos commit crimes when they discuss using night vision goggles, picking a lock and gaining entry into the victim's house. Id., 40.

*(4) Davalloo's testimony in her New York trial waived the privilege*: The court maintains that when the New York prosecutor asked Davalloo about her statements to Christos, she waived the privilege by answering them, and the waiver extends to the entire subject of the Sessler affair. Id., 34-35, 51.

### B. The Issue Is Preserved.

"[T]he essence of the preservation requirement is that fair notice be given to the trial court of the party's view of the governing law[.]" (Cit. omtd.) *State v. Jorge*, 308 Conn. 740, 753-54 (2013). The briefs and oral argument certainly preserved the issue for appeal. If for some reason it did not, the issue is reviewable as plain error, Conn. Prac. Bk. §60-5.[6]

_____

[6] "An important factor in determining whether to invoke the plain error doctrine is whether the claimed error resulted in an unreliable verdict or a miscarriage of justice. . . . Plain error review may be appropriate where consideration of the question is in the interest

Controlling law for plain error review can be found in Conn. Gen. Stat. §54-84b and *State v. Christian*, supra.

### C. The Standard of Review

"The scope of an evidentiary privilege is a question of law, which [this Court] review[s] de novo. The application of the privilege presents a mixed question of law and fact." (Cit. & inter. quo. mks. omtd.) *State v. Mark R.*, 300 Conn. 590, 597 (2011). The trial court's factual findings are, of course, reviewed for an abuse of discretion. Id.

### D. Davalloo's Conversations with Christos Are Confidential Marital Communications that Were Inadmissible at Her Trial.

To claim the marital communications privilege, Davalloo was only required to show she was validly married to Christos and their conversation occurred *during the marriage*. To rebut the presumption of confidentiality that attaches to such a statement, the state may prove that a third party was present during the conversation, or that Davalloo intended at the time, either expressly or implicitly, that Christos repeat the conversation to a third party. *State v. Christian*, 267 Conn. 710 (2004); Conn. Gen. Stat. §54-84b. Contrary to the trial court's ruling, there is no bad marriage exception to this privilege.

(1) *"What's love got to do with it."* Tina Turner (Capital Records 1984): This Court has forcefully rejected the notion that the trial court's job is to make subjective determinations of the health of a marriage before applying the marital privilege.[7] *Christian*, 267 Conn. at 721-743. It has made clear that the policy of fostering the martial relationship "applies with equal force to preserve *all* marriages, irrespective of marital difficulties," (Emph. in org.) id., 734, including "acrimonious" marriages, id., 735. The privilege does not

---

of public welfare or of justice between the parties. . . . [The] plain error doctrine [is] invoked where the record is complete and the question is essentially one of law, so that neither party is prejudiced." (Cit. omtd.) *State v. Velasco*, 253 Conn. 210, 218 n.9 (2000).

[7] The communication privilege is different from and independent of the testimonial privilege. The communications privilege, which is at issue here, unlike the testimonial privilege, can be asserted by either spouse, involves only confidential communications made during the marriage and survives the dissolution of the marriage. *Trammel v. United States*, 445 U.S. 40 (1980); *State v. Christian*, 267 Conn. at 725; Conn. Gen. Stat. §54-86a.

12

evaporate simply because a judge thinks the marriage has difficulties or is beyond repair. Id., 734-35. A marriage valid under state law is all that is required. Here, the sole question for the trial court was whether Davalloo and Christos were legally married at the time of their statements, as they indisputably were. Id., 733. The defense made this clear to the court when it relied on *State v. Christian*, supra, but the court inexplicably ignored the case. In so doing, the court committed legal error when it ruled that the marital privilege does not apply to a troubled marriage. [8]

The policy that animates the marital privilege requires that the privilege apply to all existent marriages. In *Christian*, this Court said the primary purpose of the martial communication privilege "is to foster marital relationships by encouraging confidential communication between spouses," and "to ensure that spouses . . . feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law." (cit. & quo. mks. omtd.) Id. at 728-29. A court dishonors this purpose when it undertakes a case-by-case determination of whether a marriage is strong or faltering. Such an inquiry is impractical because it depends on a judge's subjective conclusion that in the case before him the marriage is already so wrecked that there is nothing to save. It is inherently offensive because it involves an intrusive and intense, ad hoc factual inquiry into intimate marital difficulties that inevitably degenerates into a domestic relations matter. Worse still, the court here excludes Davalloo's statements to Christos because they are lies about an affair that are destructive of their marriage and narrowly confines the marital privilege to a spouses' truthful statements that fostered the marriage. However, the intent of the privilege is to promote future marital harmony regardless of the present state of the

_____

[8] Even the minority view, recognized mainly by the federal courts, is much narrower than the trial court's homemade rule here. See *Christian*, 267 Conn. at 734 n.14. Under the minority view, the privilege is inapplicable to those who are legally married but permanently separated, are not cohabiting and for whom there is no likelihood of reconciliation. See, e.g., *United States v. Singleton*, 260 F.3d 1295, 1299-1300 (11th Cir. 2001) (collecting cases). Because this view rests on these easily proven objective facts, it avoids an intrusive inquiry into whether the marriage has irrevocably deteriorated. *In re Witness before Grand Jury*, 791 F.2d 234, 238-39 (2d. Cir. 1986).

13

marriage. Indeed, spouses in a marriage that is breaking up are more likely to need to feel free to communicate their deepest feelings to each other without fear of later exposure than those in a smoothly functioning marriage.[9] The trial court's ruling is unworkable and unfair; there is no "marital health" requirement behind the privilege.[10] *State v. Serrano*, 210 P.3d 892, 898 (Or. 2009).

Enacted after the *Christian* decision, Conn. Gen. Stat. §54-84b codified the common law marital communication privilege. By its terms the statute says neither spouse can testify "to a confidential communication made by one spouse to the other *during the marriage*[.]" (Emph. add.) id., §§ (b) (1) & (2) The phrase "during the marriage" does not draw a distinction between good and bad, harmonious and acrimonious, salvageable and wreaked marriages. It does not exclude separated spouses. As the common law privilege recognized in *Christian*, the statute asks only "(1) whether the defendant had made those communications to his wife during their marriage; and (2) whether those communications were confidential." 267 Conn. at 732; see *Trammel v. United States*, 445 U.S. 40, 51 (1980) (information privately disclosed between husband and wife in confidence of marital relationship traditionally protected).  The privilege protects any confidential communications that happened during marriage and serves as a safe harbor for the marital relationship.

For the reasons that follow, Davalloo's testimony from the prior proceeding in New

---

[9] Where the spouses are separated, the communication "is far more likely to be related to preservation of the marriage than are the vast bulk of admittedly privileged communications." McCormick on Evidence (7th ed.) Vol. 1, §80, p. 512.

[10] See, e.g., *Hawkins v. United States*, 358 U.S. 74, 77-78 (1958) (rejecting the suggestion that some marriages are not worth trying to save and noting that "not all marital flare-ups in which one spouse wants to hurt the other are permanent" and that "some apparently broken homes can be saved provided no unforgivable act [like testifying against a spouse] is done by either party"); *United States v. Sims*, 755 F.2d 1239,1243 n.3 (8th Cir. 1985) ("We do not believe that courts can or should assess the social worthiness of particular marriages or the need of particular marriages for the protection of the privilege" (cit. omtd.)); *United States v. Lilley*, 581 F.2d 182, 189 (8th Cir. 1978) (the privilege does not depend "on a judicial determination that the marriage is a happy or successful one"); *People v. Vermeulen*, (Mich. 1989) (court may not inquire into the viability of the marriage); *People v. Fediuk*, 489 N.E.2d 732 (N.Y. App.1985) (privilege applies where spouses are separated and marriage is "stormy" and "deteriorate[ing]").

York and Christos' testimony in this case was admissible, insofar as they involved private conversations during their marriage.

(2) *Davalloo and Cristos' statements are induced by their marital relationship*: In a variation of its first error, the trial court believes Davalloo and Christos' statements are not *confidential* because they are not induced by the marriage, but by Davalloo's attempts to cover up and further her affair with Sessler. Common sense says that not every routine matter, such as a grocery list, that a married couple privately discussed is confidential. It must be induced by or relate to the marital relationship. However, that does not mean a private statement between spouses must be truthful or promote a healthy marriage to be confidential. The *Christian* court rejected this argument too. Christian told his wife that he killed the victim while driving drunk, and this admission sent their already "very rocky" marriage "downhill" into divorce. 267 Conn. at 722. At trial, the wife admitted the assertion of the privilege would not save the marriage. Id. Nonetheless, the privilege applied to Christian's statement despite its fatal consequences to his marriage. Like the admission in *Christian*, the martial relationship induced Davalloo's thinly veiled admission to Christos that she had an ongoing affair with Sessler and her lies to further it. That her lies later destroyed the marriage is "immaterial." Id., 735.

As proven in the previous section, court's balk at inquiring whether a marriage is "viable" or "in shambles" at the time of the marital communication because of the practical problems involved.[11] Worse still, would be a judicial inquiry into the affect on a marriage of a private spousal communication, whether truthful or a lie. This long-standing reluctance to question the worth of an individual marriage, to conclude that some broken marriages are not worth protecting, recognizes the indelicacy and want of decorum in prying into the secrets of husband and wife. See *Wolfle v. United States*, 291 U.S. 7, 14-16 (1934)

---

[11] "[T]he pragmatic difficulty involved in determining when hostility between the spouses has become implacable, argues for the more easily administered approach of terminating the privilege only upon a decree of divorce." McCormick on Evidence (7th ed.) vol. 1, §81, p 512 (2013).

(discussing policy of related testimonial privilege); *Hawkins v. United States*, 358 U.S. 40, 77-78, 79 (1958) (same), overruled in part, *Trammel v. United States*, 445 U.S. 40 (1980). If the courts use a legal test phrased with such ambiguous terms as a "viable marriage," they would be undermining the assurance of confidentiality that the privilege insists upon. Id.; see *Trammel*, 445 U.S. at 53, 44-45, 52-53 & n.12. Indeed, an "uncertain" privilege is little better than "no privilege at all." *Jaffee v. Redmond*, 518 U.S. 1, 18 (1996). A lack of clear standards for marital viability allows judges to rule according to their own prejudices on how harmonious a marriage must be, and whether a private statement is good or bad for the marriage, in order for the marital communications to qualify as privileged.

The trial court's analysis fairs no better under the language of the statutory privilege. A "confidential communication" is defined in §54-84b (a) as a statement "made between spouses during a marriage that is intended to be confidential and is induced by the affection, confidence, loyalty and integrity of the martial relationship." Id. The latter requirement speaks to the marital relationship in general and not to the specific marriage before the trial court. See *State v. Serrano*, 210 P.3d 892, 898 (Or. 2009) (en banc). This broad definition of "confidential" requires only that the conversations have to do with the privacy of the marriage and serve to protect one spouse's trust in the other to encourage the imparting of confidences. A communication "is induced by the affection, confidence, loyalty and integrity of the marital relationship" if it might not be spoken in public because it might expose the personal feelings and relationships or cause embarrassment to the spouses if done outside the privacy of the marital relationship. *State v. Pelletier*, 818 A.2d 292 (N.H. 2003). This is so because even in a clearly deteriorating marriage one spouse may cling to the illusion that they could still reconcile. *Christian*, 267 Conn. at 734-35. Who should say otherwise? Indeed, a marriage clearly in trouble, even where the spouses separate, may be most in need of the privilege to spark successful attempts at reconciliation. The legislature included all communications between spouses within the language of the statutory marital privilege, not merely those that contribute to the "health" of

16

the marriage.

(3)*Davalloo had a reasonable expectation that their statements were  confidential*:

The trial court wrongly says that Davalloo's statements to Christos are not confidential because she spoke about the affair to others. A statement is confidential if a spouse "had a reasonable expectation of confidentiality" at the time the spouse made the statement. *Christian*, 267 Conn. at 737-39.  A spouse does not have a reasonable expectation of privacy in a statement made in the presence of third parties or with the expectation that the listing spouse will convey it to others. Id.; *Pereira v. United States*, 347 U.S. 1 (1954). Mentioning the subject matter of a confidential statement to third parties does not waive the privilege because the privilege attaches to the particular marital communication, not the facts communicated. Id., 723.[12] Confidentiality does not vanish because of a spouse's "subsequent decision to disclose it to a third party" because it is the defendant's expectation at the time of the communication that counts. *State v. Miguel C.*, 305 Conn. 562, 579 n.12 (2012). Likewise, §54-84b (a) requires only that a statement must be "intended to be confidential[.]"

No one else was present when Davalloo spoke to Christos. Nothing she said supports an inference she intend that Christos repeat her statements to others and thereby invite additional scrutiny and questioning by them. Moreover, the state's inevitable discovery theory—a reasonable person who engages in an affair would expect that her husband would find out about it sooner or later and disclose it to others—is nothing but the reapplication of its judgmental bad marriage argument made with the benefit of twenty/twenty hindsight. The state showed, at best, that Davalloo discussed with others the general subject matter of the affair. See *Christian,* 267 Conn. at 737-740. Her conversations with Christos remained confidential.

---

[12] See, e.g., *State v. Serrano*, 210 P.3d at 904 (spouse's note about her affair, the resulting pregnancy and desire for divorce remained privileged even though she discussed it with others; defendant did not waive confidentiality where he disclosed to police the subject matter of his earlier statements to his wife but not what he had told her).

17

*(4) Davalloo was not on trial for assaulting Christos*: Section 54-84b (c) codifies the common law exception for domestic abuse. A spouse may testify "in a criminal proceeding against the other spouse for . . . bodily injury . . . or other violence . . . committed . . . upon the spouse[.]" Id.; see *Wyatt v. United States*, 362 U.S. 525, 526 (1960) (recognizing common law exception). The statutory language limits this exception to criminal proceedings where the state charged the defendant with a domestic violence offense. *People v. Trzeciak*, 972 N.E.2d 205, 212 (Ill. 2012), appeal granted *People v. Trzeciak*, 979 N.E.2d 887 (Sept. 26, 2012). Here, Davalloo was not on trial for her assault of Christos, but for the victim's murder.

*(5) Davalloo and Christos were not partners in crime*:  The privilege does not apply to "joint participation with the spouse in what was, at the time the communication was made, criminal conduct or conspiracy to commit a crime[.]" §54-84b (c) (1). The exception does not render admissible one spouses' confession of a crime to the other. See, e.g., *United States v. Westmoreland*, 312 F.3d 302, 306-309 (7th Cir. 2002); United States v. Estes, 793 F.2d 465 (2d Cir. 1986); *State v. Holt*, 574 P.2d 152 (Kan. 1977). Both spouses must engage in "patently illegal activity." *United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir. 1985). Nothing Davalloo and Christos talked about would even have amounted to a crime. Surveilling someone is not a crime. Davalloo and Christos did nothing illegal.

*(6) Davalloo's New York testimony did not waive the privilege*: The trial court mistakenly believes Davalloo waived the privilege with respect to her pre and post murder statements when she testified in the New York trial about stabbing Christos. During the New York prosecutor's cross-examination of Davalloo, he touched on a few details about her statements made before the murder.[13] As to her account of stabbing Christos, under

_____

[13] There the state briefly elicited that through pseudonyms, Davalloo spoke to Christos about her affair with Sessler and her competition for Sesseler's attention with her rival, the victim. State's exh. 42 at 374-75.To get Christos out of their house the night of the stabbing so that she could sleep with Sessler, Davalloo told Christos that her mentally ill brother would be spending the weekend with her, that he did not know she was married to Christos and that her brother would be very upset if he found out about it. Id., 350-51.

New York (and Connecticut) law, the exception for bodily injury to a spouse applied to that the assault charge in which Christos was the victim. As proven at page 18, by the terms of this exception it cannot apply here because Christos is not the victim of the murder charge. Davalloo's New York testimony did not waive the privilege here.[14] As proven at pages 17, her statements to Christos were privileged regardless of whether she "made the same inculpatory statement to [other] people before [or after s]he made the statement to [her husband]." *Christian*, 267 Conn. at 724.

### E. Davalloo's Statements to Christos Proved That Davalloo Had a Pathological Obsession with Sessler That Drove Her to Murder Sessler's Girlfriend, the Victim, and to Later Try to Kill Christos and Were Certainly Harmful.

"[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." *State v. Favoccia*, 306 Conn. 770, 808-09 (2012).In determining harm, this Court looks to "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative . . . and, of course, the overall strength of the prosecution's case." Id.

The marital conversations were critical to proving Davalloo's motive to kill the victim, and thereby, her identity as the murderer. Christos said that Davalloo, using pseudonyms, incessantly talked about Jack's relationship with Anna Lisa and Melissa's desire to see that relationship end so Melissa could have Jack to herself. The state offered this to prove what it called, "the Sessler obsession," 2/8 Tr., 4, or the reason why Davalloo would murder the victim. 6/30/11 Tr., 3-4, 17; App., A4, A6, A13. Others heard about the fictitious Melissa, Jack and Anna Lisa once or twice, but only Christos heard about it every day. Most importantly, Davalloo's occasional mention of the trio to her friends did not lead any of them

---

[14] See *United States v. Mitchell*, 2009 U.S. Dist. LEXIS 2978, 2009 WL 103610, at *5, *6 (N.D. Iowa Jan. 15, 2009) (holding that an implied waiver did not arise from the wife's grand jury testimony); *SEC v. Lavin*, 111 F.3d 921, 933 (D.C.Cir. 1997) (disclosure in pleadings in support of privilege did not waive it; defendant is not simultaneously using portion of privileged statement to gain advantage in litigation, as a sword and a shield); *United States v. Davis*, 286 Fed. Appx. 353, 357 (9th Cir. 2008) (defendant did not waive marital privilege by answering questions in divorce proceedings).

to view Davalloo as obsessed with Sessler.[15] Even Sessler did not see it that way. 1/26 Tr.,
48-49. Only Christos did because he was married to her and heard about it every day.

Tired from a long day at school and from teaching, Christos would come home and
have to listen to Davalloo's incessant talk about Melissa, Jack and Anna Lisa. 1/24 Tr., 76,
78, 80, 87. Christos said Davalloo always spoke to him about the Jack and Anna Lisa
relationship from Melissa's perspective and talked incessantly about Melissa's despair,
Jack's treatment of her and Anna Lisa's success with Jack. Id., 74, 76, 88, 91. Davalloo
asked, "Why is [Jack] cheating on one with the other," id., 74, and "Why isn't Jack spending
time with [Melissa]? Why doesn't he open up to her more? He's spending more time with
Anna Lisa, may be a vacation." Id., 75. He naively thought her stories were about helping a
friend spy on a cheating boyfriend. Id., 80, 87. The murder put it in a different light.

Christos "became very sick of these stories," he would "humor" her by listening to
her, but "[i]t was . . . in one ear out the other." Id., 76, 78, 80. In frustration, he told her,
"[W]hy doesn't Melissa just confront Anna Lisa [about it,]" and "[J]ust . . . let these two
women work it out between them." Id., 76-77. Christos said their marriage was not
"romantic," he and Davalloo lived together essentially as roommates, and he honestly
thought Davalloo "was living vicariously through Melissa's stories." Id., 79. In short, Christos
was a patient man, but even he could not put up with her daily ranting about the trio.

If that were not enough, Davalloo told him to leave the house for several days every

_____

[15] For example, according to Christos, Davalloo talked about her "anxieties or fears"
about Jack and Anna Lisa "a few times" in front of Christos' parents and two friends, Mr.
and Mrs. Meis, but this talk did not arose any suspicions that Davalloo was obsessed with
Sessler. 2/2 Tr., 76, 79. Davalloo told the Meises about Jack's relationship with Anna Lisa
and asked them if Melissa should confront Anna Lisa about ending her relationship with
Jack. Id., 94-99, 108. After the victim's death, Davalloo told them Melissa and Jack were
now happy together and Anna Lisa was out of the picture. Id., 100-01. Davalloo mentioned
to them that Melissa listen to Jack's voice mail to learn if he was still seeing Anna Lisa, and
related a story in which Melissa booked a seat on the same flight as Jack and sat next to
him and another in which Jack set her up on a blind date. Id., 97-98, 101. The Meises also
thought Davalloo mentioned something about DNA and fingerprinting, buying a stun gun for
her protection, Christos owning night vision goggles, having a lock pick and Melissa watching
Jack in a parking lot, but they could not remember anything specific. Id., 100, 109, 111.

couple of weeks. He said Davalloo has a brother institutionalized with schizophrenia, id., 98-99, and her family has not told her brother that she is married to Christos because they feared "he would act up at the wedding, may be cause scene." Id., 98. Davalloo told Christos her brother could not discover they were married because it could cause "a breakdown." Id., 99. Starting about a year before the murder, Davalloo would ask Christos to leave their condo for the weekend so that her brother could visit her there. Id., 99-100, 105. Davalloo told him to take all his personal items so her brother would not ask questions. Id., 100-01. Christos obliged. Id., 100-01. When he returned home, he would find that someone had moved the clothes he had left there and dishes left in the sink including wine glasses. Id., 106-07. After the victim's death, the frequency of the brother's visits increased to once every two weeks. Id., 105-06. When Christos' protested that this had to stop, Davalloo told him her brother's condition had worsened. Id., 108. Only Christos' gullibility prevented him from realizing that Davalloo's obsession with Sessler was pathological.

In its closing argument, the state hammers home this point. It says that Davalloo' Sessler obsession proves she wants to kill the victim and is guilty. The state repeatedly refers to "the Sessler obsession." 2/8 Tr., 4. It says that Davalloo killed to "eliminate[e] all obstacles to her obsession . . . [t]o rekindle a romance with [ ] Sessler," id., 6; the victim's murder and the stabbing of Christos, "it is always about [ ] Sessler," id., 8; "the stalking, . . . the night vision goggles, . . . the monitoring of office phone messages, . . . the lock pick set, . . . [the] escapade on the plane with Sessler," "the destiny deception," all "corroborate this obsession," id., 8. The Sessler obsession is persuasive, the state says, not because of the stories she told but because of "to whom she told these stories." Id., 9. It riles the jury: "[T]he depth of her obsession [is] revealed by telling her husband . . . in the guise of fake names about the affair . . . inveighing . . . [him] into assisting her in learning the tools of the trade necessary to stalk Jack and Anna Lisa," id., 9; "[T]elling those fake name stories betrays not only [Christos], but also betrays to you[, the jury,] the depth of her obsession . . . that led her to kill, [a] truly lethal obsession." Id., 9. Davalloo is, it says, "fueled by an

obsession" when she stabs the victim, id., 48; and "that moment that [Davalloo] had threatened and talked about for so long where Melissa . . . was going to confront Anna Lisa over Jack, finally occurred." Id., 50. But the Sessler obsession does not stop with the victim's death. It ends in the stabbing of a duped Christos, as he lay helpless, handcuffed and blindfolded on the floor of his home. Id., 7-8.

Without these martial conversations, the state could not have convinced a jury beyond a reasonable doubt that Davalloo killed the victim because of her obsession with Sessler. She is entitled to a new trial at which this evidence is excluded.

**Arg. 2: Davalloo's Misconduct Concerning Her Plan to Surveil the Victim and Her Assault of Her Husband Is Not Admissible to Prove She Murdered the Victim**

**A. The Relevant Facts**

*1. The State's Argument*: The misconduct consists of Davalloo's procuring night vision goggles, a tape record and a lock pick, to be used to "stalk" the victim and invade her home—none of which lead anywhere—and Davalloo's stabbing of Christos. App., A265-66; 8/18/11 Tr., 7-11. The liberal rule in sex cases applies because adultery involving consensual sex, in the state's attorney mind, is "compulsive or aberrant sexual behavior," which is of a "pathological nature." App., A267-69. The state speculates that Davalloo stabbed Christos because she feared that one day he might discovered her affair with Sessler, might suspect Davalloo of murdering the victim and might go to police with his suspicions. App., A275-76, A280; 8/18/11 Tr., 13-14. The state argues that Davalloo's assault of Christos shows a broad, amorphous plan to kill those who are "obstacles to her continued desire to continue an illicit sexual affair with Nelson Sessler,"[16] App., A259, and is "part and parcel of her over-arching plan to rekindle [her] relationship [with Sessler.]" 8/18/11 Tr., 5-6, 11-17, 60; App., A270. The state characterizes the two crimes as

_____

[16] It continues, that "the same element of irrationality and compulsiveness attendant to aberrant [sex] crimes . . . [also applies to Davalloo,] a woman motivated by sexual desire to kill a rival of her lover and them attempt to kill her husband." App., A268; 8/18/11 Tr., 21-23. The state confuses consensual sex with sexual assault and misleads the court. See *State v. Faria*, 47 Conn. App. at 170 n.10; App., A267-69; 8/18/11 Tr., 39-40, 45-46.

signature offenses because in each Davalloo made phone calls to Sessler around the time of the crimes. Id., 19-20, 61-62. The crimes are part of a common plan or scheme, the state says, because they are committed as part of a plan formed in Davalloo's mind when she killed the victim. The state says they establishes motive, and motive establishes identity. Id., App., A259. Nonetheless, the state throws in the kitchen sink and says the stabbing of Christos and all the other misconduct evidence shows "intent, lack of accident or mistake, knowledge of the intended site of the crime," id., A259, A270; 8/18/11 Tr., 18, completion of the prosecution's story and "in all probability corroboration of crucial prosecution testimony." App., A284. After claiming these makeweight exceptions, the state makes no detailed argument in support of them. 8/18/11 Tr., 18-19, 27. Worse still, the state invites the court to commit harmless error by admitting misconduct under exceptions that do not apply because if the court is wrong, one valid exception renders any error harmless. Id., 25-26.

   **2. The Defense Objection**: Defense counsel objected that (1) the liberal rule for sex crimes does not apply; 8/18/11 Tr., 35-39; (2) the misconduct especially the stabbing of Christos is propensity evidence; id., 31-33; (3) the victim's murder lacked sufficient similarity to be admissible under the common scheme and plan exception, App., A297; 8/18/11 Tr., 40-53; (4) the misconduct is too prejudicial; id., 54-56; (5) a curative instruction is insufficient, id., 46-47.

   **3. The Trial Court's Ruling**: In its analysis, the court does not distinguish between the misconduct surrounding the death of the victim, the misconduct preceding the stabbing of Christos and the stabbing. App., A387-390. The court relies on the liberal rule in sex cases because of the "aberrant compulsivity of the defendant's conduct," and adopts wholesale the arguments in the state's brief. Id., A390; see 8/18/11 Tr., 2.

   Christos' stabbing, the court says, "is indicative of a common scheme or plan by the defendant to eliminate a rival [the victim] and an impediment (Christos)," and "bears on motive and thus intent and identity." App., A287 (relying on *State v. Randolph*, 284 Conn. 328 (2007)); 8/18/11 Tr., 1-2. Moreover, it says that Davalloo's "unusual" "manipulation" of

Christos "is extremely relevant to motive[,] common scheme, identity and intent." Id., A389. Christos' stabbing, it continues, does "not show a general propensity to violence" but "violence directed at . . . [a] small, limited class" of two, Christos and the victim. Id. It concludes, "[A] specific emotion of the defendant provoked the two assaults[.]" Id. Christos' stabbing is not unduly prejudicial because, in the court's opinion, it is necessary to prove the state's case as there is no eyewitness, and the stabbing is "not gruesome or heinous," especially compared to the victim's murder. Id. Repeating the state's shotgun approach, the court rules that the misconduct is admissible "to show motive, identity, intent, common scheme, lack of accident or mistake or self-defense, completion of story, and in all probability corroboration of crucial prosecution testimony." Id., A390. The court gave limiting instructions to this effect.1/24 Tr., 61-62; 2/2 Tr., 3, 56; 2/3 Tr., 13-14; 2/9 Tr., 28

   *4. The Defense Preserved the Issue in the Trial Court*: The written objection and oral argument raised and preserved the issue of the admissibility of the misconduct evidence. App., A297; 8/18/11 Tr., 30-58. The defense argued that admission of misconduct "is contingent on [the proponent] satisfying the relevancy standards and balancing test set forth in §4-1 and §4-3, respectively," Conn. Code of Evid. §4-5 (b), Commentary

   **B. Standard of Review**

   Review of the admission of evidence begins with whether the trial court based its decision on a correct view of the law and such review is plenary. *State v. Saucier*, 283 Conn. 207, 218 (2007). Misconduct evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions, such as, intent, identity, common plan. *State v. Pena*, 301 Conn. 669, 674-75 (2011). Once the trial court correctly applies a correct exception, does it have discretion to admit it as not disproportionately prejudicial. Id.

   **C. Davalloo's Efforts to Surveil the Victim and Her Stabbing of Christos Were Excessively Prejudicial Evidence Used to Prove Her Propensity to Commit Murder.**

   Misconduct evidence is inadmissible to prove bad character or a propensity to

engage in wrongdoing, Conn. Code of Evid. §4-5 (a). It may, however, be admissible under certain exception, id., § (b). "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect[.]" *State v. Pena*, 301 Conn. at  673-74. Using the laundry list of exceptions compiled from the state's brief and the court's memorandum, the pages that follow address these claimed exceptions seriatim. They are identity, common scheme or plan, motive, intent, lack of accident or mistake or self-defense, completion of the state's story, corroboration of crucial prosecution testimony. Generally, the state and the court did not separately analyze the admissibility of the assault of Christos and the plan to surveil the victim. Not all the exceptions arguably applicable to the assault can apply to the per-murder plan, and only those applicable are discussed.

### a. The misconduct showed only a propensity to commit murder.

*1. Motive and common plan or scheme to show identity*: Misconduct that is part of a common plan or scheme may be admissible to show a defendant's "motive, and hence the doing of the criminal act, the identity of the actor, and his intention[.]" (Cit. omtd.) *State v. Shindell*, 195 Conn. 128, 133-34 (1985). There are two categories of common plan cases. *State v. Randolph*, 284 Conn. 328, 344-45 (2007). First, in the "true" common plan cases "an overall scheme or plan existed in the defendant's mind and . . . the crimes were executed in furtherance of that plan," and so, "a genuine connection [exists] between the crimes in the defendant's mind. Id., 344. Thus, the facts of the charged crime and the misconduct can be dissimilar with the defendant's plan connecting the two. Id., 345 (giving examples). In the second category are "signature" crimes, in which "the method of commission exhibits the existence of a 'modus operandi,'" and the similarities between the charged crime and the misconduct supply the "inference that the crimes were executed in furtherance of an overall common scheme or plan." Id., 344. The modus operandi theory requires a high degree of factual similarity between the misconduct and the crime. *State v. Randolph*, 284 Conn. at 350-52 & n.6. Davalloo's stabbing of Christos fits into neither

category; she did not have a plan to kill the victim *and* her husband, and the offenses are not so similar as to be signature crimes.

     *i. Common Plan and Motive*: In true plan cases, the defendant's state of mind or purpose in committing the offenses connects the two cases, rather than the factual similarities of the offenses. *Randolph*, 284 Conn. at 343-46, 354-55 (citing cases). At the time Davalloo purportedly killed the victim, she did not have a plan to kill anyone else, let alone an overarching plan to kill the victim and Christos to continue her affair with Sessler. All the state showed was that Davalloo killed the victim and later decided to kill Christos. The state also ignores the disparate facts of the crimes that show they were committed for different purposes. Sessler ended his affair with Davalloo because he preferred the victim. Davalloo confronts the victim about it and kills her. After the victim's death, Christos threatens Davalloo's renewed affair with Sessler. The state offers two reasons why Davalloo tried to kill he husband. First, it suggests Christos was becoming uncooperative in leaving the apartment, despite Davalloo's rouse about her brother visiting. Second, it suggests Davalloo had some vague speculative fear that if Christos learned about the affair, he would tell police about it, and she would become a suspect in the victim's murder. A true plan cannot exist where the motives depend on such contingent events.

     The purported plan is so overly broad and vague that it cannot support an inference that if Davalloo tried to murder Christos then she likely killed the victim. The state says, Davalloo committed both crimes "to eliminate any obstacles which stand in her path to rekindling an affair . . . with Nelson Sessler[.]" Id. Adopting this indistinct plan, the court fins a similarity based on the victims. It says that Davalloo's supposed hatred of her husband and the victim creates "a limited class of two individual," to whom she reacts violently. Id. Her relationship with her husband is much more nuanced than her "hatred." Even if it can be said she hated him, her feelings towards him are fundamentally different from her feelings towards the victim. In any event, hatred is not a plan. Presumably, if Davalloo perceived another person as "an obstacle" to her relationship with Sessler then the "limited

class" would expand to three people, and so on. Under this vague notion, the number of victims increases as a new person arrives on the scene, Davalloo perceives the person as obstacles to her Sessler affair, and presumably reacts violently. Compare with *State v. Shindell*, 195 Conn. 128, 133-34 (1985) (defendant's intent to commit arson to collect insurance money connected the two crimes). The state's plan theory is a pure propensity argument—"once a murderer always a murderer."

*ii. Signature Crimes*: Labeling the victim's murder and the stabbing of Christos "signature crimes" is even more farfetched. *Randolph*, 284 Conn. at 352. They are not "so nearly identical in method as to earmark them as the handiwork of the accused" or "so unusual and distinctive as to be like a signature." *State v. Figueroa*, 235 Conn. 145, 163 (1995). The factual dissimilarity of the two offenses cannot support an inference that the person who assaulted Christos also murdered the victim. Id., 356.

Common to most assaults and murders is the use of a weapon to inflict deadly injuries. Other than a gun, a knife is the most common method used weapon in assaults and murders.[17] Other than the generic fact of the use of a knife, the unique facts of the misconduct and the crime set them apart. They took place over four months apart. Davalloo assaulted Christos in New York and the murder occurred in Stamford. Christos lived with Davalloo and assaulted him in their home during an elaborate game in which she bound and blindfolded him and then transported him to a hospital parking lot where she again stabbed him. In contrast, the victim was a relative stranger who was surprised at her front door and stabbed during a violent struggle. Christos' stabbing is bizarre; the reasons for it obscure. The state speculates that Davalloo feared that Christos would find out about the affair with Sessler, suspect that Davalloo killed the victim and tell police about his suspicions. The victim was murdered, the state says, to eliminate a rival for Sessler's affection. The night vision binoculars, lock pick and tape recorders did not figure in the

---

[17] FBI Uniform Crime Reports for 2002 & 2003, Murder, Table 2.9 - Types of Weapon Used, Percent Distribution by Region, 2002, 2003.

murder and so, do not connect Davalloo to it. Compare this case with cases cited in *Randolph*, 284 Conn. at 347-357. The facts of the Christos stabbing and the victim's murder could not be more disparate.

The court says the two crimes are signature offenses because the victims were similar, a "small class" of two, and in each case, Davalloo violently reacted "to eliminate a rival," the victim, or "an impediment" to her affair with Sessler, Christos. Curiously, the court finds the offenses similar because of Davalloo's "manipulation" Christos. These overly broad, generic similarities did not show an overall plan to kill the victim and assault Christos in a similar way. This superficial similarity is a gossamer cover for a propensity argument.

(2) *Intent and lack of accident, mistake or self-defense*: The line between improper propensity evidence and misconduct is always particularly fine and is never more so than when the state offers misconduct to prove intent or its corollary, absence of accident or mistake. *State v. Beavers*, 290 Conn. 386, 400-01 & n.16 (2009). This is so because misconduct is relevant to prove intent only *after* the jury decides that the defendant committed the murder.[18] The jury here could only have used misconduct to show Davalloo's propensity to commit the murder because Intent, lack of mistake and self-defense were not issues at trial. The number and location of the stab wounds showed intent to kill. She rejected a manslaughter instruction. The court never told the jury it could use the misconduct only to prove intent and not to prove that Davalloo killed the victim.

(3) *Knowledge of the scene of the murder*: Davalloo's stabbing of Christos, of course, shed no light on her knowledge of the victim's apartment. Christos was clear that Davalloo never used the night vision goggles, lock pick or recording device. 2/24 Tr., 82-86.

---

[18]See *State v. Baldwin*, 224 Conn. 347, 358 (1993) (stating that admission of "prior misconduct evidence [to prove intent to sell] . . . became relevant once the jury determined that [defendant] had been in possession of the narcotics"); *State v. Meehan*, 260 Conn. 372, 395-96 (2002) (concluding that testimony that defendant police officer "allegedly took some of [the witness'] money during a search for illegal narcotics does not render it more or less likely that the defendant, during a subsequent, unrelated search of [another suspect], had the specific intent to appropriate the money in [that suspect's] possession").

Christos said one weekday morning, Davalloo called him at their home and said, "Melissa is currently sitting outside of Anna Lisa's apartment . . . [and] wants to know, should she go knock on her door and confront her about the affair." 2/24 Tr., 86.[19] Thus, none of the misconduct showed any knowledge of the victim's apartment.

*(4) Completion of the prosecutions story*: Misconduct may be admissible to "complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings." *State v. Brown*, 199 Conn. 47, 56 (1986) quoting McCormick on *Evidence* (3d Ed. 1984) §190. There state did not and could not claim there was anything contemporaneous about the stabbing of Christos and the victim. Similarly, evidence that Davalloo may have surveilled the victim and Sessler months before the murder did not place the victim's murder "in the context of nearby and contemporaneous happenings."

*(5) Corroboration of prosecution testimony*: The state never identified how the Christos stabbing corroborated any specific prosecution witness. In fact, the stabbing occurred over four months after the murder. To avoid potential prosecutorial abuse under this exception, courts require "a close relationship between the proffered evidence and the evidence to be corroborated." *State v. Mooney*, 218 Conn. 85, 127-28 (1985). The relationship must be "direct and the matter corroborated is significant." Id. Here, the promiscuous use of this "catch-all" exception undermines the bona fides of the admission of this evidence at all and shows its use to prove Davalloo's propensity to commit murder.

### b. The misconduct evidence was overly prejudicial.

The court abused its discretion in finding that the prejudicial effect of Davalloo's stabbing of Christos and the pre-murder misconduct did not outbalance its minimal probative value. *See State v. Faria*, 47 Conn. App. at 172-75. This misconduct (1) "unduly arouse the [jurors'] emotions, hostility or sympathy," (2) "create[d] a side issue that . . .

---

[19] Christos said Davalloo mentioned one other time when she surveilled Sessler at night in a parking lot but did not know if it was at the victim's apartment or at Sessler's house. 2/24 Tr., 85-86.

distract the jury," (3) "consume[d] an undue amount of time," and (4) "the defendant . . . is unfairly surprised and unprepared to meet it." *State v. Hill*, 307 Conn. 689, 698-99 (2013).

The picture of Davalloo stabbing her husband, as he lay bound and gagged, delaying medical treatment and stabbing him again in the hospital parking lot overwhelmed the jury. However, the state did not stop here. Rather than relying on her New York testimony admitting the stabbing, the state called five other witnesses, including three New York officers, who detailed Davalloo's lies to police about stabbing her husband, her failure to call 911 for help and her call to Sessler the night of the stabbing. Incredibly, it said her lies and omissions showed her consciousness of guilt *for the stabbing*, not the murder. The court finally lost patience with the state when it called these numerous witnesses to prove every irrelevant, inflammatory detail of the stabbing, which he had admitted. After repeated objections from the defendant that enough was enough, the court finally stopped it. 2/1 Tr., 62-63, 101-128; 2/2 Tr., 43-50, 57-60; 2/6 Tr., 2-10.But, it was too little too late; the damage could not be undone. The emotional hostility created by this image is palatable. This Court has applauded trial courts that "sanitize" misconduct by eliminating prejudicial details. See, e.g., *State v. Beavers*, 290 Conn. at 399 (court "sanitized" misconduct by eliminating details of arson); *State v. James G.*, 268 Conn. 382, 396 (2004) (same re sexual misconduct). A limiting instruction could not catch this lightening in a bottle. The jury certainly inferred Davalloo had a propensity to commit violent assaults and that if she stabbed her husband then she stabbed the victim. Davalloo's aborted efforts to acquire and use night vision goggles, eavesdropping devices and a lock pick were overly inflammatory because they never amounted to anything, did not figure in the murder, were not part of a common plan or scheme, and did not show motive, intent, or her identity as the murderer. The jury's hostile reaction to them overweighed whatever little probative value they had.

### D. The Wrongful Use of Davalloo's Pre-Murder Misconduct and Her Stabbing of Christos to Prove Her Propensity to Commit Murder Was Certainly Harmful.

The defendant has the burden of proving that nonconstitutional error is harmful by

showing there is not "a fair assurance that the error did not substantially affect the verdict."
(Cit. omtd.) *State v. Snelgrove*, 288 Conn. at 758. Without the misconduct evidence, the
state's case was weak: The evidence of motive was weak because Sessler said the affair
ended amicably and he did not view Davalloo as obsessed with him; The evidence that her
voice was on the 911 tape was disputed, The DNA evidence placing Davalloo in the
victim's home was ambiguous. Without the inflammatory misconduct, the jury would likely
have acquitted her. The harmless error analysis in *State v. Merriam*, 264 Conn. 617, 661-
68 (2003) in limited to the common plan or scheme exception where the evidence is
erroneously admitted to prove identity and is inapplicable to different exceptions
erroneously relied upon here, See, e.g., pages 28, on intent exception. Davalloo is entitled
to a new trial untainted by evidence of pre and post crime misconduct.

**Arg. 3: Davalloo Did Not Waive Her Right to Counsel.**

**A. The Relevant Facts**

**a. Davalloo's intelligence and capacity to represent herself:** Although born in the
United States, Davalloo grew up in Iran. Rec., __ (competency report). Upon returning
here, she received a master's degree in public health. Id. At the time of the trial, she was
forty-two years, convicted after a court trial in New York of attempted murder and imprisoned
for the last eight years in prison in New York. Id. 11/21/11 Tr., 16-17. Following her arrest in
New York, she was treated in-patient at the psychiatric unit of Westchester Medical Center.
Rec., __ (competency report). There, psychiatrist diagnosed her with Schizoaffective
Disorder, Bipolar Disorder, Hypomanic, Moderate Adjustment Disorder with Mixed Anxiety
and Depressed Mood, Borderline Personality Disorder with Paranoid Personality Features
and Self-defeating Personality Features. Id A competency team reviewed these psychiatric
records and found her "mildly or moderately impaired with a latent or chronic mental illness"
but did not opine on her competency to waive counsel and represent herself. Id.;11/21/11
Tr., 5-16; App., A391; see *People v. Davalloo*, 833 N.Y.S.2d 576 (A.D.2d 2007).

**b. Davalloo's understanding of the possible punishment:** The court told her the

maximum penalty was 60 years with a mandatory minimum of 25 years, but not that the court could impose it consecutive to her twenty-five year New York sentence. Id., 17, 25.

**c. The court's explanation of the dangers and disadvantages of representing oneself:** The court told her she had a constitutional right to appointed counsel. Id., 18-19. It asked if she understood "there are great dangers involved in self-representation?" and she said she had "educated" herself on the elements of the offense, jury selection and the law of evidence. Id., 18, 19, 25. The court said one of the "pitfalls" of representing oneself is that "it's very difficult to be objective about what's going on in the courtroom," and the jury might "not see [things] from your perspective[.]" Id., 19. It continued, "[The court] would give you some leeway in the trial process but you're going to have to follow the rules of evidence just like a lawyer has to and have to follow the proper courtroom procedures." Id., 18. The court noted her "history of mental health issues," asked if she considered a mental state defense and warned that such a defense required knowledge of the relevant law and the burden of proof, and that she "might be better off having an attorney helping you with that[.]" Id., 21, 22. She said she had "done a great deal of research," was "not a neophyte," had been in prison almost eight years and [had] a little experience, jailhouse lawyer experience," and was not pursuing it. Id. She added: "[She was] very clear with my New York cases, obviously, [a]nd will be able to represent myself as well. Pretty funny."[20] Id.

**d. Davalloo reasons for representing herself:** Davalloo said her attorney, Public Defender Butler had done "a phenomenal job," and she had "a good rapport" with him but "had ideological differences with [him]." Id., 20. She disagreed with Butler about a plea and "felt that my hands were a little tied in terms of some of the decision-making process," "the order of witnesses [and] which witnesses to call." Id., 20. She said, "[T]here's only minimal rights that I had as a represented individual and I wanted a little bit more leeway in the decision-making process." Id., 21. The court said that lawyers and clients often disagreed

---

[20] On appeal of her New York conviction, Davalloo claim her counsel was ineffective in pursuing a mental state defense. *People v. Davalloo*, 833 N.Y.S.2d 576 (A.D.2d 2007).

on strategy but that does not mean the lawyer is not doing a good job. Id., 21.

    **e. The Court's Ruling:** The court found Davalloo had "knowingly, intelligently and voluntarily decided to represent herself" and was "capable of [doing so]." Id., 24-27. It warned her, "[Y]ou're not going to be able just to change your mind and go back to having your lawyer represent you unless the Court allows you to do that." Id., 22-23. As Davalloo requested, the court appointed Butler as standby counsel and said his role was to answer her questions, and not "to jump up and object[,] [ ] unless you object," but he can "point out things that are favorable to your side of the case[.]" Id., 18, 23, 25, 26

    **B. The Issue Is Reviewable on Appeal.**

    The issue was not raised in the trial court and is reviewable on appeal under the *Golding* doctrine,[21] *State v. Collins*, 299 Conn. 567, 610 (2011), and as plain error under Conn. Prac. Bk. §60-5, for failure to substantially comply with id. §44-3. See footnote 6.

    **C. The Standard of Review**

    This Court reviews a waiver of counsel for an abuse of discretion. *State v. T.R.D.*, 286 Conn. 191, 202 (2008). The underlying facts found by the trial court are subject to the "clearly erroneous" standard subject to the caveat that in constitutional fact-finding be tested by a "scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence." *State v. Damon*, 214 Conn. 146, 154 (1990).

    **D. Davalloo Did Not Voluntarily and Knowingly Waive Counsel.**

    To proceed *pro se*, a defendant must knowingly and intelligently waive the right to counsel. *Farettav. California*, 422 U.S. 806, 835 (1975); *State v. Gethers*, 193 Conn. 526, 534 (1984).To ensure a valid waiver of counsel, a judge must make a "penetrating and comprehensive examination" of the relevant circumstances," *Von Molke v. Gillies*, 332 U.S.

---

    [21] *State v. Golding*, 213 Conn. 233, 239-40 (1989). In *Golding*, the Court established a four-pronged test for unpreserved constitutional error: (1) the record must be adequate for review ; (2) the claim must be of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation must clearly exists and deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.

708, 724 (1948), and a "searching or formal" inquiry into both the defendant's understanding of the Sixth Amendment waiver and the defendant's awareness of the disadvantages of self-representation, *Iowa v. Tovar*, 541 U.S. 77, 89 (2004). A valid waiver is the intentional relinquishment or abandonment of a known right or privilege. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The United State's Supreme Court has adopted a "'pragmatic approach to the waiver [of counsel] question,' one that asks 'what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage,' in order 'to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized." *Iowa v. Tovar*, 541 U.S. at 90. The warnings of the dangers and disadvantages of self-representation must be the most "rigorous[ly]" conveyed to a defendant who proceeds to trial without counsel because "at trial, counsel is required to help even the most gifted layman adhere to the rules of procedure and evidence, comprehend the subtleties of *voir dire*, examine and cross-examine witnesses effectively . . ., object to improper prosecution questions, and much more." *Patterson v. Illinois*, 487 U.S. 285, 298, 299 n.13 (1987). "[R]ecognizing the enormous importance and role that an attorney plays at the criminal stage [of trial]," the Court has "imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him [to] waive his right to counsel at trial." Id. 298.

Here, the trial court did not explain to Davalloo the technical problems she faced in proving herself innocent and the importance of counsel to the presentation of an effective defense.[22] It did not tell her that by representing herself she substantially increased the risk

---

[22] See *Von Moltke*, 332 U.S. at 724; *United States v. Sandles*, 23 F.3d 1121, 1127 (7th Cir. 1994) (insufficient to say there are many matters from the jury instructions to legal matters that need to be addressed); *Shafer v. Bowersox*, 329 F.3d 637, 648 (8th Cir. 2003) (same re advantageous to have an attorney); *United States v. Taylor*, 113 F.3d 1136, 1141 (10th Cir. 1997) (insufficient to say "federal criminal procedure was 'very technical' and 'not a simple matter'"); *United States v. Welty*, 674 F.2d 185, 188-89 (3d Cir. 1982) (defendant

34

that although she may be innocent, the jury may find her guilty because she does not know how to establish her innocence.[23] The court accepted her assurance that she knew the benefits of counsel and desired to waive them. Moreover, the court, Judge White, who was not going to preside at the trial, misled her to believe the trial judge would not rigorously enforce the rules of evidence and procedure if she represented herself. The court did not explain that despite substantial evidence of a mental state defense, she was giving up as a practical matter a defense of extreme emotional disturbance and an instruction on a lesser-included offense of manslaughter with its substantially lesser sentence. The court did not explain that it could impose a sentence on a murder conviction consecutive to her New York sentence, which would ensure that she died in prison. *State v. T.R.D.*, 286 Conn. 191, 198-206 (2008); *State v. Diaz*, 274 Conn. 818 (2005). The court did not probe her dissatisfaction with counsel that drove her to represent herself. A request to represent one's self based on dissatisfaction with counsel undermines the voluntariness of the waiver of counsel and the decision to precede pro se, irrespective of whether the request is unequivocal.[24]

### E. Denial of Counsel Is Structural Error and Can Never Be Harmless.

"The right to counsel is so basic that its violation mandates reversal even if no particular prejudice is shown and even if there is overwhelming evidence of guilt." (Cit. omtd.) *State v. T.R.D.*, 286 Conn. 191, 206 (2008). Davalloo is entitled to a new trial.

### CONCLUSION

Based on each of the three arguments above, Davalloo is entitled to a new trial.

---

not told he "may be hampered in presenting his best defense by his lack of knowledge of the law"); *United States v. Keen*, 104 F.3d 1111, 1115 (9th Cir. 1997) (same).

[23] See, e.g., *State v. Gethers*, 197 Conn. 369, 371-72 (1985); *Government of Virgin Islands v. James*, 934 F.2d 468, 473 (3d Cir. 1991); *United States v. Silkwood*, 893 F.2d 245, 248 (10th Cir. 1989); United States v. Ant, 882 F.2d 1389, 1394 (9th Cir. 1989); *United States v. McDowell*, 814 F.2d 245, 250-51 (6th Cir. 1987); *United States v. Bailey*, 675 F.2d 1292, 1300 (D.C. Cir.),

[24] See, e.g., *Pazden v. Maurer*, 424 F.3d 303, 316, 318 (3d Cir. 2005) (involuntary waiver when defendant given choice between unprepared counsel and self-representation); *James v. Brigano*, 470 F.3d 636, 644 (6th Cir. 2006) (same); *United States v. Silkwood*, 893 F.2d at 248-49 (same); *State v. Carter*, 200 Conn. 607 (1986).

Respectfully submitted,
THE DEFENDANT, SHEILA DAVALLOO

BY: *Mark Rademacher*
MARK RADEMACHER, HIS ATTORNEY
ASSISTANT PUBLIC DEFENDER
APPELLATE OFFICE
2911 DIXWELL AVENUE
HAMDEN, CT 06518
(203) 230-3357
FAX (203) 230-3361
JURIS NO. 416157

Filed: August 30, 2013