# Appendix   C

## 2 of 2

# SUPREME COURT

## OF THE

# STATE OF CONNECTICUT

Judicial District of Stamford/Norwalk at Stamford

# S.C. 19032

# STATE OF CONNECTICUT

## v.

# SHEILA DAVALLOO

## DEFENDANT'S SEPARATELY BOUND
## ONE VOLUME APPENDIX

MARK RADEMACHER
ASSISTANT PUBLIC DEFENDER
JURIS 416157
OFFICE OF THE CHIEF PUBLIC DEFENDER
2911 DIXWELL AVE, 4TH FLOOR
HAMDEN, CONNECTICUT 06518
TEL. (203) 867-6150; FAX: (203) 867-6157

COUNSEL OF RECORD
AND
ARGUING ATTORNEY

# INDEX TO APPENDIX

**Issue 1**

1. State's Trial Brief Regarding Marital Communications,
   Dated January 15, 2011 ............................................................... A1

2. Defendant's Motion in Limine to Exclude Testimony
   Concerning Confidential Marital Communications,
   Dated May 26, 2011................................................................... A23

3. Defendant's Motion in Limine to Exclude Testimony
   Concerning Martial Communications,
   Dated May 31, 2011 ................................................................... A31

4. State's Motion in Limine Regarding the Admissibility
   Of Martial Communications dated June 1, 2011, and
   State's Supplemental Brief to Motion in Limine Dated
   June 1, 2011 Regarding Marital Communications,
   Filed June 22, 2011 ................................................................... A49

5. Excerpt of June 30, 2011 Transcript, pp. 1-50,
   (oral argument on motions in limine regarding
   martial communications and trial court's ruling
   thereon) ................................................................................... A57

6. Excerpt of January 24, 2012 Transcript, pp. 64-177;
   Excerpt of January 25, 2012 Transcript, pp. 87-110
   (entire testimony of state's witness, Paul Christos) ................. A113

   6A Excerpt of January 24, 2012 Transcript, pp. 64-177
      (testimony of state's witness, Paul Christos) ..................... A115

   6B Excerpt of January 25, 2012 Transcript, pp. 87-110
      (testimony of state's witness, Paul Christos) ..................... A 231

**Issue 2**

7. State's Brief in Support of State's Use of Other
   Misconduct Evidence, dated January 15, 2011 ....................... A257

8. Defendant's Motion in Limine Re Subsequent
   Misconduct Evidence, filed August 16, 2011 .......................... A297

9. Excerpt of August 18, 2011 pp. 1-63
   (argument on state's motion to admit evidence
   of defendant's misconduct) ................................................... A315

10. Excerpt of Transcript of September 1, 2011, pp. 1-2
    (court announces its ruling on motion to admit evidence
    of defendant's misconduct) ................................................. A381

11. Court's Memorandum of Decision on State's Motion
    To Admit Defendant's Misconduct, filed September 1, 2011 ................................ A385

**Issue 3**

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
    (competency hearing and defendant's waiver of
    counsel before Judge Gary White) ....................................... A391


Constitutional and Statutory Provisions Relied Upon ................................................. A421

## WITNESS INDEX

1. Excerpt of January 24, 2012 Transcript, pp. 64-177;
   Excerpt of January 25, 2012 Transcript, pp. 87-110
   (entire testimony of state's witness, Paul Christos)  ............................................. A113

# 1.

# State's Trial Brief Regarding Marital Communications,

# dated January 15, 2011

FST 165602

STATE OF CONNECTICUT

V.

SHEILA DAVALLO

SUPERIOR COURT

JUDICIAL DISTRICT OF STAMFORD-
NORWALK AT STAMFORD

JANUARY 15, 2011

TRIAL BRIEF REGARDING

MARITAL COMMUNICATIONS

Background

The defendant Sheila Davalloo is charged in a one count information with the crime of

murder. That crime arises from the November 8, 2002 assault upon Anna Lisa Raymundo at her

condominium located at 123 Harbor Drive in Stamford. On that date, shortly after noon, officers

of the Stamford police department responded to an assault complaint at that address. There they

discovered her recently murdered body.

Thereafter, an investigation ensued, resulting in the defendant's arrest approximately five

years later. The State alleges that Nelson Sessler, the live- in boyfriend of the deceased, had

engaged in a sexual affair with the defendant prior to the murder of the deceased. The State

alleges, in short, that, motivated by her obsession with Sessler, the defendant Davalloo assaulted

and murdered Anna Lisa Raymundo, her rival for his affections. Paul Christos was married to

the defendant Davalloo during her affair with Sessler and at the time she is claimed by the State

to have murdered Anna Lisa Raymundo.

During the course of this marriage the defendant made various dishonest and

incriminating statements to her husband Christos. Six months after her murder of Raymundo, the

A3

defendant attempted to murder her husband Christos as part of her misguided scheme to eliminate obstacles to her obsession with Sessler.

Synopsis of Anticipated Testimony of
The Defendant's Spouse

During the course of this case the State anticipates calling Paul Christos to the witness stand. He is the former husband of the defendant Shiela Davalloo. At all relevant times prior to the death of Anna Lisa Raymundo, Christos was ceremoniously married to the defendant. In March of 2003, five months after her murder of Raymundo, the defendant assaulted Christos with a knife and seriously injured him. Thereafter he filed for divorce and the marriage was dissolved by a New York court on September 3, 2004.

When called by the State, the former husband Christos will testify to certain relevant statements and conduct he heard and observed during the course of the marriage. His anticipated testimony can be summarized as follows. Christos would testify that sometime during the summer of 2002 the defendant described to Christos a love triangle which she learned about at work. The triangle involved a woman named Anna Lisa, a man named Jack, and a woman named Melissa. Davalloo told her husband that Melissa was her close friend.

According to what the defendant told her husband, Jack was living with Anna Lisa and was also having an affair with Melissa. Melissa thought that Anna Lisa was mean to Jack. Defendant Davalloo would tell Christos that Davalloo was going out to meet with Melissa (Davalloo's friend and confidant) to follow Anna Lisa and see what her and Jack were doing. According to Christos the defendant had in her possession night vision goggles, a scanner and a lock pick set. She would practice using the pick set by picking the lock on their apartment door.

A4

## 1. State's Trial Brief Regarding Marital Communications,
### Dated January 15, 201

Davalloo did so in order to assist Melissa in gaining access to the Raymundo condominium. Her husband assisted her attempt to learn the use of the lock pick set.

She also stated that Melissa had obtained Jack's mail code and would check his voice mail. Davalloo recounted to her husband that she, Davalloo, would wait outside the condominium of Raymundo in order to track her movements. Sometime after November of 2002 the defendant stopped telling Christos about the love triangle, so Christos asked her what had happened. Davalloo replied that Anna Lisa and Jack had broken up and that Jack had gotten his own apartment. Jack was seeing Melissa, and Melissa and Jack were now very happy, but Jack may be moving to England. In fact, at that time Anna Lisa Raymundo was already deceased and Nelson Sessler had been offered a job opportunity in England.

Christos also stated that the defendant had returned to their home on an occasion with a lock pick set that the defendant said belonged to Melissa. She told Christos that she and Melissa planned to pick the lock at Anna Lisa's home and enter to see if photos of Jack and Anna Lisa showed they were happy together. She also told her husband that she and Melissa intended to hook up a device to Jack's phone at work to record his conversations with Anna Lisa.

Christos would also testify to those events which are relevant to a subsequent act of similiar, relevant misconduct on March 23, 2003. On that date the defendant stabbed her husband several times. At or about the time of this stabbing event, Davalloo called Sessler on her cell phone and invited Sessler to the marital domicile (the scene of the stabbing) for dinner. It is anticipated that this testimony is highly relevant to motive, identity and common scheme. Nelson Sessler was clearly the object of the defendant's obsession.

After the stabbing, the State of New York charged Sheila Davalloo with attempt at murder, two counts of assault in the first degree (one for each stab wound), and criminal

possession of a weapon (the knife). The State of New York claimed that the motive for the attempted murder was an obsessive love affair which the defendant conducted with Nelson Sessler. See Transcript pages 55-65.

The defendant was convicted after a trial to the court. Both her and her husband/victim testified during the trial. During the trial the defendant admitted that she had spoken to her husband about a *fictitious* love triangle at work involving Melissa, Jack and Anna Lisa. That in reality *she was talking to her husband about an affair in which she was engaged*. The defendant called herself "Melissa", she called Nelson Sessler "Jack" and Anna Lisa was Anna Lisa Raymundo. See Transcript at pages 374-75. She also admitted that she told Sessler that she was divorced. She would have her husband leave when Sessler would travel to their apartment. She employed the tactic of telling her husband that her mentally ill brother would be visiting and that Christos should move out for the evening or weekend. See Transcript at page 350. Christos confirmed that she told him this during his testimony. Tran. at page 168. He also described her conduct and words before, during and in the wake of the assault. Transcript at pp. 133-231.

As the trial unfolds various other relevant statements made by Davalloo to her husband will be elicited to elaborate on the events summarized above.

## Legal Discussion

### The Two Privileges: Husband-Wife Testimonial Privilege and
### Confidential Marital Communications

A.

**1. State's Trial Brief Regarding Marital Communications,**
**Dated January 15, 201**

Husband-Wife Testimonial Privilege

At early common law in a criminal proceeding one spouse was not a competent witness for or against the other. *State v. Saia*, 172 Conn. 37, 42 (1976). The rule was based on the legal unity of spouses and the policy of preventing discord between them. *Saia*, supra at 43.

In Connecticut the common law rule has been abrogated by C.G.S. Sec. 54-84a. That section provides in relevant part that one spouse is a competent witness against the other. However, the same statute provides that while a spouse may be competent to testify, the testifying spouse may elect not to do so. Thus, the statute creates a Husband-Wife testimonial privilege during the course of the marriage which privilege is held by the spouse of the defendant.

The statute carves out an exception to this privilege where the testifying spouse has been the victim of violence perpetrated by the spouse or when certain specified statutes concerning violence against and exploitation of family members and children have been committed. The state may compel a spouse to testify against the other spouse where such a violation has occurred. This privilege belongs solely to the witness-spouse and *exists only so long as the marriage*. See *State v. Christian*, 267 Conn. 710, 725 (2004); *State v. Volpe*, 113 Conn. 288, 290 (1931). In the present case, the divorce of the defendant and her husband is dispositive of the right of the husband to elect not to testify against the defendant. Furthermore, the husband is a willing witness and he has been the victim of domestic violence.

B.

Confidential Marital Communications

The second marital privilege which has developed since the abandonment of spousal testimonial incompetence is that which guards confidential marital communications.

A7

State's Trial Brief Regarding Marital Communications
Dated January 15, 201

That such a privilege might exist in our state was recognized in the case of *State v. Littlejohn*, 199 Conn. 631 (1986). There the court stated that, while such a privilege had never been explicitly recognized, "such a privilege commends itself to judicial acceptance". *Littlejohn*, supra at 649. The court reasoned that it need not reach the issue, since any communication which had been the subject of testimony during the trial was a communication made in the presence of a third party and therefore not confidential. Therefore, any error at the trial level in not recognizing the privilege was harmless. See *Littlejohn*, supra. Full recognition of the privilege would await the case of *State v. Christian*, 267 Conn. 710 (2004).

In *Christian* the defendant husband was charged with vehicular homicide. Driving while intoxicated, he had left the roadway and killed a female passenger in the car. Hospitalized in the immediate wake of the accident, he confessed to his wife that he had been driving. At trial he claimed that the victim was the driver. The State called the wife as a witness to his admission. The State argued that the privilege did not exist in Connecticut, and, alternatively, if it did, it did not apply in this case, because, by the time of trial, the marriage had irretrievable broken down. The defense argued to the contrary. The State prevailed in the trial court, thereafter the defense prevailed before the Supreme Court.

The Supreme Court held that indeed there was a testimonial privilege for marital communications made in confidence. The Court did so with great caution noting that

"their effect (testimonial privileges) is instead clearly inhibitive, rather than facilitating illumination of the truth, they shut out the light". 1 C. McCormack, Supra, Sec. 72, p.299 Privileges have the "effect of withholding relevant information from the factfinder... *Accordingly although a ....privilege must be applied so as to effectuate its purpose, it is to be applied cautiously*

A8

*and with circumspection because it impedes the truth seeking function of*

*the adjudicative process.* (Italics added)

See *Christian*, supra at 727-28.

The court went on to state that:

"a privilege should be recognized only if four essential conditions have

been met: (1) The communication must originate in a confidence that

they will not be disclosed. (2) This element of confidentiality must be

essential to the full and satisfactory maintenance of the relation of the

parties. (3) The relation must be one which in the opinion of the community

ought to be sedulously fostered. (4) The injury that would inure to

the relation by the disclosure of the communications must be greater

than the benefit thereby gained for the correct disposal of the litigation.

*Christian*, supra at 728

Reviewing cases and statutes from across the country, our Supreme Court reasoned that

indeed there was a compelling basis for accepting the privilege in our state.  In so doing the court

noted that such a decision "aligns us with every other jurisdiction in the country.

Connecticut is unique among its sister states, which each have a statute or a rule of evidence

expressly providing for the privilege.  *Christian* at 730, notes 9 and 10.

The court then reviewed the rationale for such a privilege stating "the marital

communications privilege protects information privately disclosed between husband and wife

in the confidence of the marital relationship once described as the best solace of human

existence." *Christian*, supra at 728.  The privilege "exists to insure that spouses generally, prior

to any involvement in criminal activity or a trial, feel free to communicate their deepest feelings

to each other without fear of eventual exposure in a court of law. *Christian,* supra at 729.

The court then went on to define the contours of the privilege. It protects "communications" which are "utterances or expressions intended to convey information between the spouses" *Christian,* supra at 732. The communication must be made during the course of the marriage, *Christian* at 733, and the privilege survives the dissolution of the marriage. Christian, at 734. The communication must be confidential. All marital communications are presumptively confidential, *Christian* at 737, and the state bears the burden of overcoming the presumption. Id at 737. The court adopted an objective test to determine whether the communication was intended to be confidential. That test is whether at the time of the communication the communicator had a reasonable expectation of confidentiality. Id. at 738. The presence of a third party or an expectation of disclosure to a third party evidences a lack of such an expectation. Id. at 738.

The court thereafter reviewed the trial court's decision that, although the parties were married, the marriage had irretrievably broken down and therefore the privilege did not apply. The Court found error, but held such error cumulative, because the same admission had been made to three other parties and was cumulative.

While relying on the law of sister states to define the new privilege and explicitly expressing its intent to align the privilege with the law of sister states, the Court did not outline in dicta the various traditional exceptions to the rule that have been commonly adopted across the country. See Jones On Evidence, 7th Edition Sec. 44:8 et seq. These exceptions include the crime fraud exception, the domestic violence exception, waiver, and necessity. While the Supreme Court did not expressly adopt any of these exceptions in dicta, the Court's expressed desire to align our state law with that of our sister states leads one to the reasonable conclusion that, if

A10

**1. State's Trial Brief Regarding Marital Communications,
Dated January 15, 201**

presented with a case in controversy, they would do so.

That such an approach will be adopted at the appellate level was suggested in *State v. Beavers*, 290 Conn. 386 (2009). In that case the Supreme Court once again discussed the marital communications privilege. In *Beavers* the defendant was convicted of arson murder and related charges. At the trial his wife testified to his previous similar misconduct which included a prior arson of their trailer for insurance purposes, threats to burn down their current domicile, and boasts of unrelated arsons for hire. Trial counsel neglected to raise the privilege as an objection during the wife's testimony. The day following her testimony he asked the court to strike her testimony on grounds of the privilege and conceded his neglect in not raising the objection the previous day. The trial court denied his motion and cited various exceptions to the privilege in so doing. After conviction the defendant appealed.

In reviewing the trial court's decision (Judge Gold) the Supreme Court ultimately held that the exception which applied was the obvious one: waiver–the failure of trial counsel to object contemporaneously to the wife's testimony. The Court predicted that whether trial counsel's conceded inadvertence fell below the level of expected competence and was harmful would be the subject of future habeas proceedings. However, in arriving at the conclusion, the Court did describe the various grounds relied upon by the trial court. At footnote 24 the Court noted as follows:

> The trial court stated that, in its view, the statements at issue
> in this case were distinct from those in *Christian* and *Littlejohn*
> because they did not involve the defendant "*really opening his*
> *heart and confessing in a sense in a confidential way to a spouse*
> *of prior criminal activity...*" (Italics added by writer)

*Beavers*, at footnote 24

The Court in the same footnote went on to describe how the trial court reasoned that the wife's sharing in the proceeds of the defendant's ongoing criminal enterprise involved the testifying spouse as a co-conspirator and therefore her statements were subject to the exception to the privilege. The Court so described Judge Gold's reasoning without disapproval, and with an apparent eye to the habeas proceeding to follow where the issue of exceptions would be relevant to whether the outcome of the case would be different. That, in combination with the court's desire to harmonize the privilege with that of sisters states, leads easily to the conclusion that our Supreme Court anticipates adopting the exceptions to the marital privilege. A discussion of those exceptions follows.

<u>The Statements of Defendant Davalloo</u>

<u>Were not Confidential For Purposes of</u>

<u>The Privilege</u>

As stated above, our Supreme Court has adopted an objective test to determine whether statements made in private to one's spouse are confidential. That test is whether the communicator had a reasonable expectation of confidentiality. See *Christian*, supra at 737, 738. While statements made to one's spouse are presumptively confidential, such a presumption is rebuttable. The presence of a third party, *Christian*, supra at 739, or when the communication was intended or *expected to be disclosed to a third party*, Christian, supra at 739., are common examples of situations where the presumption is rebutted.

In this case the communicating party, the defendant wife, described to her husband a

**1. State's Trial Brief Regarding Marital Communications,**
**Dated January 15, 201**

fictitious love triangle where she had changed the names of the parties to hide her own involvement in the triangle. Her motive in describing the triangle to her husband was not to seek the comfort of "the best solace of human existence (the marital relationship), see *Christian*, supra at 728, citing *Trammel v. United States*, 445 U.S. 40 (1980); and *Beavers*, supra, citing Judge Gold's comments, but rather to trick him into aiding her in her betrayal of their marital relationship. While she may have hoped that he would not soon discover her secret maneuver, she had no reasonable expectation that he would remain ignorant forever. A reasonable person would expect to be found out at some point and expect that the husband would disclose the betrayal to family, friends and a divorce attorney. With hindsight, it is clear that such an expectation of discovery was one motive, and probably the primary motive, for stabbing her husband as part of a common scheme to escape detection in eliminating obstacles to her obsessive affair with Nelson Sessler. This is so, because, if her affair ever flowered to the point where her wish to be permanently with Sessler came true, her inquiring husband would inevitably discover that the man for whom his wife left him worked with her at Purdu Pharma. He would also soon learn that his replacement formerly lived with a woman who was murdered. He would also learn that the murdered previous lover was named "Anna Lisa" and had also worked at Purdu Pharma. It would not be long before the jilted and betrayed husband would bring these suspicious coincidences to the attention of investigating authorities.

The communications were also not confidential because the fictive triangle was discussed by Davalloo with third parties in the presence of her husband Christos. Those third parties were Tammy and Emilio Mei, close friends of Davalloo and her husband. On one occasion in October of 2002 both couples were at a dinner party and, as described by Emilio Mei, Davalloo was describing crazy sex stories concerning the trysts of "Mellissa" and "Jack" (in reality the

defendant and Sessler).  Davalloo, who with hindsight had difficulty containing her obsessive

emtions, could naturally expect that her husband would be questioned by the Mei's, particularly

Emilio Mei, concerning the wild sex tales his wife spun.  Davalloo also discussed purchasing a

stun gun, DNA detection, fingerprints and other criminal forensic techniques with the Mei's.

     In the words of our Supreme Court, "we apply an objective test, wherein a

communication is confidential if, at the time of the communication, the communicator could

have had a reasonable expectation of confidentiality." See *Beavers*, supra, at 409, footnote 23.

     Clearly, none could exist here.

     Even assuming *arguendo* that the defendant may have subjectively harbored the hope that

eliminating her husband might seal her communications from future disclosure, that hope was

not an expectation reasonable in the eyes of society.  The defendant cannot hold a reasonable

expectation of confidentiality in her relevant statements to her husband, because she is

communicating lies to him, lies that hide her betrayal of their relationship, lies meant to trick him

into assisting her in crimes against here rival in an affair, crimes which may ultimately make him

a suspect in her rival's demise, and lies which may ultimately lead to his own murder, and lies

which did ultimately lead to her attempt to murder him.   The marital privilege was certainly not

intended to cover such communications, and no one can hold a reasonable expectation of privacy

in such communications which are not made in reliance of the love and comfort of the marital

relationship, but, rather, intended to culminate in its violent destruction.  As Judge Gold said in

*Beavers* (without disapproval from our own highest court) the defendant was not "really opening

up his heart and confessing in a confidential way" See block quote above.  At bottom, the

communications made by Davalloo are entirely out of the scope of the ambit of statements which

the privilege is intended to protect.  Not only are her lies and verbal machinations not made in

**1. State's Trial Brief Regarding Marital Communications,
Dated January 15, 201**

honest search of the solace of marital confidentiality, they are intended lead to its violent demise.

The Statements Are Excepted From The Privilege

By the Crime/Fraud Exception

Where the spouses are joint participants in a crime or a conspiracy to a commit a crime, a communication between them in furtherance of that crime is not privileged. See *United States v. Ammar*, 714 F.2d 238 (3rd Cir. 1983). Society does not value criminal collusion between spouses, so any confidential statements concerning a joint criminal enterprise are not protected by the privilege. *United States v. Short*, 4 F.3rd 475,478 (7th Cir. 1993). The same is true where one spouse informs the other of his (or her) crimes in order to recruit the other spouse to participate in the crimes or efforts to help conceal those crimes from the authorities. *United States v. Parker*, 834 F. 2d 408, 413 (4th Cir. 1987) (Powell, J., sitting by designation). See generally, Jones On Evidence, 7th Edition, Sec. 44:18.

In *Parker*, supra, the defendant enlisted the aid of his wife in a murder and kidnaping scheme. Ultimately, she joined in the crime and was called against him as a witness after his arrest and during his trial. The defendant sought to exclude statements he made to her concerning his intent to commit the murder. These statements were made before she agreed to join the conspiracy. Justice Powell, then a retired justice of the Supreme Court, wrote the decision of the court. He found the privilege inapplicable because of the crime/fraud exception. In so doing he reasoned:

the basis for the joint criminal participation exception

**A15**

is that the public interests in protecting marital privacy

and encouraging open and honest marital communications

do not justify assuring a criminal that he can enlist the aid

of his spouse in a criminal enterprise without fear that by

recruiting an accomplice or co- conspirator he is not creating

another potential witness.

He reasoned further that the public interest in protecting marital communications that

pertain to criminal activity and which take place in the context of a relationship that has fostered

joint criminal participation is greatly diminished.   See *Parker*, supra at 413.

In the case at bar the defendant solicited the aid of her husband in what she claimed was a

scheme to assist a friend in a surreptitious surveillance. which included stalking, trespass,  illegal

eavesdropping and burglary.  By assisting her, however well intentioned and misguided his

motive, Christos became a co-conspirator in an agreement that those crimes be committed.

Christos did actively aid and abet by lending his wife equipment to assist in her scheme with the

fictitious partner, Melissa.  That he did so while cautioning against the scheme and limiting his

own participation, mitigates but does not exonerate him from criminal liability.  Clearly the

conversations do not fall within Justice Powell's rationale for the privilege, which is "protecting

marital privacy and encouraging open and *honest* marital communications", *Parker*, supra at 413.

The crime fraud exception clearly applies.

**1. State's Trial Brief Regarding Marital Communications,
Dated January 15, 201**

Domestic Violence Exception

Jones on Evidence states, "Most state codifications of the spousal communications privilege contain an exception admitting communications that are relevant in prosecutions involving domestic violence or threats, and courts regularly endorse and apply this exception. See Jones, 7TH Edition, Sec. 44:17.  Jones collects a number of cases which hold generally that abusive communications relevant to a crime against a spouse are not privileged. See Jones, supra citing *People v. Johnson*, 233 Cal. App. 3d 425 (1991); *Brown v. State*, 588 So. 2d 551 (1991); *People v. Mills*, 804 N.E. 2d 392 (2003): *State v. Byrant*, 56 Ohio App. 3d 20 (1988).   The logic of such a rule is obvious: communications or threats made during the course of physical abuse are not entitled to be cloaked in the privilege because the maker is not relying on any confidential relationship to preserve the secrecy of his acts and words.  See *People v. Mills,* supra.  The Mills court reasoned that such statements are not induced by the affection, loyalty and confidence engendered by such relationship." *Mills*, supra at 396.

In the present case, as has been already argued, the defendant's description of the false triangle and her solicitations of aid in effectuating and covering up the surveillance of "Anna Lisa" and "Jack" are certainly not induced by the sentiments of loyalty, affection and confidence that the privilege is designed to foster among married people.  To the contrary, her statements were methodically designed to eliminate human obstacles in the path of her goal of a sexual relationship with Nelson Sessler.

Ultimately, this scheme, common to both the murder of Anna Lisa Raymundo and the attempted murder of witness Christos, inevitably resulted in her attempt to stab to death her husband on March 23, 2003 some five months after the murder of Anna Lisa Raymundo.  Both

A17

events are inextricably interwoven in the pattern of the defendant's misconduct and are
admissible pursuant to the same domestic violence exception.

<u>Waiver</u>

The subject matter of the acts and communications which the State intends to offer at trial
has already been the subject of some testimony at a previous trial. As described above, the near
fatal assault by Davalloo upon Christos was tried to a court in Westchester County, New York.
The affair in which Nelson Sessler and Shiela Davalloo engaged was the alleged motive for the
assault. During the course of the trial both the defendant Davalloo and her husband testified.
Davalloo admitted that when she described a fictive love triangle to Christos, that she was really
describing her own illicit affair with Sessler. She also admitted that she falsely told her husband
that her brother was coming to visit, when in fact Sessler would meet her at her apartment. She
admitted that she told Sessler she was divorced and hid her husband's things when he would
visit. More evidence concerning the affair and its obsessive nature was elicited from various
psychiatrists and psychologists who testified regarding whether at the time of the event the
defendant's suffered from diminished capacity. Therefore the basic contours of the
communications the State intends to offer have already been disclosed in a public trial, and any
further damage to the general institution of marriage and the privilege upon which other couples
legitimately rely for solace would be minimal. That such would be the case is due in no small
measure to the legal actions of the defendant. The defendant chose to testify in her own trial and
was questioned concerning the subject matters of her communications. She did not object to her
spouse's testimony either. The spousal communication privilege may be waived by the

**1. State's Trial Brief Regarding Marital Communications,
Dated January 15, 201**

communicating spouse's failure to assert it, by voluntary revelation, by express waiver, or by

urging authorities to question the other spouse. See Jones on Evidence, Seventh Edition, at Sec.

44:16.  See also, *State v. Cerreta*, 2003 W.L. 431554 (2003) (Damiani, J.) (Unpublished

decision).  And see *State v. Beavers*, supra, and *State v. Saia*, 172 Conn. 37 (1976).

### The Statements of the Defendant Stand Completely

### Outside the Rationales Supportin the Privilege

As stated at the beginning of the legal discussion of this brief, our Supreme Court adopted

the marital privilege after a discussions of the rationales for the adoption of a privilege.  Those

four essential rationales were discussed in *Christian*, supra at p.728.  The court stated the

communication must originate in a confidence that they will not be disclosed, this confidentiality

must be essential to the full and satisfactory maintenance of the relation of the parties, the

relation must be one the which in the opinion of the community ought to be sedulously fostered,

and the injury that would inure to the relation by the disclosure must be greater than the benefit

thereby gained for the correct disposal of the litigation.

While there can be no doubt that the relationship of marriage is served and fostered by the

existence of the marital communication privilege, it is difficult to see how the application of the

privilege to bar disclosure of the Davalloo statements in this case fosters confidentiality in the

marital relationship.

In speaking to husband concerning the fictive love triangle or the surveillances she was

not honestly discussing matters so as to seek solace in the marital relationship, or seeking to

discuss a matter of embarassment or confessing the truth to seek forgiveness for a all too

common failing, but, rather, perversely misusing his trust to involve him promoting an affair with another man. Futhermore, her designs were malevolently violent towards both her husband and her rival. Under the circumstances, as Judge Gold said at the trial level, the defendant was not really opening his(her) heart and confessing in a sense in a confidential way." She was in fact taking one more step down a path of betrayal which would culminate in her attempt to kill her husband. In the State of New York there is an exception for marital statements which are not induced by the marital relationship and prompted by the affection, confidence and loyalty engendered by such relationship. *People v. Mills*, 804 N.E. 2d 392,396 (2003). This rule is based upon statute. Such a rule conforms with the rationales ennunciated by our Court in adopting the marital privilege. Such a rule also provides the basis for the more specific exceptions listed and argued above. Because application of the privilege under the circumstances would work a paradoxical injustice, the statements should be admitted.

Respectfully submitted,

_____

James Bernardi

Supervisory Assistant State's Attorney

# 2.

# Defendant's Motion in Limine to Exclude Testimony Concerning Confidential Marital Communications, dated 5/26/11

### 2. Defendant's Motion in Limine to Exclude Testimony Concerning Confidential Marital Communications, Dated May 26, 2011

| | |
|---|---|
| NO. CR08-165602T | SUPERIOR COURT |
| STATE OF CONNECTICUT | J/D OF STAMFORD-NORWALK |
| V | AT STAMFORD |
| SHEILA DAVALOO | MAY 26, 2011 |

<u>MOTION IN LIMINE</u>

## TO EXCLUDE TESTIMONY CONCERNING CONFIDENTIAL MARITAL COMMUNICATIONS

The defendant, by his counsel, moves the Court pursuant to Practice Book §§ 42-15, relevant evidentiary principles, Amendments Five, Six, Eight, and Fourteen to the United States Constitution, and Article I, Sections 8 and 9, of the Connecticut Constitution, to preclude the prosecution from privileged and confidential marital communications between the defendant Sheila Davalloo and her husband Paul Christos. It is anticipated that the State will seek to offer the testimony of the defendant's husband Paul Christos( See State's Trial Brief Regarding Marital communications).More specifically, it is anticipated that the State will seek to offer Mr. Christos' testimony regarding the content of conversations between Cristos and his wife Sheila Davalloo that were communicated privately, during the course of their marriage. The defendant seeks to suppress and/or exclude these private communications between Davalloo and Christos due to their confidential and privileged nature.

At all relevant times prior to the death of Anna Lisa Raymundo the defendant and Paul Christos were married until their divorce was granted by a New York Court on September 3, 2004.

**2. Defendant's Motion in Limine to Exclude Testimony Concerning Confidential Marital Communications, Dated May 26, 2011**

## II. STATEMENT OF LAW

Our nation and our state have recognized and adhered to the principle that the trust and confidences shared in marital relationships should not be divulged to the public by force of law. In applying this principle, our law has delineated two forms of privileges against the exposure of spousal communications: the privilege against adverse spousal testimony, and the privilege of confidential communications.

The common law rules of testimonial privilege recognize two distinct marital privileges. The adverse spousal testimony privilege permits an individual to refuse to testify in a criminal proceeding against her or his spouse. This privilege rests on the notion that a husband and wife should be able to trust each other completely, and that marriage is a sanctuary. The privilege is described as being broadly aimed at protecting marital harmony. The second marital privilege, the confidential marital communications privilege is narrower than the adverse spousal testimony privilege and seeks only to protect the intimacy of private marital communications, but it can be invoked by either spouse to prevent the revelation of such communications. United States v. Premises, 71 F.3d 1067, 1070 (2nd Cir. 1995).

The marital privilege against adverse spusal testimony has been recognized by our legislature and codified in Connecticut General Statutes' 54-84a.1 This statute gives the witness spouse the option of testifying against an accused spouse. State v. Saia, 172 Conn. 37, 43, 372 A.2d. 144 91976). This common law marital privilege against adverse spousal testimony is distinct from the confidential-communication privilege that requires a

## 2. Defendant's Motion in Limine to Exclude Testimony Concerning Confidential Marital Communications, Dated May 26, 2011

communication, made in confidence, from one spouse to another during a period of marriage.  See C. Tait & J. LaPlante, Connecticut Evidence ' 12.6 (2nd Ed. 1988).

The confidential communications rule that protects private communications made from one spouse to the other is entirely distinct crom the aforementioned privilege against adverse spousal testimony and it may be claimed by the accused spouse to preclude from introduction into evidence any such private spousal communications. Wolfe v. United States, 291 U.S. &, 14, 54 Ct. 279 (1934); Blau v. United States, 340 U.S. 332, 333, 71 S. Ct. 301 (1951); Pereira v. United States, 347 U.S. 1, 6, 74 S. Ct. 358 (1954); U.S. v. Estes, 793 F.2d 465, 466 (2nd Cir. 1986); U.S. v. Premises, 71 F.3d 1067, 1069-70 (2nd Cir. 1995).  Communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged. Wolfe, 291 U.S. at 14.  It is the rule that marital communications are presumptively confidential. Blau, 340 U.S. at 333.  The normal evidentiary rule applicable to confidential marital communications precludes the admission of testimony regarding spousal communications made in confidence. Estes, 793 F.2d at 466.

The privilege protecting confidential marital communications operates much like other confidentiality rules such as the attorney/client privilege, and as such it allows either spouse to compel the non-disclosure of the substance of confidential communications between the two. Premises, 71 F.3d at 1069.  The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails. Wolfe, 291 U.S. at 14.  The marriage=s later deterioration does not destroy the marital

communication privilege. Therefore, a confidential communication made during a valid marriage, if privileged when made, will continue to be privileged even though the marriage has been terminated by divorce, annulment, or death. Wharton=s Criminal Evidence, 15th Ed., 11:43.

Although the Connecticut Supreme Court has never explicitly held that confidential communications between husband and wife are privileged, its early case of State v. Hoyt, 47 Conn. 518 (1880), strongly suggested that the Hoyt court felt there was such a privilege. State v. Littlejohn, 199 'Conn. 631, 649, 508 A.2d 1376 (1986). Furthermore, the case of Spitz=s Appeal, 56 Conn. 184, 14 A. 776 (1887), clearly hypothesizes such a privilege. Littlejohn, 199 Conn. At 649. This spousal confidential communications privilege commends itself to judicial acceptance and admission of such statements may be deemed erroneous. Id. At 649-650.

In the instant case, the defendant requests that the communications he made in confidence to his wife Sheila Davaloo be precluded frm admission into evidence pursuant to the spousal confidential communication privilege. This privilege presumptively attaches to any communications related by the defendant to his wife during he period of their marriage. Blau, 340 U.S. at 333; Pereira, 347 U.S. at 6. The defendant married Sheila Davaloo on   Sep any they were remarried on    . They remained married until .Communications between the defendant and Sheila Davaloo during the time of their marriage should be recognized a s marital communications that are presumptively confidential and consequently inadmissible.

III.    CONCLUSION

**2. Defendant's Motion in Limine to Exclude Testimony Concerning
Confidential Marital Communications, Dated May 26, 2011**

For the foregoing reasons as well as those presented before the Court at a full

hearing on the matter, the defendant requests that the Court suppress confidential marital

communications.

THE DEFENDANT

BY:

_____

BARRY BUTLER
PUBLIC DEFENDER

# O R D E R

After having heard upon the foregoing, it is hereby ordered:
**GRANTED/DENIED.**

BY THE COURT

_____

JUDGE  /  CLERK

This is to certify that a copy of the
Foregoing has been given to the
State's Attorney for the Judicial
District of Stamford-Norwalk on this date

_____,

BARRY BUTLER

3

Defendant's Motion in Limine to Exclude Testimony

Concerning Marital Communications,

dated 5/31/11

3. Defendant's Motion in Limine to Exclude Testimony
Concerning Martial Communications, Dated May 31, 2011

NO.  CR08-165602T                    SUPERIOR COURT

STATE OF CONNECTICUT          J/D OF STAMFORD-NORWALK

V                                    AT STAMFORD

SHEILA DAVALOO                   MAY 31, 2011


## MOTION IN LIMINE TO EXCLUDE TESTIMONY CONCERNING

## CONFIDENTIAL MARITAL COMMUNICATIONS


The defendant, by her counsel, moves the Court pursuant to Practice

Book §§ 42-15, relevant evidentiary principles, Amendments Five, Six, Eight,

and Fourteen to the United States Constitution, and Article I, Sections 8 and

9, of the Connecticut Constitution, to preclude the prosecution from offering

privileged and confidential marital communications between the defendant

Sheila Davalloo and her husband Paul Christos. It is anticipated that the

State will seek to offer the testimony of the defendant's husband Paul

Christos( See State's Trial Brief Regarding Marital communications).More

specifically, it is anticipated that the State will seek to offer Mr. Christos'

testimony regarding the content of conversations between Christos and his

wife Sheila Davalloo that were communicated privately, during the course

1

Case 3:17-cv-01257-VAB Document 25-4 Filed 11/08/17 Page 38 of 422
3. Defendant's Motion in Limine to Exclude Testimony
Concerning Martial Communications, Dated May 31, 2011

of their marriage. The defendant seeks to suppress and/or exclude these private communications between Davalloo and Christos due to their confidential and privileged nature. At all relevant times prior to the death of Anna Lisa Raymundo and afterward the defendant and Paul Christos were married until their divorce was granted by a New York Court on September 3, 2004.

## II. STATEMENT OF LAW

Our nation and our state have recognized and adhered to the principle that the trust and confidences shared in marital relationships should not be divulged to the public by force of law. In applying this principle, our law has delineated two forms of privileges against the exposure of spousal communications: the privilege against adverse spousal testimony, and the privilege of confidential communications.

The common law rules of testimonial privilege recognize two distinct marital privileges. The adverse spousal testimony privilege permits an individual to refuse to testify in a criminal proceeding against her or his spouse. This privilege rests on the notion that a husband and wife should be able to trust each other completely, and that marriage is a sanctuary. The privilege is described as being broadly aimed at protecting marital harmony.

2

### 3. Defendant's Motion in Limine to Exclude Testimony
### Concerning Martial Communications, Dated May 31, 2011

The second marital privilege, the confidential marital communications

privilege is narrower than the adverse spousal testimony privilege and seeks

only to protect the intimacy of private marital communications, but it can be

invoked by either spouse to prevent the revelation of such communications.

United States v. Premises, 71 F.3d 1067, 1070 (2nd Cir. 1995).

The marital privilege against adverse spousal testimony has been

recognized by our legislature and codified in Connecticut General Statutes'

54-84a.  This statute gives the witness spouse the option of testifying against

an accused spouse.  State v. Saia, 172 Conn. 37, 43, 372 A.2d. 144(1976).  This

common law marital privilege against adverse spousal testimony is distinct

from the confidential-communication privilege that requires a

communication, made in confidence, from one spouse to another during a

period of marriage.  See C. Tait & J. LaPlante, Connecticut Evidence ' 12.6

(2nd Ed. 1988).

The confidential communications rule that protects private

communications made from one spouse to the other is entirely distinct from

the aforementioned privilege against adverse spousal testimony and it may

be claimed by the accused spouse to preclude from introduction into

evidence any such private spousal communications. Wolfe v. United States,

3

**Defendant's Motion in Limine to Exclude Testimony Concerning Martial Communications, Dated May 31, 2011**

291 U.S. &, 14, 54 Ct. 279 (1934); <u>Blau v. United States</u>, 340 U.S. 332, 333, 71 S. Ct. 301 (1951); <u>Pereira v. United States</u>, 347 U.S. 1, 6, 74 S. Ct. 358 (1954); U.S. v. Estes, 793 F.2d 465, 466 (2nd Cir. 1986); <u>U.S. v. Premises</u>, 71 F.3d 1067, 1069-70 (2nd Cir. 1995). Communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged. <u>Wolfe</u>, 291 U.S. at 14. It is the rule that marital communications are presumptively confidential. Blau, 340 U.S. at 333. <u>State v Christian</u>, 267 Conn. 710(2004). The normal evidentiary rule applicable to confidential marital communications precludes the admission of testimony regarding spousal communications made in confidence. <u>Estes</u>, 793 F.2d at 466.

The privilege protecting confidential marital communications operates much like other confidentiality rules such as the attorney/client privilege, and as such it allows either spouse to compel the non-disclosure of the substance of confidential communications between the two. <u>Premises, 71 F.3d at 1069</u>. The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails.

4

### 3. Defendant's Motion in Limine to Exclude Testimony Concerning Martial Communications, Dated May 31, 2011

Wolfe, 291 U.S. at 14.  The marriage's later deterioration does not destroy the marital communication privilege.  Therefore, a confidential communication made during a valid marriage, if privileged when made, will continue to be privileged even though the marriage has been terminated by divorce, annulment, or death. Wharton's Criminal Evidence, 15th Ed., 11:43.

Although prior to State v Christian, the Connecticut Supreme Court had never explicitly held that confidential communications between husband and wife are privileged, its early case of State v. Hoyt, 47 Conn. 518 (1880), strongly suggested that the Hoyt court felt there was such a privilege. State v. Littlejohn, 199 'Conn. 631, 649, 508 A.2d 1376 (1986).  Furthermore, the case of Spitz's Appeal, 56 Conn. 184, 14 A. 776 (1887), clearly hypothesizes such a privilege.  Littlejohn, 199 Conn. At  649.  This spousal confidential communications privilege commends itself to judicial acceptance and admission of such statements may be deemed erroneous.  Id. At 649-650.

In State v Christian, the Connecticut Supreme Court ruled that the marital privilege "commends itself to judicial acceptance and we expressly accept that privilege as a fixture of our common law".  Christian, Supra.  In Christian, after a fatal automobile accident the defendant husband made

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 42 of 422
3. Defendant's Motion in Limine to Exclude Testimony
Concerning Martial Communications, Dated May 31, 2011

admissions to his wife that the trial court admitted into evidence over the

defense's assertion of the marital privilege. On appeal the defense argued

that the trial court improperly allowed confidential communications

between the defendant and his spouse.  In <u>Christian,</u> the Supreme Court's

analysis found that the defendant had argued that the marital

communications privilege is alive and well in Connecticut.    The court noted

that:

> "Specifically, the defendant claims that, although neither the
> courts nor the legislature explicitly have recognized such a privilege,
> "the case law and the statutory history . show that this privilege is
> well recognized."    The defendant therefore contends that the trial
> court improperly precluded the defendant from asserting the privilege
> concerning the communication, which had been made in confidence
> and while the couple was living together and in a legally valid marital
> relationship.    In response, the state urges us not to recognize the
> marital communications privilege because "the cost of recognizing the
> common law . privilege exceeds its dubious benefits."    Rather, the
> state contends, the legislature has enacted "a reasonable compromise"
> by codifying the separate and distinct adverse marital testimonial
> privilege in General Statutes § 54-84a.6  The state further argues that,
> even if we recognize the marital communications privilege, it is
> inapplicable in the present case because the defendant's previous
> statements to Vorih, Ruggiero and Ford rendered his communication
> to his wife not confidential.

### 3. Defendant's Motion in Limine to Exclude Testimony
### Concerning Martial Communications, Dated May 31, 2011

We agree with the defendant."  Therefore it is clear that Connecticut

recognizes this important privilege. .

As reaffirmed in <u>Christian</u> the principles underlying the marital

communications privilege are well recognized.   "The basis of the immunity

given to communications between husband and wife is the protection of

marital confidences, regarded as so essential to the preservation of the

marriage relationship as to outweigh the disadvantages to the

administration of justice which the privilege entails.  Hence it is that the

privilege with respect to communications extends to the testimony of

husband or wife even though the different privilege, excluding the

testimony of one against the other, is not involved."   (Citations omitted.)

<u>Wolfle v. United States</u>, 291 U.S. 7, 14, 54 S.Ct. 279, 78 L.Ed. 617 (1934).   The

marital communications privilege protects "information privately disclosed

between husband and wife in the confidence of the marital relationship-once

described . as 'the best solace of human existence.'"   <u>Trammel v. United</u>

<u>States</u>, supra, 445 U.S. at 51, 100 S.Ct. 906, quoting <u>Stein v. Bowman</u>, 38 U.S.

(13 Pet.) 209, 223, 10 L.Ed. 129 (1839).   The privilege has been described as

"almost sacrosanct." <u>Johnson v. United States</u>, 616 A.2d 1216, 1224

7

**Defendant's Motion in Limine to Exclude Testimony Concerning Martial Communications, Dated May 31, 2011**

(D.C.App.1992), cert. denied, 507 U.S. 996, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993).   "[T]he primary purpose of the confidential marital communication privilege is to foster marital relationships by encouraging confidential communication between spouses." <u>Curran v. Pasek</u>, 886 P.2d 272, 276 (Wyo.1994).   The privilege "permits[s] a husband and wife to communicate freely with one another without fear that their communications will be used against them at some future date."   G. Sodaro & P. Wilson, "Spousal Privileges," in 2 Testimonial Privileges (S. Stone & R. Taylor eds., 2d Ed. 1995) § 5.07, p. 5-11.   "We encourage married people to confide in each other by protecting their statements from later scrutiny in court."  <u>United States v. Lea</u>, 249 F.3d 632, 641 (7th Cir.2001).

It therefore is apparent that the purposes underlying the marital communications privilege asserted by the defendant are quite different from those supporting the separate and distinct privilege against adverse spousal testimony relied upon by the state.   "The [adverse spousal testimony] privilege looks forward with reference to the particular marriage at hand: the privilege is meant to protect against the impact of the testimony on the marriage.   The marital communications privilege in a sense is broader and more abstract: it exists to insure that spouses generally, prior to any

8

### 3. Defendant's Motion in Limine to Exclude Testimony
### Concerning Martial Communications, Dated May 31, 2011

involvement in criminal activity or a trial, feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law." United States v. Byrd, 750 F.2d 585, 590 (7th Cir.1984); see also State v. Adamson, 72 Ohio St.3d 431, 433, 650 N.E.2d 875 (1995) ("[s]pousal privilege and spousal competency are distinct legal concepts which interrelate and provide two different levels of protection for communications between spouses"). We therefore are not persuaded by the state's assertion that the privilege against adverse spousal testimony, codified at § 54-84a, alone is sufficient to protect the interests of open communication in the marital relationship.

The court's analysis must determine if the communications were made during their marriage; and (2) whether those communications were confidential. In the present case, State v Davalloo, it is clear that the parties were married at all times when the sought after communications were made, as conceded in the State's trial brief. In Christian, the trial court determined that the marital communications privilege, if it existed, was inapplicable because "at the time the statement was made, but most importantly now, at the time of trial," the defendant's marriage irretrievably had broken down. The trial court ruled this way despite the fact that the

9

3. Defendant's Motion In Limine to Exclude Testimony
Concerning Martial Communications, Dated May 31, 2011

parties had not yet divorced.    The state contended that the trial court's

decision was proper, because the defendant's marriage was "beyond repair"

both at the time the statement was made and at the time of trial. The

defendant claimed that the trial court improperly refused to apply the

privilege.    Specifically, Christian claimed that the trial court's focus was

imprecise because the privilege attached at the time that the confidential

statement was made, and if made during the marriage, the privilege

survives the dissolution of the marriage.    The Supreme Court in Christain

stated that "We agree with the defendant."

Moreover, the marital communications privilege survives divorce.

'Once the marital communications privilege has attached…..it continues to

survive even after the marriage has ended.    See Pereira v. United States, 347

U.S. 1, 6, 74 S.Ct. 358, 98 L.Ed. 435 (1954) ("divorce . does not terminate the

privilege for confidential marital communications"); …(privilege explicitly

provide that it continues after death or divorce);  C. Tait, supra, § 5.35.4, p.

330 (marital communications privilege continues after divorce and death of

spouse).    In other words, the privilege focuses on the marital relationship

between the spouses at the time that the communication was made, and not

at the time of trial." Christian, Supra.

10

**3. Defendant's Motion in Limine to Exclude Testimony
Concerning Martial Communications, Dated May 31, 2011**

After determining that the communications privilege survived an
acrimonious marriage the <u>Christian</u> Court then concluded that they
communications were confidential despite their supposed communications
to third parties. The court stated:  " We next focus our analysis on the
question of whether the communications were confidential.    The state
contends that the trial court's denial of the defendant's motion in limine can
be affirmed, nevertheless, because the marital communications were not
confidential.    Specifically, the state relies on the defendant's previous,
similar statements to Vorih, Ruggerio and Ford. We disagree.

The court also concluded that ;" the determination of the second
factor, that is, whether a communication was confidential, depends on the
facts of the particular case." The presumption is that the communications are
confidential and the State bears the burden of overcoming this presumption.
"   It is axiomatic that the marital communications privilege protects only
those communications that are confidential.   <u>Wolfle v. United States</u>, supra,
291 U.S. at 14, 54 S.Ct. 279.   "Although marital communications are
presumed to be confidential, that presumption may be overcome by proof of
facts showing that they were not intended to be private."  <u>Pereira v. United</u>

11

**3. Defendant's Motion in Limine to Exclude Testimony
Concerning Martial Communications, Dated May 31, 2011**

States, supra, 347 U.S. at 6, 74 S.Ct. 358; see also State v. Smith, 384 A.2d 687,

691 (Me.1978) (following "the near universal rule, that all marital

communications are presumed to be confidential, and the party seeking to

introduce the evidence must overcome the presumption" [citations

omitted]).   The state, therefore, as the party seeking to introduce the marital

communication into evidence, bears the burden of overcoming the

presumption of confidentiality by proving that the communication between

the defendant and his wife was not confidential.   See Blau v. United States,

340 U.S. 332, 333, 71 S.Ct. 301, 95 L.Ed. 306 (1951) ("[M]arital

communications are presumptively confidential.)

The presumption has been held to have been overcome in some

instances, noted the Christian Court, "the party offering the marital

communication usually can overcome the presumption of confidentiality

through evidence that the communication had been made in the presence of

a third party.   See, e.g., United States v. Taylor, 92 F.3d 1313, 1331-32 (2d

Cir.1996) (evidence that third person had been in room with defendant and

spouse overcame presumption of confidentiality), cert. denied, 519 U.S.

1093, 117 S.Ct. 771, 136 L.Ed.2d 717 (1997); State v. Levi, supra, 67 Haw. at

250, 686 P.2d 9 (defendant's statements to wife in presence of third parties

12

### 3. Defendant's Motion in Limine to Exclude Testimony
### Concerning Martial Communications, Dated May 31, 2011

not confidential); <u>State v. McMorrow</u>, supra, 314 N.W.2d at 288-89 (marital communications not confidential when made while couple in car with third person).

Ultimately, despite holding that disclosure to third parties did not automatically dissolve the privilege in <u>Christian</u>, the Court found the testimony harmless and noted its cumulative nature.

In the instant case, the defendant requests that the communications he made in confidence to his wife Sheila Davaloo be precluded from admission into evidence pursuant to the spousal confidential communication privilege. This privilege presumptively attaches to any communications related by the defendant to his wife during he period of their marriage.  <u>Blau</u>, 340 U.S. at 333; <u>Pereira</u>, 347 U.S. at 6.  The defendant Sheila Davaloo and Paul Christos were married long before the communications in question took place. Communications between the defendant Sheila Davaloo and her husband were made during the time of their marriage should be recognized as marital communications that are presumptively confidential and consequently inadmissible.

13

Case 3:17-cv-01257-VAB Document 25-4 Filed 11/08/17 Page 50 of 422
3. Defendant's Motion in Limine to Exclude Testimony
Concerning Martial Communications, Dated May 31, 2011

## III.   CONCLUSION

For the foregoing reasons as well as those presented before the Court at a

full hearing on the matter, the defendant requests that the Court suppress

confidential marital communications.

THE DEFENDANT

BY:

BARRY BUTLER
PUBLIC DEFENDER

O R D E R

After having heard upon the foregoing, it is hereby ordered:
GRANTED/DENIED.

BY THE COURT

JUDGE  /  CLERK

14

**3. Defendant's Motion in Limine to Exclude Testimony
Concerning Martial Communications, Dated May 31, 2011**

This is to certify that a copy of the
Foregoing has been given to the
State's Attorney for the Judicial
District of Stamford-Norwalk on this date

BARRY BUTLER
PUBLIC DEFENDER

15

4.

State's Motion in Limine Regarding the Admissibility of

Martial Communications and State's Supplemental

Brief to Motion in Limine Dated June 1, 2011

Regarding Martial Communications,

dated 6/1/11

**4. State's Motion in Limine Regarding the Admissibility of Martial Communications dated June 1, 2011, and State's Supplemental Brief to Motion in Limine Dated June 1, 2011 Regarding Marital Communications, filed June 22, 2011**

FST 165202                                              SUPERIOR COURT

STATE OF CONNECTICUT                          JUDICIAL DISTRICT OF STAMFORD
                                                            NORWALK AT STAMFORD

V.

SHEILA DAVALLOO                                  JUNE 1, 2011


STATE'S MOTION IN LIMINE

REGARDING THE ADMISSIBILITY

OF MARITAL COMMUNICATIONS


The State of Connecticut moves this Honorable Court in limine to rule prior to trial that certain statements made by the defendant to her husband, Paul Christos, are admissible during the State's case in chief, and in support thereof relies upon the State's brief regarding marital communications dated January 15, 20011.


Respectfully submitted,

The State of Connecticut

By Supervisory Assistant State's Attorney

James M. Bernardi

**4. State's Motion in Limine Regarding the Admissibility of Martial Communications dated June 1, 2011, and State's Supplemental Brief to Motion in Limine Dated June 1, 2011 Regarding Marital Communications, filed June 22, 2011**

CERTIFICATION

I, James Bernardi, hereby certify that I have hand delivered a copy of the attached motion in limine to Barry Butler, Public Defender, attorney of record.

James M. Bernardi

Sup. Asst. State's Attorney

**4. State's Motion in Limine Regarding the Admissibility of Martial Communications dated June 1, 2011, and State's Supplemental Brief to Motion in Limine Dated June 1, 2011 Regarding Marital Communications, filed June 22, 2011**

FST 165202                                    SUPERIOR COURT

STATE OF CONNECTICUT              JUDICIAL DISTRICT OF STAMFORD
                                              NORWALK AT STAMFORD

V.

SHEILA DAVALLOO                          JUNE 21, 2011

**STATE'S SUPPLEMENTAL BRIEF
TO MOTION IN LIMINE DATED
JUNE 1, 2011 REGARDING MARITAL
COMMUNICATIONS**

PROCEDURAL BACKGROUND

The above captioned case is currently docketed for trial in September of 2011. On June 1, 2011 the state filed a motion *in limine* seeking to have the court rule on the admissibility of certain statements made by the defendant to her spouse during the course of their marriage. The state claims that the statements as described in its June 1, 2011 brief are relevant and not barred by the common law marital communications privilege. In that brief the State argues various grounds for admissibility, including waiver, lack of confidentiality, the crime/fraud exception, and the domestic violence exception. The state also argues that barring admission of the statements would be clearly contrary to the rationales which supported adoption of the privilege by our Supreme Court.

Since filing its brief, the State has learned that in its just concluded session our legislature has passed a statutory marital communications privilege intended to define the contours of the privilege as adopted by our Supreme Court. That statutory privilege is part of a larger bill entitled "An Act Concerning Domestic Violence". That bill, Substitute Bill No. 6629 is expected to be signed by the Governor shortly. The privilege is described at Section 15 of the

A53

**4. State's Motion in Limine Regarding the Admissibility of Marital Communications dated June 1, 2011, and State's Supplemental Brief to Motion in Limine Dated June 1, 2011 Regarding Marital Communications, filed June 22, 2011**

bill. A copy is attached hereto.

A reading of the Substitute bill reveals that Section 15 defines the marital communication privilege and its exceptions. Section 15 clearly defines a privilege consistent with the purpose of the privilege. Section 14 defines the right of one spouse not to testfiy against the other. Rights defined in Section 14 do not survive divorce, and therefore are not applicable to this case.

In subsection (a) of Section 15 the bill defines the communication privilege as follows "confidential communication means any oral or written communication made by one spouse to the other during the marriage that is intended to confidential *and is induced by the affection, confidence, loyalty, and integrity of the marital relationship.* The bill then goes on to describe certain exceptions to the privilege at subsection (b) including the crime/fraud and domestic violence exceptions.

While adopting all arguments made by the State in its previous brief, the State would add that, under this new statute, the statements of the defendant would not be considered confidential communications, *because they were not induced by the affection, confidence, loyalty, and integrity of the marital relationship.* In fact, the statements were clearly made as part of a scheme to betray that relationship by pursuing an illicit affair with another. That affair would ultimately lead to the death of Anna Lisa Raymundo---the defendant's rival for her lover's affection, and culminate in the defendant's attempted lethal attack on her own spouse. As such, these statements would not be considered confidential communications under the anticipated statute.

Nor would the statements be considered confidential, since the *faux* triangle (described in

A54

**4. State's Motion in Limine Regarding the Admissibility of Martial Communications dated June 1, 2011, and State's Supplemental Brief to Motion in Limine Dated June 1, 2011 Regarding Marital Communications, filed June 22, 2011**

the first brief) was described to others in the presence of the spouse. Therefore, the defendant did not have and could not have had a reasonable expectation that her husband would not describe this triangle to others.

Furthermore, the statements were part of the defendant's common scheme to eliminate through violence any obstacles to her continued love affair with a man from work. As part of that scheme, she murdered Anna Lisa Raymundo and later attempted to murder her own spouse. As such, the statements are relevant to criminal proceedings against a spouse who was subject to bodily injury in the same criminal scheme and transaction.

Furthermore, her statements concerning night vision goggles, lock pick sets and the stalking of the victim and her lover enticed her spouse to jointly participate as an accessory to eavesdropping, trespass and burglary.

For all the above reasons, as well as those reasons described in its original brief, the state respectfully submits to this Honorable Court that, *in limine*, the statements of the defendant to her spouse be ruled admissible.

Respectfully submitted by the State of Connecticut

_____

James Bernardi Supervisory Asst. State's Attorney

Certification

The undersigned certifies that he hand delivered a copy of this brief to Public Defender Barry Butler's office on June 21, 2011.

_____

5.

Excerpt of June 30, 2011 Transcript, pp. 1-50

Oral Argument and Trial Court's Ruling on

State's Motion in Limine Re

Marital Communication Privilege

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

1

```
 1          ATTY. BERNARDI:  Your Honor, the next matter
 2     before the Court is State versus Shelia Davalloo.
 3          THE COURT:  Yes.  I have to take a two minute
 4     break so I can get my papers on that.  Mr. Bernardi,
 5     if you and Mr. Butler will join me we'll take a five
 6     minute break.
 7          (Court Recess)
 8          (Court Resumes)
 9          THE COURT:  Good afternoon, all.  Please be
10     seated.  All right.  This is the matter of State of
11     Connecticut versus Shelia Davalloo.  The State has
12     moved in limine in this matter and the defense has
13     filed a brief in opposition to the claim being made
14     in the in limine motion.
15          Go ahead, Mr. Bernardi.  It's your motion in
16     limine and I'll hear from Mr. Butler.
17          ATTY. BERNARDI:  Yes, Your Honor.  I guess the
18     issue before the Court is whether or not certain
19     statements made by the defendant during the course of
20     her marriage to Paul Christos would be barred by the
21     marital communications privilege.
22          By way of background on this matter, the State
23     has filed two briefs.  I believe one is January --
24     dated January 15th of this year and another is dated
25     June 21st of this year.
26          The June 21st brief was prompted by the fact that
27     after the State filed its January brief where it
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

2

| | |
|---|---|
| 1 | outlined the common law approach the State |
| 2 | Legislature passed a bill entitled An Act Concerning |
| 3 | Domestic Violence which contains at section 15, a |
| 4 | statutory marital communications privilege. |
| 5 | It's the State's contention that it sums up the |
| 6 | common law. |
| 7 | THE COURT:  It's a codification of the common |
| 8 | law of the sister states. |
| 9 | ATTY. BERNARDI:  As well as the State of |
| 10 | Connecticut. |
| 11 | THE COURT:  To some degree. |
| 12 | ATTY. BERNARDI:  And so that prompted that |
| 13 | brief.  I am just going to add here the last I heard |
| 14 | that act had yet to be signed by the Governor.  It's |
| 15 | effective date would be October of this year. |
| 16 | So at any rate, it seems to -- it would seem to |
| 17 | have persuasive value in this case regardless of |
| 18 | whether or not its open.  I believe the |
| 19 | qualifications are that it will be. |
| 20 | At any rate, to commence with the argument, by |
| 21 | way of background, the State alleges that on November |
| 22 | 8th of 2002 Anna Lisa Raymundo was murdered at or |
| 23 | about noon time in her Stamford condominium. |
| 24 | The State further alleges that the murder was |
| 25 | committed by the defendant Shelia Davalloo.  Shelia |
| 26 | Davalloo first became a suspect in the matter when |
| 27 | she attempted to murder her husband Paul Christos in |

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

3

| | |
|---|---|
| 1 | their New York condominium and at a hospital in |
| 2 | Westchester in March of 2003. |
| 3 | So that's approximately five months later.  The |
| 4 | investigation resulted in her arrest in the year |
| 5 | 2007.  During its case in chief the State will call |
| 6 | Paul Christos, her husband at that time, to the |
| 7 | witness stand to testify to statements and conduct he |
| 8 | heard and observed regarding his then wife Shelia |
| 9 | Davalloo. |
| 10 | Christos would detail to the jury that during |
| 11 | the year prior to the murder and at least during the |
| 12 | summertime prior his wife began to describe to him a |
| 13 | certain triangle which she had learned about at work |
| 14 | and that triangle being a love triangle. |
| 15 | The triangle involved three people, a person she |
| 16 | identified as Jack, a person she identified as |
| 17 | Melissa, and a person she identified as Anna Lisa. |
| 18 | She told him that Jack was living with Anna Lisa |
| 19 | but that Jack was also simultaneously seeing a woman |
| 20 | named Melissa also.  And of course both of these -- |
| 21 | with regard to both of these woman, he was sexually |
| 22 | intimate. |
| 23 | She said that she, the defendant, was first |
| 24 | friends with Melissa, who was generally worried that |
| 25 | she was losing the battle for Jack's affections. |
| 26 | Now parenthetically here, the defendant would |
| 27 | later admit at her New York trial for stabbing her |

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

4

```
 1              husband that this triangle actually was a triangle

 2              involving her in the Melissa role, Nelson Sessler in

 3              the Jack role, and Anna Lisa Raymundo in the Anna

 4              Lisa role.

 5                   And having added that parenthetically, she went

 6              on to inform her husband that Melissa had enlisted

 7              her, the defendant, in a scheme to conduct a

 8              surveillance of Jack and Anna Lisa.

 9                   As part of this scheme she asked her husband for

10              his night vision goggles to surveil the competing

11              couple at -- or the competing love interest with Jack

12              at night.

13                   As part of this scheme she purchased a lock pick

14              set to gain entry to the apartment and she practiced

15              using this set with her husband on the doors in her

16              own apartment, their domicile, hers and Paul

17              Christos.

18                   As part of this scheme she obtained Jack's

19              password, re: Nelson Sessler ultimately, to his work

20              voicemail and listened to his messages with the

21              intent so she told her husband of informing Melissa

22              how close the couple was becoming.

23                   As part of this scheme she told him she intended

24              to put an electronic recording device in Jack's

25              office also to determine how close Jack and Anna Lisa

26              were becoming, of course Jack meaning Nelson Sessler,

27              the live in boyfriend of Anna Lisa Raymundo at the
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

5

1       time of her death.

2           As part of this scheme she discussed whether

3       Melissa should confront Anna Lisa about the triangle

4       and how it should be resolved.

5           All these things were done in order to satisfy

6       what is apparent from this description of this

7       triangle, an obsessive curiosity on the part of

8       Melissa, re:  Shelia Davalloo, as to how close her

9       rival was to her lover's heart.

10          He would also testify that he heard about this

11      triangle constantly almost on a daily basis.

12          Some time around November of 2002 he stopped

13      hearing about this triangle and about I believe

14      approximately not more than a week after Anna Lisa

15      Raymundo was killed he heard from others at work

16      because they are all involved in the same

17      pharmaceutical scientific community.

18          He heard that a woman had been murdered who

19      worked at Purdue and concerned because he had been

20      hearing about this triangle he asked how Anna Lisa

21      was doing.

22          She, the defendant, responded to him that Anna

23      Lisa was okay -- that Anna Lisa was okay and that

24      Jack had turned his affections basically exclusively

25      to Melissa and they were together now.

26          In fact, that was becoming truer and truer

27      because as Mr. Christos would testify and as the

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 68 of 422

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

6

1        facts would show, Sessler and Davalloo were becoming

2        closer as Davalloo now continued on with her scheme

3        by comforting a bereaved Sessler and rejuvenating

4        their sexual affair.

5        He would further testify that from November 2nd

6        -- and that really is part and parcel of what I would

7        call the first category of statements made by the

8        defendant, which is the surveillance, the faux

9        triangle, these things that occurred in the run up to

10       the murder of Anna Lisa Raymundo.

11       He would further testify that from approximately

12       November -- oh, he would further testify that from

13       that point until March of 2003 he began to get

14       increasing requests from his wife to leave the

15       apartment on various weekends.

16       The excuse that she gave him was that because

17       her mentally ill brother was going to visit on these

18       weekends he had to get out of the marital domicile,

19       their condo in New York.

20       And she would explain to him that her brother

21       was mentally ill, which apparently is true, but that

22       she would go on to say that because of his strict

23       religious beliefs apparently he would disapprove of

24       the fact that she was now married to Mr. Christos,

25       who would be her second husband, because he did not

26       believe in divorce or such things.

27       And so because of his mental illness and the

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

7

1    fact that she was remarried and living with another

2    man, he should move to a hotel while his -- while the

3    brother was visiting.  Of course, she would bring

4    over her lover for the weekend.

5        He would also testify that finally as part of

6    this common scheme -- well what the State would

7    characterize as part of her common scheme to

8    violently eliminate opposition to her affair, she

9    stabbed him multiple times on March 23rd of 2003.

10       He would testify that the day before the

11   stabbing she suggested that they play a game that she

12   had heard about at work.  This game was described as

13   follows:

14       A person is blindfolded.  He is handcuffed.

15   When he lies down on the floor -- the person lies

16   down on the floor and is handcuffed to a chair while

17   blindfolded.

18       Items are retrieved from various areas in the

19   household and pressed against the skin of the cuffed

20   and blindfolded person and that the person who is

21   cuffed and blindfolded then guesses the nature and

22   identity of the object pressed against him.

23       The following day, the day that he was stabbed,

24   they did in fact play this game.  She in fact went

25   first and then it was his turn.

26       During his term -- during his turn she pressed

27   several items against him, he guessed their nature,

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

8

```
1        and then she stabbed him then.  He felt a, what he

2        describes as I think like a dumbbell falling on his

3        chest twice.

4             In fact, that was the blade of a knife and she

5        stabbed him twice during the course of the game.

6        Then when he realized what was going on when the

7        blindfold came off she told him it was an accident.

8             He thought somehow or another a candle with a

9        hard wick had been involved.  He watched her speak

10       into a cell phone and call what she referred -- which

11       she described to him was 911 and talk as if she was

12       getting an ambulance.

13            In fact, the facts would reveal that these calls

14       that were made twice were not calls to 911.  No one

15       received an emergency call from their condominium and

16       a fair inference can be drawn as it was during the

17       New York trial that she was waiting for him to bleed

18       out.

19            Finally in fact the facts will further reveal

20       that a call was made to Mr. Sessler to set up a

21       dinner date for that evening while he was bleeding in

22       their apartment.

23            At any rate -- and I should add parenthetically

24       here, Mr. Sessler did not know that she was divorced

25       -- or that she was married to a man because she had

26       denied that.

27            I guess when he would visit she would hide his -
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

9

```
 1          - her husband's belongings.  But be that as it may,

 2     when he failed to bleed out and the ambulance did not

 3     arrive he demanded to be driven to the hospital.

 4          He did not -- he survived the ride to the

 5     hospital apparently to her dismay because upon

 6     arrival at the hospital she stabbed him once again

 7     outside the medical center in the parking lot.

 8          She was subsequently apprehended.  At her New

 9     York trial she testified and confirmed many of the

10     details that I described to the Court and I believe I

11     attached a transcript of her testimony in relevant

12     part to the brief that the State filed with the Court

13     on January 15th.

14          The State would seek to -- while the admissibly

15     in general on relevancy grounds is not an issue

16     before the Court, the State having briefed the

17     relevancy and admissibility of this -- these other

18     acts of misconduct on her part is part of a separate

19     brief, which Your Honor is going to hear separately.

20          The issue solely before the Court at this point

21     is --

22          THE COURT:  So relevance and other acts of the

23     accused are not directly an issue relative to the

24     argument you are making today?

25          ATTY. BERNARDI:  The issue is competency

26     actually.  The sole issue today is competency and

27     their admissibly with regard -- the sole -- the sole
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

10

```
 1            issue before the Court today is the applicability to

 2            these statements of the marital communications

 3            privilege and whether or not that privilege bars

 4            admission on that basis and on that basis alone.

 5                 THE COURT:  Okay.

 6                 ATTY. BERNARDI:  So basically the -- as I

 7            indicated to the Court earlier, a statue has been

 8            passed by the Legislature at this time and the State

 9            would submit to the Court that that sums up the

10            common law and the argument to the Court is the same

11            under both statutes.

12                 But that statute -- to deal with the statute

13            first, it first defines communications, what is a

14            marital communication under Connecticut law, and it

15            does so at section 15.

16                 And it defines a marital communication for

17            purposes of the privilege as one which is

18            confidential and one which is inspired by the

19            affection, competence, loyalty, and integrity of the

20            marital relationship.

21                 These communications, first of all, were not

22            confidential.  Police reports and statements taken

23            from various witnesses indicate that the defendant

24            described his faux triangle and the sexual exploits

25            attendant to that triangle, in other words, sexual

26            acts that Melissa engaged in with Jack, to friends in

27            the presence of her husband.
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

11

```
1        Her confessing about this faux triangle and the
2    sexual exploits of Melissa with Jack in the presence
3    of mutual friends shows -- and her husband shows that
4    she had no reasonable expectation of privacy in the
5    subject matter because of course with her husband
6    sitting there seeing her talking about it with other
7    people --
8        THE COURT:  No reasonable expectation of
9    confidentiality.
10       ATTY. BERNARDI:  Right.  That's what I meant to
11   say.  I am confusing it with Fourth Amendment
12   arguments.  Thank you for correcting me, Your Honor.
13       THE COURT:  Right.
14       ATTY. BERNARDI:  And second, with regard to
15   whether or not these statements that she made to her
16   husband meet the second prong and they utterly fail.
17   And that second prong is that the comments be
18   inspired or engendered by the love, affection,
19   loyalty, integrity, and confidence in the marital
20   relationship.
21       In light of the fact that she is in reality
22   talking about her own elicit affair and talking in
23   sexual detail, these conversations are not induced by
24   affection, loyalty, and integrity of the marital
25   relationship.
26       In fact, she is bubbling over in obsessive
27   excitement over her betrayal of that relationship and
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

12

```
1        that's a relationship that ultimately will end in the

2        lethal demise of the victim in this case Anna Lisa

3        Raymundo as well as the attempted lethal demise of

4        her husband.

5            Based on that I think -- based upon that second

6        prong I don't think any of these statements could

7        possibly fall within this privilege.  They are in

8        fact all lies as far as who is involved in the

9        triangle and in fact they are intended to even entice

10       her husband, inveigle her husband into getting

11       involved in this surveillance by lying to him that

12       she's now involved in the relationship and seeking

13       his assistance in what to do next, how to accomplish

14       the illegal acts.

15           They are far from the scope intended -- of

16       intended protected communications that would be

17       covered by this privilege.  In fact, I read no case

18       in doing the research where lies to your spouse were

19       covered by the relationship.

20           It's normally an honest confession of having

21       done something wrong and you tell your wife or you

22       tell your husband.  And, you know, because as these

23       cases say apparent -- well as the cases say it's the

24       -- people are seeking solace in their marital

25       relationship.

26           This is far, far a field from that type of

27       disclosure to a spouse and in fact it turns the
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

13

```
 1        rationales of the privilege upside down.  And that's

 2        under the statute and at the common law.

 3              Furthermore, there is a law on waiver.  The case

 4        law also accepts waiver as an exception to this

 5        privilege.  Here she testified to much of what I

 6        described in her court trial in New York State.

 7              She did so when she took the stand in her own

 8        defense during that trial and a transcript of the

 9        relevant portions of her testimony is attached to my

10        original brief.

11              Based upon that, confidentiality in these

12        statements has been waived.

13              There's also an exception that covers joint

14        participation in a crime.  However stupidly, her

15        husband did engage -- or I should put it this way,

16        she enlisted or inveigled her husband into

17        participating in the conspiracy, a scheme, to invade

18        the privacy of the other faux couple as it were, f-a-

19        u-x.

20              And that scheme, that conspiracy contemplated

21        burglary, trespass, and eavesdropping in violation of

22        Connecticut statutes.  This --

23              THE COURT:  That's the common law crime of the

24        fraud exception.

25              ATTY. BERNARDI:  That's exactly correct, Your

26        Honor.

27              THE COURT:  Okay, okay.
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in
limine regarding martial communications and trial court's ruling thereon)

14

```
 1              ATTY. BERNARDI:   This is also part of a common
 2         scheme resulting in bodily injury to the husband.
 3         The new -- under the new statute codifying the
 4         privilege and the Court's decisions -- well let me
 5         put it this way.
 6              Under that common law scheme it obviously
 7         doesn't cover a confidential communication made
 8         between people in the classic example of a husband
 9         and a wife team up to do a bank robbery who uncover
10         their statements as part of that conspiracy.
11              In this particular instance she's inveigled her
12         husband into helping her learn how to use the lock
13         pick set and which she stated she intends to use on
14         the condominium of the victim Anna Lisa -- well Anna
15         Lisa, not Anna Lisa Raymundo, but we know now --
16              THE COURT:   For purposes of surveillance,
17         trespass, and burglary that would be required.
18              ATTY. BERNARDI:   That's correct, Your Honor.
19         And eavesdropping because of the electronic device
20         put in the office of Nelson Sessler, who she was
21         referring to as Jack as part of that triangle.
22              Now these -- that would be under that crime
23         fraud exception.  So under the new statute codifying
24         the privilege and the Court's decision in the
25         Christian case and the subsequent decision in Beaver,
26         which included I would characterize approving
27         discussion of Judge Gold's reasons for allowing the
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

15

```
 1      privilege to fail at the trial level, I would say

 2      that under common law -- I would respectfully submit

 3      to the Court under common law or under this new

 4      statute which undoubtedly will be applied at trial,

 5      it's effective date being October 1st, that these

 6      statements are admissible and are not barred by the

 7      marital communications privilege.

 8           And just to sum up, why I say that, you really

 9      have three categories of statements in time.  You

10      have the surveillance and the faux triangle

11      statements that are basically made in the run up to

12      November --

13           THE COURT:  Let me see if I get it.  There are

14      three categories that you are talking about here;

15      statements to the run up and murder of Anna Lisa

16      Raymundo --

17           ATTY. BERNARDI:  And --

18           THE COURT:  -- and the faux triangle description

19      that was given at the time, f-a-u-x.  The second

20      category is statements after the death of Raymundo to

21      accommodate the relationship with Sessler and the use

22      of the condominium.

23           The third category, statements leading up to and

24      relative to the attack and attempted murder of Mr.

25      Christos.

26           ATTY. BERNARDI:  Right, the --

27           THE COURT:  Is that --
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

16

```
 1              ATTY. BERNARDI:  -- stabbing statements.  That's

 2       basically the categories.

 3              THE COURT:  Okay.

 4              ATTY. BERNARDI:  And all of those categories,

 5       right, are covered -- I should saw none of these

 6       categories of statements meet the definition of a

 7       privileged marital communication because none of them

 8       are inspired by the love, affection, loyalty, and

 9       integrity of the marital relationship.

10              So they fall outside.  In fact -- or with the

11       exception of things she is saying in -- almost all of

12       these statements somehow or another contain some type

13       of lie to a spouse and they are going to turn out to

14       be legal lies.

15              The surveillance is also covered -- the

16       surveillance, the things like where he is helping her

17       to learn how to use the lock pick set or giving her

18       the night vision goggles, these are all part and

19       parcel of aiding and abetting someone who is either

20       going to eavesdrop, commit a burglary, or commit a

21       trespass.

22              That first category not only falls outside the

23       privilege, but it's also covered by the time fraud

24       exception.

25              The stabbing, the false triangle, inducing the

26       husband to leave were waived also by her testimony at

27       the trial where she has basically talked about all of
```

A74

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

17

1    this already.

2         So there's been a waiver here and as a practical

3    matter at this point any further talking about even

4    if there was such privilege, the violation would be

5    so diminimous as to be not worth protecting at this

6    point because at her own doing she has already talked

7    about all of this in the public record in New York.

8         THE COURT:  Under oath.

9         ATTY. BERNARDI:  Under oath.  The bodily injury

10   exception, which is the domestic violence exception,

11   covers the stabbing and the motive for such and as --

12   that basically includes the entire -- the entire

13   transaction as I have just described to Your Honor

14   because once you get into the stabbing, her

15   statements are relevant under domestic violence and

16   they are relevant generally to this crime in general

17   because it's all part of the common scheme on the

18   misconduct grounds to eliminate through violent means

19   her rivals, her obstacles to a continued love affair

20   with Nelson Sessler.

21        But that exception would allow the entry of the

22   statements and then to show motive and how the

23   background led up.  It covers just about everything

24   also.

25        And I don't know that I argued this, but I

26   believe I did, the fact that these are not -- there

27   is no reasonable expectation on her part in

```
1          confidentiality covers at least the initial

2          statements made to others about this faux triangle

3          and statements that were made in the presence of her

4          husband.

5              So based upon all of that, Your Honor, the State

6          respectfully submits to the Court that the marital

7          communications privilege does not bar the statements

8          that I have described to the Court.

9              And I should indicate that these -- I have

10         summed up the highlights, in other words, the

11         headline dialogue that occurred between the defendant

12         and her spouse.

13             Thank you very much.

14             THE COURT:  We are not involved here -- this is

15         strictly the marital communications privilege, not

16         the husband and wife testimonial privilege that's

17         involved in these in limine motions at all and/or the

18         response thereto other than indicating that the

19         testimonial privilege, the husband/wife testimonial

20         privilege is not an issue here, is that correct?

21             ATTY. BERNARDI:  Well he -- I think that -- I

22         don't think Counselor is pushing the husband -- the

23         testimonial privilege being the statutory privilege

24         not to testify against your wife.  That does not

25         survive the divorce.

26             I don't know whether or not counsel is pushing

27         that, but I could bring in a copy of the divorce
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

19

```
1      decree, but --
2           THE COURT:  He didn't push it.  What he did was
3      he pointed it out to me in his brief.  That's all.
4           ATTY. BERNARDI:  Okay.  Well my response, quick
5      response to that is that privilege does not survive
6      the divorce.  The parties are divorced.  It does not
7      make a difference whether or not they were divorced
8      at the time -- whether or not they were married at
9      the time that the statements were made or that -- it
10     does not -- at the time of trial they are divorced
11     that privilege does not -- the testimonial privilege
12     does not exist.
13          THE COURT:  The spousal testimonial privilege
14     does not exist.
15          ATTY. BERNARDI:  That's correct.
16          THE COURT:  Okay.  What do you say there, Mr.
17     Butler?
18          ATTY. BUTLER:  Yes, Your Honor.  Thank you for
19     the opportunity to argue this motion in limine that
20     was filed on the 31st of May, some thirty days ago.
21          THE COURT RECORDING MONITOR:  Excuse me.
22     Attorney Butler, can you stand near a microphone?
23          ATTY. BUTLER:  Oh, yes.
24          THE COURT RECORDING MONITOR:  Thank you.
25          ATTY. BUTLER:  Thank you.  The Court correctly
26     points out that the brief does seek to educate the
27     Court in areas the Court already appears to be
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

20

1    educated on regarding the two different privileges

2    regarding spouses.

3        One is the adverse spousal testimony and the

4    other is the martial communications.  The thrust and

5    the crux, if you will, the thrust of this argument is

6    mainly about the marital communications.

7        But it is clear that the adverse spousal

8    testimonial privilege would -- would allow a spouse

9    to elect to testify but not force a spouse to

10   testify.

11       And I think counsel is correct in the statement

12   of the law that that does not survive divorce.

13       THE COURT:  Thank you.

14       ATTY. BUTLER:  Having said that, the marital

15   privilege does survive a divorce and I think it's

16   pretty clear and I think the State would agree that

17   the parties were married, statements were made at the

18   time they were married.

19       The divorce was subsequent to any of these

20   statements the State seeks to utilize.  So the

21   marital privilege does apply and we would argue that

22   it should be enforced.

23       Give me a few minutes and I'll make the

24   argument, Your Honor.  Thank you.

25       THE COURT:  Sure.

26       ATTY. BUTLER:  The marital privilege is broader

27   and it is as the State indicates to allow people to

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

21

```
1     speak freely and confidentially and know that the law
2     cannot force one spouse to testify and actually break
3     into the confidences of the marriage and that's the
4     policy behind it.
5          THE COURT:  Right.
6          ATTY. BUTLER:  And the policy is a good one,
7     Your Honor.
8          THE COURT:  Sure because it's to advance the
9     sanctity of the relationship.
10         ATTY. BUTLER:  That's correct.  Now on page
11    three of my brief as was pointed out to me by Your
12    Honor a few weeks ago, I am citing Tate and Laplante
13    and of course that's the second addition.
14         This is what happens when you sometimes utilize
15    a previously written brief of your -- of previous
16    work and I wish to make a correction for the record.
17    We are already on the fourth addition of Tate and
18    Laplante.
19         THE COURT:  We have had that discussion.  You
20    made that known to me --
21         ATTY. BUTLER:  Yes.
22         THE COURT:  -- when you looked at it carefully.
23    I appreciate you making that part of the record, sir,
24    but you have certainly --
25         ATTY. BUTLER:  And the exception would be --
26         THE COURT:  -- you certainly in doing your due
27    diligence --
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

22

```
1              ATTY. BUTLER:  Thank you.

2              THE COURT:  -- made that clear to me.

3              ATTY. BUTLER:  The section is 5.341 ET sequence

4         of the fourth addition.

5              THE COURT:  Yes, sir.

6              ATTY. BUTLER:  It would be around page 245.  In

7         Tate and Laplante, it's not Tate and Laplante anymore

8         because unfortunately Professor Laplante is dead and

9         it's now Professor Prescott.

10             THE COURT:  I've got it.

11             ATTY. BUTLER:  Thank you.

12             THE COURT:  Yes, sir.

13             ATTY. BUTLER:  I think an important case to look

14        at is Wolfe versus the United States.  That's 991

15        United States 14.  It's a 1934 case.  And Blau [ph]

16        versus the United States, which is 340 United States

17        332 and it's a 1951 case.

18             But in these cases they acknowledge that the

19        marital privilege, the marital communications

20        privilege is important and it has an important policy

21        argument and it's really important to the sanctity of

22        marriage.

23             And those cases point out that marriage in and

24        of itself is sacrosanct, Your Honor.

25             Now, these communications between spouses are

26        presumed and assumed to be privileged and the party

27        seeking to pierce that privilege bears the burden.
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

23

```
 1              So the burden is on the State not just to make
 2       the claims that the privilege is -- should not
 3       prevail here, they have to show facts, Your Honor.
 4       And as I heard the State argue, one of the things I
 5       was thinking to myself when I made notes about it is
 6       that, okay, whether or not the second prong is
 7       violated or reached or the facts establish this or
 8       that, we have to have the facts.  We have to have the
 9       evidence.
10              Well actually you have to hear people testify
11       for a fact finder or a court to determine whether or
12       not they actually have breached the first prong or
13       the second prong.
14              These are some of the things I was thinking as I
15       listened to the State argue along, Your Honor.  But
16       --
17              THE COURT:  The State would never be able to
18       make the argument it makes if that were the case.
19              ATTY. BUTLER:  Well one can anticipate perhaps
20       an evidentiary hearing outside the presence of the
21       jury, but --
22              ATTY. BERNARDI:  Well I would -- I would have
23       that hearing this summer.  This is going to be a long
24       trial and I don't mean to interrupt, I thought that
25       we decided to do this basically on the basis of
26       allegations, but to interrupt what may end up being a
27       four or five, six week trial to do hearings outside
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

24

```
1        the presence of the jury that we can do this summer,
2        I would -- that's just no way to run a railroad in
3        plain and simple English.   That would be -- but be
4        that as it may --
5             ATTY. BUTLER:  Perhaps --
6             ATTY. BERNARDI:   -- I did not expect to have to
7        call witnesses.
8             ATTY. BUTLER:  I am not expecting to ask for an
9        evidentiary hearing.  I think it's -- one of the
10       things that I was trying to point out is that certain
11       facts must be proved.
12            And the State if they seek to have testimony of
13       Mr. Christos about things that were said between my
14       client and her ex-husband now, he can testify about
15       that stuff and I anticipate that he will be allowed
16       to testify about some, but I am just saying that I
17       think -- perhaps I interrupted my own argument by
18       looking down at something that I wanted to make sure
19       that I remembered to argue, but I think the point I
20       am trying to make here is not that I require -- that
21       I believe it is required that we have evidentiary
22       hearings prior to the trial.
23            I think the Court can rule on these motions.  I
24       do believe that.  But one of the things I think that
25       needs to be made clear is that, you know, whether or
26       not these communications were confidential, the State
27       just can't say they are not confidential.
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

25

```
 1              They have to -- they -- we have the presumption

 2        they are confidential.  They have to pierce that

 3        presumption and that's the point I think I was trying

 4        to make and I have not made very artfully at this

 5        time.

 6              But let me continue on if I would be able to,

 7        Your Honor.

 8              They are presumed to be confidential and that's

 9        the Blau case I cited and that was cited also in

10        State versus Christian.

11              Of course, the Court is aware that prior to

12        Christian it wasn't absolutely clear and expressed by

13        the Connecticut Supreme Court that in fact they do

14        adopt the privilege.

15              They say we noted in State versus Littlejohn,

16        which is also cited in both briefs, that we look

17        favorably on this, but then State versus Christian,

18        267 Connecticut 710 in 2004, they finally came right

19        out and said so.

20              Now we all like the Code of Evidence, which they

21        came up with in 2000, to make things streamlined and

22        make things more clear and easier for counsel and

23        courts to decide, but when you look at page 14 under

24        privileges, basically all they are saying is the

25        smallest section there is in the whole code, Your

26        Honor.

27              It's about two lines and it says in section 5.1,
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

26

```
 1          except as otherwise required by the Constitution of

 2          the United States -- you follow the common law.

 3               So we can set down the evidence code and we can

 4          go back to the common law, which now I believe is

 5          State versus Christian and I think the Court and

 6          State would agree that Christian is giving us our

 7          marching orders.  I think the State would kind of

 8          agree with that.

 9               The policy behind these privileges, Your Honor,

10          as Your Honor is well aware, it's just like the

11          policy between attorney/client privilege,

12          doctor/patient, priest, parishioner.

13               You want people to be able to speak freely

14          without thinking that some day it could be pierced

15          and it could be forced out, the confidences.

16               THE COURT:  In furtherance of the relationship.

17               ATTY. BUTLER:  That's correct, Your Honor.  And

18          the distinction between the adverse spousal

19          testimonial privilege and the marital communications

20          privilege is that the marital communications

21          privilege is not vitiated by a later breakdown of the

22          marriage as is the case here in a subsequent divorce

23          as is the case here and it survives throughout that,

24          Your Honor.

25               If I may move ahead a little bit on the --

26               THE COURT:  Can you just hold your thoughts for

27          one second?
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

27

```
 1              ATTY. BUTLER:  Sure.
 2              THE COURT:  I want to -- there's a note or two I
 3      made on your briefs that I left on my desk.  Just
 4      hold on one second.
 5              ATTY. BUTLER:  All right.  I'll stay in
 6      position.
 7              THE COURT:  Sit for just a second.  I'll be
 8      right back.  Just stay where you are.
 9              (Pause)
10              THE COURT:  I am sorry to have interrupted your
11      flow, sir.  Go ahead.  I just --
12              ATTY. BUTLER:  It's all right.  May I ask for
13      just a moment, Your Honor?
14              THE COURT:  Sure.
15              (Pause)
16              ATTY. BUTLER:  Thank you, Your Honor.
17              THE COURT:  Sure.
18              ATTY. BUTLER:  So as I was saying earlier, the
19      marital privilege is very broad and it survives a
20      divorce, Your Honor.  I think the Court's analysis
21      and we are given our marching orders from State
22      versus Christian and what they basically say is,
23      first, they have to determine whether or not the
24      communication was -- the communications were during
25      the marriage.
26              I think we can all agree that all the
27      communications we are talking about in this case,
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

28

```
 1          State versus Davalloo, were in the course of the

 2     marriage.

 3          The next question is the Court has to make a

 4     determination whether those communications are

 5     confidential.  And I think that it would be our

 6     argument that the State just cannot assert that they

 7     are not confidential.

 8          Now there may be arguments about third parties

 9     being involved and that's a whole other argument that

10     I am going to get to shortly, very shortly, Your

11     Honor.

12          But the thing is is that the State has to be

13     able to show because they have the burden here to

14     overcome the presumption, they have to be able to

15     show that they are not confidential and were not

16     expected to be confidential.

17          And one of the problems the defense is seeing is

18     that we may have a situation, Your Honor, where some

19     of the information was intended to be confidential

20     within the solace of the great sanctity of the

21     doctrine of marriage and some were not.

22          And it may be very difficult to parse that out

23     and I may find myself during a trial before the Court

24     making subsequent objections claiming that certain

25     statements are still confidential even though the

26     Court has ruled that certain statements are not.

27          And I am not saying that this is -- I am trying
```

A86

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

29

```
 1          to make it any more difficult for the Court, but as I

 2          sit here I don't think we can just take a broad brush

 3          and paint the whole conversation of all three

 4          categories enumerated by the State and say, these are

 5          not confidential, some may, some may not be.

 6                 And I do want to get to the argument about the

 7          third parties and what that means because Christian

 8          seems to talk about that for us.

 9                 Basically, Your Honor, again, in the brief we

10          point out that they survive divorce and even the

11          death of a spouse.  Also, Your Honor, the Court has

12          to determine whether the communication was

13          confidential and that depends on the facts of a

14          particular case according to State versus Christian.

15                 And the presumption that the communications are

16          confidential and the State bears this presumption is

17          even noted and cited in Wolfe.  It is axiomatic that

18          the marital communications privilege protects all --

19          only those communications that are confidential and

20          then again they cite Wolfe, which I previously cited

21          for the Court.

22                 And although marital communications are presumed

23          to be confidential, it can be overcome.  So the State

24          bears the burden of overcoming that, Your Honor, and

25          it falls squarely on their laps and we don't have to

26          prove they are confidential, although I am sure there

27          is jousting going to be going back and forth in that
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

30

```
 1        regard.

 2              And also the Blau case which I cited earlier,

 3        340 United States 332, mentions the same thing about

 4        the burden of proof, Your Honor.

 5              THE COURT:  But you would concede that there's

 6        not a reasonable expectation of confidentiality if in

 7        fact the faux triangle and the statements leading up

 8        to the murder of Anna Lisa Raymundo, if they were

 9        shared with Emilio and Tammy Mei or Fay or whoever --

10              ATTY. BUTLER:  M-e-i, Mei is the correct

11        pronunciation, Your Honor.

12              THE COURT:  Mei.  If they were shared in one

13        form or another with those third parties that could

14        not possibly be an expectation of confidentiality

15        under those circumstances.

16              ATTY. BUTLER:  You know, I would agree without

17        waiving too much here.  I would agree with the Court

18        that if I am talking with my spouse and you are in

19        the room and --

20              THE COURT:  And my wife and I are in the room

21        listening to you.

22              ATTY. BUTLER:  Yeah.  That those are not even --

23        under any circumstances privileged because they are

24        not confidential because the third parties are

25        sitting there.

26              One would make the argument from the defense

27        table that, well the State can get that evidence from
```

A88

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

31

| | |
|---|---|
| 1 | those third parties.  And if you and your wife were |
| 2 | there with the defendant and I or my wife and I and |
| 3 | we were having these conversations, the State could |
| 4 | call Your Honor under that theory. |
| 5 | It wouldn't have to ask the spouse where there |
| 6 | is the marital communications privilege.  That would |
| 7 | be our claim. |
| 8 | Now to the extent that -- |
| 9 | THE COURT:  But the issue is confidentiality |
| 10 | there, not cumulative evidence being offered.  The |
| 11 | issue is one of confidentiality.  Those are two |
| 12 | distinct concepts there. |
| 13 | ATTY. BUTLER:  Correct. |
| 14 | THE COURT:  Okay.  Go ahead. |
| 15 | ATTY. BUTLER:  I find myself agreeing -- |
| 16 | THE COURT:  Fair enough, sir. |
| 17 | ATTY. BUTLER:  -- with the Court on that. |
| 18 | THE COURT:  I always have a -- you and I always |
| 19 | get into these jousting matches and I abuse you that |
| 20 | way.  I don't mean to interrupt your flow.  If I do |
| 21 | -- stop me if I do and just tell me you'd like to |
| 22 | finish up.  Whatever you want to do, but -- |
| 23 | ATTY. BUTLER:  Thank you, Your Honor. |
| 24 | THE COURT:  -- I do see those as two distinct |
| 25 | concepts.  Go ahead. |
| 26 | ATTY. BUTLER:  Well, when I look at State versus |
| 27 | Christian, which I think we are all obligated to do |

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

32

```
 1          and take our marching orders from the Connecticut

 2          Supreme Court, one of the things that was unusual

 3          when I read Christian, at least unusual and

 4          interesting to me, is that in Christian they make

 5          statements that it may not be confidential if there

 6          are third parties present, yet in Christian there

 7          were third parties present and they still upheld the

 8          marital communications in Christian.

 9               And I think the logic and the thinking was that

10          when she spoke with her husband when he was in the

11          hospital bed after the accident, when he kind of

12          admits to her that he was driving, he points to

13          himself and makes the motion with his hands that he

14          was driving and she hushes him up, that those are

15          privileged under the marital privilege doctrine, Your

16          Honor.

17               However, earlier he supposedly admitted to

18          driving to three other individuals who were EMS

19          workers and folks of that nature.  And even though

20          the Christian court says third parties present in

21          conversations with third parties would violate the

22          confidentiality and therefore you can break the

23          marital communications privilege, in Christian they

24          didn't.

25               And they said, yeah, he talked to those other

26          people, but we are still going to hold the marital

27          communications privilege.  But then later the
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

33

```
1      Christian court seems to go a step further and pull
2      back a little bit and they say but the evidence was
3      cumulative.
4          So the fact that Judge Gold let it in and he
5      shouldn't have, that was cumulative because third
6      parties testified.  So Christian while it seeks to
7      clarify for all of what the common law is actually
8      confuses some of us, at least it confused me a little
9      bit, when it said, well third parties doesn't
10     necessarily mean it's not confidential and it pierces
11     the communications privilege, which is code of armor
12     for the marriage, Your Honor.
13         And then they say but it's cumulative and it was
14     harmless.  So Judge Gold and the trial court
15     shouldn't have let it happen, but he let it happen
16     and it's harmless because third parties were there.
17         And so I think that we all read Christian with
18     an eye towards trying to understand how they parsed
19     out the facts in that case, which leads me back to my
20     argument that everything is different depending on
21     the facts of a particular case.
22         Now I would submit that the Court makes a decent
23     argument about in New York when you testify under
24     oath and there's a transcript and it's prior
25     testimony and you didn't have to take the stand and
26     you talked about this, that that particular aspect of
27     it weighs heavily against my argument that these
```

A91

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

34

```
 1        should be marital communications held privileged and

 2        inviolate.

 3             That testimony in and of itself, one wonders who

 4        was driving the defense bus for the defense when they

 5        let questions about Stamford and the Stamford murder

 6        take place in a New York proceeding which we would

 7        argue was separate and distinct from a New York case

 8        that she wasn't even charged in, but that's another

 9        matter for another court.

10             THE COURT:  Be that as it may, she in fact

11        testified under oath.

12             ATTY. BUTLER:  She did, Your Honor.  What I

13        would submit to the Court --

14             THE COURT:  And talked about these matters under

15        oath.

16             ATTY. BUTLER:  I would submit to the Court that

17        she didn't bring them up under direct, but they

18        certainly came out on cross and she answered under

19        oath.

20             THE COURT:  Right.

21             ATTY. BUTLER:  So I would submit to the Court

22        that that weighs heavy against our argument as to

23        those particular things she said there.

24             But the argument we would make is that if the

25        State is claiming a third party heard it, bring in

26        the third parties to say what they heard.  Don't make

27        Mr. Christos do it.
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

35

```
1            THE COURT:  One is a confidentiality type of
2       argument and the presence of third parties and their
3       participation --
4            ATTY. BUTLER:  Uh-huh [affirmative].
5            THE COURT:  -- and the defendant's communication
6       and how that communication took place.
7            ATTY. BUTLER:  Uh-huh [affirmative].
8            THE COURT:  The other is a waiver argument.
9            ATTY. BUTLER:  Right.
10           THE COURT:  I mean there's two different things
11      and what you are doing is you are crossing the two.
12      And I don't want the record to reflect that the Court
13      has to consider these in seriatim, the claims being
14      made here, because I have.
15           I read that New York transcript because it was
16      submitted with the State's brief and I have read the
17      assertion that the Mei's were present during certain
18      points during conversations relative to the faux
19      triangle for lack of a better descriptive term.
20           So I am in my mind looking at these in different
21      ways.  There are separate exceptions to the
22      confidentiality privilege here and I want the --
23      review in court to understand that the Court has
24      considered same.  Go ahead.
25           ATTY. BUTLER:  The last thing I'd say about the
26      waiver issue in New York, Your Honor, is that that
27      could be litigated and down the road or perhaps it is
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

36

```
1    being litigated or has been litigated about whether

2    or not that was an effective assistance of counsel.

3    We'll let someone answer questions where they are

4    presumed to be innocent and could have taken the

5    Fifth Amendment having to do with the Stamford case.

6         THE COURT:  I wouldn't argue with you about

7    that.  You are the expert in that area certainly.

8         ATTY. BUTLER:  Well, thank you, Your Honor.  I

9    am not sure I'm an expert on habeas corpus, but I am

10   certainly experienced with what habeas lawyers do on

11   behalf of petitioners.

12        THE COURT:  Yes, sir.

13        ATTY. BUTLER:  But in any event, Your Honor, the

14   sum and the substance of the defense argument is that

15   these are privileged.  Some of the statements may

16   still be privileged because they were confidential

17   and they were -- and some may not be because the

18   confidentiality may have been pierced by third

19   parties being present.

20        And I think that each case as Christian points

21   out has to be decided on the particular facts of each

22   case.

23        And we would ask the Court to grant our limine

24   motion to prevent the State from bringing in all the

25   evidence through Paul Christos that they want.

26        Now the State also -- just in conclusion, I do

27   want to mention, the State has brought up and the
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

37

```
 1        Court has acknowledged a crime fraud exception or a

 2        sexual domestic abuse exception to certain things and

 3        we would agree that if I am the victim or if someone

 4        is the victim of domestic violence that the other

 5        perpetrator of the domestic violence can't really

 6        then say, ah, it's privileged and you can't ever

 7        testify against me when I beat you up or I assaulted

 8        you.

 9            I understand the logic of that, but we would

10        think the policy of that is still that the

11        perpetrator of the assault can't hide behind the

12        privilege when the victim of the assault testifies in

13        the case of the assault that was being litigated.

14            Now the argument here is that she may not be

15        able to hide behind the privilege in the New York

16        trial that she had where Paul Christos was the victim

17        of the stabbing in the New York trial that she had

18        and that the policy behind limiting the exceptions --

19        limiting the privilege's ability is to protect the

20        assault victims in the trial that she had.

21            And I would submit to the Court that that's

22        something we could not have successfully argued in

23        the State of New York if we were New York lawyers at

24        the defense table here and I don't think the New York

25        lawyer even tried to do that.

26            I don't think that that was what his strategy

27        was, whatever strategy he had.
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

```
 1              THE COURT:  What about statements she makes at

 2       the time of the attack or temperately connected or

 3       close to the attack itself on Mr. Christos?

 4              I mean is it your position that he can't get on

 5       the stand in this matter and talk about that?

 6              ATTY. BUTLER:  Well that would be the defense

 7       claim, Your Honor.  I am not certain if I will win

 8       every time on the objections that I would have to his

 9       testimony about that, but the point I think I am

10       trying to make is that the public policy argument is

11       to allow a domestic violence victim to testify about

12       the domestic violence without the spousal perpetrator

13       of the violence being able to hide behind the

14       privilege of the martial communications privilege and

15       that what happened in that case in New York [as

16       said].

17              What I am suggesting here is that if Anna lisa

18       Raymundo, the victim in this case, if she had

19       survived, if she had survived and she would testify

20       and perhaps her spouse was charged, then the

21       privilege would not be able to prevent her from

22       testifying against her spouse had she been married

23       and her spouse was the perpetrator just to draw the

24       analogies.  That's what I am trying to do, Your

25       Honor.

26              I find that I can continue to argue and make

27       point after point.  I think I would like to conclude
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

39

```
 1          with addressing the crime fraud exception.
 2               THE COURT:  If you would, the State has
 3          indicated that she enlisted or was aided by Mr.
 4          Christos relative to eavesdropping, trespassing,
 5          burglary, and/or the use of devices in furtherance
 6          there of.  Would you like to comment on that?
 7               ATTY. BUTLER:  Very briefly, Your Honor.  The
 8          crime fraud exception makes some sense when people
 9          are in a conspiracy and they agree to do things that
10          they can't hide behind the privilege about their
11          conspiracy.
12               But I don't think there was any agreement to do
13          things and whether or not Paul Christos was duped or
14          naïve and he was brought into this little escapade
15          about watching people, following people, seeing what
16          people are doing, eavesdropping, if he was brought
17          into that I don't think the crime fraud exception
18          would really apply because first off he is not
19          charged with any crime.
20               The statute of limitations has gone by.  He
21          could never be prosecuted for any of those things and
22          we are talking about 2002.  This is 2011.  There is
23          no statute of limitations.
24               So the crime fraud exception is a difficult one
25          for the defense in my argument here and I would
26          submit that to you, but I would suggest to the Court
27          that Paul Christos was not a co-conspirator, was not
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

40

```
 1        a knowing conspirator at all, and I don't think he

 2        was a conspirator at all.  He just -- you know,

 3        somebody, lend me your night vision goggles.  I want

 4        to go over here.  Okay.  Here they are.  Teach me how

 5        to pick a lock.

 6             If this is true, and I again, you know, I don't

 7        know what's true.  I wasn't there.  But assuming --

 8             THE COURT:  But the scenario didn't play out the

 9        way the State has presented itself --

10             ATTY. BUTLER:  May I sit?

11             THE COURT:  Sure.

12             ATTY. BUTLER:  Thank you.

13             THE COURT:  -- is that general conversation

14        between spouses, lend me your night vision goggles,

15        teach me how to pick a lock, show me how, participate

16        with me, and how to gain entry into an apartment, I

17        mean that would be rather bizarre, wouldn't it --

18             ATTY. BUTLER:  I think if --

19             THE COURT:  If the scenario didn't lend itself

20        to the presentation of the facts as the State has

21        presented it to me in its in limine presentation and

22        in it's argument here today?

23             I mean the argument that you are making is

24        strange to say the least if in fact it's just out of

25        the blue that we are talking about let's talk about

26        my night vision goggles and my picking of locks to

27        enter into apartments and that is very strange.
```

A98

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

41

```
 1          ATTY. BUTLER:  I am just suggesting it's not the

 2     normal, typical crime fraud to the crime fraud

 3     exception.  It's just different.

 4          THE COURT:  Well it doesn't fit perfectly as you

 5     described the crime fraud exception.  I will admit

 6     that as you described.

 7          ATTY. BUTLER:  I guess in conclusion what I

 8     would say about that, Your Honor, is that frankly we

 9     don't know what Paul Christos thought when she wanted

10     to borrow the night vision goggles.

11          And, you know, if I want to borrow night vision

12     goggles even if I want to do it for a bad purpose or

13     a good purpose the spouse doesn't seem to know.  It's

14     not like she said, I need to borrow these so that I

15     can go do surveillance on something that I might

16     commit a crime there.

17          And by the way, going out into the public, in

18     the public view and observing things that anybody in

19     public view, in plain view can observe people's

20     comings and goings into the public parking areas and

21     into -- up steps and down stairways, and out by

22     boats, and the fishing areas, these are all things

23     out in the public domain and what the police officers

24     would say in plain view.

25          THE COURT:  Uh-huh [affirmative].

26          ATTY. BUTLER:  So I am not sure that that's

27     necessarily a crime that the crime fraud exception
```

A99

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

42

```
1        should adhere to.  Thank you.

2               THE COURT:  Okay.  Do you have anything to --

3               ATTY. BERNARDI:  I'll try to make a short

4        rebuttal.

5               THE COURT:  Yes, sure.

6               ATTY. BERNARDI:  And to cut to the chase on this

7        obviously the State is not interested in having a

8        line by line dissection out of presence of the jury,

9        a hearing, in the middle of the trial on this.

10              If the Court feels that one is necessary I would

11       ask that we do it this summer because the jury would

12       probably just get up and leave town if we stopped for

13       a week to do that in the middle of a trial.

14              But I don't think that that's necessary because

15       a line by line dissection of everything that I have

16       spoken about to the Court today or detailed in the

17       briefs would indicate that not a single statement

18       made by that woman was every made in contemplation or

19       induced by the affection, love, or mutual trust or

20       loyalties attended to the marital relationship and

21       therefore not a single thing that has been outlined

22       to the Court is induced and is a martial

23       communication pursuant to the statute or the common

24       law.

25              To say that they were would stand this privilege

26       on its head.  It is obvious that this woman was

27       having an affair with another man and that she
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

43

```
1        attempted to inveigle an unsuspecting husband into
2        her conspiracy to surveil that person to see how well
3        she was doing in that affair.
4             That's not covered by this privilege, not at
5        common law, not in any world but bizzaro [as said]
6        world would such statements be covered by a marital
7        privilege.
8             They stand the privilege on its head.  Nor the
9        statements with regard to the faux triangle, with
10       regard to please leave for the weekend because my
11       mentally ill brother wouldn't understand why I have
12       married for a second time and then Sessler comes in
13       who doesn't even know she is married and that's
14       supposed to be covered by a marital privilege?  Not
15       in this country, not in any country that I can think
16       of, not under any law, common law or otherwise, not
17       under the Code of Hammurabi, not under the Common Law
18       of England, not under the Common Law of the United
19       States that a person who made certain statements
20       during a stabbing of their spouse, this is a marital
21       communication that's covered by a privilege in this
22       country.
23            Not in the country that we live in.  Maybe some
24       other country, but you'd have to travel thousands of
25       miles to find it.  There is not one statement made
26       here that's covered, that is made as our legislature
27       has stated --
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

44

```
 1              THE COURT:  That was induced by the affection,

 2       confidence, loyalty, and integrity of the marital

 3       relationship.

 4              ATTY. BERNARDI:  Not one.  And if --- counsel is

 5       free to stand up and describe which one it was.  Now

 6       there may be some statements that she thought in her

 7       own mind should be confidential.  Forget about

 8       whether or not they are induced by the -- but they

 9       are only confidential in her mind subjectively

10       because she wants to get away with what's she is

11       doing, not because she wants to foster a marriage

12       whose lethal demise she is plotting as she is

13       speaking.

14              So while she may hope that these things remain

15       confidential so that she evades responsibility for

16       the criminal acts she has committed or is about to

17       commit, that is not a reasonable expectation of

18       privacy or confidentiality.  I am sorry.

19              And with regard to the Christian case and its

20       discussion of confidentiality the difference between

21       the Christian case and confidentiality and this case

22       is the presence of parties there when she describes

23       the triangle.

24              In the Christian case where they get into that

25       harmless argument and all of that, the facts of

26       Christian are a man tells the ambulance people, a

27       man tells some other people, right, and then as he is
```

A102

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

45

```
 1        lying in a hospital bed his wife comes in with nobody
 2        else in the room.
 3             She has no idea that he had already said what he
 4        is about to say to her to other people.  And with his
 5        wife there whether he is seeking solace from her or
 6        whatever or he is just drunk, he tells her he killed
 7        somebody while he was drunk driving.
 8             There is nobody else in the room.  As that woman
 9        hears that, she has no knowledge that he has told
10        other people and that he is doing anything but
11        relying on the confidentiality, love, and affection
12        attended to that marriage.
13             In this particular case as opposed to that
14        Christian case -- but ultimately in the Christian
15        case they say, yeah, that shouldn't have come in.
16        There wasn't a third party present, right, even
17        though he told on separate occasions third parties
18        there was none present in the room, so one might
19        think that he had a reasonable expectation of
20        confidentiality in what he told her when they were by
21        themselves on that subject.
22             In this particular --
23        THE COURT:  I expect you will offer here the
24        Mei's or at least the testimony of Mr. Christos that
25        these people were present when this faux triangle was
26        described.
27        ATTY. BERNARDI:  Well, I would probably call the
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

46

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 108 of 422

```
 1     other people, right.  He -- now I have spoken to Mr.

 2     Christos.  He has mentioned to me that he has heard

 3     her talking to Tammy Mei on the phone, it's come up

 4     at the table when they are -- and that she described

 5     it to a different party who is not in the case --

 6              THE COURT:  That's --

 7              ATTY. BERNARDI:  -- who was his best friend.

 8              THE COURT:  But you'll make an offer in that

 9     regard --

10              ATTY. BERNARDI:  Right, but he didn't --

11              THE COURT:  -- and you --

12              ATTY. BERNARDI:  I probably won't make any

13     offers at trial, Your Honor, because anything that's

14     going to be talked about -- well I am going to call

15     him to testify --

16              THE COURT:  That's what I mean.  That's what I

17     was saying.

18              ATTY. BERNARDI:  And I am not going to make an

19     offer outside of the presence of the jury.

20              THE COURT:  Yes.  I am not talking about an

21     offer of proof outside the presence of the trier of

22     the fact.  I am talking about evidence being offered

23     at the trial.

24              ATTY. BERNARDI:  But regardless, even if that

25     wasn't true the bottom line here controlling, end of

26     story, fact, is that there's nothing that's put down

27     here that was made because it was induced by the
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

47

```
 1        confidence and loyalty and trust of the marital

 2        relationship.

 3             As a matter of fact, the privilege would have to

 4        be stood on its head for that kind of argument to be

 5        made and in fact co-counsel, who has great persuasive

 6        powers when he's got some facts to argue, has never

 7        talked about the fact that none of these statements

 8        were induced.

 9             It can't be argued otherwise.  So as far as the

10        argument that I should just call other people to

11        testify to that, the law has always been clear in

12        this situation and in others, lets say that a person

13        confesses to three people that a crime was committed,

14        the defense doesn't get to pick what witnesses the

15        State is going to call.

16             THE COURT:  I agree.

17             ATTY. BERNARDI:  And domestic violence, it's

18        interesting because counsel indicates that this is

19        not the proceeding that has the charges directly

20        related to the domestic violence.

21             THE COURT:  It's not the attempted murder case

22        in New York is what you are saying.

23             ATTY. BERNARDI:  Right.  And if one reads the

24        statute, all right, as opposed to the way other

25        statutes have been written or even at section 14 I

26        think there's the testimonial, it doesn't ever say in

27        the proceedings, it just makes a bodily injury
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

```
1           exception.

2                There is nothing in there that states in the

3           proceedings where those injuries are the subject

4           matter of the criminal charges or whatever

5           phraseology that was used in other cases or in the

6           statute regarding the testimonial privilege.

7                And the legislature if it wanted to say such a

8           thing certainly knows how to say it.  But I think if

9           Your Honor looks at the subsection 2 of the

10          exceptions, which I think is the bodily injury one, I

11          don't have a copy of it in front of me, but there's

12          no reference to it being limited to the criminal

13          proceedings that directly concern the bodily injury

14          inflicted on the harmed spouse.

15               THE COURT:  Uh-huh [affirmative].

16               ATTY. BERNARDI:  Does Your Honor have a copy of

17          it there?

18               THE COURT:  I do.

19               ATTY. BERNARDI:  So maybe my memory has failed

20          in that regard, but that's -- so -- and once again,

21          there's been a -- a person has talked about this case

22          and waived her right to stand on this privilege when

23          she has testified about all of these things already

24          in New York.

25               And considering that she has already testified

26          about them already in New York what purpose is served

27          by applying that privilege in this particular
```

**A106**

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

49

```
 1        proceeding?

 2            The damage is done if there is any damage.  I

 3        mean, any -- going over it in this particular case

 4        would be diminimous at the most.

 5            So based upon all of those reasons, Your Honor,

 6        but I would say this too, if we are going to have a

 7        line by line hearing, which I suggest to the Court is

 8        not necessary, but let's do it this summer because I

 9        don't think anybody wants to interrupt a lengthy

10        trial for a two week line by line hearing outside the

11        presence of a jury.

12            But thank you very much, Your Honor.

13            THE COURT:  Are you suggesting a line by line

14        hearing?

15            ATTY. BUTLER:  No, Your Honor.  In fact, I'll

16        state for the record that I don't want to go there.

17            THE COURT:  Okay.

18            ATTY. BUTLER:  It's not necessary.  I think that

19        is --

20            THE COURT:  I don't think that it is either.

21            ATTY. BUTLER:  Let's assume for the sake of this

22        argument that the Court rules against me, now I know

23        the Court hasn't ruled yet and I still have hope

24        because hope springs eternal, but if the Court rules

25        against me and this information comes in through live

26        witnesses, and I think that's all I was suggesting,

27        that they have to have live witnesses to say this
```

5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)

50

```
1       that I can cross-examine under our sixth amendment

2       right to do so.

3           If a particular statement is about to come out

4       that I understand might be privileged more so than

5       the Court has already ruled, then I'll object at that

6       time.

7           I don't see that we need to go line by line.  I

8       know what the State's disclosure says.

9           THE COURT:  I can't preclude you from doing your

10      job --

11          ATTY. BUTLER:  Right.

12          THE COURT:  -- with reasonable diligence as I

13      know you do.  I mean that would be silly for me to

14      rule now that I -- that any potential objection you

15      may have at a later date that's outside what we have

16      discussed here today, I would preclude you from.

17          There's no way I could do that, nor would I do

18      that.

19          ATTY. BUTLER:  That's all I am saying is I agree

20      --

21          THE COURT:  But the issue here is whether the

22      marital privilege, the confidential communication

23      privilege should apply to what I see as the three

24      timeframes involved and the statements made during

25      those timeframes.

26          I think that's what is before me.  I am of the

27      opinion here that based upon a review of all of the
```

**A108**

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

51

1       submittals made that there was in fact a waiver here.

2       She in fact testified in the Westchester proceeding,

3       that if in fact statements were made in the presence

4       of the Mei's that there is no reasonable -- there

5       couldn't possibly be a reasonable expectation of

6       confidentiality under those circumstances.

7           That in any event everything I have heard here

8       is that these statements were not made in furtherance

9       or induced by affection, confidence, loyalty, and

10      integrity of the relationship, quite the contrary.

11          It is just the opposite.  The statements made to

12      the run-up of the murder of Anna Lisa Raymundo, the

13      description of a faux triangle, again, for lack of a

14      better word, it would be bizarre to classify those as

15      in furtherance of the sanctity of the marital

16      relationship.

17          The plan here was to do in a potential third

18      party suitor of Mr. Sessler or a third party suitor

19      of Mr. Sessler and ultimately Mr. Christos have him

20      removed from the scene either by way of divorce

21      and/or physically remove him from the scene.

22          And in fact, this defendant was convicted of the

23      attempted murder of her husband in those Westchester

24      proceedings.  So those statements leading up to the

25      run-up in this triangle and what not for various

26      reasons don't fall within the purview of the marital

27      privilege.

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 114 of 422
5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in
limine regarding martial communications and trial court's ruling thereon)

52

```
 1          To rule that way would be to be bizarre.

 2     Statements after the death of Raymundo to accommodate

 3     the relationship with Sessler fall in the same

 4     category, as well as the statements leading up to and

 5     relative to the attack and attempted murder of Mr.

 6     Christos.

 7          To argue that these were in furtherance of the

 8     marital relationship defies common sense, are in fact

 9     bizarre, and could only be applicable to some

10     parallel universe to which I am not a -- with which I

11     am not acquainted.

12          So based upon the discussions we have had it

13     would seem to me that for the various reasons set

14     forth in the State's brief, and I compliment your

15     argument, Mr. Butler, I think it was well done, but

16     there are a myriad of exceptions, but the most

17     important exception which would not give rise to the

18     marital privilege being asserted is that none of

19     these statements were induced by the affection,

20     confidence, loyalty, and integrity of the marital

21     relationship, and the Court so finds at this point

22     based upon what has been presented here.

23          I am going to grant the State's in limine motion

24     because that's what you have filed here in accordance

25     with the request you have made.

26          I am going to deny your in limine motion, Mr.

27     Butler, and/or your objection to the State's in
```

**5. Excerpt of June 30, 2011 Transcript, pp. 1-50, (oral argument on motions in limine regarding martial communications and trial court's ruling thereon)**

53

```
 1        limine motion, however you wish to characterize your
 2        filing of May 31st.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13                    *       *       *
14
15
16
17
18
19
20
21
22
23
24
25
26
27
```

6

Excerpt of January 24, 2012 Transcript, pp. 64-177;

Excerpt of January 25, 2012 Transcript, pp. 87-110

(entire testimony of Paul Christos)

6A

Excerpt of January 24, 2012 Transcript, pp. 64-177

(testimony of Paul Christos)

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

64

```
 1    P A U L   C H R I S T O S

 2    (Having been duly sworn in testified to the following)

 3    DIRECT EXAMINATION BY ATTY. BERNARDI:

 4        Q   Mr. Christos, if you could speak up loud enough so

 5    that we can hear you down here, all right?

 6        A   Sure.

 7        Q   Okay, all right.  Now, you indicated, I think, just

 8    now, that you lived at 300 Mamaroneck Avenue?

 9        A   That's correct.

10        Q   Apartment 424.

11        A   Yes.

12        Q   All right.  And what town are you living in?

13        A   White Plains.

14        Q   And how old are you, sir?

15        A   Forty-four.

16        Q   Now, are you working?

17        A   Yes.

18        Q   Where do you work?

19        A   I work at Weill Cornell Medical College in Manhattan.

20        Q   And how long have you been working at Weill Cornell

21    Medical College?

22        A   I started there in January of 2001.

23        Q   And you -- right up to the present?

24        A   Yes.

25        Q   All right.  And what do you do there at the Cornell

26    Medical College?

27        A   I work there as a Biostatistician.
```

Case 6:7-cv-01357-VAB Document 24, 2012 Transcript, pp. 64-170 Page 122 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-170
(testimony of Paul Christos)

65

1    Q    Uh-huh.

2    A    That's a person that looks at or analyzes date from

3  medical research studies.  And I also teach medical students

4  and we perform epidemiologic studies looking at risk factors

5  for disease in the population.

6    Q    All right.  And what's your education, sir?

7    A    I have a Master's in Public Health in epidemiology

8  and an MS, Master's of Science in Biostatictics.  And a

9  Doctorate in Public health and epidemiology.

10    Q    All right.  Are you divorced?

11    A    Yes.

12    Q    And when did you get divorced?

13    A    September of 2004.

14    Q    Okay, and in September of 2004, who was the spouse

15  that you divorced?

16    A    Sheila Davalloo.

17    Q    All right.  And if you saw her again, of course,

18  you'd be able to recognize her?

19    A    Yes.

20    Q    And she's here today in Court?

21    A    Yes.

22    Q    Just for the record, could you point her out, please?

23    A    Sitting at the Defense table in a black outfit.

24         ATTY. BERNARDI:  All right.  May the record --

25         THE COURT:  All right.  The record will reflect

26     he's identified the Defendant, Ms. Davalloo.  Go

27     ahead.

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

66

```
 1    BY ATTY. BERNARDI:

 2       Q    And how long had you known -- when did -- what year

 3    did you first meet the Defendant?

 4       A    I believe it was around April of 1994.

 5       Q    And at that time, what were you doing?  What were the

 6    both of you doing as a matter of fact?

 7       A    We were both enrolled in graduate school together at

 8    New York Medical College in Valhalla, New York.

 9       Q    And what year did you get married, if you would tell

10    the jury?

11       A    May 28, 2000.

12       Q    And did you have children together?

13       A    No children.

14       Q    Once again, you divorced in 2004?

15       A    That would be the official divorce date, correct.

16       Q    All right.  And I take it you must have had mutual

17    friends?

18       A    Yes.

19       Q    And -- and with regard to your mutual friends, would

20    they include Tammy and Emilio May?

21       A    That's correct.

22       Q    Now, I'm going to take you back to the year 2002, and

23    ask you a couple of questions about where you and the

24    Defendant worked and where you lived.  All right.

25       Now, with regard to the Defendant, where was she working

26    in 2002?

27       A    Purdue Pharma, a pharmaceutical company in Stamford.
```

67

```
 1      Q    All right.  And what did she do there?

 2      A    She was a, I believe in her last position, she was a

 3  Manager of Medical Coding, Thesaurus Administration.

 4      Q    All right.  And were you living with your wife in

 5  2002?

 6      A    Yes.

 7      Q    All right.  And where did you live?

 8      A    We lived at 21 Foxwood Drive in Pleasantville,

 9  apartment number 6.

10      Q    Okay, and what were you doing that year?

11      A    I was working at Cornell, as I stated before.  I also

12  was in a PhD program at Columbia.  I was pursuing my

13  Doctorate at the time.  And I believe I may have also been

14  working part time -- a part time job at night.

15      Q    Okay --

16      A    Teaching.

17      Q    That sounds like you were busy man.

18      A    Yes, very busy at that time.

19      Q    But, were you continuously living, during that period

20  of time, with your wife at 21 Foxwood Drive in Unit 6?

21      A    Yes.

22      Q    That's where you slept at night?

23      A    Yes.

24      Q    All right.  Now, around the beginning of that year,

25  2002, did you being to hear about a curious love triangle

26  from your wife at that time, the Defendant?

27      A    Yes.
```

A120

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

68

1    Q    Okay, now, did she tell you where this triangle was

2    occurring?

3              MS. DAVALLOO:  Your Honor, I object to the use

4         of the word love triangle.  If the jury would have to

5         be excused, I could argue on that matter.  There is -

6         -

7              THE COURT:  Are you going to claim the line?

8              ATTY. BERNARDI:  Well, I don't know how else to

9         -- I -- we could say love quadrangle.  I mean, it's a

10        geometric argument that we're --

11             MS. DAVALLOO:  There would have --

12             ATTY. BERNARDI:  -- about to have here.

13             MS. DAVALLOO:  I think there would have to be an

14        offer as to whether it was a triangle or if it was

15        love.

16             THE COURT:  Just give me a second so I could

17        talk to her, okay.  Thank you.

18                   **(JURY PANEL EXITS)**

19             ATTY. BERNARDI:  You know what, Your Honor.  I

20        can use the phrase affair.

21             MS. DAVALLOO:  Your Honor, the objection is --

22             THE COURT:  Hold it a second.

23             MS. DAVALLOO:  Oh, sorry.

24             THE COURT:  Wait a second.

25             All right.  Ma'am, please go ahead.

26             MS. DAVALLOO:  I apologize.

27             THE COURT:  Yes, ma'am.

1     MS. DAVALLOO:  The characterization and the use

2     of the word love triangle, it's been thrown around

3     kind of lightly, Your Honor.  And I just want further

4     clarification on whether it was actually a triangle.

5     Whether there was love involved.  It's just being

6     used a little too lightly, Your Honor.

7         THE COURT:  What's your position on that?

8         ATTY. BERNARDI:  Well, I'm using it, merely, to

9     orientate people.  I don't think that calling it a

10    love triangle is somehow or another prejudicial to

11    the jury.

12        They're going to hear many details about the

13    fact that this Defendant was having an affair with

14    Nelson Sessler at various points in time between 2000

15    and March of 2003.  And that prior to November 8th of

16    2002, Nelson Sessler was living with, and intimate

17    with, Anna Lisa Raymundo

18        THE COURT:  Anything else to add?

19        MS. DAVALLOO:  Yes, Your Honor.  Your Honor --

20        ATTY. BERNARDI:  I would indicate this before

21    she speaks.  This -- the triangle was described to

22    him; but with false names in it.

23        THE COURT:  Okay.

24        ATTY. BERNARDI:  So, there's really two

25    triangles.

26        MS. DAVALLOO:  Yeah, I just -- the word love,

27    Your Honor, I mean, if he -- if the State's Attorney

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 127 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

70

1       wants to use an affair as to the 2000 -- the affair

2       going on between 2000, I believe he said, and 2003,

3       that's still to be determined, Your Honor.  It's not

4       a fact.

5           I think there's going to be testimony that will

6       disprove that.  And I don't think this witness, Your

7       Honor, can testify that that was actually love

8       involved, and whether it was a triangle.  I think

9       this witness was never present during that time.  So,

10      he doesn't really know; and he's going by information

11      that he's gathered.

12          So, I just -- I just object to that.  The use --

13      I think if he wants to say, you became aware of an

14      affair your wife was having.  Or, your wife was

15      talking to you about somebody having an affair in

16      their workplace; that would be acceptable.

17          But, in terms of a love triangle, it's yet to be

18      determined.

19          ATTY. BERNARDI:  Your Honor, his information,

20      all -- we've had a whole motion and briefs on this

21      issue so Your Honor is not unfamiliar with the

22      situation.  The information that he's going to convey

23      is information he received from the Defendant; and

24      observations he made concerning the Defendant while

25      she was relating information about a love triangle

26      involving Melissa, Anna Lisa and Jack.

27          She later admitted to him, after her trial, that

1   indeed, there was no Melissa.  Melissa, in fact, was

2   the Defendant, as she stated in her New York trial.

3   That there was no Jack, that was Nelson Sessler.  And

4   that Anna Lisa Raymundo was Anna Lisa Raymundo.

5        MS. DAVALLOO:  Your Honor, I think --

6        ATTY. BERNARDI:  And I don't think there's any

7   dispute as to that.

8        MS. DAVALLOO:  I -- I just -- this is the last

9   I'm going to say on this, Your Honor.  I just think

10  all of those facts should come through first, in

11  whatever form or questions need to be asked, before

12  the State just puts in an opinion.  And love trial is

13  an opinion, as to their characterization of that

14  relationship.

15       Whether the relationship is true or not.  And

16  whether this witness knows for a fact, maybe ask the

17  witness, do you remember hearing the actual words,

18  love triangle?  Was that how it was characterized to

19  you?

20       But, for the State to say, you -- you know, you

21  came -- you have been  made aware of a love

22  triangle, without any explanation, that's just a form

23  of a conclusion almost.

24       THE COURT:  I appreciate the nature of the

25  objection.  Your objection is overruled.  You can

26  take it up in cross examination if you wish.

27       Let's go.  Bring them in.

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

72

1    ATTY. BERNARDI:  While we're -- while we're

2    waiting for them to come in.  I have two diagrams of

3    the individuals involved, as first described; and I

4    will show them to the Defendant.

5    THE COURT:  Sure.

6    ATTY. BERNARDI:  So there is no confusion in the

7    matter.  That's as described.  That's as actually --

8    Your Honor, can Inspector Mecozzi set up the

9    machine?

10   THE COURT:  Sure.

11   MS. DAVALLOO:  Yes, no objection, Your Honor.

12   THE COURT:  Okay.

13   **(JURY PANEL ENTERS)**

14   THE COURT:  Stipulate to the presence of the

15   full jury?

16   ATTY. BERNARDI:  So done, Your Honor.  And while

17   they were out, Your Honor, I --

18   MS. DAVALLOO:  Yes, Your Honor.

19   ATTY. BERNARDI:  I showed the Defendant State's

20   Exhibit 11 and State's Exhibit 12 for identification.

21   And I believe there's no objection to these

22   diagrams.

23   MS. DAVALLOO:  That's fine.

24   THE COURT:  11 and 12 Full.  Thanks for your

25   patience.  I have to do it sometimes.  Tomorrow

26   you're going to bring your sneakers.  I know you

27   will.

```
1            Okay, continue on with your line, please.
2            ATTY. BERNARDI:  Yes, sir.
3    BY ATTY. BERNARDI:
4      Q    I think I asked you whether going back in time to
5    that calendar year 2002, your wife began -- your wife, the
6    Defendant, began to describe to you a love triangle that was
7    occurring at Purdue Pharma?
8      A    Correct.
9      Q    And I think the question that I actually asked you
10   was, where was the -- where was this affair, this triangle,
11   occurring.  The answer was Purdue Pharma?
12     A    Correct.
13     Q    Okay, now, did she tell you that she had a friend?
14     A    Yes.
15     Q    All right.  And did she tell you what the name of the
16   friend was?  If you could tell the jury.
17     A    The friend's name was Melissa.
18     Q    Okay, and did she tell you who Melissa was involved
19   with?
20     A    She said Melissa was involved with a man named Jack,
21   who worked at Purdue.  Or, I think initially, she said he
22   might have worked at a company across the street from
23   Purdue, but would do contract work with Purdue, initially.
24     Q    Okay.
25     A    And that Melissa was involved with Jack.  And Jack
26   was also involved with a woman named Anna Lisa.
27     Q    Okay, and did she indicate to you at that point, what
```

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

74

1  the last name of Anna Lisa was?

2    A   No.

3    Q   I take it at some point, you don't have to answer the

4  question now.  But, at some point did you learn what the

5  last name of Anna Lisa Raymundo --

6              MS. DAVALLOO:  Objection, Your Honor.

7  BY ATTY. BERNARDI:

8    Q   Did you learn --

9              THE COURT:  Overruled.  Go ahead.

10             ATTY. BERNARDI:  I'll withdraw it.  It's not a

11        problem.  I'll get to it.

12 BY ATTY. BERNARDI:

13   Q   Now, did she indicate to you that who she was

14 associated with among these people?

15   A   She described it as Melissa was her friend.

16   Q   All right.

17   A   So, everything she told me was from Melissa's

18 perspective.

19   Q   All right.  And did Melissa have a problem?

20   A   Yes, Melissa was involved in a relationship with

21 seeing a man named Jack, who was in a relationship with Anna

22 Lisa.  And Sheila would ask me what I thought of Jack's

23 mindset.  Why is he in this relationship with two women?

24 Why is he cheating on one with the other?  Things like that.

25   Q   Okay, so she indicated to you that Jack was having a

26 sexual affair with both women?

27   A   Yes.

A127

1    Q   All right.  And did this Melissa have a fear about

2    how long this relationship would continue?  According to

3    what you were told by the Defendant?

4    A   Yes, there were times where she would describe

5    Melissa as being sad and depressed.  Why isn't Jack spending

6    time with her?  Why doesn't he open up to her more?  He's

7    spending more time with Anna Lisa, maybe on a vacation.

8    Things along those lines.

9    Q   Okay, did she indicate to you whether or not Anna

10   Lisa was bringing any pressure with regard to Jack?

11   A   I believe she described Anna Lisa as being somewhat

12   demanding on Jack.  I don't have more specifics than that.

13   But, wanting him to be in the -- stay in the relationship.

14   Something like that, perhaps.

15   Q   And did you begin to -- and once again, when did you

16   begin to hear this talk about this -- this --

17   A   I would say, it could have been sometime in 2002.

18   But, it could have been as early as late -- late 2001.

19   Q   All right.  Late 2001.  But, definitely during --

20   since the commencement of the calendar year 2002?

21   A   I can't be sure, but somewhere around early 2002 for

22   sure, I would think, yeah.

23   Q   All right.  And how often would this issue come up?

24   A   There was a time period where she would tell me this

25   story about these three people at work, every day.  There'd

26   be conversations about, you know, why is Jack doing this?

27   What's his mindset?  Just describing to me the activities,

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

76

```
 1   what was going on.

 2     Q   All right.  And basically, what was Melissa's

 3   complaint as relayed to you by the Defendant?

 4     A   Maybe a lot of anxiety.  Always trying to question

 5   what is Jack's motive.  How does he think?  Asking me as a

 6   man, how do you think Jack is -- why is Jack doing this?

 7   Why doesn't open to me more?  Those types of anxieties or

 8   fears, I guess you could characterize them as.

 9     Q   And would she talk --

10     A   Questioning.

11     Q   -- about this just with you?  Or, would she mention

12   it when you were present, would she mention it to others?

13     A   She talked about it infront of other friends of ours,

14   Tammy and Emilio May.  She mentioned it a few times infront

15   of my parents when we were all together; and one or two

16   other friends as well.

17     Q   Did she ever ask you about, as this -- these stories

18   went on, about what Melissa should do?

19     A   In terms of?

20     Q   In terms of, like, bringing the matter to a head?

21     A   Yeah, there were times where I would give my opinion

22   about, you know, why doesn't Melissa just confront Anna Lisa

23   and tell her, we're both involved with the same person.  I

24   suggested that a couple of times.  I was hearing this story

25   every day.  It was kind of in one ear out the other.

26     I was very busy with school so I became very sick of

27   these stories.  So, I often would just say, let these two
```

 1  women work it out between them.  Essentially, yeah.

 2      Q    All right.  Just because these names are new to

 3  everyone.  I --

 4           THE COURT:  Can everybody see that?  Or, is it

 5      too small?  Too small?

 6           ATTY. BERNARDI:  Too small?

 7           THE COURT:  Mr. Mecozzi, can you make that

 8      bigger?

 9           Is that better?  Does that help or is that

10      still too small?

11           ATTY. BERNARDI:  All right.  So -- may I

12      approach, Your Honor?

13           THE COURT:  Just point out on the triangle

14      where you're talking about there.

15  BY ATTY. BERNARDI:

16      Q    So, once again you're hearing the story about this

17  going on at Purdue Pharma?

18      A    Correct.

19      Q    And the Defendant, right, was telling that she's

20  friends with Melissa, right?

21      A    Correct.

22      Q    Melissa is involved in an affair as it were?

23      A    Yes.

24      Q    Right.  And that affair involves a man named Jack,

25  right?

26      A    [No audible answer].

27      Q    And at the other end, over here, is a woman

**A130**

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

78

1   identified only as Anna Lisa, all right.  And did she tell

2   you -- if you recall, would she ever mention the living

3   arrangements between Anna Lisa and Jack?

4      A   At one point, she said they were living together.

5   She also had mentioned that Jack had his own residence as

6   well.  But, there was some point during that time period

7   that they were living together, yes.

8      Q   Okay, and how often would you say this would come up?

9   She would talk about this?

10     A   I want to say every day or at least every other day.

11  There were some period of time, maybe where it wouldn't be

12  discussed for a week or so.  But, for the most part

13  throughout that year, it came up a lot, very frequently.

14     Q   And that year is 2002?

15     A   2002, yes.

16     Q   All right.  Now, why did you listen to this?

17     A   Well, I would come home from work and school.  She

18  would tell me these stories.  I would often ask, why are you

19  so interested?  She would even describe the intimate

20  relations between Jack and Melissa.

21     Q   Sex?

22     A   Sex.  And would say, you know, I would say things

23  like, why doesn't Melissa ever ask about your sex life?  Why

24  is it always this one sided kind of conversation?  So, I was

25  just listening to humoring her.

26     I -- our marriage at this point was very -- we were

27  almost living as roommates.  We weren't even romantic

A131

Case 3:17-cv-01575-VAB Document 11-25 Filed 11/08/17 Page 136 of 422
6A Excerpt of January 24, 2012 Transcript pp. 64-177
(testimony of Paul Christos)
79

1    anymore at that point.  So, I just assumed she was living

2    somewhat vicariously through Melissa's stories.   In

3    hindsight, that's hard to believe in a sense.  But, she told

4    this to other people, other friends, my parents.

5        So, at the time I never suspected --

6        Q    Did you say she mentioned it even to your parents?

7        A    Yeah, we could be out to dinner or something, and it

8    would come up.

9        Q    All right.  Your mom and dad, I take it, were -- are

10   they still alive?

11       A    Yes.

12       Q    Okay, now, did there come a point in time when she

13   began to mention to you, or you may recall, about a

14   surveillance that was going on?

15       A    Yes.

16       Q    Okay, can you tell the jury about that?

17       A    The earliest one I remember is that she said she

18   wanted to go on a stake out, Sheila did.  Like, on a stake

19   out with Melissa.  Help her friend Melissa to spy on Jack,

20   follow him, see what he was doing.  See how he was

21   interacting with Anna Lisa, I believe.

22       And she just told me that in passing.  And I said, oh,

23   okay, you're going to go on a stake out with your friend and

24   spy on, what I perceived, as a cheating boyfriend. And she

25   told me that, and, you know, I didn't object per say or

26   anything.

27       I had a pair of night vision binoculars that I had from,

A132

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 137 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

80

1   like, in the early 90s.  And I even said, yeah, take these,

2   you can see better in the dark.  As it was being portrayed

3   to me, it was helping a friend spy on a cheating boyfriend.

4   So, you know, I thought it was a little odd; but I didn't

5   really have a big problem with it.

6       Again, I wasn't paying attention very much given my work

7   and school.  And I was always writing papers, and I was

8   teaching.  So, I would listen and that was about it.

9       Q   So, you had to show her how to use the night vision

10  goggles?

11      A   Yes, I showed her how to use them.  She said she

12  would go with Melissa in the car, I believe.  And if it was

13  at night, you could just use these night vision binoculars

14  to see.

15      Q   And they were spying on who?

16      A   They were spying on -- definitely Jack.  I believe it

17  was Jack and Anna Lisa.  But, it was mainly portrayed as

18  following Jack around.

19      Q   Well, it got odder, did it not?

20      A   What's that?

21      Q   I mean, tells us about the lock pick set.

22      A   Yeah, so one point she said that Melissa had

23  purchased a lock pick set or she had pictured -- purchased a

24  lock set kit for Melissa.  And she said that Melissa and --

25  Melissa wanted to break into Anna Lisa's apartment during

26  the day when she wasn't home to look at pictures in the

27  house to get a sense of the relationship between Jack and

Case 3:17-cr-01257-VAB Document 45-17 Filed 11/08/17 Page 138 of 422
Excerpt of January 24, 2012 Transcript, pp. 54-177
(testimony of Paul Christos)

81

```
 1   Anna Lisa.

 2       Q    How close they were?

 3       A    How close they were.  And I said, that's crazy.  Why

 4   would -- you know, you're going to break into somebody's

 5   apartment just to look at pictures.

 6       Again, at that point, I was so sick with the stories that

 7   I just kind of got angry and whatever kind of thing.

 8       Q    But, did you observe her trying to use the lock pick

 9   set?

10       A    Yes, she showed me the lock pick set.  I remember her

11   practicing -- trying to play with it on our front door in

12   Pleasantville; front door and the patio door.  I myself

13   looked at it.  I had never really seen a lock pick kit

14   before so I myself looked at it.

15       And I myself tried to play with it on her door.  Just,

16   really, out of curiosity.  I never took it seriously that

17   she would ever go through with it.  The kit didn't --

18       Q    You did warn her?

19       A    -- work.  What's that?

20       Q    You did warn you?  Did you --

21       A    I warned her not to do it, correct.

22       Q    All right.  Now, in so assisting her, I told you that

23   if you tell the truth, you're not going to face charges with

24   regard to this assistance that you rendered with regard to

25   the lock pick set?

26       A    Yes, I -- I provided --

27       Q    And the night vision goggles?
```

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

82

```
 1      A    -- all that.  I had provided all that information

 2  very early on to the Stamford Police.

 3      Q    Okay, now -- so I think you said you tried to use

 4  them on the door too?

 5      A    I remember playing with it out of curiosity.  I -- I

 6  -- it was a very inexpensive looking kit, so I remember

 7  playing with it for a few minutes.  She couldn't get it to

 8  work.  I couldn't get it to work.  And then that's the last

 9  I really saw of it at that point.

10      I believe it was somewhere in our kitchen in a drawer.

11  And I never heard about it after that incident.

12      Q    But, if you had figured out how to use it, you would

13  have told your wife, right?

14      A    In the moment.  I suppose if I -- if I had figured

15  out right there how to use it, I might have shown her.  But

16  again, I -- I never really took it seriously.  I never

17  thought -- again, I think -- I thought she was doing this

18  with Melissa.

19      So, there never came a point where, the day after or the

20  day after that, she said, we're actually going to go in and

21  do this; so I would have an opportunity to object more.

22  That never happened, so -- but, yes, in the moment, if I had

23  figured out how to use it, I would have shown her.

24      Q    How about an eavesdropping device?

25      A    Yes, I owned a eavesdropping device.  After college,

26  I wasn't sure what I wanted to do and I thought about,

27  maybe, going into private investigation.  And I had ordered
```

**A135**

Case 3:17-cv-01265-TEJ Document 11 Filed 01/06/16 Page 140 of 422
Excerpts of January 24, 2012 Transcript, pp. 164-172
(testimony of Paul Christos)

83

1  this, like, a bugging device from the back of a catalog.

2  Which I had, probably, in the early nineties.  But, it was in

3  my closet in Pleasantville.

4      And she had said that Melissa wanted to -- she knew I had

5  -- Shelia knew I had this device.  And she said Melissa

6  wanted to know if she could use that to put it into Jack's

7  office at Purdue, to listen to his conversations.

8      Q    Did you ever observe her try to use the device?

9      A    Yeah, I believe I showed it to her and how it would

10  work, essentially.  I -- I assumed she was giving it to

11  Melissa, to again, in a sense gain evidence about a cheating

12  boyfriend.  That's -- that's how it was described to me.

13      Q    And was there more than one eavesdropping device

14  involved here?

15      A    The one that I had, I believe she said she used and

16  it didn't work.  And then she, on her own, purchased another

17  device from the manufacturer that was listed on the device

18  that I owned.  And the device that she purchased for

19  Melissa, as it was described to me, was a -- kind of like a

20  tape recorder that you would attach to the phone jack in the

21  office; and it could record incoming and outcoming

22  conversations.

23      So, it wasn't really a bugging device.  It was just a

24  recording device that you could plug into the phone.  And --

25      Q    Did she tell --

26      A    Go ahead.

27      Q    Go ahead.

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

84

1    A    And I believe she said that didn't work.  And I

2  remember her even calling the person who made it.  And I

3  don't remember what his response was; but you're in a

4  corporate building or something like that.  It might not

5  work.  Something along those lines.

6    And that device, the last I saw that device, was also

7  somewhere in my kitchen which was kind of filed away

8  somewhere, I believe.

9    Q    Well, did she tell you what Melissa was going to do

10  with that device?

11    A    She said they would hook it up to Jack's phone, in

12  his office so that she could hear conversations between Jack

13  and Anna Lisa.

14    Q    And who was going to actually do that?  Melissa or

15  the Defendant?

16    A    That I don't recall.  It seemed like it was always a

17  team effort.  I don't know who actually would have

18  physically installed it.  I believe she said Melissa used

19  the first device that didn't work.  I don't remember which

20  one actually, physically was going to do it in the story.

21    Q    All right.  How about Jack's phone messages.  What

22  did she tell you about that?

23    A    She --

24    Q    What did she tell you about Melissa and Jack's phone

25  messages in his office?

26    A    She said that Melissa had access to Jack's voicemail

27  system at work.  She had stumbled onto his password.  I

A137

Case 3:17-cv-00123-Document 1-1 Filed 01/06/17 Page 142 of 422
Excerpts of January 24, 2012 Transcript pp. 64-173
(testimony of Paul Christos)

85

1   think it was described as Jack did not change the default

2   password on his -- on his phone system at work.   And Melissa

3   could -- she knew the password so she could actually listen

4   any messages Jack was -- Jack was receiving on his phone,

5   work phone.

6       Messages from anybody.   It could be Anna Lisa.   It could

7   be any calls coming in, I suppose she could listen to.

8       Q    And did she tell you how often Melissa would track

9   Jack's phone messages?

10      A    She said she would track them often.   Daily, I

11  believe.

12      Q    Daily?

13      A    I believe so, yeah.

14      Q    Now, with regard to these surveillances, did the

15  Defendant ever tell you that she was afraid she might have

16  got caught?

17      A    That she was afraid that she'd get caught?

18      Q    No, that she was afraid she might have been caught.

19  In other words, that Jack, whoever Jack was, may have seen

20  her?

21      A    Yes, there was one time where she said that on one of

22  the stake outs that she and Melissa were on, I believe they

23  were at either Anna Lisa's residence or Jack's residence.

24  It wasn't 100 percent made clear to me.   But, she was in the

25  parking not with Melissa; and they were driving out of the

26  parking lot, they saw Jack standing on the side of his car.

27  I guess about to go into his car.

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

86

```
1        And she was nervous that maybe Jack saw her as she was
2   driving out of the parking lot.  This was at night.  And I
3   believe the next day, she actually asked me to go downstairs
4   with her at our condo where we live to see, you know, if I'm
5   coming at you with my car lights, can you see me.  Kind of
6   like a reenactment in the sense.
7        Q    She was worried about it?
8        A    She was worried about it.  And I said, well, if Jack
9   saw you, then I guess you'll find out about in when you go
10  back to work on -- on Monday or something.  That was the
11  extent of it.
12       Q    She ever give you a call and indicate to you that
13  either she or Melissa was sitting outside of Anna Lisa's
14  condo?
15       A    Yes, there was one morning, I -- it was a weekday
16  because I was getting up for work.  It was very early.  And
17  I received a call on my home phone, where we both lived.
18  And Sheila -- I thought Sheila was probably at work; but she
19  had told me that, as we were on the phone, she told me
20  Melissa is currently sitting outside of Anna Lisa's
21  apartment.
22       And she would like -- she wants to know, should she go
23  knock on her door and confront her about the affair.  You
24  know, get it out in the open.
25       Q    Now, you don't remember what date that is?  I've
26  asked you about that before, right?
27       A    I do not, no.
```

87

```
1      Q    Okay, you did tell me though, you remembered what
2   time of -- what time of day it was?
3      A    It was early in the morning because I was getting up
4   out of the shower.  So, I'm assuming it was a work day.
5      Q    All right.
6      A    Right.
7      Q    Now, on this issue of Melissa confronting Anna Lisa.
8   That wasn't the first time that came up, was it?
9      A    There might have been some conversations early on
10  where, should she confront her.  I think I often recommended
11  it just to get this thing out in the open.  I always felt
12  that Anna Lisa would have a right to know.
13     I didn't know any of these people.  I didn't know
14  Melissa.  I didn't know Anna Lisa.  I didn't really know any
15  of Shelia's work friends at Purdue.  So, after hearing all
16  these stories, I always felt the woman, Anna Lisa, has a
17  right to know her boyfriend is cheating on her, just --
18  somebody should tell her.
19     So, yeah, I might have said a few times, she should know.
20     Q    She should confront her?
21     A    Yes.
22     Q    Now, did she ever talk to you about a business trip
23  between Melissa and Jack in October of 2002?
24     A    Yes.
25     Q    Okay --
26     A    I believe it was Halloween of 2002.
27     Q    Can you tell the jurors -- it's in that area of
```

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

88

1    Halloween?

2        A    I believe so, yeah, yeah.

3        Q    Can you tell the jurors about that?

4        A    She had said Melissa was on a trip with Jack.  I'm

5    not sure where it was.  It was around Halloween of 2002.

6    They were -- maybe they went out and did something.  Jack

7    went back to his hotel room.  I think he was drunk or had a

8    little bit to drink.

9        And Melissa was upset that Jack didn't want to sleep with

10   her at that point.  I guess he just kind of -- kind of

11   pushed her off and he was going to bed.  Something like

12   that.

13       Q    So Melissa was upset that Jack was not interested?

14       A    Yes.

15       Q    How about a plane trip?  Did she ever mention a plane

16   trip to you?

17       A    Yes, she said one time that Melissa had -- she knew

18   that Jack was traveling somewhere by plane.  And she

19   actually, Melissa called, I guess his travel agent or the

20   airport or whatever, airline; and arranged it so that she

21   could be on the same plane with him in the same seat.

22       And the way -- the way the story went was that Melissa

23   would fly to the location that Jack would be coming back

24   from; and conveniently run into him at the airport as he was

25   boarding the plane.  And then, I believe that's what

26   happened in the story.  And then they got on the plane and

27   they were on the same -- they were sitting next to each

1  other.  From Jack's perspective, by coincidence.

2      Q    Kind of a destiny thing?

3      A    Correct, right.

4      Q    Summer of 2002, did she tell you about this Anna Lisa

5  having gotten a job someplace else?

6      A    Yes, she said Anna Lisa had taken a job at Farmacia

7  in New Jersey.

8      Q    All right.

9      A    But that she was still living in Stamford and worked

10 -- worked from home on Fridays.

11     Q    Okay, and she also indicated that -- what about Jack?

12     A    As far as I know, Jack was still at Purdue.

13     Q    Okay, but, even though she had gotten a job at

14 Farmarcia, was this whole thing still continuing?

15     A    Yes, they were still in a relationship.  I believe at

16 some point they were still living together.  Jack and Anna

17 Lisa.

18     Q    And what emotion -- well, did that cause Melissa

19 concern, let's put it that way?  According to what you're

20 being told.

21     By the way, everything you're telling us right now is

22 something that your then wife, the Defendant, told you?

23     A    Correct.

24     Q    Did this cause Melissa concern about whether or not

25 her affair would be able to continue with Jack?

26     A    Concern at that point when Anna Lisa moved to

27 Farmacia?

**A142**

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

90

```
 1    Q    I'll withdraw the question and move on.

 2    All right.

 3    Did you ever meet this Melissa?

 4    A    No.

 5    Q    Okay, did you ever have an opportunity to travel to

 6    Purdue Pharma?

 7    A    Yes, there were times I would go with Sheila on the

 8    weekend.  She would do some work on the weekend and I would

 9    be doing school work.  And I would go to the company and I

10    would, like, sit in a conference room and do my work while

11    she was working.

12    Q    Did she -- when you were at Purdue, did she show you

13    any photographs?

14    A    Yes, she took me by what she told me was Melissa's

15    cubicle.  I don't remember seeing a name tag or anything

16    like that.  But, she showed me a picture that was on this

17    girl's desk.  It was like four or five people that were kind

18    of wearing Halloween costumes.  I guess for a Halloween

19    party.

20    And she pointed to the girl in the middle who was

21    dressed, I think, as a witch; and she said, that's Melissa.

22    Q    Now, did she take you to any other offices?

23    A    She took me also to Anna Lisa's office at the time.  I

24    believe it was the same day.  And said, this is Anna Lisa's

25    office.  I'm like, great, whatever.  And I remember seeing a

26    picture of Anna Lisa on her desk.  On the -- Anna Lisa's

27    office desk.
```

1     Q   And what did she ask you about that picture?

2     A   She said, you know, what do you think?  Do you think

3  Anna Lisa is pretty?  Anna Lisa was standing on a dock.  A

4  picture of a dock coming out of a building, or a resort, or

5  a complex of some kind.

6     Q   How about Nelson Sessler?  Had you ever heard the

7  name -- well, up until that point, had you ever heard the

8  name Nelson Sessler?  If you could tell the folks on the

9  jury --

10     A   Not the full name.  I knew the name Nelson once or

11  twice, I believe, from early 2001.  Where Sheila had said

12  that Nelson was a co-worker who had a band.  And Sheila used

13  to like to write poetry.  And she gave some poetry lyrics to

14  Nelson to use in one of his songs.

15    And I think she was a little upset that Nelson changed

16  the wording.  She didn't like the way he changed the

17  wording, something like that.  But that was very early in

18  2001, long before I ever heard any of these stories about

19  Jack and Melissa.

20     Q   Now, if I have this date right.  If I have it wrong,

21  correct me.  But by -- let me ask some -- were you working

22  in the same industry, as it were, in November of 2002, as

23  was your then wife, the Defendant?

24     A   I work for an academic institution, so -- she works -

25  - she had worked for a pharmaceutical company.  It's not

26  really the same.  They do research, obviously, on

27  pharmaceuticals, I don't in my job.

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

92

1    Q    Well, she had indicated to you that Anna Lisa was now

2  working where?

3    A    Yes, she said Farmacia in Connecticut.

4    Q    All right.  In Connecticut or --

5    A    I'm sorry, New Jersey.  New Jersey.

6    Q    And I believe the date is November 12th of 2002, it

7  might be the 13th, correct me if I'm wrong here.  But I'm

8  going to direct your attention to that date and ask you if

9  you had an opportunity to meet with people from Farmacia as

10 part of your work?

11   A    Yes, I was actually working on a -- a lung cancer

12 study at Cornell.  And it was a clinical trial where they

13 were testing the efficacy of this drug.  And Farmacia,

14 coincidentally, was the company that was being used to

15 supply the drug.

16   I believe it was called Celebrex for the treatment of

17 lung cancer.  And I had interactions with some of these

18 people through emails initially, in terms of how to design

19 the study, how to randomize the drug to person A or B.  That

20 kind of stuff.

21   And we had a luncheon one day.  I believe it was November

22 12th or 13th --

23   Q    Well, hold it for a moment.

24   A    Sorry.

25   Q    November 12th of 2002?

26   A    2002.

27   Q    Four days after November 8th of 2002?

A145

93

1    A    Correct.

2    Q    My math -- I'm -- my math is correct?

3    A    I believe it was the 13th, actually.

4    Q    The 13th.

5    A    The 13th of 2002.

6    Q    Okay, five days after November 8th of 2002?

7    A    Correct.

8    Q    And did something come up at the meeting about a

9  dramatic event?

10   A    Yes, the -- this was a lunch meeting.  And two of the

11 Farmacia reps had said that --

12            MS. DAVALLOO:  Objection, Your Honor, hearsay.

13            ATTY. BERNARDI:  Whether it's true or not, Your

14       Honor, I don't think is relevant.  It's the fact that

15       he heard it and then went back and talked to her

16       about it.  And what her reaction was.

17            THE COURT:  So, it's offered for the effect on

18       the mind of the hearer?

19            ATTY. BERNARDI:  Yes, Your Honor.

20            THE COURT:  All right.  I'll allow it.  Go

21       ahead.  Go ahead, keep going, sir.

22            THE WITNESS:  They had said that after they were

23       finishing up here at this meeting, they were going to

24       a wake in Manhattan, in New York City, for a

25       colleague of theirs that was just murdered

26       previously, the week before.  The wake, I believe,

27       was in New York City.

A146

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

94

1    So, they were going to -- our meeting was in New

2    York City.  They were going to go to this wake

3    afterwards.  And they said it was a colleague of

4    theirs at Farmacia that had been killed the previous

5    week, I believe.

6    I didn't think anything of it at the time.  They

7    didn't say the individual's name.  As I was, maybe

8    later in the day, or as I was going home, I started

9    thinking, wait a minute, you know, in these stories

10   I'm hearing, Anna Lisa had just taken a job at

11   Farmacia.  And I remember thinking, just for a

12   second, oh my God, maybe Melissa, in the story, did

13   something to Anna Lisa.  I was just, you know,

14   speculating.

15   So, I went home that evening.  And I just kind

16   of, in passing, mentioned to Sheila, is Anna Lisa

17   okay?  I just heard that a Farmacia employee was

18   killed.  I never got the name of the person at the

19   meeting.

20   And I don't remember her answer; but it was

21   something, no, she's fine.  She's now at -- in New

22   Jersey, at Farmacia, but I don't -- she didn't seem

23   shocked or surprised.  There was no real explanation.

24   I didn't pursue it because I didn't have any

25   information about the name at that luncheon.

26   BY ATTY. BERNARDI:

27   Q   But, at that point, you had clearly communicated to

1    the Defendant --

2    A    Yes.

3    Q    -- that you knew than an Anna Lisa who worked for

4    Farmacia had just been murdered?

5    A    No, no, I -- I had heard --

6         MS. DAVALLOO:  That wasn't -- objection, Your

7         Honor, that wasn't the -- the witness' testimony.

8         THE COURT:  He's clearing it up.  Go ahead.

9         Go ahead, Mr. Christos.

10        THE WITNESS:  They had said a colleague of

11        theirs was murdered a few days earlier, and they were

12        going to the --

13        ATTY. BERNARDI:  I'm sorry, I -- I --

14        THE WITNESS:  -- to the -- right.

15   BY ATTY. BERNARDI:

16   Q    You indicated that you asked your wife if Anna Lisa

17   was --

18   A    Yes.

19   Q    -- okay.

20   A    Correct.

21   Q    Go ahead.  So, when was it that you -- once again,

22   what was it that you said to your wife?

23   A    I asked her, hey, is Anna Lisa okay?  I heard a

24   Farmacia employee was recently killed.  And I remember you

25   telling me that Anna Lisa had moved to Farmacia.  And I

26   remember even thinking that -- I'm not sure if I said it to

27   her, but I remember thinking, you know, oh my God, maybe

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 153 of 422
**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

96

1    Melissa could be -- could be involved somehow.

2      Or -- just like a random thought.  Never really took it

3    seriously.  I asked her, she said Anna Lisa was fine, no

4    she's fine.  And that was the extent of the conversation.

5      Q    But, at that point you made the Defendant aware that

6    you had made that connection?

7      A    Yes.

8      Q    Now, as fall of 2002 progressed -- just have a moment

9    here.

10     What -- did the conversations with regard to this

11   triangle you were hearing about between Melissa and Jack and

12   Anna Lisa; did they begin to change?

13     A    Yes, I'd say in the late 2002, she had said that Jack

14   and Anna Lisa had broken up.  Now Melissa and Jack are

15   together somewhat alone, exclusively.  I might have said --

16   I think I said, I'm surprised, you know, I know -- you know,

17   he was involved with Anna Lisa.

18     I'm surprised that Anna Lisa gave up that easily in terms

19   of wanting to stay with Jack.  She never gave me any details

20   about why they broke up; but just that they had broken up.

21     Q    And to the best of your recollection, this is after

22   November 8th of 2002?

23     A    Yes.

24     Q    All right.  And do you ever remember seeing a cut on

25   the Defendant's thumb?

26     A    Yes, she came one -- I came home one day from work,

27   and I came in, she was in the kitchen.  She told me that she

Case 3:17-cv-01025-IEG-MSB   Document 11-08-17   Filed 11/08/17   Page 154 of 422
Excerpts of January 24, 2012 Transcript, pp. 54-177
(testimony of Paul Christos)

97

1    had cut her thumb, I'm not sure of it was right or left

2    hand.  But, she had cut her thumb opening a dog food can.

3    We had had two dogs at the time.

4       Q   What's the period of time on this, if you recall?

5       A   Late November.

6       Q   Okay, and what do you remember about the cut?

7       A   I remember that the cut was -- it wasn't actively

8    bleeding; but it looked like a nasty cut.  And there was

9    fatty tissue kind of hanging out from inside the cut, as if

10   the cut hadn't been stitched and there was some tissue --

11   dried tissue, not actively bleeding, but kind of protruding

12   from the wound.

13      Q   All right.  Did it look like an old wound that was

14   healing over?

15      A   I wouldn't say that old.  But, certainly not actively

16   bleeding.  I suppose the tissue hanging out looked a little

17   dry.  So, I can't -- I'm not a physician so I don't know

18   really how to characterize the extent of the wound at that

19   time.

20      Q   Do you remember whether or not your wife ever asked

21   about DNA?

22      A   Yes, there were times she asked me about DNA and

23   fingerprints actually, two things.

24      Q   And do you recall when -- do you recall when that

25   was?

26      A   I don't recall when it was, no.

27      Q   Okay.

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

98

```
 1      A    What month --

 2      Q    Well, how about the season or year?

 3      A    Probably 2002.

 4      Q    Okay, you don't know the season?  Spring, fall,

 5  winter, whatever?

 6      A    Yeah, actually, it would have been late --

 7      Q    Late 2002?

 8      A    -- late 2002, right.

 9      Q    Okay, now does the Defendant have a brother?

10      A    As far as I know, yes.

11      Q    As far as you know.  You've never met him?

12      A    I've never met him, correct.

13      Q    Okay, all right.  Did she tell you about this

14  brother?

15      A    Yes, we were married in May of 2000, but Sheila's

16  brother never attended the wedding.  He was diagnosed with

17  schizophrenia at a younger age, I believe when he was a

18  freshman in college.

19      Q    According to what your wife told you?

20      A    According to what they told me -- she told me,

21  correct.  And he actually didn't come to our wedding because

22  he -- she and her parents both felt -- all felt that he

23  would act up at the wedding, maybe cause a scene. So, he

24  didn't -- he never knew, at that point, we were married.

25      Q    Well, did she tell you what his reaction would be if

26  he learned that you were married to each other?

27      A    To each other.  She said that he could act up.  He
```

A151

1    might become unstable.  He had been hospitalized a number of

2    times at a short term inpatient facility, so -- it was

3    portrayed to me that they were worried he might have some

4    kind of a breakdown like that, if he had learned this

5    information.

6       Q   Okay, well then, despite that problem with the

7    brother, did she tell you that at times that that brother

8    wanted to some over to visit?

9       A   Yes, I'd say, beginning in, my earliest memory would

10   have been in November of 2001.  She started saying her

11   brother wanted to visit her at our condo; but I couldn't be

12   there because he didn't know we were married. So, she would

13   ask me, while my brother comes over tonight to spend time

14   with me, can you stay somewhere else for this evening.

15      So, I would either stay at my parents who lived in White

16   Plains.  Or, sometimes I would stay at a -- a local

17   hotel/motel in -- in Tarrytown, New York.

18      Q   So, and the reason she would tell you this is because

19   she wanted to do what, again?

20      A   She said she wanted to spend some quality time with

21   her brother.

22      Q   With her brother.

23      A   Sick brother, correct.

24      Q   Okay, and so she would ask you move out for the

25   weekend?

26      A   Sometimes it would be one weeknight.  Other times it

27   was a weekend, yeah.

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

100

1    Q    Okay, and to keep your wife happy, you would move

2    out?

3    A    Yes, I genuinely believed at the time she was

4    spending quality time with her brother.  Again, our -- our

5    marriage was kind of going nowhere at that point.  I might

6    have suspected something maybe was going on at that point.

7    But, I was so unhappy in the relationship anyway that I

8    remember thinking, if I had stumbled onto something, I would

9    have been happy if it wasn't really her brother coming over.

10        But, at the time, early on when the story started, I

11   believed genuinely, she was spending time with brother.  You

12   know, I knew about the brother from her, from her parents.

13   It wasn't just her telling me that.  It was her parents as

14   well.  So, I had no reason to doubt that she had a very sick

15   brother.

16   Q    Well -- so that her brother would not -- well, as she

17   told you this, that the brother did not want -- that she did

18   not want the brother to know that you were married to her --

19   A    Correct.

20   Q    Well, what would she do about your belongings?

21   A    She would say, well, when he comes over, I don't want

22   him to know that you're living here.  So, she would move my

23   -- I didn't have too many belongings, but -- like my razors,

24   and stuff in my bathroom, she would -- she would put, like,

25   underneath the cabinet.

26        Sometimes, as gullible as I was, I would even put the --

27   my own belongings under the cabinet knowing that her brother

A153

1  was coming over that night.  So, yeah.

2     Q   I think you said, gullible as you were.

3     A   As gullible as I was at that time.  Because I

4  believed the brother was coming over and I was -- the couple

5  of times I moved my own items, I thought I was doing it

6  because her brother was coming over that night.

7     Q   All right.  And as gullible as you were, I think,

8  some time after 2005 you had a conversation with your wife,

9  correct?

10     A   Correct.

11     Q   Okay, and in that conversation you talked about the

12  testimony that she gave in the trial in New York in 2004?

13     A   Correct.

14     Q   And during the course of that conversation, did she

15  make certain -- even though you had not sat there and heard

16  her testify in the New York trial.  She made certain

17  admissions to you, did she not, about who was actually in

18  that triangle?

19     A   Yes.

20     Q   Okay, I'm going to direct your attention to State's

21  Exhibit number 12 which there's been no objection to,

22  correct?

23          THE COURT:  There's no objection, go ahead.

24  BY ATTY. BERNARDI:

25     Q   And I'm going to put that on -- put my glasses on so

26  I could see.  During this conversation that you had with the

27  Defendant years later, she admitted to you that indeed,

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

102

```
 1    right, was there a Melissa?  Was there ever a Melissa?

 2      A   There was never a Melissa, correct.

 3      Q   Who was Melissa?

 4      A   Sheila Davalloo.

 5      Q   All right.  And Sheila was having -- Sheila Davalloo,

 6    the Defendant, was not having an affair with Jack, who was

 7    she having an affair with?

 8      A   Nelson Sessler.

 9      Q   And who was Nelson Sessler living with?

10      A   Anna Lisa Raymundo.

11      Q   Okay, let's get back to what we were talking about.

12    Is that -- is that State's --

13            THE COURT:   Twelve.

14    BY ATTY. BERNARDI:

15      Q   -- twelve accurate as to the actual triangle?

16      A   Yes.

17      Q   According to you what your wife admitted to you?

18      A   Yes.

19      Q   But, back in 2002, 2003, right, this is the way she

20    described it to you, correct?

21      A   Correct.

22      Q   She told you she was friends with this Melissa, who

23    you found out never existed?

24      A   Correct.

25      Q   Who was having an affair, she claims, with Jack.  But

26    that was really who?

27      A   Nelson.
```

```
 1    Q    Nelson Sessler.  And Anna Lisa, of course, the

 2  deceased, turned out to be?

 3    A    Anna Lisa Raymundo.

 4    Q    That's what she told you, correct?

 5    A    Yeah, we talked -- she had told me about that in some

 6  of those conversations.  I also knew about it early on,

 7  obviously, in the New York case, even before that.

 8           ATTY. BERNARDI:  Your Honor, this may be a

 9        good time to break for lunch.

10           THE COURT:  Please keep your own counsel.

11        We'll see you back here at two o'clock, okay.

12                    (JURY PANEL EXITS)

13           THE COURT:  You can stay right there, Mr.

14        Christos.

15           THE WITNESS:  Okay.

16           THE COURT:  Any other matters for the record?

17           ATTY. BERNARDI:  No, -- oh, yes, there is, Your

18        Honor.  I don't know if I brought it up on the record

19        already.

20           THE COURT:  Well, let's wait until the -- one

21        way or another, we're still in session, Marshal.

22           MARSHAL:  Have a seat.

23           ATTY. BERNARDI:  Please be seated.  The Court is

24        still in session.

25           MARSHAL:  Have a seat.

26           THE COURT:  Do you wish to excuse Mr. Christos

27        before you're heard?
```

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

104

1        ATTY. BERNARDI:  Yes, we can.

2        THE COURT:  All right.

3        ATTY. BERNARDI:  Thank you, Your Honor.

4        THE COURT:  Let the man go.

5        ATTY. BERNARDI:  All Right.  Your Honor, I just

6    want to alert the Court to the fact that I returned

7    State's Exhibit 1; which was the -- the -- from the

8    hearing, from a pre-trial hearing --

9        THE COURT:  The 911 tape from the pre-trial

10   hearing?

11       ATTY. BERNARDI:  Right, the 911 tape which Your

12   Honor had released to the State custody.

13       THE COURT:  Okay.

14       ATTY. BERNARDI:  For purpose of Mr. Owen's

15   analysis.  At any rate, your Clerk asked for that to

16   be returned this morning, and we have returned it.

17       THE COURT:  Okay, and then the next -- the tape

18   that was marked here is a --

19       ATTY. BERNARDI:  Is a different tape of the same

20   -- the same --

21       THE COURT:  Okay.

22       ATTY. BERNARDI:  -- 911 call.

23       THE COURT:  All right.  Is there anything else

24   you want to put on the record?

25       ATTY. BERNARDI:  No, sir, I just wanted to put

26   that on the record.

27       THE COURT:  Anything else right now?

```
 1              MS. DAVALLOO:  No, Your Honor.

 2              THE COURT:  Okay, very well.  We'll stand in

 3      recess until two.

 4                       (RECESS)

 5                   (JURY ENTERS)

 6              THE COURT:  Good afternoon all.  You may be

 7      seated.

 8              Stipulate to the presence of the full jury.

 9              ATTY. BERNARDI:  So stipulated.

10              THE COURT:  Ms. Davalloo, do you stipulate to

11      the presence of --

12              MS. DAVALLOO:  Yes, Your Honor.

13              THE COURT:  Thank you, Ma'am, I appreciate that.

14              Mr. Christos, you're still under oath.  We're

15      just going to pick it up where we left off.

16              Sir.

17              ATTY. BERNARDI:  Yes, sir.

18  DIRECT EXAMINATION BY ATTY. BERNARDI:

19      Q   We were -- when we left off, we were talking about

20  how on occasion you would move out of the house because of a

21  schizophrenic, purported schizophrenic brother of the

22  Defendant.

23      I -- after November of 2000, moving into the year 2003,

24  up until March 23rd of 2003, did -- well, can you describe

25  the frequency.  Did the frequency of the visits by the

26  brother change?

27      A   They -- they increased.  I would say they were about
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 163 of 422
**6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)**

106

1  once every two weeks.

2      Q    All right.  And -- with regard to what might happen

3  after you returned -- did you ever notice anything that

4  would cause you to question, although you didn't, what might

5  be going on when the brother was there?

6      Let me ask you this, did you ever notice that your

7  clothing, anything about your clothing in the closets?

8      A    Yes, towards later in, maybe, March or -- sorry,

9  maybe February, around there, my -- she started to -- my

10 clothes started to move from the -- we had a master bedroom

11 walk in closet.  Some of those clothes were placed into the

12 small bedroom closet, in a second bedroom.

13     Q    And did you ask the Defendant about why that had

14 happened?

15     A    I did, she said he brother was starting to try on

16 some of my clothes.  And -- which didn't really make sense

17 because he was always described as being much heavier,

18 overweight.  But, she just said she moved the clothes so he

19 wouldn't start playing with them or trying them on and stuff

20 like that.

21     Q    What about glasses?

22     A    Yes, there was sometimes I came home and there would

23 be -- it appeared she had cooked dinner for her brother or -

24 - and I would see dishes in the sink, wine glasses.  I

25 remember thinking to myself, if he's schizophrenic on

26 medication, why would there be wine glasses?  But, again,

27 you know, I didn't think much of it.

Case 3:17-cv-01265-WQH Document 125-1 Filed 11/08/17 Page 164 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 84-177
(testimony of Paul Christos)
107

1    Q    Sheets?

2    A    Sheets, yeah, she would wash the sheets.  Sometimes,

3    even before I would leave, she would set up the -- the

4    futon, which was in the second bedroom, as if the brother

5    was going to be staying there as a guest.  And yes, I would

6    see sheets in the machine.

7        Even occasionally, sometimes other clothing that didn't

8    belong to me like a T-shirt that would show up in the

9    laundry, as I would wash the laundry, things like that.

10    Q    Now, you indicated that at the beginning of 2003, the

11    frequency of the visits increased?

12    A    Yes.

13    Q    And did that prompt you to say anything to the

14    Defendant?

15    A    Yes, I was getting very tired of it.  I said, your

16    brother has to be told that we're married.

17    Q    what was her response?

18    A    Her response was that she was actually -- she told me

19    she would tell him that we were going to be married on

20    Valentine's day 2003, physically married on Valentine's day

21    2003.  She would tell him that's what happened.  And then,

22    after that, I could start coming over to the -- he could

23    start coming over with me present in the condo.

24    Q    All right.  Well, did she ever tell you that she

25    tried to tell him?

26    A    She said she wouldn't get around to it.  I kept

27    pressuring her.  There was one weekend where she said she

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 165 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

108

1   was going away with her brother.  And she told him and he

2   got upset.  He had some kind of a reaction.  They needed to

3   meet with his therapist the following Monday, which would

4   have been, I believe, Monday the 17th of March.

5       And as a result of those discussions, he wanted to stay

6   over the condo two more nights, Monday March 17th and

7   Tuesday, March 18th and for me not to be home for those two

8   nights.

9       Q   Well, did you tell her that you wanted this to end?

10      A   Did I tell her what?

11      Q   Did you tell her that you wanted this to stop?

12      A   Yes, and I'd say, in most of February, I was getting

13   more and more angry about it and he should be told -- he

14   needs to be told.  I'm getting tired of leaving the condo.

15      Q   Okay, and -- but I take it you were still leaving in

16   March, is that correct?

17      A   Yes, up to March 18th, I believe.

18      Q   All right.  Now, I'm going to direct your attention

19   to March 22nd of 2003.

20          THE COURT:  Keep your voice up.  You dropped

21      your voice.  I can't --

22          ATTY. BERNARDI:  I did drop my voice, I'm

23      sorry.

24   BY ATTY. BERNARDI:

25      Q   I'm going to direct your attention to March 22nd of

26   2003; which, if you recall, was what day of the week?

27      A   That was a Saturday.

1  Q   Okay, and on this Saturday, did there come a point in

2  time when your wife came home?

3  A   I'm not sure where we were, what we were doing, but I

4  believe it was some time on Saturday we were talking in the

5  kitchen area.

6  Q   Okay, and did she talk to you about a game?

7  A   Yes, she mentioned that she heard about a game at

8  work that she wanted to play.  It was a guessing game.  And

9  she described some of the details of the game to me.

10  Q   Okay, did she describe -- on March 22nd, the day

11  before March 23rd, the reason I mentioned that will become

12  obvious in a moment.  Did she give you some of the details

13  of how this game was played?

14  A   Yes, she said it was a game where each person would

15  be blindfolded and their hands would be bound or handcuffed.

16  It was a guessing game.  It wasn't described as a sexual

17  game in any way.  It was basically a game where you would --

18  a person would be blindfolded and their hands would be

19  handcuffed behind their head.

20  And you would have to guess what certain items were that

21  you were touching on the person's face, arms, things like

22  that.  So, kind of depicted as a guessing game.

23  Q   It was depicted to you as a guessing game?

24  A   A guessing game, yeah.

25  Q   Okay, now, did you play the game that day?

26  A   No.

27  Q   All right.  Now, I guess the -- if I understood you

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 167 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

110

```
 1    correctly, you're handcuffed in this game?

 2        A    Yes.

 3        Q    And you're blindfolded in this game?

 4        A    Correct.

 5        Q    All right.  And while you're handcuffed and

 6    blindfolded, another person touches you with an object?

 7        A    Correct.

 8        Q    And of course you can't see it.  And you can't feel

 9    it, is that correct?

10        A    You would only feel it as its being placed on your

11    face or your --

12        Q    Okay, but you can't feel it with your hands?

13        A    Your hands -- exactly, right.

14        Q    Okay, so, I'm going to direct your attention to the

15    next day, March 23rd, which was a Sunday.

16        A    Okay.

17        Q    All right.  Do you remember what you did that

18    morning?

19        A    That morning, I believe I had a meeting with some

20    students at Columbia University in the City.  I met with

21    them because I had a school project due the next day, which

22    would have been a Monday.  I came home, and I believe Sheila

23    had suggested, let's go visit my mother.

24        So, we -- we went to visit my mother in White Plains

25    around, I want to say one o'clock on Sunday.

26        Q    Okay, and what did you go to your mom's for?

27        A    We just went to visit her.  We had a cup of tea.  I
```

1   had a sandwich.  Just my mother was present, and Sheila and

2   I.

3       Q    Okay, and anything remarkable happen while you were

4   having tea with your mom and your then wife?

5       A    Nothing remarkable.  My mother was talking about the

6   Academy Awards which were being aired that night.  Just a

7   short conversation.  We were there about an hour, and then

8   we left.

9       Q    So around what time did you get back?

10      A    I would estimate, probably around 2:30.

11      Q    Okay, and we're talking about --

12      A    Three o'clock.

13      Q    -- getting back to your apartment or condominium --

14      A    Condominium, correct.

15      Q    Right, located at?

16      A    21 Foxwood Drive in Pleasantville.

17      Q    Okay, and so you got home, right.  Do you remember

18  what you did when you got home?

19      A    I think, as I said, it was around --

20      Q    As soon as you got home, I mean --

21      A    -- 2:30 or 3.  I think I walked the dogs, brought

22  them back in.  And we were, at some point, playing with the

23  dogs in the small bedroom in the apartment, the second

24  bedroom.

25      Q    Uh-huh.

26      A    And at that point, she had suggested, oh, let's play

27  that game that I had talked about yesterday.

A164

1     Q   Okay, do you recall around what time in the afternoon

2   that was?

3     A   I'm estimating.  We probably got home around 3.  I'd

4   say the time the game started might have been around 4,

5   quarter to four, somewhere around there, maybe.  I can't --

6   I can't be 100 percent sure.

7     Q   Okay, so, once again, how would this game be played?

8     A   Well, the game was described in more detail that

9   second day.  So --

10    Q   Right.

11    A   -- essentially, a person would be lying on the floor

12  on their back.

13    Q   Right.

14    A   With a pillow behind your head.

15    Q   Right.

16    A   In the small bedroom, I had a desk and a wooden chair

17  infront of it.

18    Q   Right.

19    A   And the wooden chair had, like, a horizontal bean at

20  the base of the chair, like most chairs would.  So, you'd be

21  laying on your -- on your --

22    Q   A bar going between the wooden -- the wooden bar --

23    A   Yeah, like a support bar underneath the chair.  You'd

24  be laying --

25    Q   Going from chair leg to chair leg?

26    A   A chair leg.  So, I'd be laying on the floor flat on

27  my back, pillow behind my head, your arms would be behind

1   you handcuffed to the car of the -- the horizontal bar of

2   the chair.  So, your hands would be, kind of, wrapped around

3   the bar with the handcuff on each side.

4       Q    What were you blind -- what was being used as a

5   blindfold?

6       A    The blindfold was a pair of pantyhose.

7       Q    Could you see through them?

8       A    No, not clearly.  No, you couldn't.

9       Q    Okay, so did you start playing this game?

10      A    Yes.

11      Q    By the way, how were you dressed while the game went

12  on?

13      A    I was wearing khaki shorts -- green khaki shorts and

14  a gray t-shirt.

15      Q    Okay, and what was your wife, the Defendant, wearing?

16      A    I believe she was wearing jeans and maybe a white t-

17  shirt.

18      Q    All right.

19      A    I can't be 100 percent sure.

20      Q    So, did you actually commence to play the game at

21  some point?

22      A    Yes.

23      Q    Okay, and when you commenced to play the game, who

24  went first?

25      A    Sheila went first.

26      Q    Okay, so what did you to get the game going here with

27  your Defendant?

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 171 of 422
**6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)**

114

    1      A    She lied on the floor.  I actually retrieved a pair

    2    of handcuffs that I had from high school, which I had in a

    3    closet in my room.  I -- she laid flat on the floor.  I

    4    handcuffed her hands to the -- to the horizontal bar of the

    5    chair, over her head, like this.

    6      Q    All right.  I take it, it was a wooden bar?

    7      A    A wooden bar, sorry.  And she had provided the

    8    pantyhose.  And she showed me how to put them on and just

    9    put them on over her head -- over her eyes.

   10      Q    You blindfolded her?

   11      A    Over her eyes, right.  And then, I proceeded to have

   12    her guess certain items.  The first item I used was one of

   13    our two dogs.  So, I put one of the dogs on her, kind of her

   14    midsection; and she tried to guess which dog it was.  One

   15    was lighter than the other.

   16      And then, I don't remember some of the other items, but

   17    things in the room.  Like, it might have been a camera, a

   18    box, printer cartridges in the room.  Things like that.

   19      Q    All right.  Did you say anything suggestive or

   20    anything like that to your wife?

   21      A    No.

   22      Q    While you were doing this?  Did you ever slip and

   23    item underneath her clothes, or anything like that?

   24      A    No, at that point of our marriage, we weren't even

   25    romantic anymore.  So, there was no sexual aspect to the

   26    game at all.

   27      Q    But you were staying there every night?

1    A   I was.

2    Q   Except for when you were asked to leave?

3    A   Correct.

4    Q   Now, it came to be your turn?

5    A   Yes.

6    Q   So, what happened with you?  What did you do?

7 What happened?

8    A   She said, okay, let's stop, let's switch, you're your

9 turn now.  So -- sorry, I un-handcuffed her and we switched.

10    Q   Tell the jury.

11    A   Sorry, we switched and she laid in the same position.

12 Laid flat down on her back.  I handcuffed her -- I'm sorry,

13 I'm getting confused.

14    Q   You get --

15    A   I went -- I laid on the floor, hands behind my head,

16 handcuffed to the chair same exact way.  And then we

17 proceeded --

18    Q   Were you blindfolded?

19    A   Blindfolded, exactly.

20    Q   With the women's stocking?

21    A   Yes.

22    Q   Okay, so I take it, in this position, you were

23 allowed to taste, smell, or hear the object?

24    A   Yes.

25    Q   Could not touch except if it was touched to you?

26    A   Correct.

27    Q   You couldn't touch it with your hands and you

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

116

1   couldn't see it?

2       A   Correct.

3       Q   And do you remember what kind of items, at first,

4   your wife pressed against your skin?

5       A   I believe the first item she used was one of the two

6   dogs again for me.  Then, a number of items that I guessed

7   correctly.  One was a boxed printer cartridge.  One was a

8   Spiderman figurine that was in the small bedroom, a

9   calculator, household calculator.

10      I don't remember any other items; but that was the

11  majority of them.

12      Q   All right.

13      A   Shampoo bottle.

14      Q   All right.

15      A   She'd be moving around to different parts of the

16  house to retrieve certain objects.

17      Q   Well, did there come a point in time when you heard

18  her moving about in the kitchen?

19      A   Yes, I heard her move into the kitchen, bathroom,

20  various places to get other items, I believe.

21      Q   Well, let's talk about after you heard her moving

22  around in the kitchen --

23      A   Okay.

24      Q   Did she come back out and say anything to you?

25      A   Yes, at one point, she came back from that direction

26  and said, okay one last item, one more thing to guess.

27      Q   Okay, and when she said, one last item, one more

1   thing to guess, right; did she take up a position on your --

2   on your -- on your torso as you were handcuffed with your

3   arms extended behind your back to a chair, right, and a

4   woman's stocking blindfolding your eyes.

5       What position did she take up on you?

6       A    She was sitting on my midsection pretty much right on

7   my -- my chest area. My legs kind of underneath her.

8       Q    Uh-huh.

9       A    And she actually touched the item to my face.  I

10  couldn't identify what it was.  I believed later it was a

11  candle.  But, I didn't know as I was guessing it, what it

12  was.  But, that was the last item she was rubbing on my

13  face.

14      Q    And what happened next?

15      A    As I was trying to guess what that item was, as it

16  was kind of grazing my cheek.  All of the sudden I felt,

17  like a large thrust on my chest.  It felt like a -- the best

18  way to describe it is like a dumbbell was dropped on my

19  chest, like a heavy weight was dropped on my chest.

20      I was -- I didn't say anything.  Maybe two seconds passed

21  and then I felt another large thrust on my chest. Not

22  specifically localized.  Again, it felt like a dumbbell had

23  fallen ontop of me.

24      Q    What --

25      A    And I -- go ahead.

26      Q    -- did the Defendant say?

27      A    After about a two or three second pause, she said, oh

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

118

1    my God, I think I hurt you.  You're bleeding.  Something

2    along those lines.  And I started to get winded.  I started

3    to sweat a little bit.

4    Q    Well did you ask -- you're blindfolded still?

5    A    Yes.

6    Q    And you're cuffed --

7    A    I'm still cuffed, correct.

8    Q    And you're laying on your back.  Did you ask her --

9    A    I asked her, what happened.  She said something fell

10   on you.  I think the candle hurt you.  I said, okay, don't

11   panic, the blindfold off.  She did.  At this point, I'm

12   still handcuffed to the chair behind my head.

13       So, I -- she couldn't find the handcuff keys, so I

14   couldn't get out of the handcuffs.  So, I said, all right,

15   help me --

16   Q    How do you know she couldn't find the handcuff keys?

17   A    I don't know where the handcuff keys were, yeah.

18   Q    Well, I mean --

19   A    The -- she didn't --

20   Q    Did she say anything that indicated --

21   A    I believe she said couldn't find the handcuff keys.

22   Q    Okay, she couldn't find the handcuff keys.

23   A    And so, I --

24   Q    Did you see your chest at that point?

25   A    Not yet.

26   Q    Okay, so --

27   A    I said to her, okay, help me break the chair so the

1    handcuffs can at least slide off that horizontal beam of the

2    chair.  And she did.  She helped me break the chair, my

3    hands fell free from the chair.  I'm still handcuffed at

4    this point, but now the chair is out of the picture.

5        At that point, I rolled over onto my side.  And most of

6    my pain was in the chest area.  Some pain in the back.  I

7    mainly felt kind of winded, low blood pressure, that kind of

8    feeling.

9        Q    And you felt pain in your chest?

10       A    I felt pain all over the chest, correct.

11       Q    Could you see it yet?

12       A    At some point I asked her to --

13       Q    Well --

14       A    Go ahead.

15       Q    Let me ask you this.  Did you ask her to cal 911?

16       A    Yes, at that point I had -- after I was free from the

17   chair, I said, call 911, call an ambulance.  And I saw her

18   pick up a phone and speak into a phone.

19       And she said, I could hear her speaking into the phone

20   saying, my husband has been hurt.  We were playing a game.

21   He's bleeding.  He's having trouble breathing.  She gave the

22   address of the location, 21 Foxwood Drive.  She was kind of

23   running back -- back and forth to the room as she was on the

24   phone.

25       Q    How'd her voice sound?

26       A    She sounded like she was in a panic.  Like, my

27   husband's been hurt, please hurry, please hurry.  That kind

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 177 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

120

1    of --

2        Q    Panting?

3        A    Panting, yeah.  Scared in a startled -- in a startled

4    way talking on the phone, right.

5        Q    So, you couldn't hear whether or not there was

6    anybody on the other side of that phone, could you?

7        A    No, no.

8        Q    So, now what do you start doing?

9        A    At some point I asked her to show me the wound.  So,

10   she brought me a mirror, a small mirror from the bathroom.

11   I pulled up my shirt.  I was able to look at one of the

12   wounds --

13       Q    Well, let me ask you this, the last time you were

14   describing this, you were still in handcuffs, so --

15       A    Yes, I believe --

16       Q    While you're waiting for the ambulance to come after

17   this call, are you still in handcuffs?

18       A    Right.

19       Q    Okay, well, go ahead.

20       A    She --

21       Q    You're still in handcuffs.

22       A    She brought the mirror, she showed me the wound, from

23   best I could see it from the angle that I was laying on the

24   floor.  I didn't really perceive any depth to it. It looked

25   more like a scrape.

26       Q    Uh-huh.

27       A    So, I didn't -- I didn't suspect anything at that

1  point. I thought maybe she had fallen on me, or she had

2  some kind of a seizure. I couldn't really understand what

3  was going on with the -- the strength of the blow.

4  Q  Couldn't figure out how it is that you got hurt?

5  A  Yeah, I saw the candle. She said, I think the candle

6  hurt you. There was a wire inside the candle which I

7  thought was a wire from my view. So, I thought, maybe the

8  wire somehow punctured me. It didn't really make much

9  sense, but --

10  Q  You didn't see a knife in the area at that point, did

11  you?

12  A  Did not see a knife, no.

13  Q  There was another thing you couldn't figure out at

14  that time, right?

15  A  Say that again?

16  Q  Well, did the ambulance get there?

17  A  A significant -- a few minutes passed, I said,

18  where's the ambulance? Call again. So, I saw her pick up

19  the phone, call again, or appear to call again. At one

20  point I asked to speak to the operator, and she said, the

21  operator --

22  Q  Who is she?

23  A  Sheila said, the operator doesn't want to speak to

24  you. She just wants you to lie down, you know, flat or just

25  lie down. And then she told me there was two ambulances out

26  --

27  Q  She, being the Defendant?

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 179 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

122

1      A    The Defendant -- Sheila told me there was --

2      Q    That the operator told her --

3      A    The operator told here that there was a delay.   There

4    was two ambulances that were currently out on other calls.

5    One was --

6      Q    There were only two ambulances?

7      A    I believe two.   She said two ambulances were out on

8    other calls.   One was on a stroke case, one was on some

9    other thing I didn't -- I don't remember.   And there would

10   be a 25 minute response time.

11     Q    Did you ask your -- the -- did you ask the Defendant

12   at this point, on this second call, whether or not you could

13   talk to the 911 operator?

14     A    I did, yes.

15     Q    And what did the Defendant tell you when you asked

16   her that?

17     A    She said, the operator does not want to speak to you.

18   She just wants you to lay down and stay calm; something

19   along those lines.

20     Q    And wait 25 minutes because two ambulances -- only

21   two, are on other, more important calls?

22     A    Correct.

23     Q    Now --

24     A    She also said it might seem longer to you because

25   you're hurt and your sense of time is off.   Something like

26   that.

27     Q    The Defendant told that to you?

```
1       A    Yes.

2       Q    Okay, now, are you still in your handcuffs at this

3  point?

4       A    At one point I was able to pull my hand out of one of

5  the handcuffs because one of them was on loose.  So, I was

6  able just to pull my hand out of it.  So, at this point now

7  I am essentially free except one handcuff is still dangling

8  from my hand, my other hand.

9       And at some point I got up and I moved to the futon that

10 was in the small bedroom where we were playing this game.

11 And I was able to sit on that couch/futon for a little bit.

12      Q    Well, before you got -- before you managed to get to

13 your feet, I take it that -- are you still in one cuff or

14 did you get out of both cuffs?

15      A    I believe I was still in one cuff.  One cuff was

16 still on, yes.

17      Q    Did your wife leave?

18      A    At one point while I was still on the floor --

19      Q    Right.

20      A    -- she did run out for a second and she came back and

21 said that, there was nobody around.  There was an old man

22 outside but he didn't want to get involved.

23      Q    Well, did she tell you why she's running out the

24 door?

25      A    Did she tell me why?

26      Q    Yeah.

27      A    No.
```

**A176**

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

124

1    Q    I mean, all of the sudden --

2    A    No.

3    Q    -- she runs out?

4    A    I don't -- she -- it's not a clear memory.  She ran

5    out for a moment and then came back and just sat down.

6    Q    Okay.

7    A    While I was still laying on the floor.

8    Q    She didn't say she was going for help or anything

9    like that?

10   A    No, that -- an incident like that happened later.

11   Q    And incident like that happened later, okay.

12   A    Right.

13   Q    All right.  So, I take it you said that after that

14   you got out of the -- one of the handcuffs.  And you --

15   well, before we move on to that, she returned after having

16   gone outside, and came back in, and said what to you?

17   A    She said there's an old -- there was an old -- there

18   was nobody around.  There was an old man outside but he

19   didn't want to get involved.

20   Q    Okay, all right.  So now, she returns and tells you

21   that.  At this point, you said you moved to a futon?

22   A    Correct.

23   Q    All right.  So you moved to the futon?  When you

24   moved to the futon, what do you do?

25   A    I was just sitting there trying to, I guess, keep it

26   together.  I think at one point, I asked her to bring me

27   some juice.  She brought me some juice.  And then at some

```
 1    point I was able to move from the small bedroom.  I walked

 2    to the living room and sat on the couch there while I was

 3    waiting, hypothetically waiting, for this ambulance.

 4        Q    Hypothetically waiting for this ambulance?

 5        A    Well, I believed I --

 6        Q    Because your --

 7        A    -- was waiting for the ambulance at that point.

 8        Q    Okay, the ambulance that never arrived?

 9        A    Correct.

10        Q    Okay, so, does she indicate now she's going to leave?

11        A    At one point she said she was going to -- as we were

12    waiting for the ambulance.

13        Q    For the ambulance.

14        A    At one point, she said she was going to go to the

15    local docs.  Local doc, DOCS, which was, I think in

16    Thornwood.  That she was going to go there and see if there

17    was anybody there that could help.  She left, she came back

18    very quickly.

19      I mean, that -- that docs is probably a good, you know,

20    ten minutes to get there from our location.  So, I remember

21    thinking, how could she get back that quickly.  But, in any

22    event, she came back and said they were closed. And all this

23    was happening in the context of me still waiting, hopefully

24    waiting, for the ambulance.

25      Q    So there was nobody to help?  The clinic is closed

26    and an ambulance is too busy.  Okay.

27        A    Correct.
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 183 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

126

1    Q    So, did you sit down on the futon with her now?

2    A    yes, at one point we did.

3    Q    Okay, at some point you begin to talk about what?

4    A    As I'm waiting there for the -- I'm waiting there, I

5    just start talking to her about, you know, things have been

6    bad between us.  We need to work on things.  Kind of

7    rambling about stuff like that.  There hasn't been any real

8    affection between us.

9    She said, I love you.  She said, you're very brave.  She

10   was kind of, at one point I was laying on the couch and she

11   was, kind of, holding me from behind saying, I love you.

12   You're brave.  I got, kind of, restless because I felt

13   better sitting up.  And then at some point, we --

14   Q    So you sat up -- you felt up and --

15   A    I sat back up on the couch, I believe.

16   Q    Felt a little bit letter.

17   A    A little better.

18   Q    This is after your wife told you that she loved you

19   and --

20   A    Correct.

21   Q    -- told you she thought you were brave.

22   A    Correct.

23   Q    Okay, go ahead.

24   A    And then at some point, we just -- we just -- I

25   decided to -- we decided to go to the hospital.  At one

26   point I was maybe even a little hesitant, because I felt if

27   I leave right now, the ambulance is going to show up two

Case 3:17-cv-01357-VAB   Document 125-4   Filed 11/08/17   Page 184 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 54-177
(testimony of Paul Christos)
127

1    seconds later.

2       Q    Well, the ambulance -- okay, go ahead.

3       A    So -- but, at some point, we decided to go.  She

4    helped me put my jacket on.  She helped me put my shoes on.

5    And she actually, I believe -- she went downstairs to bring

6    -- to bring my car.  She happened to be driving -- she took

7    my car and brought it to the front entrance of the condo, so

8    I didn't -- I'd have to walk down my stairs, you know, a

9    little path right to where my car would be.

10      Q    So, where is she going to take you now?

11      A    We -- she -- the discussion was going to the

12   Westchester Medical Center.

13      Q    You're familiar with the Westchester Medical Center?

14      A    Yes, yes.

15      Q    Okay, and how are you familiar with the Westchester

16   Medical Center?

17      A    I went to -- we both went to graduate school --

18      Q    You both went to Westchester Medical Graduate School?

19      A    Right.

20      Q    Okay.

21      A    New York Medical College, which is on the same campus

22   as the Westchester Medical Center in Valhalla, New York.

23      Q    And there's a further connection, is there not; to

24   the medical center?

25      A    Um --

26      Q    Do you have -- you had a mother-in-law --

27      A    Yes, her mother-in-law [Sic] had -- had worked there

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

128

1  for, I believe, 18 years as an Operating Room Nurse.

2      Q    All right.  So, I guess you're -- the Defendant here

3  helps you into the car?

4      A    I believe so.  I don't -- I remember getting into the

5  rear passenger side of the car.  I sat in the back, and she

6  was driving.  I don't remember if she helped me in the car;

7  but, she might have.  But, I got into the car.

8      Q    So, what happens?

9      A    She looped around.  She drove kind of --

10     Q    Looped around?

11     A    She -- well, --

12     Q    Is that the way you would have gone to Westchester

13 Medical Center?

14     A    Well, now, where the car was parked, I walked down

15 and got into the car.  She has to follow the road around.

16 And the first exit you would come to would be, typically,

17 the main entrance you would use to leave the condominium

18 complex.  And she would take a left at that point to exit

19 the condominium complex.

20     She took a right and went up towards the back of the

21 complex where there is a second exit that you can leave.

22 Some people use that exit; but that's not the common exit to

23 use.  She -- as she proceeded to go up that way, at one

24 point she stopped the car, got out and said, lay down.

25 Please lay down.  You'll feel better, maybe, if you lay down

26 flat.

27     I was sitting -- I was kind of sitting up along side the

```
 1   rear door at that point.  I said, no, I feel better sitting

 2   up, just go.  It's taking too long.  I can't believe how

 3   long this is taking.  I'll drive to the hospital if I have

 4   to.  At this point, I felt I could drive.

 5      She said, you can't drive.  And then she proceeded to go

 6   out the back entrance and then drive the -- the normal route

 7   you would go to the Medical Center.  And she was looking

 8   back at me at times.  I kept telling her, you know, keep

 9   your eyes on the road; because she was looking back at me.

10   And eventually, we arrived at the Medical Center complex.

11      Q    But not the Emergency Room?

12      A    Correct, she drove into a building which is called

13   the Behavioral Health Center, which is a -- a short -- short

14   term in-patient psychiatric facility of the Westchester

15   Medical Center.  It's probably a building away from the

16   Emergency Room.

17      But, she pulled into that -- the entrance of that

18   building.  And, like, I remember the gate was up.  There was

19   no guard on duty that day.  She went into the entrance and

20   she pulled towards the back of the parking lot.  The parking

21   lot for that building.

22      Q    Sure, okay.  Now -- so she parks the car, right?

23      A    She parked the car kind of in an area that, I

24   wouldn't really call it a parking spot.  It was more toward

25   the end of the parking lot along side a -- kind of like the

26   edge of the parking lot.

27      Q    The edge of the parking lot?
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 187 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

130

1    A    Right.

2    Q    Kind of like the far edge of the parking lot?

3    A    The parking lot was -- ran parallel to the building.

4 But, where she parked would have been farthest from the

5 entrance.  The entrance had a circle driveway where you

6 could just pull up.

7    Q    And that's not the building you're going to anyway,

8 is it?

9    A    Correct.  I hadn't seen at that point what building

10 it was.  I asked her, is this the Emergency Room?  I don't

11 remember what she said.  She said, I think so.  I thought

12 maybe we could just walk there; because I was able to walk

13 to my car.

14    So, I figured I could just maybe walk to the next

15 building and we would be right there.

16    Q    And you both went to school there, and her mother

17 worked there, right?

18    A    Correct.

19    Q    Okay, now, so she gets out of the car, right.  And

20 when she gets out of the car, are you still in the car in

21 the back?

22    A    She turned off the ignition.  She -- I remember her

23 dropping the keys to her feet.  She exited the car, came

24 around to the rear driver's side door.  And I was trying

25 exit.  My foot was a little bit stuck behind the passenger

26 side seat.  So, I thought she was kind of helping me move my

27 foot, to dislodge my foot.

**SA7 Excerpts of January 24, 2012 Trial Transcript pp. 64-177**
**(testimony of Paul Christos)**

131

1    Q    You thought that until you saw her face?

2    A    As she's moving my foot, I see her face, like, with

3  an angry expression; and she lunges at me.

4    Q    You looked at her face and you saw what kind of

5  expression?

6    A    Like a distressed, angry type look.

7    Q    And then what kind of movement came at your chest?

8    A    I didn't see the knife at that point.  But, I felt a

9  sharp jab into my chest.  And then when she recoiled, I saw

10  the knife -- a knife.

11    Q    Did you see her hand move toward your chest?

12    A    Yes.

13    Q    Was it clenched?

14    A    It was clenched, correct.

15    Q    Right, and did it make contact with your chest?

16    A    Yes.

17    Q    And when it did, did you feel pain in your chest?

18    A    I did.

19    Q    And when her fist moved away from your chest, could

20  you see what was in her balled fingers, or balled fist?

21    A    Yes.

22    Q    What was in it?

23    A    A knife.

24    Q    Okay, is that he first time you saw the knife?

25    A    First time, yes.

26    Q    All right.  Now, what do you say at that point?

27    A    Well, at that point I -- I kind of instantly realized

**A184**

1    that I must have been stabbed also twice in the condo.   So,

2    I -- I kind of put it together quickly at that point.   My

3    first statement was, what are you doing?  Oh my god!   You

4    know, you're trying to kill me.   I somehow pushed my way out

5    of the car.   I'm standing there with her holding the knife.

6    I'm kind of holding the blade --

7        Q    Well, before you're kind of holding the blade, what

8    happens -- she's got the knife --

9        A    Right.

10       Q    How do you end up holding the blade?

11       A    I somehow forced myself out of the car.   I don't have

12   a good memory of how I got out of the car.   But, I get out

13   of the car and I'm standing with her.   I think I'm holding

14   her wrists.   She's holding the knife, I'm holding her wrist.

15   I think I was holding the blade, maybe, a little bit with

16   one hand.   And that's when I was saying --

17       Q    So you struggled over the knife?

18       A    Correct.   And at that point, she said, you're taking

19   me away from my brother.

20       Q    You're taking me away from my brother.

21       A    I can't let you take me away from my brother.   I love

22   my brother.   I'm taking my brother's medication.   I said,

23   that's not true.   I'm not taking you away from your brother.

24   And then she said, no, you've been pressuring me a lot about

25   having to leave the condo.

26       And that's the last real conversation I remember, as I'm

27   still holding the knife.

133

1    Q    Well, what did you do with the knife?

2    A    We moved away from the car at one point, onto, like,

3    a grassy area at the end of the parking lot.  I kept saying,

4    let go of the knife, let go of the knife.  At this point, my

5    shirt is very red.  Much more blood from the -- from

6    anything that was in the condo.

7    And finally, she lets go of the knife.  And then I say to

8    her, sarcastically I say, you know, I'm sorry, I'm going to

9    have to kill you now just to scare her; like with a dead pan

10   --

11   And then she kind of backs up.  She says, please don't.

12   And then I retreat about twenty feet and there was two piles

13   of red masonry bricks behind me.  They were two piles close

14   together.  And I put the knife in a crack in between the two

15   bricks.  My intention being, I just wanted to get rid of the

16   knife.  Put it somewhere it could not be accessible.  So

17   either I couldn't be hurt any more, or her.  I just wanted

18   to get rid of the knife at that point.

19   Q    Well, do you see hospital people at that point?

20   A    At that point, she says --

21   Q    Oh, by the way.  I wanted to -- as she -- as this

22   pushing is going on here, is she saying anything to you as

23   she's pushing you away from --

24   A    Well, when I got the knife away, she said, good, you

25   got rid of the knife, when she saw me put it in the bricks.

26   Then she came towards me and then grabbed onto me and said,

27   please, stay with me, talk to me, talk to me.

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

134

1    Q    Please stay with me?

2    A    Please stay with me, talk to me, talk to me.

3    Q    Not like, let's get to the Emergency Room.  Please

4    stay with me?

5    A    Correct.

6    Q    Okay, now you see hospital people, right?

7    A    First I see some kids playing basketball far away.

8    There was a playground nearby.  I yell to them for help.

9    They look at me, they don't really hear me.  They keep

10   playing basketball.  And then I'm still trying to get away

11   from her at this point.

12       Finally, I do break free.  I think I might've swung at

13   her.  I'm not sure if she fell down or not; but I broke

14   free.  She was grabbing onto my jacket.  I had a jacket on

15   over the T-shirt.  And I run about 200 feet towards the

16   entrance of the Behavioral Health Center, and there are two

17   people standing there.  One was a Resident, somebody else,

18   and I --

19   Q    Do you yell something to them?

20   A    I yelled to him, help --

21   Q    What did you yell to him?

22   A    I've been stabbed.

23   Q    And when you yelled to them, help, I've been stabbed.

24   What did she yell?

25   A    She -- when I reached them, she -- she came up behind

26   us and then she said, no, he attacked me; but then she said,

27   he needs help.  You know, she was kind of in an area.

```
 1      Q    Did she say, that's not true, he stabbed me?

 2      A    Yes, she said, that's not true, he stabbed me.   At

 3   that point I was sitting on the curb.

 4      Q    All right.

 5      A    Say again?

 6      Q    That's not true, he stabbed me?

 7      A    Correct.

 8      Q    Okay, then what happens?

 9      A    I told the Resident, please call 911.  I'm assuming

10   at that point he was a Resident because he was working in

11   the building, a Medical Resident.

12      Q    And while that -- and while that's going on, what

13   happens with her in the car?

14      A    She disappears at one point.  He calls 911 and he

15   sits me down on the curb, right infront of the entrance.

16      Q    She doesn't call -- somebody else calls 911?

17      A    The Resident, the Medical Resident called 911 on his

18   cell phone.  I don't know when, but a few minutes later, she

19   returned with the car.

20      Q    Right.

21      A    She got -- took the car from where it was, brought it

22   to the front of the unit -- the circle driveway.  And I

23   don't remember what she said, I think she was saying, I can

24   take him to the Emergency Room.  Something like that.  I

25   know where -- I'm not 100 percent sure.  But, let her -- let

26   him go with me.  I can take him take him to the Emergency

27   Room.  Something along those lines.
```

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

136

1    Q    Did she tell you about anything that you should say?

2    A    Yes, so, when they -- I guess they had said they

3    weren't going to let her take me anywhere.  So, she sat down

4    on the curb next to me and she -- at one point she leaned in

5    and said, you can't say what happened or I'll get in

6    trouble.

7        I told her, just get away, go away, just leave the --

8    leave the area.  And after that, I think the ambulance came

9    and I was put in the ambulance at that point.  I'm not sure

10   of the exact time.

11   Q    The ambulance got there.

12   A    The ambulance got there fast.  I was put into the

13   ambulance.  The police onsite asked me where was the knife.

14   I told them where it was.  I directed them to where it was.

15   Then I just remember being taken into the Emergency Room.

16   Q    What kind of surgery did you have there?

17   A    I had -- they hooked me up to an echocardiogram.  And

18   I eventually -- I need -- that evening I got open heart

19   surgery.

20   Q    For how many stab wounds?

21   A    There was three stab wounds.  One had punctured or

22   nicked the heard so the lateral to the left descending --

23   left descending artery, I believe it was.  And that required

24   open heart surgery at that point to drain the blood and heal

25   that -- and to stitch up that wound.

26           ATTY. BERNARDI:  I believe it's 14 for ID.

27           MS. DAVALLOO:  No objection

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 194 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

137

```
 1              ATTY. BERNARDI:  No objection.  Your Honor,
 2         there's no objection to 14 for ID.  I'm just going to
 3         put it on the --
 4              THE COURT:  All right.  14 Full.
 5    BY ATTY. BERNARDI:
 6         Q   Who is that?
 7         A   That is me at the Westchester Medical Center on March
 8    26, '03.  I had --
 9         Q   Is that you recovering from open heart surgery.
10         A   Open heart surgery, correct.
11         Q   For three stab wounds?
12         A   Correct.
13         Q   Thank you.  In the aftermath of this, -- in the
14    aftermath of this, your wife was arrested, right?
15         A   Correct.
16         Q   And I believe that was for Attempted Murder and
17    Assault related charges?
18         A   Yes.
19         Q   There was a trial?
20         A   Correct.
21         Q   All right.  Now, you weren't there when she testified
22    at her trial in New York, is that correct?
23         A   No, I was not.
24         Q   All right.  But, I think I -- I think I already asked
25    you this.  There came a point in time when you did talk to
26    her about the triangle, is that right?
27         A   Correct.
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 195 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)
138

1   Q   An at that point -- and when she talked to you about

2   that triangle, she admitted that the triangle really

3   involved these -- these three people as shown on State's 12,

4   is that correct?

5   A   That's correct.

6   Q   Now --

7          THE COURT:   These three being?  They can't see

8       it down in that box.

9          THE WITNESS:  I'm sorry?

10          THE COURT:   You want to --

11          ATTY. BERNARDI:   You know what, I don't have my

12       -- let me put my glasses on.

13          THE COURT:   I know, I can't see it.

14          JUROR:   We're good.

15          THE COURT:   You guys all right down there?  Can

16       you see it?

17          JUROR:   Yeah.

18          THE COURT:   okay, well, you're better than I am

19       then.   Go ahead.

20   BY ATTY. BERNARDI:

21   Q   And there also came a point in time when you -- well,

22   let me ask you this.   I'm going to go back to that

23   conversation that you had with her on November 13th of 2003.

24   And -- which is five days after November 8th of -- I'm

25   sorry, I got my dates wrong.

26   I'm going to take you back to that conversation you

27   described having on November 13th of 2002.

1    A    Uh-huh.

2    Q    Which is five days after November 8th of 2002.  And

3  did you have an opportunity to ask your wife any questions

4  about that conversation?

5    A    Yes.

6    Q    And before -- just so that I can refresh the jury's

7  recollection here.  You had a conversation with your wife on

8  November 13, 2002?

9    A    Correct.

10   Q    And that's the day that you were over there with

11 colleagues from Farmacia, or at least people that you knew

12 through work at Farmacia?

13   A    Correct.

14   Q    And they told you some -- about a dramatic event that

15 had occurred with one of their colleagues?

16   A    Correct.

17   Q    Had been murdered in Stamford?

18   A    Yes.

19   Q    That's basically what you heard, okay.  And then you

20 went back that night and you talked to your wife about --

21 about that, is that correct?

22   A    Yes.

23   Q    Okay, and basically, in so many words, informed her

24 that you had made this connection about the murder and Anna

25 Lisa.  Not that you had made the full connection --

26   A    Yes.

27   Q    That you saw a -- a possible connection?

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 197 of 422
**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

140

1    A    Correct.

2    Q    Okay, now, did you ever have an opportunity to talk

3  to your wife after this trial?  To talk to the Defendant

4  about why she did not tell you about Anna Lisa Raymundo that

5  day?

6    A    Yes.

7    Q    All right.  Now, before you do that, did she admit

8  that she had committed this crime?

9    A    No.

10    Q    All right.  But, what did she tell you about that

11  conversation and why she didn't tell you the truth?

12    A    I had asked her why you didn't tell me that Anna Lisa

13  Raymundo was killed -- or, in the context of those stories,

14  why Anna Lisa wasn't killed.  She had said, if I had told

15  you that Anna Lisa had died, you would have stumbled on to

16  the whole affair.  I suppose I would have learned that Anna

17  Lisa was not dating a man named Jack, it was in fact Nelson.

18  And then maybe the whole story would have fallen apart at

19  that point.

20    So, she was basically saying, I didn't tell you that Anna

21  Lisa dies because you might have stumbled onto my affair,

22  her affair with Nelson.

23    Q    All right.  Now, of course, as of March 23 of 2003,

24  you still did not know that she was seeking Nelson Sessler,

25  is that correct?

26    A    As of -- I did not, no.

27    Q    Okay.

```
 1      A    I didn't -- correct.

 2      Q    And you still didn't know he was the live in

 3   boyfriend of Anna Lisa Raymundo?

 4      A    No, I only learned that at around March 27th after I

 5   had got out of the hospital and I met with the lead

 6   Detective for the case, for my case.

 7      Q    So, as you sat there on March 23, nursing your

 8   wounds, you didn't make any further connections?

 9      A    Not yet, no.

10      Q    All right.  Now, in the days following your stabbing

11   on March 23rd of 2003, you had contact with Stamford Police

12   -- a Stamford Police Department Officers who were

13   investigating the death of Anna Lisa Raymundo, is that true?

14      A    Correct.

15      Q    And I believe you gave them several written

16   statements?

17      A    Yes.

18      Q    Okay, and you also gave them, I believe, some phone

19   records from Sheila -- from the Defendant, Sheila Davalloo?

20      A    I did.

21      Q    All right.  Phone -- the cell phone that she owned at

22   that time, who's name was it in?  Who was getting the bill?

23      A    It was actually in my name.

24      Q    It was in your name?

25      A    Right.

26      Q    And did you even have a cell phone in 2002?

27      A    I did not, no.
```

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

142

```
1      Q    Okay, so you weren't using on yet?

2      A    No.

3      Q    There's probably a lot of us that are in that club in

4  2002.  And I'm going to direct your attention to this

5  document, State's Exhibit 15 for ID.  I don't think there

6  will be an objection to this.

7           MS. DAVALLOO:  No objection.

8  BY ATTY. BERNARDI:

9      Q    Direct your attention to this document and ask you --

10          THE COURT:  State's 15 full.

11          ATTY. BERNARDI:  State's 15, there's no

12      objection I don't think.

13      THE COURT:  Okay.

14  BY ATTY. BERNARDI:

15     Q    If you can --

16     A    You might have to turn it.

17     Q    Yeah.  Okay, I'll get my glasses on here.

18     All right. I'm not going to ask you to interpret it at

19  this point.

20     A    Oh.

21     Q    But, do you know what this document is?

22     A    It's hard to see --

23     Q    Okay.

24     A    My -- it's phone records, yeah, from --

25     Q    All right.  Are those the phone records from the cell

26  phone that your wife, the Defendant, your then wife, the

27  Defendant, was using on November 8th?
```

143

```
 1    A    Yes.

 2    Q    If I could zoom in here.

 3    A    If you zoom in I could tell.  Yes.

 4    Q    Okay, hold on.  Well, you've seen it before.  I don't

 5  see the actual cell phone number on this --

 6    A    No, the --

 7    Q    This one particular page.

 8    A    The earlier pages would have the -- the actual

 9  account number and the --

10    Q    But, anyway, you've been through these before; and

11  you recognize this as her cell phone bill from that day?

12    A    Yes.  Could you move it --

13    Q    Here, let me zoom out a little.

14    A    Could you move it a little bit to the date?  Yeah,

15  11/8, yeah.

16    Q    I think there's a list of 11/8 calls in this area

17  here, is that correct?

18    A    Correct.

19    Q    Now, are you familiar with this dark figure aspect of

20  the New York trial from having --

21    A    Yes.

22    Q    -- spoken to your wife?

23    A    Yes.

24    Q    All right.  And did your wife admit to you anything

25  about this dark figure as far as your stabbing was

26  concerned?

27    A    Yes, that --
```

**A196**

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

144

```
1      Q   What did she tell you?

2      A   She saw a dark figure was present.  That she saw it

3   picking up the knife and hitting me with the knife; but she

4   didn't -- she didn't have any recollection of doing it

5   herself.  The dark figure did it, and then she could see the

6   aftermath of that figure.

7      Q   A dark figure did it for her?  Is that basically --

8      A   Right, she --

9      Q   All right.

10            THE COURT:  This is with regard to what?  The

11         stabbing that took place when he was handcuffed and

12         -- so we know?

13            ATTY. BERNARDI:  That's correct, Your Honor.

14            THE COURT:  Well, let him know what you're

15         talking about.

16            ATTY. BERNARDI:  I think I -- I believe I

17         indicated the March 23rd --

18            THE COURT:  Maybe I --

19            ATTY. BERNARDI:  -- stabbing; but if I'm not

20         clear, let me redo it here.

21   BY ATTY. BERNARDI:

22      Q   Your wife, of course, testified on -- concerning --

23   at her trial in New York, concerning your stabbing, is that

24   correct?

25      A   Correct.

26      Q   All right.  And you became familiar with the gist of

27   that testimony, is that correct?
```

A197

Case 3:17-cv-01357-VAB   Document 25-1   Filed 11/08/17   Page 202 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

145

1    A    Yes, I read a number of reports and I'd seen -- about

2    that testimony, yes.

3    Q    And while she claimed that she was present, of

4    course, while you were being stabbed.  She claimed that

5    there was a dark entity there with her?

6    A    Correct.

7    Q    All right.  And you know that because she admitted

8    that to you?

9    A    Yeah, we had conversations about that after the trial

10   was over.

11   Q    Okay, and did she ever indicate to you that that

12   entity as it were, had been present with her before March

13   23rd of 2003?

14   A    Yeah, she had described an incident where she was

15   reading a book, or looking out the window and she saw a dark

16   figure, and she was holding a book.  And then when she

17   looked down at the book, the book was all ripped up.  Right.

18   Q    Was there another occasion that she mentioned it?

19   The dark entity.

20   A    She mentioned, I believe she mentioned the dark

21   figure, examples of when it was there was that incident when

22   she ripped the book.  When she, obviously, stabbed me on

23   March 23rd.  And when she cut her thumb on a dog can.

24   Q    In November of 2002, correct?

25   A    Um --

26   Q    That's when she cut -- in the month of November --

27   A    Oh, the cut, yes, November of 2002.

**A198**

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 203 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

146

1   Q   2002.

2   A   Correct.

3   Q   She mentioned the dark entity being there too, right?

4   A   Correct, the ripped book story, I don't remember when

5   that -- that -- I believe that was around Thanksgiving of

6   '02.  The ripped book.  But that was -- I had seen that in a

7   report, a psychiatric report.

8   Q   All right.  Let's not --

9   A   Okay.

10   Q   -- go there.  Now, did she ever talk to you about --

11   this is after the trial, 2006, about wanting to break into

12   the Raymundo apartment?  Of course, she always denied that

13   she committed this murder, is that correct?

14   A   Correct.

15   Q   Okay, now, did there ever come a time when she talked

16   about how she thought about breaking into the Raymundo's

17   apartment?  Into the Raymundo apartment?

18   A   There was a conversation about that.  She had

19   mentioned she -- I had asked her about the stun gun.  This

20   is the conversation we're talking about, right?  And she had

21   said, -- I had said, what did you do with the stun gun.  And

22   she had said that she --

23              MS. DAVALLOO:  Your Honor, objection.

24              THE WITNESS:  I'm sorry.

25              MS. DAVALLOO:  There's -- I -- I don't

26      understand just the relevance of this, Your Honor.

27      If the jury can be removed, I'll argue more on this.

Case 3:17-cv-01237-JBA Document 123 Filed 01/09/18 Page 204 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 164-177
(testimony of Paul Christos)

147

```
 1              THE COURT:  You going to connect this a little
 2         bit?
 3              MS. DAVALLOO:  I'm sorry?
 4              ATTY. BERNARDI:  I'll -- let me lead and I'll --
 5         I'll get --
 6              THE COURT:  Why don't you do that --
 7              ATTY. BERNARDI:  -- around the stun gun aspect.
 8              THE COURT:  -- so we can connect it.  Go ahead.
 9    BY ATTY. BERNARDI:
10       Q   All right.  Did there ever come a time when she told
11    you that she thought of breaking in to Anna Lisa Raymundo's
12    apartment and hiding under the bed?
13       A   Yes.
14       Q   All right.  And did she say that she wanted to do so
15    because she wanted to see what her and Nelson Sessler were
16    doing when they came home at night?
17       A   Yes, this was after the trial was over.  She said she
18    would -- she wanted to get under the bed.  If they came home
19    at night, she wanted to hear what their conversations were.
20       Q   And, I don't know if there's going to be an objection
21    to this.  But, if she had been caught, did she indicate to
22    you what it is that she would have done.
23       Is there an objection to that part?
24              MS. DAVALLOO:  No objection, Your Honor.
25              ATTY. BERNARDI:  All right.
26              THE WITNESS:  That's what prompted the
27         conversation.  She said she had the stun gun because
```

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

148

```
 1        if she had gotten caught under the bed, she would
 2        have something to protect herself with.
 3  BY ATTY. BERNARDI:
 4     Q   All right.  I take it that at some point she
 5  indicated to you she owned a stun gun?
 6     A   No, earlier --
 7     Q   Well, I'm going to withdraw the question then --
 8     A   All right.
 9     Q   -- because, where you got the information would be
10  hearsay.
11     All right.  Did she ever tell you she was going to write
12  a fictional account of the Raymundo murder?
13     A   She did once in a conversation after the trial, yes.
14     Q   All right.  And --
15        ATTY. BERNARDI:  You know, what.  On that note,
16  I have no further questions.
17        THE COURT:  Here's what we're going to do.
18        We're going to ten minute break so you can stretch a
19        little bit and then we'll finish up for the
20        afternoon, okay.  Ten minutes.
21            (JURY PANEL EXITS)
22        THE COURT:  Just stay right where you are for a
23        second, Mr. Christos, okay?  Thank you.
24        Okay, sir, you can step down, okay.
25        THE WITNESS:  Okay, thank you.
26        MS. DAVALLOO:  Excuse me, Your Honor.
27        MARSHAL:  Court is in Session.
```

```
1         MARSHAL:  Court is still in session, folks.

2         MS. DAVALLOO:  Your Honor, I apologize -- I --

3         THE COURT:  Yes, ma'am.

4         MS. DAVALLOO:  -- apologize for holding you.  If

5    Your Honor would --

6         MARSHAL:  Have a seat.

7         MS. DAVALLOO:  -- permit me to please stay here

8    so I can use the pen, rather than being in lock up.

9    So I could take some notes.

10        THE COURT:  You want to stay here with Mr.

11   Butler, is that what you're doing?

12        MS. DAVALLOO:  Yes, with the Marshals.

13        THE COURT:  Yes, let her stay right there at

14   counsel table --

15        MS. DAVALLOO:  Thank you.

16        THE COURT:  -- so she can talk to her lawyer.

17        MS. DAVALLOO:  Thank you, Your Honor.

18        THE COURT:  Okay, ten minutes.

19                   (RECESS)

20                 (JURY ENTERS)

21        THE COURT:  All right.  You may be seated.

22        All right.  Ms. Davalloo, do you have any

23   questions of Mr. Christos?

24        MS. DAVALLOO:  Yes, Your Honor, thank you.

25        THE COURT:  Please.  Yes, ma'am.

26   CROSS EXAMINATION BY MS. DAVALLOO:

27     Q   Good afternoon, Mr. Christos.
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 207 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

150

1    Now, Mr. Christos, you mentioned that I spoke to you

2    about this fictional -- you started in your testimony saying

3    that I spoke to you about this fictional triangle that was,

4    you know, some kind of relationship going on at work.

5       Did, -- in my description of that, did I ever -- isn't it

6    true that I never spoke to you about the word love?

7    A    You said that Melissa loved Jack, yes.

8    Q    I -- I actually said that she loved him?

9    A    Yes.

10   Q    Okay, so, you -- I also mentioned to you that -- oh,

11   you stated that Jack worked as a contractor at first for

12   Purdue?

13   A    Yes, at some point early in the stories you were

14   telling me.  He had worked at a company outside.  And he was

15   coming to work often at Purdue.

16   Q    Okay, and are you aware that Mr. Nelson Sessler never

17   worked as a contractor for Purdue?

18   A    I'm aware of that now, yes.

19   Q    Okay, now, many times in your testimony you mentioned

20   that our relationship, for all practical purposes had ended,

21   correct?  You had mentioned that we still lived together,

22   but the relationship had ended.

23   A    Right, we were no longer romantic.  We were living

24   together as roommates essentially.

25   Q    Right, yeah, right, you mentioned those exact words.

26   We weren't spending any time together, roommates --

27   A    We -- correct.

151

```
 1      Q    So, at that point in our relationship, would you say
 2   that, really, the trust had also gone out of the
 3   relationship?
 4               THE COURT:  I didn't hear you, ma'am, I'm sorry.
 5               MS. DAVALLOO:  I'm sorry.
 6   BY MS. DAVALLOO:
 7      Q    Did you -- would you say that there was really no
 8   trust in between us.  That the relationship had sort of
 9   fallen apart?
10      A    No, I would say I still trusted you.  You -- we still
11   talked about things.
12      Q    Okay.
13      A    Family things.  I perceived there was still trust,
14   yes.
15      Q    Right, but do you, now sitting here, looking back in
16   hindsight, and those are your words, think that everything I
17   told you at that time was the truth?
18      A    Looking back now?
19      Q    Correct.
20      A    I don't think it was the truth.
21      Q    Okay, and part, some, or maybe all of the things I
22   told you about this relationship could have been a fantasy?
23               ATTY. BERNARDI:  I'm going to object, Your
24          Honor.
25               MS. DAVALLOO:  Withdrawn.
26               ATTY. BERNARDI:  It requires speculation.
27               MS. DAVALLOO:  Withdrawn.
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 209 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

152

```
 1              THE COURT:  It does.  Go ahead.  Continue on,

 2         ma'am.

 3    BY MS. DAVALLOO:

 4         Q    Okay, and Mr. Christos, you have no way of verifying

 5    that in fact, the things that I told you were the truth,

 6    correct?  They could have been fictional.

 7         A    Correct.

 8         Q    Okay, for instance, when you say, and these are your

 9    words, stake outs.  You don't know if they actually took

10    place.  There's no way that you would know for sure that

11    they took place?

12         A    Correct.  I only know that you told me they took

13    place; but I -- I have no way to verify that.

14         Q    Right.  And when you mentioned the lock pick set --

15    first of all, do you recall that I had purchased a lock pick

16    set and the recording device which you had something similar

17    to, you just testified to that, as a gift to you?

18         A    I do not.

19         Q    You don't recall that, or you -- I did not?

20         A    You did not purchase the lock pick set as a gift for

21    me, no.

22         Q    Okay, I -- you're saying that I -- that's not what I

23    ever told -- I didn't tell you that; but you don't know what

24    I --

25         A    You told -- you told me you purchased the lock pick

26    kit for Melissa.  Or, Melissa had bought it and you had had

27    it.  I'm not sure who purchased it but --
```

Case 3:17-cv-01257-VAB   Document 25-1   Filed 11/08/17   Page 210 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

153

```
 1     Q    Okay, but you don't recall, Mr. Christos, that you
 2  had your night vision binoculars --
 3     A    Correct.
 4     Q    You had a device, some kind of sending/receiving
 5  device that you just explained you -- you had shown to me.
 6     A    Correct.
 7     Q    You had -- handcuffs.  Those were items that you were
 8  obviously interested in, correct?
 9     A    Correct, I owned those, yes.
10     Q    Right.  And at some point you were interested in law
11  enforcement.  I guess you got into purchasing some of those
12  items much, much younger stage, correct?
13     A    Correct.
14     Q    But, you don't recall that along those lines, I had
15  purchased items similar to those for you?
16     A    As a gift for me, no.
17     Q    Okay, and did -- this lock pick set, I didn't -- I
18  don't know if the testimony actually got to talking about
19  whether it was ever worked.  Because you said we tried it,
20  but I wasn't sure if --
21     A    Yes, I don't recall -- no, we didn't.  I couldn't get
22  it to work.  And I don't recall you being able to get it to
23  work, right.  In my presence.
24     Q    Was it a toy set?
25     A    It looked like a relatively cheap, inexpensive lock
26  pick kit.
27     Q    But --
```

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

154

```
1     A    What do you mean a toy set?

2     Q    Maybe what?

3     A    What was your question?  A toy set?

4     Q    What was it, like a toy, like a toy kind of -- fake

5  kind of thing or --

6     A    You had told me it was a lock pick kit.  I remember

7  it had three or four prongs to it.  But, I can't testify as

8  to the quality of it.  But, you -- I don't recall --

9     Q    But you don't know if it was purchased, like, from a

10 toy store or from -- from some sort of --

11    A    I don't -- no.  No, I don't know.

12    Q    Okay, and it sounded like I had abandoned it

13 somewhere in some closet or drawer?  That you --

14    A    That's where -- that's where it was recovered by the

15 police, right.

16    Q    Okay, and when I had mentioned this fictional Melissa

17 wanted to use the lock pick set to check out Anna Lisa's

18 apartment, I meant when she wasn't home, correct?

19    A    Correct.

20    Q    All right.  And I never told you, you know, if you

21 want to believe what I was telling you right then.  I never

22 actually mentioned that me, or Melissa, or anybody else went

23 through with using this -- this set.  This -- whatever it

24 is, this lock pick set, correct?

25    A    Correct, correct.

26    Q    So, it was never -- I never mentioned that to you?

27    A    You never mentioned if you actually went through with
```

**8A Excerpt of January 24, 2013 Transcript, pp. 154-173**
**(testimony of Paul Christos)**

155

```
 1   it, no.

 2      Q   Okay, and when I was talking to you about this

 3   triangle at work -- well, I had said that one of the -- one

 4   of the persons in this triangle wasn't even at work at

 5   first.  And you thought he was, like, a contractor.

 6      Did I ever give you a time frame when this relationship

 7   was going on?

 8      A   It was -- the stories that you were telling me were,

 9   pretty much, all through out 2002, to the best of my

10   recollection.

11      Q   Okay, but it could have been, like, it could have

12   started in 2001.  It could have been an old story.  It -- I

13   made it sound to you like it was ongoing, correct, but you

14   don't know whether it was from years past?

15      A   The earliest -- no, the earliest I would -- it could

16   have gone would have been November of 2001.  But it

17   certainly wasn't in 2000 or any time period like that.

18      Q   Okay, but what I'm trying to get at.  Here's another

19   example, is you testified just right now, that in the summer

20   of 2002, I mentioned to you that Anna Lisa moved to Farmacia

21   in New Jersey?  Is --

22      A   Around that time.

23      Q   I'm sorry, Mr. Christos, is -- that was a yes or no

24   question.

25      A   Can you repeat the question?

26            THE COURT:  He just answered it.  Around that

27            time is what he said.  Go ahead.
```

1  BY MS. DAVALLOO:

2    Q   Right, so around -- oh, I didn't hear it, okay.  So,

3  around that time of summer of 2002, I mentioned to you that

4  Anna Lisa had moved to Farmacia, correct?

5    A   I don't know the exact date you told me.  Some time

6  in 2002.

7    Q   Okay, because my point is, that she actually moved to

8  Farmacia in January of 2002.  So, my information could have

9  -- I could have just been giving you that information sic

10  months later?

11   A   You could have.  Or -- or maybe you did tell me in

12  January.  I don't -- I don't recall.

13   Q   Oh, you just -- okay.

14   A   I don't recall.

15   Q   And you had testified in a different hearing that

16  back then, you were very self absorbed; and rightfully so.

17  And you were never home.  And you -- you had all these hours

18  you were at work.  And you had testified that you felt that

19  you had abandoned me because of that.

20   Is that -- could you speak up, Mr. Christos?

21   A   Sure, yes.

22   Q   So, could I have been telling you these stories just

23  to engage you?

24          ATTY. BERNARDI:   Objection, calls for

25      speculation.

26          THE COURT:   Yes, I'm going to sustain.   That's a

27      speculative question, ma'am.  He can't answer that

Case 3:07-cv-01357-AB Document 25-1 Filed 11/08/17 Page 214 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

157

```
 1             question.
 2                  MS. DAVALLOO:  Withdrawn.
 3                  THE COURT:  Go ahead, ask another question.
 4  BY MS. DAVALLOO:
 5     Q    Okay, and when I was talking to you about this
 6  relationship, you just testified that, actually, one time
 7  you had threatened to contact Anna Lisa yourself, correct?
 8     A    Correct.
 9     Q    Okay.
10     A    Well, I said, give me -- give me her phone number.
11     Q    I -- that -- it was just a yes or no question, Mr.
12  Christos.
13     A    Correct.
14     Q    Now, Mr. Christos, you have some interest in this
15  particular case, correct?
16     A    Interest?
17     Q    Yes.
18     A    Sure, yes.
19     Q    Okay, because you have spent some of your time in
20  this Courtroom for pre-trial hearings?
21     A    Correct.
22     Q    Okay, and are you interested in the -- what kind of
23  interest do you have in the case?  In the outcome of the
24  case?  Do you --
25     A    Well, it was a -- it's a case that's been, obviously,
26  in my life for many years after what you did to me.  This
27  case here, so I just, obviously, want to know what's
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 215 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

158

1    happening and --

2       Q    Okay, and how many times have you met with the

3    State's Attorney in this case?

4       A    I'd say maybe three times.

5       Q    Okay, and how many times have you me with other

6    individuals from the State's Attorneys Office?

7       A    State's Attorneys Office, none.

8       Q    Okay, and what about phone conversations?

9       A    Just to arrange to meet to come in for a meeting for

10   those three times, or four times; but that's it.

11      Q    And you have, obviously, gathered a lot of anecdotal

12   evidence about this case, correct?

13      A    In what way?

14      Q    In just generally -- just -- just information about

15   this case.  I said that wrong, --

16      A    Yes, I --

17      Q    -- information about this case?

18      A    I contributed information that I knew during the

19   investigation, yes.

20      Q    Now, some of the information you mentioned earlier in

21   your testimony differs a little bit from your previous

22   testimony in the New York case.  Is it possible that some of

23   the information is tainted?  Your memory is tainted --

24            ATTY. BERNARDI:  Well, I'm going to --

25            THE COURT:  Hold it a second.

26            ATTY. BERNARDI:  I'm going to object on a number

27        of grounds.  That's speculation.  And if there's a

Case 9:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 216 of 422
6A Excerpt of January 24, 2012 Transcript pp. 64-177
(testimony of Paul Christos)

159

1    prior inconsistent statement from the previous trial,

2    he should be shown that and asked to explain.

3         MS. DAVALLOO:  Yes, Your Honor, I'll do just

4    that.

5         ATTY. BERNARDI:  All right.  Well, then --

6         THE COURT:  All right.  Fine, we'll -- if you'd

7    refrain from the editorial comments, ma'am, and just

8    ask your question.  If you have something you want to

9    show them, show it to them.  But --

10        MS. DAVALLOO:  Yes, Your Honor.

11        THE COURT:  -- let's not testify here, please.

12        MS. DAVALLOO:  Yes, Your Honor.

13        THE COURT:  Yes, ma'am, go ahead, please.

14 BY MS. DAVALLOO:

15   Q   Okay, but isn't it true that, Mr. Christos, since

16 this case is about ten years old, the incident with you and

17 some of the information that you have is from approximately

18 ten years ago.  Is it possible that your memory is tainted a

19 little bit?

20        ATTY. BERNARDI:  Objection, that's speculative.

21    It's ten years -- it's ten years ago, obviously,

22    there was a trial and he's had to live with this.  If

23    there's some time of inconsistency, it should be

24    brought to his attention and shouldn't be asked to

25    guess whether or not.

26        THE COURT:  Your objection is sustained.  It's

27    argumentative and speculative.

A212

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 217 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

160

```
 1              Go ahead, ask your next question, ma'am.

 2   BY MS. DAVALLOO:

 3      Q   Now, you had mentioned that you would come to Purdue

 4   Pharma with me, and at some point, in reference to a picture

 5   of Anna Lisa that I showed you at Purdue.  You're also shown

 6   -- at some point, shown a picture of Anna Lisa Raymundo by

 7   the Stamford Police.  But, you didn't recognize her when

 8   they showed you her picture, correct?

 9      A   I did not, no.

10      Q   So, is it possible that the picture I showed you in

11   Purdue was of somebody else?

12      A   It was a picture sitting in Anna Lisa's office.  But,

13   it could have been --

14      Q   But, was that -- you remember seeing the placard.

15   Because you said you didn't remember seeing Melissa's

16   placard in her office --

17      A   Yes.

18      Q   You actually remember seeing the placard that that

19   was her office?

20      A   Correct, I did.

21      Q   So, you don't remember her picture because when the

22   police showed it to you, you couldn't recognize her?

23      A   They had showed me a different picture from the one I

24   saw on the desk that day?

25      Q   And she looked completely different?  You couldn't

26   identify her?

27      A   I didn't recognize her, no.
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 218 of 422
**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

161

 1    Q   Okay, now, at one point you testified just earlier,

 2  that you said maybe it was 2001.  And I'm just quoting you

 3  from -- from earlier, that I gave Nelson some poetry for

 4  some lyrics, correct?

 5    A   Correct.

 6    Q   Now, suddenly I'm not talking to you in terms of

 7  Melissa and Jack.  But, I'm talking to you about myself

 8  personally giving Nelson some lyrics?

 9    A   Correct.

10    Q   And I was annoyed that he was -- he had changed some

11  of it, correct?

12    A   Correct.

13    Q   Annoyed how?  How?  Like I -- as an artist and

14  somebody is changing their work kind of annoyed?

15    A   Yeah, along those lines, yeah.

16    Q   And that -- is that the only time I had mentioned

17  Nelson in that instance?  Because all of the sudden you're

18  saying I mentioned his name --

19    A   To the -- to the best of my recollection, you had

20  mentioned to me in -- much earlier than the stories about

21  Melissa and Jack.

22    Q   Right, exactly.  And you -- in your meeting with

23  Farmacia reps, you don't actually know that the death that

24  they were talking about was Anna Lisa's death, correct?

25    A   I do not.

26    Q   You had talked about a cut on the thumb.  You said

27  that it was caused by a can of dog food, correct?

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

162

```
 1      A    That's what you had told me, yes.

 2      Q    Right, now, if you think back, you -- do you ever

 3   remember us, when we were married and we had the dogs; ever

 4   buying canned dog food?

 5      A    Yes.

 6      Q    The actual can of dog food rather than the dry food?

 7      A    Usually we had dry food; but sometimes I believe we

 8   had canned food.

 9      Q    So, you don't remember me saying that it was a can of

10   pumpkin at Thanksgiving time?

11      A    No.

12      Q    And regarding the DNA questions, you don't remember

13   when I specifically asked you those questions, you said,

14   correct?

15      A    Correct.

16      Q    And you don't know the context of those questions,

17   correct?

18      A    The way you asked them?

19      Q    Why I asked you those questions?

20      A    You had asked me what -- what is DNA?  How does it

21   work?

22      Q    But, you don't know what the purpose of those

23   questions were, correct?

24      A    I asked you and you said, people are talking about it

25   at work.  I just want to know.

26      Q    Okay.

27      A    I didn't pursue it.
```

1    Q   So, now, do you have any experience as a biologist or

2    a biochemist?

3    A   No.

4    Q   Okay, and what is my degree in, Mr. Christos?

5            THE COURT:  Do you know what her degree is in?

6            THE WITNESS:  Your undergraduate degree is in

7        Biochemistry.

8    BY MS. DAVALLOO:

9    Q   Okay, so I had, with a Biochemistry degree, I was

10   asking you about -- like I came and asked you about the

11   structure of DNA?  The -- the molecular --

12   A   You asked me how its --

13   Q   -- make up of the cell.  The nucleus?  You don't have

14   any expertise in molecular biology --

15           THE COURT:  Let him answer.

16           MS. DAVALLOO:  I'm sorry.

17           THE COURT:  What did you ask him?

18           THE WITNESS:  You would just ask me what is DNA,

19       how does it work?  I told you, well, why are you

20       interested all of a sudden.  Why don't you watch

21       shows like CSI Miami.  You can learn about it.

22           That was the extent of the conversation.

23   BY MS. DAVALLOO:

24   Q   Okay, now did I -- when I talked about this fictional

25   relationship, did I talk about spending, Melissa spending

26   any birthdays or holidays with Jack?

27   A   I don't recall.

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 221 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

164

1    Q    Okay, did I talk about any exchange of gifts?

2    A    I think you -- you said Melissa had bought him a gift

3    once or twice.

4    Q    What was that gift?

5    A    I'm not sure, some kind of gift.

6    Q    And did I specifically say that -- excuse me, one

7    moment.

8                THE COURT:  Sure.

9    BY MS. DAVALLOO:

10   Q    Now, Mr. Christos, this is a yes/no question.  Did I

11   specifically say in this fictitious triangle that Melissa

12   was overly disappointed that she wasn't spending birthdays

13   and holidays with Jack?

14               ATTY. BERNARDI:  I'm going to object to co-

15         counsel's question on relevancy grounds.

16               THE COURT:  What is the relevancy of the line?

17               MS. DAVALLOO:  Your Honor, this relevancy is

18         that this relationship has to be fleshed out.  And

19         they're trying to make this relationship into

20         something that I don't really think exists.  And I

21         just want to get to the --

22               THE COURT:  Stop, ask your question again, I'm

23         going to let him answer it.

24               MS. DAVALLOO:  Okay.

25               THE COURT:  Go ahead, ask that question again.

26         If he can answer it -- if he can answer it, he'll

27         answer it.  Go.

Case 3:17-cv-01357-VAB   Document 25-4   Filed 11/08/17   Page 222 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

165

```
 1                MS. DAVALLOO:  Right.
 2   BY MS. DAVALLOO:
 3      Q    Did I specifically say -- or, do you recall if I
 4   specifically said that this -- that Melissa was overly
 5   disappointed that Jack wouldn't spend birthdays and holidays
 6   with her?
 7      A    I -- I don't recall.
 8      Q    Okay, and you don't know for a fact whether Melissa
 9   ever actually went through with eavesdropping on Jack's
10   phone calls?  Yes or no?
11      A    No.
12      Q    And you have said in your statements to the police
13   that Melissa would drive to Anna Lisa's residence, or
14   Jack's, because you don't know actually where Melissa would
15   drive, or even if she would drive anywhere for that matter,
16   correct?
17      A    Can you repeat that?
18      Q    Okay, what I'm getting is that it you -- you don't
19   know for a fact that she would actually drive anywhere and
20   actually go see anybody, or go to Anna Lisa's house, or to
21   Jack's house.  You had specifically said you don't know
22   whose house she was going to?
23      A    Correct, I only know what you told me?
24      Q    Okay, now, Mr. Christos, at some point did it -- when
25   you started talking to the Stamford Police, were you asked
26   to listen to a 911 tape recording?
27      A    I was.
```

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

1    Q    Okay, and do you remember some of the contents of the

2    tape recording?

3    A    Somewhat, yes.

4    Q    And were you asked to identify whether that caller --

5    whether you could recognize my voice as the caller in that

6    case?

7    A    I was.

8    Q    Okay, and you had said that the caller did not have

9    the right inflection --

10              THE COURT:  Why don't you ask him what he said

11         when he was asked that question as opposed to reading

12         something to him, please.

13              MS. DAVALLOO:  Well, Your Honor, this is out of

14         a police report.

15              THE COURT:  It is important that you ask him a

16         question, not testify from a document not in

17         evidence, madam.

18              MS. DAVALLOO:  Yes, could we talk for one

19         second.  I'm not sure --

20              Okay, understood, Your Honor.  So --

21              THE COURT:  Okay.

22    BY MS. DAVALLOO:

23    Q    You -- you -- isn't it true that you had said in

24    reference to the 911 call, that it wasn't the right

25    inflections?

26    A    I had said it wasn't the right inflections.  Part of

27    the tape sounded like you, part didn't.

Case 3:17-cv-01257-VAB Document 25-4 Filed 11/08/17 Page 224 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

167

```
 1      Q    Okay, and by inflections, what do you mean?  It's not

 2   the right inflections.  Do you mean intonation?

 3      A    It sounded like --

 4      Q    Do you mean, like, the manner of speaking?

 5      A    Yes, it sounded to me like you were slightly -- it

 6   was you, you were slightly changing your voice.

 7      Q    Okay, and you had said that I speak -- in that report

 8   you had mentioned that I speak three other languages as far

 9   as you know.  What -- why did you mention that, in reference

10   to what?

11      A    I believe it was in reference to if -- I think I had

12   said you -- it sounded to me like you were trying to make

13   your voice sound, maybe, like a different language, like

14   Spanish.  There was that type of inflection.  A different

15   language inflection.  And that's when I mentioned that you

16   spoke two other languages.

17      Q    Okay, but I don't speak Spanish, Mr. Christos, right?

18      A    Correct.

19      Q    Okay, and when finally you were pressed one way or

20   the other, to -- to say -- confirm that -- Is that your wife

21   on the phone?  You know, you had known me for almost ten

22   years by then.  You -- when you were pressed you said, you

23   have to say, what?

24      A    I said no.  I said it was not your normal speaking

25   voice.

26      Q    And in the course of the police investigation, you

27   were asked if I had access to a beige colored van?
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 225 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

168

1    A    Yes, correct.

2    Q    And what was your response to that?

3    A    I said, no.  I think I mentioned some friends had

4    bought a van, tan type color van; but, you did not -- you

5    did not have access to one that I knew of.

6    Q    Okay, now, Mr. Christos, I want to draw your

7    attention to the events of March 23, 2003.  You had

8    mentioned that we had progressively become distant leading

9    up to the incident.  That we weren't -- we were really co-

10   existing as roommates.  And the little free time we had, we

11   were spending apart from each other, correct?

12   Q    We were together on some weekends; but for the most

13   part we weren't together that much.

14   Q    And you -- you started noticing this decline in our

15   relationship when?

16   A    I would say, probably, mid-2002, somewhere around

17   there.

18   Q    Okay, but is it possible that it had started earlier;

19   but you just weren't aware of it?

20            ATTY. BERNARDI:  I'm going to object to

21        speculation.  He's answered the question as best he

22        could.  You can't lead --

23            THE COURT:  He has as best he can.

24            MS. DAVALLOO:  Withdrawn, Your Honor.

25            THE COURT:  Okay, go ahead, keep going.

26   BY MS. DAVALLOO:

27   Q    And you had specifically stated that my productivity

Case 3:17-ex-01257-VAB   Document 25-4   Filed 11/08/17   Page 226 of 422
**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

169

1    at work had declined in -- leading up to -- a year leading

2    up to the incident in March 23, 2003, correct?

3        A    Yes.  I believe I said in the three months prior to

4    March 23rd your productivity had declined, correct.

5        Q    Right, and you had stated that -- and you based that

6    on what, Mr. Christos?

7        A    Observation.

8        Q    Okay.

9        A    And things you told me.

10       Q    And you had stated that I would go home from work

11   around lunch time, and spend hours at lunch time at work

12   [Sic], walking the dogs and then stay hours at home,

13   correct, during lunch breaks?

14       A    Correct.

15       Q    All right.  And how often would I do that, Mr.

16   Christos?  As far as you know.

17       A    I don't know how many times; but it seemed very

18   frequent.

19       Q    All right.  So, you have known me to leave work two

20   to three hours a day in the middle of the day?

21       A    Do I have need?

22       Q    You -- you -- you were aware that I was leaving work

23   two, three hours a day in the middle of the day?

24       A    You had -- you had told me you were leaving work at

25   times for X number of hours to walk the dogs, take naps, go

26   back later in the day, yes.

27       Q    And even once I had told you that I didn't know what

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)**

170

1    was wrong with me, correct?

2        A    Correct.

3        Q    And when you say the decline in productivity, it has

4    to do with -- with paying bills too, right?  I was falling

5    behind on those?

6        A    Correct.

7        Q    So, there came a time where you would have to bring

8    me in a blank check to sign?

9        A    Correct.

10       Q    And you would fill out the rest of the check for me?

11       A    Correct.

12       Q    Okay, and you had stated that in a previous hearing,

13   that I used to sleep for maybe twelve, fourteen hours

14   straight sometimes?

15       A    Yes.

16       Q    Okay, and you went as far as saying, and, you know,

17   that you felt the sense of responsibility that you had

18   missed the signs of my decline?

19       A    Yes, I was very busy with school and my --

20       Q    And you said that you feel responsible for me turning

21   to someone else like Mr. Sessler, correct?

22       A    Yes.

23       Q    Now, turning to the guessing game you just described

24   to us.  Do you by chance remember --

25              THE COURT:  This is the March 23rd --

26              MS. DAVALLOO:  Yes, Your Honor.

27              THE COURT:  2003 --

1    MS. DAVALLOO: I'm sorry, yes.

2    THE COURT: -- game with the handcuffs and the

3    blindfold?

4    MS. DAVALLOO: Yes.

5    THE COURT: All right. Go ahead, yes ma'am, I'm

6    sorry to interrupt. Go ahead.

7    MS. DAVALLOO: That he had described in his --

8    THE COURT: Okay, go ahead.

9    MS. DAVALLOO: -- previous testimony.

10   BY MS. DAVALLOO:

11       Q    Do you remember showing -- that I showed you pictures

12   of a preview week's ski trip that we had played a similar

13   game?

14       A    Pictures, I don't recall, no.

15       Q    Now, when you said it was my turn to retrieve items

16   for you to guess, you said I went to various other rooms

17   after exhausting some of the items in the guest bedroom. We

18   were in the guest bedroom, correct?

19       A    Correct.

20       Q    And you said I went to -- and you know that how?

21       A    I had heard you moving around in other rooms.

22       Q    So, it's not like I went immediately to the kitchen?

23       A    I would have no way of knowing, correct.

24       Q    Right, but you said you thought I was going to

25   various other rooms. You had said that you kind of knew the

26   items I was retrieving already because you knew which room

27   it was coming from?

**6A Excerpt of January 24, 2012 Transcript, pp. 64-177**
**(testimony of Paul Christos)**

172

1    A    That's true, correct.

2    Q    Okay, for example, you mentioned a shampoo bottle

3  which was most likely, I would guess, if you had guessed the

4  shampoo item, it was retrieved from an adjacent bathroom,

5  correct?

6    A    Correct, most likely, yes.

7    Q    Okay, and at some point I must have retrieved a knife

8  from the kitchen, correct?

9    A    You're asking me -- at some point -- I assume so.

10    Q    Okay, but, this paring knife.  I mean, you're

11  familiar with the knife?

12    A    Yes.

13    Q    And can you tell us a little bit about this

14  particular knife?

15    A    This was a paring knife that was always in our

16  kitchen.  It was always pretty much by the dish rack.  And

17  we had used it a lot for most things, cutting fruit, food.

18  It was the most commonly seen knife in the kitchen area.  It

19  was not in a drawer or anything like that.

20    Q    And wouldn't you say that that was the smallest knife

21  we had in the house?

22    A    I don't know if it was the smallest, but it was a

23  paring knife.

24    Q    Okay, but we had a drawer full of much bigger knives,

25  correct?

26    A    That's correct, yes.

27    Q    And for the purpose of this guessing game, I didn't

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 230 of 422
6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

173

```
 1   choose any of the big knives, just the most accessible knife
 2   which was just sitting there on the counter.  Or, like you
 3   said, on the dish rack on the counter?
 4       A   Yes.
 5       Q   Now, at some point you had said that I started
 6   screaming.  And you said, I told you that you were bleeding,
 7   correct?
 8       A   Yes, uh-huh.
 9       Q   And you had said in your testimony and previous
10   testimonies that I said, I think I might have hurt you.  Is
11   that correct?
12       A   Correct.
13       Q   I mean, how could I have been in doubt about hurting
14   you?
15              THE COURT:  How would he know that?
16              MS. DAVALLOO:  Okay.
17              THE COURT:  Ask him another question.
18              THE COURT:  Okay.
19   BY MS. DAVALLOO:
20       Q   And you said I was in a state of panic?
21       A   You seemed to be in a state of panic on the phone.
22       Q   Okay, did it -- did it seem like I didn't know what I
23   was doing?
24       A   No.  No, you seemed like you knew what you were
25   doing.
26       Q   But, in a state of panic, you said --
27       A   Well, you spoke in a panicked voice on the phone.
```

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

174

1    Q    Okay.

2    A    And you --

3    Q    But, I was screaming to you.  I was shocked you said.

4    A    Yes, and then you moved the dogs into the other

5    bedroom.  And then you made the phone call.

6    Q    Okay.

7    A    I believed you made the phone call.

8    Q    Did you -- did you actually -- didn't you have to,

9    Mr. Christos, walk me through what to do?  The steps to

10   take, at that point?

11   A    Yes, I told you how to help me break the chair.

12   Q    And you asked me to take off the blindfold, correct?

13   A    Correct.

14   Q    And I -- I obliged.  I did that, right?

15   A    You did.

16   Q    And I was -- you said I was frantically looking for

17   the keys.  Is that correct?

18   A    I believed you were looking for it, but you didn't --

19   you couldn't find it.

20   Q    And who was the last person to use the key, Mr.

21   Christos?

22   A    I would have released you from the handcuffs, so I

23   would be holding it last.  I don't recall --

24   Q    But I didn't need the keys to -- to lock --

25   A    Correct.

26   Q    Okay.

27   A    I didn't need the keys to handcuff you, correct.

Case 6:47-cr-01257-JAH Doc 24, 2012 Transcript, Doc 24-177 Page 232 of 422
(testimony of Paul Christos)
175

1  Q Do you remember where you had put the keys?

2  A I don't.

3  Q Okay, and at one point you had asked me to help you

4 break the chair?

5  A Yes.

6  Q And I did as you had asked?

7  A Yes.

8  Q And you asked me at one point to bring you a mirror,

9 correct?

10  A Yes, yes.

11  Q Okay.

12  A Uh-huh.

13  Q And then I did that?

14  A Correct.

15  Q And you had asked me to bring you some juice,

16 correct?

17  A Yes.

18  Q Okay, and I did that as well?

19  A Yes.

20  Q So, I did, basically, everything you had requested of

21 me?

22  A Except call 911.

23  Q But, Mr. Christos, you don't know if I didn't call

24 911, correct?

25  A I know that you did not call 911.

26  Q How do you know that?

27  A Because there was records from our phone ever placed

6A Excerpt of January 24, 2012 Transcript, pp. 64-177
(testimony of Paul Christos)

176

1    to 911.

2        Q   Okay, but asked me to call 911, correct?

3        A   I did.

4        Q   Right.

5        A   Uh-huh.

6        Q   And you heard me on the phone telling somebody that

7    my husband was hurt, correct?

8        A   Correct.

9        Q   Okay, and do you remember saying at one point that

10   wearing the handcuffs to the hospital was embarrassing for

11   you?

12       A   Yes, I recall that.

13       Q   Okay, and are you sure that you heard me give the

14   operator our address?

15       A   Yes.

16       Q   Okay, I'm going to have to pull this out.   Mr.

17   Christos, in a previous hearing, you had stated that your

18   memory is starting to fade.   This was back in 2004.   And you

19   don't remember the exact details of what I said on the

20   phone.   Is that true?

21       A   That was a statement when?

22       Q   In 2004, in a trial.

23       A   I don't believe the prosecutor asked me specific

24   details to that level.

25       Q   Would it refresh your recollection if I showed you

26   this?

27       A   Sure.

```
 1          ATTY. BUTLER:  Could we approach for a moment?

 2          THE COURT:  Sure, why don't we send the jury out

 3     for two minutes.  How much more do we have today on

 4     this line, so they know.

 5          MS. DAVALLOO:  Your Honor --

 6          THE COURT:  How much more do you have?

 7          MS. DAVALLOO:  This might be a good time to

 8     break.

 9               (JURY PANEL EXITS)

10

11

12

13

14

15

16

17

18

19          *          *          *

20

21

22

23

24

25

26

27
```

6B

Excerpt of January 25, 2012 Transcript, pp. 87-110

(testimony of Paul Christos)

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 237 of 422
**6B Excerpt of January 25, 2012 Transcript, pp. 87-110**
**(testimony of Paul Christos)**

87

```
 1   P A U L   C H R I S T O S

 2   (Having been previously sworn in, testified to the

 3   following):

 4   RESUMPTION OF CROSS EXAMINTION BY MS. DAVALLOO:

 5       Q    Good afternoon, Mr. Christos.

 6       A    Good afternoon.

 7       Q    I think we left off yesterday, if I'm not mistaken,

 8   regarding a 911 call that, I guess, you had mentioned.   This

 9   911 call was made out of our -- well, I think there was some

10   discussion on whether the 911 call was ever made out of our

11   condominium complex in Pleasantville, New York, correct?

12       A    Correct.

13       Q    And you had mentioned in your testimony --

14            ATTY. BERNARDI:  If we may, Your Honor, just to

15       help to orientate.  We're talking about whether or

16       not a 911 call was made on March 23rd. of 2003.

17            MS. DAVALLOO:  Yes, thank you.

18            THE COURT:  At the time of the incident --

19            MS. DAVALLOO:  Incident.

20            THE COURT:  -- where the game was played?

21            MS. DAVALLOO:  Yes, yes, Your Honor.  Thank you

22       for the explanation.

23            THE COURT:  Yes, ma'am, go ahead.

24   BY MS. DAVALLOO:

25       Q    The March 23rd incident, Mr. Christos, after -- or,

26   some time after we were playing a game, there was a question

27   of whether a 911 call was made.  You had testified yesterday
```

Case 3:17-cv-01157-VAB Document 125-4 Filed 11/06/17 Page 238 of 422
Excerpts of January 25, 2012 Transcript, pp. 187 - 110
(testimony of Paul Christos)

88

1  that you had heard details about -- or me telling you about

2  two ambulances, their being busy, possibly a trauma, a 25

3  minute delay.

4     Can you just go over that what -- what you recall.

5     A    Yes, I believe this was after the second call

6  operator.  You had told me that the operator said there

7  would be a delay.  There was two ambulances out on other

8  calls and there would be, an approximate, 25 minute response

9  time.

10     Q    Right, Mr. Christos, in a previous hearing, do you

11  recall that regarding his -- the details; you weren't clear

12  about the details of what I had told you about the

13  ambulances.  You said I had possibly said like, they were --

14  they were busy.  And that memory is fading you.  This was in

15  a 2004 hearing.

16     Do you recall saying that your memory was fading; and

17  that you don't, really, precisely recall this -- the details

18  of that particular --

19     A    I remember saying --

20              ATTY. BERNARDI:  If I -- if I may, Your Honor,

21         it does not sound like a prior inconsistent statement

22         from here.  She just asked him whether or not he

23         spoke about -- we're talking about the ambulances.

24              THE COURT:  Let him -- let him finish what he

25         was going to say.

26              Go ahead, Mr. Christos.

27              THE WITNESS:  I believe I recall saying that I

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 239 of 422
6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

89

1           didn't hear exactly the details of what you said on

2           the phone to the 911 operator.  But, what the

3           operator had told you.  Some of those statements

4           about the 25 minute response time were in -- they're

5           in my supporting deposition that was made to

6           Detective Alison Carpentier.

7                But, I don't -- the prosecutor did not elicit

8           all those details in my original testimony.

9    BY MS. DAVALLOO:

10       Q   Right, so, in the 2004 hearing, you don't remember

11   testifying that you told -- that I told you there may be

12   some kind of a delay; but you're not sure that your memory

13   fades?

14       A   I might have said that.

15       Q   So, let me back up a little bit, Mr. Christos.  Now,

16   in the occasions, again, related to the game and even prior

17   to that, you had testified that on occasions I would ask you

18   to leave the -- the condominium, correct?

19       A   Correct.

20       Q   And you don't know if, actually, on those occasions,

21   somebody would physically come over, correct?

22       A   Correct.

23       Q   Okay, and sometimes you have testified that -- one

24   moment.

25                THE COURT:  Sure.

26   BY MS. DAVALLOO:

27       Q   Right, and you have testified that sometimes you

Case 3:17 Excerpt of January 25, 2012 Transcript
(testimony of Paul Christos)

90

```
 1   would leave for just part of the evening, not the whole

 2   night, correct?

 3       A   Usually if I went to stay at my parents, or in a

 4   hotel room, I would stay overnight.  There were times that

 5   you had called me and said, the person had left and if I

 6   wanted to I could come home.  But, already, it was late at

 7   that point.

 8       Q   Right.

 9       A   Correct.

10       Q   And you have -- we had, at that point, started

11   talking about divorce, correct?

12       A   We had casually talked about it, at some point, yeah.

13       Q   And you would have not contested such a divorce,

14   correct?

15       A   No.

16       Q   And regarding this game, Mr. Christos -- one moment,

17   Your Honor.

18       Okay, Mr. Christos, after the assault on you, and after

19   our divorce, we -- your family, yourself, and I stayed still

20   in contact one and off, correct?

21       A   Correct.

22       Q   And during one of our visits, I was concerned about

23   the scarring on your -- on your --

24       A   Correct, yes.

25       Q   -- chest area?

26       A   Yes.

27       Q   And had asked to see it, correct?
```

6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

91

1      A    Correct.

2      Q    Or, you had showed it to me?

3      A    Correct, yeah.

4      Q    And I had mentioned that poss -- and -- and I had

5   mentioned that there could possibly be way to reduce the

6   scarring, correct?

7      A    Yes, that's true.

8                MS. DAVALLOO:  One moment, Your Honor.

9                THE COURT:  Sure.

10               ATTY. BERNARDI:  Your Honor, the State has no

11          objection to a lunch break at this point.

12               MS. DAVALLOO:  I can continue, yes.

13   BY MS. DAVALLOO:

14      Q    Regarding the guessing game, you said in a previous

15   hearing, that the guessing game was actually fun, correct?

16      A    Correct.

17      Q    That you seemed to be having a good time playing -- I

18   --

19               ATTY. BUTLER:  Take a minute.

20               THE COURT:  Do you need a break, ma'am?  Would

21          you prefer a break?

22               MS. DAVALLOO:  Yes -- yes, Your Honor.

23               THE COURT:  Okay, let's break for lunch.  Please

24          keep your own counsel.  See you at two.

25               **(JURY PANEL EXITS/RECESS/JURY PANEL ENTERS)**

26               THE COURT:  Afternoon all.  You may be seated.

27               All right.  Mr. Chistos, you want to come up,

**A237**

```
 1          sir?
 2              All right.  You may be seated and we're going to
 3          continue your cross.
 4              Yes, ma'am, please, go ahead.
 5              MS. DAVALLOO:  Yes, thank you, Your Honor.  I
 6          apologize for earlier.  I seem to have John Boehner's
 7          affliction.
 8   BY MS. DAVALLOO:
 9      Q   At some point, Mr. Christos, you said that the -- in
10   the process of this guessing game, correct, you had said
11   that I was going to other rooms to retrieve items, correct?
12      A   Correct.
13      Q   And at some point in the game, things went awry where
14   you stated, you felt, you had described it as two thrusts to
15   your chest, correct?
16      A   Correct.
17      Q   Okay, and you thought at the time that it was -- you
18   thought I had a seizure and I had fallen on you.  That's the
19   sensation that you could tell from your standpoint?
20              ATTY. BERNARDI:  Your Honor, I'm going to
21          object.  That wasn't his testimony.
22              THE COURT:  He could answer it.  She's asked him
23          whether he said that.
24              ATTY. BERNARDI:  I would object to --
25   BY MS. DAVALLOO:
26      A   Isn't it true --
27              THE COURT:  I hear you.  You're objection is
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 243 of 422
6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

93

1          overruled.

2               ATTY. BERNARDI:  I'll rephrase it.

3               THE COURT:  Go ahead.  Why don't you try it.

4    BY MS. DAVALLOO:

5      Q   Isn't it true that you had, at some point, had

6    characterized it as, from your standpoint, it felt that it

7    was, like, I had a seizure and I had fallen on you.  That

8    was your --

9      A   That was one speculation I had, correct.

10     Q   Right, and you said that you didn't feel pain at the

11   time; but you felt winded and generalized pressure in your

12   chest area, correct?

13     A   Correct, I felt winded and sweating first.  And then

14   pain over the chest shortly after.

15     Q   And you have, at some point, said that you felt --

16   about a few seconds after you felt this pressure, this

17   thrust to your chest area, that I had started screaming,

18   correct?

19     A   After the second thrust, yes.

20     Q   Right, okay, and you -- did you ask me what happened

21   at that point?

22     A   I believe I did.

23     Q   Yeah, and I told you, you were bleeding?

24     A   Your -- your first words, I think I hurt you, you're

25   bleeding.  I asked you what had happened.  I think you said

26   something fell on me.  Something along those lines.

27     Q   Okay, and at this stage, you have previously said

1  that I was in a state of panic?

2    A   You said, I think I hurt you.  You're bleeding.  You

3  were panicky.  You put the dogs in the other bedroom.  And

4  then I heard you on the -- when you picked up the phone, you

5  were -- seemed to be in a state of panic, correct.

6    Q   Okay, so before -- Yeah, I'm trying to recall.  Okay,

7  so, at this point though, you're still blindfolded.  You

8  have the blindfolds on, correct?

9    A   Correct.

10    Q   Okay, and you're immobilized?

11    A   Yes.

12    Q   Okay, and you testified, I believe yesterday, that

13  you helped -- that I helped you break the chair, correct?

14    A   Correct.

15    Q   Did you show me how to break it?

16    A   I believe I said, step on a part of the chair and

17  push down on it and it broke, yes.

18    Q   Okay, and I was obliging.  I did as you had said.

19  Or, did whatever it took to, like, break the chair, correct?

20    A   Yes.

21    Q   And before breaking the chair though, I had taken off

22  the blindfold per your suggestion.  Or, did I do it on my

23  own volition?

24    A   I don't remember.

25    Q   Okay, but I took off the blindfold?

26    A   Yes.

27    Q   Okay, I didn't leave you there immobilized and

6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

95

1    blindfolded, correct?

2       A    Correct.

3       Q    And, just trying to move it along a little bit.   It

4    came a point where, I guess, after the alleged 911 call,

5    there came a point where you said I left the -- the

6    apartment all together?   I went out.   I went outside?

7       A    Yes.

8       Q    Okay, and by this point, there is -- I had -- I

9    recall testimony, or you had said at some point that, you

10   had -- you weren't as winded any more.   Color had come back

11   to you, I think.   Or, you felt a little better.

12      A    I felt a little better when I moved into the living

13   room area.

14      Q    Right, with -- okay, and why didn't you at that point

15   call 911 yourself?

16      A    I believed the ambulance was already on the way.

17      Q    Okay, so you didn't feel that you needed to --

18      A    No.

19      Q    Okay, and at some point, you -- by mutual agreement,

20   decided to -- we decided to just go to the hospital?

21      A    As best as I can recall, yes.

22      Q    Right, and before going -- leaving the apartment, I

23   helped you put on your shoes.

24      A    Yes.

25      Q    And I helped you put on your jacket, correct?

26      A    Yes, uh-huh.

27      Q    Did you need that additional help at that time?

96

1    A    I was able to walk.  You helped me out on the jacket;
2    and then I just proceeded to walk down the stairs.
3    Q    Okay, and I brought the car around for you, you
4    testified?
5    A    You brought the car to the front of the walkway
6    leading up to our entrance.
7    Q    And why -- do you know why?  Did we decide to do
8    that?  Or, is that something I decided to do?
9    A    I believe you decided to do it.
10   Q    Okay, do you know why?
11   A    I can only assume so I'd have less of a distance to
12   walk to the car.
13   Q    And then when you said -- you testified yesterday
14   that I drove out the back entrance of the condo; wasn't that
15   actually routine of habit for me?
16   A    You had used that exit more than I did, correct.
17   Q    Right, and is it -- is it possibly even a little
18   closer to the parkway?
19   A    When you -- when you reached that exit, that side of
20   the complex, you would be closer to the Saw Mill entrance,
21   correct?
22   Q    Okay, and then you testified that -- well, you didn't
23   testify yesterday; but I heard you -- I've heard testimony
24   that I was at this point driving erratically?
25   A    You were looking back at me, so you were swerving.
26   Q    Okay, and you said at one point I had swerved off the
27   road a little bit?

**A242**

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 247 of 422
6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

97

```
 1    A    Slightly, yeah.

 2    Q    Okay, and I was looking back and checking on you,

 3  correct?

 4    A    Correct.

 5    Q    Okay, and you're familiar with a vast secluded park

 6  called the Rockefeller State Park in Pleasantville?

 7    A    Yes.

 8    Q    Okay, and you -- do you know that that's about

 9  walking distance to the Phelps Memorial Hospital in

10  Pleasantville?

11    A    I don't recall the exact location, but I know it's in

12  the area.

13    Q    Right, okay, and I used to walk the dogs and hike

14  there off-leash, right.  Walk them --

15    A    Yes.

16    Q    Yeah.

17    A    Yes.

18    Q    And -- and so, I didn't drive you to that state park

19  or to that hospital, correct?

20    A    No.

21    Q    Okay, and you testified that I drove you directly to

22  the Westchester Medical Center?

23    A    Correct.

24    Q    Correct.  In Valhalla, New York.  And do you recall

25  any conversations we had, either back then or more recently

26  that I had said that I was hoping that my mother was on duty

27  then, at the time?
```

1    A    I believe I read that in your -- your -- one of your

2    transcripts to the Detective; but I don't recall --

3    Q    Okay.

4    A    -- personally having the conversation.

5    Q    All right.  And when we reached the hospital, you

6    didn't object to me parking where I parked, correct?

7    A    No, I asked you -- I believe I asked you, is this

8    where the emergency room was.  I'm not sure of your

9    response.  You might have said, I think so.  I assumed it

10   was nearby and we could walk to it.

11   Q    Okay, and did we have any occasion to frequent the

12   ER, the emergency room?

13   A    Not in the recent years, no.

14   Q    Right, and you testified yesterday that -- the

15   emergency room was just one building over, correct?  From

16   where we actually ended up?

17   A    I believe it is, correct.

18   Q    Right, and there were staff members there, and kids

19   playing nearby, correct?

20   A    Towards the back of the Behavioral Health Center

21   there was a playground towards the back of the parking lot

22   where there were some kids playing basketball.

23   Q    But in eyesight?

24   A    In eyesight, yes.

25   Q    All right.  Okay, and you testified that -- well,

26   previously stated, that when I lunged at you, I looked

27   distressed.  That I had a distressed look on my face?

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 249 of 422
6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

99

1    A    Correct.

2    Q    And you have previously stated that I looked kind of

3    crazy at that time?

4    A    Crazy, angry, correct.

5    Q    And you said that when we were both holding the

6    knife, I was holding the handle, and you were holding the

7    blade, correct?

8    A    Yes.

9    Q    Okay, and you have previously stated that -- that

10   there was really no struggle between -- there was just a

11   hold on both of our --

12   A    We were just holding the knife together for some

13   time.  I was holding your wrists.  And I was holding part of

14   the blade, correct.

15   Q    And you have said before that, since you were holding

16   the blade, I could have easily pulled the knife out of your

17   hand if I wanted to?

18   A    I did speculate that, yes.

19   Q    No, I --

20   A    But you could have, yes.

21   Q    Yes, okay.

22   A    Correct.

23   Q    And you have stated that when I was holding the knife

24   together at that point, you observed that I seemed out of

25   it?

26   A    Yeah, you were rambling on about your brother at that

27   point.  Things like that.

100

```
 1      Q    Okay, you said -- testified yesterday that I was
 2  holding onto your jacket.  Was it necessarily a strong hold?
 3      A    Yeah, you were holding me, trying to keep me in that
 4  location.
 5      Q    Okay, but you managed to easily get away?
 6      A    Not easily.  I pulled away, you came back at me,
 7  grabbed on again and then I possibly might have swung at you
 8  and you fell back.  And then I ran -- I broke away at that
 9  point and ran about 200 feet.
10      Q    okay, but I was holding onto your jacket.  You could
11  have really taken the jacket off and gone?
12      A    Well, it was fully on.  It wasn't zippered; but you
13  were kind of grabbing my back shoulders onto the coat.
14      Q    All right.
15      A    Something like that.
16      Q    Okay, let me move on.  Just lastly on this topic, Mr.
17  Christos.  You had written to the Judge in New York, at
18  least a couple of letters, asking for leniency, correct.
19      A    Correct.
20      Q    And you had told the Judge that you can't reconcile
21  my actions on March 23$^{rd}$ with the woman that you've know for
22  nine years?
23      A    Correct.
24      Q    And you mean that that was kind of an anomaly because
25  you had also said that -- that you have never seen me
26  demonstrate a capacity for violence, correct?
27      A    Correct.
```

**6B Excerpt of January 25, 2012 Transcript, pp. 87-110**
**(testimony of Paul Christos)**

101

1    Q   Okay, and you have mentioned a lot of good qualities,

2  you know, walking dogs, rescue dogs, volunteer at animal

3  shelters.  You said, always helpful to family and friends,

4  correct?

5    A   Correct.

6    Q   And genuine concern for family members?

7    A   Correct.

8    Q   And that everybody who knew me thought I had a big

9  heart, you said --

10    A   Correct.

11    Q   -- in the letter to the Judge.

12    A   Uh-huh.

13    Q   And you had said that we've had arguments but they

14  seemed very normal?

15    A   Correct, uh-huh.

16    Q   Okay, and you have said that I wished -- I never

17  wished harm on other people, even those I disliked?

18    A   Correct.

19    Q   Okay, and had said that I don't watch any violence on

20  television or movie.  I can't.  I turn my head away,

21  correct?

22    A   I -- in the letter?  I said that, yes, correct.

23    Q   Is that not correct?

24    A   That's correct, uh-huh.

25    Q   Okay, and you had said that the actions of March 23rd

26  just doesn't make sense to you?  That you had said that I

27  had -- I was lying, and deceiving, and had an affair and all

1   of that.  You described all of that.  But, you said that

2   wouldn't explain why I would suddenly become violent towards

3   you, correct?

4     A   Correct.

5     Q   Okay, and very last question, Mr. Christos, you -- at

6   some point you had -- had stated speaking -- well, the

7   Stamford Police started asking you some questions.  And one

8   of the questions they asked you was about my physical

9   strength, correct?

10     A   Correct,

11     Q   They had asked you about my upper body strength,

12   specifically?

13     A   Yes.

14     Q   And what was your response to that?

15     A   I believe my response was, I didn't think you had

16   much upper body strength at that time.

17     Q   Right, and what do you base that observation on?  Or,

18   what was your point of reference?

19     A   Maybe just working out at the gym, occasionally,

20   together.  Things like that.

21     Q   Was I generally winded carrying one bag or something?

22     A   No, no, I was just going by upper body shoulder

23   strength.

24     Q   Okay, so --

25     A   It was my opinion.

26     Q   -- never really worked it out?

27     A   Correct.

**6B Excerpt of January 25, 2012 Transcript, pp. 87-110**
**(testimony of Paul Christos)**

103

1    Q   Smaller in upper body strength, that kind of thing?

2    A   Correct.

3    Q   Okay, and never seen me to lift any weights per say?

4    A   Weights, like in a gym?

5    Q   Free weights, yes.

6    A   Nothing overly heavy, no.

7    Q   Right, and as you can -- if you can visually, looking

8 at me right now, has there been a change in my height and

9 weight, as you recall, since 2002?

10    A   I can't be sure, maybe a little thinner.

11        MS. DAVALLOO:  No further questions, Your

12       Honor.

13        THE COURT:  Do you have anything else for Mr.

14       Christos?

15        ATTY. BERNARDI:  I do, Your Honor.

16  **REDIRECT EXAMINATION BY ATTY. BERNARDI:**

17    Q   I take it after waiting for the ambulance and this

18 ride to the hospital where your wife was driving and you

19 were in the back.  When you didn't bleed to death on this

20 rescue ride, she stabbed you again at the medical center, is

21 that correct?

22    A   Correct.

23    Q   All right.  Now, you said these things to a Judge in

24 New York?

25    A   Yes.

26    Q   Okay, and you said them when?

27    A   When did I say them?

Case 3:87-cr-00125... Excerpt of January 25, 2012 Transcript ... 108/87-119 ... Page 254 of 422
(testimony of Paul Christos)

104

```
 1    Q    Yeah.

 2    A    Two -- some of them were in a few letters and then

 3  the -- I spoke in Court at a hearing.

 4    Q    The hearing was what kind of a hearing?

 5    A    It was a sentencing hearing.

 6    Q    Okay, and at this sentencing hearing, you spoke up on

 7  behalf of the Defendant, did you not?

 8    A    I did.

 9    Q    You spoke up on her behalf despite the fact that she

10  stabbed you three times and that's what the sentencing

11  hearing was all about, right?

12    A    Correct.

13    Q    All right.  And you did, I think because, as you said

14  before, you felt partly responsible, maybe, because maybe

15  you should have spent more time with the woman that stabbed

16  you three times?

17    A    I felt partially responsible for missing signs of

18  depression.

19    Q    All right.

20    A    Correct.

21    Q    And do you think that maybe you still loved her?

22  Still loved your wife?

23    A    At the time, I believe I did, yes.

24    Q    All right.  And so you --

25    A    There -- there --

26    Q    -- spoke up for her and asked for leniency, is that

27  correct?
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 255 of 422
6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

105

1    A   Yes, after reading everything and psychiatric reports

2  and so forth, I wanted to bring up what I could remember

3  about good things about her because I was -- well, I was in

4  a -- somewhat in a state of denial at the time; and it was

5  very hard for me to imagine her --

6    Q   Because you were her husband?

7    A   Post-trial and in -- in a prison setting.  So, the

8  prosecution had asked for a very long sentence.  I felt if I

9  asked for a shorter sentence, it would be somewhere in

10  between; because I still had some confusion about what was

11  the true cause or what was the true -- could there be a

12  psychiatric component.  That kind of thing.

13   Q   You still cared for her?

14   A   Yes, yes.

15   Q   You still loved her?

16   A   I did, yes.  I wouldn't characterize it as romantic

17  love at that point; but I did feel an obligation to her, a

18  familial type obligation.

19   Q   You loved her the way a man loves his wife?

20   A   Yes.

21   Q   Despite what she did to you?

22   A   Correct, fair to say.

23   Q   And with regard to -- you still cared for her?

24   A   Yes.

25   Q   And I think that you more or less brought up on your

26  own in that New York trial, that -- I think at the New York

27  trial, you said in the weeks leading up the stabbing, that's

1    when she began to be less productive?

2        A    Yes.

3        Q    Maybe a little bit -- getting more sleep --

4        A    Correct.

5        Q    -- than she should be getting.

6        A    Yes.

7        Q    And by the way, you said that sometimes she would

8    sleep in the afternoon.  How did you know that, because she

9    told you so?

10       A    She would tell me she was going home to walk the

11   dogs.  She would tell me she slept X number of hours.

12       Q    She would tell you?

13       A    Tell me.

14       Q    Right.

15       A    I observed her sleeping on weekends maybe, but during

16   the week, it was more --

17       Q    It's just because she --

18       A    -- of a call.

19       Q    -- told you?

20       A    She told me, correct.

21       Q    Right.  And she asked you, this had been going on for

22   a year, when you volunteered that information at your first

23   trial, you said it was only the weeks leading up to the

24   stabbing.  Would you like to look at the transcript?

25       A    Sure.

26       Q    Would you like to look at the transcript?

27       A    Sure.

6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

107

1    Q    I'm going to direct your attention to page 136 of the

2  New York trial transcript, and ask you, down there on the

3  bottom, when you volunteer that information, does that

4  refresh your recollection as to how long that went on?

5    A    Yes.

6    Q    And that really wasn't in response to a questions

7  asked to you by a prosecutor, was it?

8    A    No, actually, I -- he had finished his question and

9  then I felt the need at the time to volunteer some more

10  information about her.

11   Q    Because you still cared for her?

12   A    Correct.  Right, I wanted this information to get out

13  to the -- to the press.  To the -- the hearing --

14   Q    Trying to make --

15   A    -- at the time.

16   Q    Making excuses for her?

17   A    Excuse me?

18   Q    You were making excuses for her?

19   A    I was searching for an alternative explanation to it,

20  in my mind, to explain what had happened, possibly.

21   Q    Because a -- and I think on the same page, you

22  volunteered that you claimed partial responsibility for what

23  she did to you?

24   A    I did.  I felt that because I wasn't very active in

25  the marriage in the last two years because of school and

26  work --

27   Q    Well --

Case 3:17-cv-01056-ULB Doc 1 … Bernardi 25, 2012 Transcript pt 1 … Filed 11/06/87 - Page 258 of 422
(testimony of Paul Christos)

108

```
 1    A    I --
 2    Q    -- there's a lot of men out there that are not very
 3  active --
 4              THE COURT:  Is that a question here?
 5              ATTY. BERNARDI:  No, it isn't, Your Honor.
 6              THE COURT:  Let's go.
 7  BY ATTY. BERNARDI:
 8    Q    The fact of the matter is, is that you volunteered
 9  that?
10    A    Yes.
11    Q    And, I take it, even with regard to -- well, first of
12  all, in this particular case, is there anything you've told
13  this jury that isn't true?
14    A    Everything I've said is true.
15    Q    And do you still care for her?
16    A    No.
17    Q    Okay, all right.  This is ten years ago now.  But, I
18  take it during those ten years you've had a lot of time to
19  think about this?
20    A    Yes.
21    Q    It looks like maybe you -- hair might've gotten gray
22  in the meantime?
23    A    Correct.
24    Q    All right.  And I'm sure that you puzzled over this
25  many a night remembering the details and going over them in
26  your own head?
27    A    Uh-huh, many years, yes.
```

6B Excerpt of January 25, 2012 Transcript, pp. 87-110
(testimony of Paul Christos)

109

```
 1    Q   All right.  And the fact of the matter is, is that
 2  whatever mental deterioration that was clear to you that she
 3  was undergoing happened after November of 2002, right?
 4    A   Correct.
 5    Q   Yeah, so there's explanations that might be innocent
 6  for that, and there may be some that are consistent with the
 7  different explanations, isn't that correct?
 8    A   Correct.
 9    Q   And this caring emotion that you still had for a
10  woman that stabbed you three times.  You know, when you
11  listen to that 911 call, did you have that emotion in your
12  head still?
13    A   Which call?
14    Q   The 911 call.  The one on the November 8th matter?
15    A   No, I do not have that emotion.
16    Q   You do not?
17    A   I'm -- oh, when I heard the tape then?
18    Q   Yeah, back then --
19    A   Yes, that was early in 2003, so I was still finding
20  it hard to process.  So, yes, I still cared for her at that
21  point in time, yes.
22    Q   And you probably didn't want to be the man that said,
23  that's her?
24    A   I couldn't be -- I didn't fully recognize the voice.
25   So -- but, yes, obviously, I -- I would have preferred it
26  not to be her at that point, right.
27        ATTY. BERNARDI:  Thank you.
```

A255

1          THE COURT:  Anything else, madam?

2          MS. DAVALLOO:  No, Your Honor.  Thank you very

3     much, Mr. Christos.  Please don't discuss your

4     testimony with anyone.

5          MR. CHRISTOS:  Okay, thank you.

6

7

8

9

10

11

12

13

14

15

16                    **\* \* \***

17

18

19

20

21

22

23

24

25

26

27

7

State's Brief in Support of State's Use of Other

Misconduct Evidence, dated January 15, 2011

## 7. State's Brief in Support of State's Use of Other Misconduct Evidence, dated January 15, 2011

FST 165602                                    SUPERIOR COURT

STATE OF CONNECTICUT                          JUDICIAL DISTRICT OF STAMFORD-
                                              NORWALK AT STAMFORD
V.

SHEILA DAVALLOO                               JANUARY 15, 2011


<u>BRIEF IN SUPPORT OF STATE'S USE OF OTHER MISCONDUCT EVIDENCE</u>

<u>Introduction</u>


In the case before the Court, the State will seek to introduce at trial certain acts of other misconduct evidence committed by the accused, Sheila Davalloo. The principle act of relevant misconduct occurred subsequent to the charged November 8, 2002 murder of Anna Lisa Raymundo. The State will seek the introduction of the related subsequent uncharged act of Davalloo where she attempted to kill her husband on March 23, 2003. The facts will show that both Raymundo (whom she killed) and her husband (whom she subsequently attempted to kill) were obstacles to her continued desire to continue an illicit sexual affair with Nelson Sessler, the boyfriend of Anna Lisa Raymundo. The State does not offer such evidence to show the general bad character or propensity to violence of the accused. Rather, the State claims that such evidence shows motive, common scheme and consciousness of guilt, all of which are evidence of the identity of the perpetrator. Also, in a case where there is no eyewitness to the crime, the evidence also shows malice, intent and a lack of accident or mistake at the time of the crime. Because there is no witness to the crime, this highly probative course of conduct clearly outweighs any potential prejudicial effect.

FACTUAL BACKGROUND

On November 8, 2002 the Stamford Police Department Emergency Dispatch Unit received a 911 call shortly after twelve noon. A female voice reported that her neighbor was being attacked.

In reporting the attack, the female voice described various unit numbers for her "neighbor" and the wrong street name for the address of the condominium complex in which she claimed that she and her neighbor resided. Police units ultimately responded to Unit 105 of the Harbor Drive condominium complex in Stamford. Upon gaining entry into Unit 105, officers discovered the body of Anna Lisa Raymundo lying on the foyer floor. The foyer area was the scene of an apparent struggle, and the deceased had suffered various recent stab wounds inflicted during the struggle.

The State Police Major Crime Squad forensic unit was called to the scene. That squad processed the scene and seized sixty one items of possible forensic value.

Subsequent investigation revealed that Anna Lisa Raymundo was a thirty two year old single woman, previously employed by Purdue Pharma in Stamford. At Purdue Pharma she met and became intimately involved with Nelson Sessler, a fellow scientist. During the spring of 2002 Nelson had moved from his own apartment to Raymundo's apartment at Unit 105, Harbor Drive. Because of this relationship, Sessler was immediately viewed as a person of interest when he returned from work to the apartment.

Sessler returned to Unit 105 from his office at Purdu Pharma at approximately 5:00 p.m. and identified himself to officers on the scene as the deceased's live-in boyfriend. He was

**7. State's Brief in Support of State's Use of Other Misconduct Evidence, dated January 15, 2011**

informed of the death of his girlfriend and subsequently interviewed. He indicated to the officers that he had left the unit at approximately 8:30 in the morning and arrived at Purdu Pharma at approximately 9:00 a. m.. He stated he did not leave the building until he left work at approximately five o'clock in the evening. At Purdue Pharma both parking lot video cameras and swipe card read outs confirmed he was at work all day. A subsequent review of the phone records of Anna Lisa Raymundo showed that she left a phone message to her parents in Florida at 10:34 a.m. that morning. This was confirmed by her father who recognized her voice on the message. Therefore, Sessler was eliminated as the perpetrator of the crime.

A review of the phone records also showed that a call had been made to Sessler's office number from Unit 105's land line at 11:57 a.m., shortly before the homicide was reported. The length of the call was only 14.5 seconds. Sessler stated that he was not in his office when such a call would have come in and that no message was left.

Sessler was questioned about the length of his relationship with the deceased. He responded that he had commenced the relationship with the deceased approximately two years before, and gradually they began living together. He continued to maintain a separate residence in Stamford. He denied any other recent lovers but the deceased, with whom he had discussed marriage. Thereafter, the investigation continued and various persons of interest were scrutinized without result.

On March 25, 2003 Nelson Sessler contacted Stamford police detective Thomas McGinty and informed him that a woman who worked at Purdu-Pharma had been arrested in New York after she had allegedly stabbed her husband. Her name was Sheila Davalloo. Davalloo was a co-worker of Nelson Sessler at Purdu Pharma. He asked the officer if Davalloo might be a suspect in the Raymundo homicide. Officer McGinty, who was investigating the

Raymundo homicide, contacted the Westchester County detectives who were investigating the

stabbing.

Those detectives informed McGinty that, indeed, they were investigating the stabbing of

Paul Christos by Sheila Davalloo, the wife of Christos. The stabbing had occurred at their

marital residence. Curiously, Davalloo had driven Christos to the hospital after stabbing him. In

the hospital parking lot she stabbed him once again. Witnesses in the parking lot intervened and

Davalloo fled in her automobile. She then returned to the scene and was arrested. Christos

survived the stabbing and detailed the event to the police.

Shortly thereafter, Westchester County police detectives secured the Christos/Davalloo

residence as a crime scene. While the scene was so secured Nelson Sessler arrived. He told

officers he had been invited by Davalloo to the residence for evening dinner. He was not aware

that Davalloo was married. Westchester County detectives checked the cell phone of Davalloo

and saw that a phone call was made to Nelson Sessler's cell phone number at 4:59 p.m. that day.

Witnesses at the hospital stated to the investigating officers that the assault at the hospital

occurred at approximately 5:30 p.m. Therefore, the call to Sessler was made at or about the time

of the stabbing of Christos at the residence. Phone records indicate the call was billed as a three

minute charge. Sessler stated that during the call Davalloo invited him to dinner at her home that

evening. He accepted the invitation and arrived to find the police securing the apartment.

Shortly thereafter he contacted the Stamford police but only indicated he had heard about the

stabbing at work.

Sessler was recontacted by the Stamford police who wished to inquire regarding his

relationship with Sheila Davalloo. At first he refused to talk further, however on March 27, 2003

he spoke with officers and stated that Davalloo was a co-worker at Purdu-Pharma with whom he

**7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011**

became intimate after the death of Anna Lisa Raymundo. He said he could not recall being intimate with her before November 8, 2002.

On April 25, 2003 he was reinterviewed with Attorney Pastore present, who now represented him. During this interview he admitted that he had been involved intimately with Davalloo prior to the murder of Raymundo. He stated they had been intimate on four or five occasions since March or April of 2002. He stated that after the homicide she had befriended him and they became closer. He stated they had originally met at a "happy hour" gathering of co-workers from Purdu Pharma. It was not precisely determined when Sessler had commenced the relationship with both women, but it was clear that at some point prior to the Raymundo murder, the relationships had been coterminous.

Paul Christos, the defendant's husband, gave further details when interviewed by the police. With regard to the stabbing event of March 23, 2003 he stated that, at his wife's suggestion, they had played a "game" that afternoon in the apartment. One party would be handcuffed and blindfolded. Then the other party would touch the restrained party with an object. The restrained party would then attempt to guess the nature of the item. At some point Christos assumed the position of the restrained party. While handcuffed to a chair and blindfolded by a stocking, Christos felt two sharp pains in the chest. He discovered that he had been stabbed twice by Davalloo. She told him that she had stabbed him by accident and that she would call 911. According to Christos the ambulance never arrived despite Davalloo's representations to him that she had repeatedly called 911. He finally asked her drive him to the hospital. When they arrived at the hospital she stabbed him again with a knife while they were still in the car. He struggled free from her and witnesses intervened.

Records show that 911 was never contacted by Davalloo. The same phone records do

show she called Sessler at a time when the stabbing event was in progress.

Davalloo was interviewed by the Westchester County detectives. The interview was video and audio taped. The interview lasted three hours. Apparently assuming that Christos had died of his wounds, Davalloo recounted a false description of the stabbing event during the first portion of the interview. She stated she had been home when Christos returned from work that afternoon. She elaborated further that he arrived at the apartment already bleeding from stab wounds previously inflicted by an unknown party. She did not ask and he did not say how he had received the wounds, but he asked her to look at the wounds and Davalloo observed two stab wounds to the chest. She then drove him to the hospital. She maintained this version of the event until she was asked about the "game" and told that her husband had already talked to the police. She then changed her story.

After some denials, Davalloo now stated that she had indeed played the game as described by Christos to the police. She denied stabbing her husband, but when confronted with his description of the event she said that whatever he said must be true, because she loved him and he wouldn't lie. A recess in the interview was taken

Later the interview was continued. Davalloo now admitted that indeed her and her husband had played the game. She admitted that her husband had been handcuffed and blindfolded at the time of the stabbing. She stated further that she had accidently stabbed him and when she did so he lurched upward into the knife in a knee jerk reaction and was stabbed a second and third time. She denied stabbing her husband at the hospital.

She denied making any phone calls from the home although she claimed that she had picked up her phone and considered but decided not to call her mother or Christos' parents for help. She was not questioned about Nelson Sessler or the Raymundo homicide.

**7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011**

On March 27, 2003 Westchester County detectives contacted Stamford detectives and informed them that they had asked Paul Christos if Sheila Davalloo, his wife, had ever mentioned a woman named "Anna Lisa". He said she had. He proceeded to tell detectives that sometime during the summer of 2002 Davalloo had told him of a love triangle at her work place. The triangle involved three people: "Anna Lisa", "Jack" and "Mellissa". Mellisa liked Jack who was living with Anna Lisa. Davalloo told Christos that she was friends with Mellissa and frequently told him she would be meeting Mellisa to follow Jack and Anna Lisa. She also said that Anna Lisa was mean to Jack and treated him badly. Christos further described how at about the same time, Davalloo began watching crime investigation T.V. shows and asking him questions about forensics, finger prints and rubber gloves. Davalloo had a lock pick set, night vision goggles and a scanner. She practiced picking the lot at their apartment. Sometime around November of 2002 Davalloo ceased talking about the triangle. Christos asked her what ever happened to the lovers in the triangle. Davalloo replied that Jack and Anna Lisa had broken up and that Jack was with Mellissa and happy. These and other facts are outlined in an brief on the marital communications privilege previously filed with this court.

When interviewed by the Stamford investigators Christos gave additional facts. He said that his wife told him that "Mellissa" had access to "Jack's" voice mail and would listen to his messages. She said that "Mellissa" had also expressed a desire to find a way to listen to "Anna Lisa's" voice mail. "Mellissa's purpose was to discover if the couple was really close. He confirmed that his wife had borrowed his night vision goggles in order to spy on the couple with "Mellissa" after work hours. He also confirmed that Davalloo had purchased a lock pick set for "Mellissa". Both he and Davalloo had tried to open two of their own condo's doors with the set.

He also gave Davalloo two listening devices which she intended to use to spy on "Jack".

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 270 of 422
7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011

One was a device which hooks up to a phone jack in order to record incoming and outgoing calls. The other was a microphone which one would hide in an office in order to listen to conversations broadcast to a nearby receiver. He said that Davalloo took both to work where she and Mellissa intended to set the devices up in Jack's office. He continued by stating that Davalloo would tell him about the triangle almost daily or at least every three days. Sometime near the end of 2002 Davalloo told Christos that Jack and Anna Lisa broke up and that Jack was now seeing Mellissa. This had made Mellissa happy. He also said that at some point Davalloo told him that "Anna Lisa" had left Purdu-Pharma and taken a job at Pharmacia in New Jersey.

Sheila Davalloo would later admit during her trial on New York charges that "Anna Lisa" was Anna Lisa Raymundo, "Jack" was Nelson Sessler, and that she was "Mellissa."

In a subsequent interview Christos indicated that before his wife had stabbed him his marriage with Davalloo had lost its original passion. He also stated that during the months preceding the stabbing of March 2003, Davalloo would ask him out of the blue about DNA, fingerprints and stun guns. He also indicated in November of 2001 Davalloo had asked him to leave the apartment for the weekend because her brother, who was mentally ill, would be visiting her. He did so then, and frequently thereafter. He questioned her as to why upon his return after a weekend absence, his belongings had been moved to different places. In response, she told him that, since her brother disapproved of their marriage, she would hide Christos' belongings so that her brother would not see them. This corroborated Sessler's claim that he was unaware that Davalloo was living with anyone or that she was married.

He also stated that his wife would write poetry which she told him she would then send to Nelson Sessler. She told him that Nelson Sessler then used the poetry in songs he would write.

Her husband was not the only person with whom Davalloo discussed the love triangle. In

7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011

the Supreme Court *en banc* assigned itself the task to "review our jurisprudence regarding the

admissibility of uncharged misconduct" *Randolph*, supra at 339. It did so because "a review of

our case law further reveals that, although we have been consistent in our application of this

stringent standard, we have been inconsistent in our articulation and explanation of the principles

that guide our analysis". See *Randolph*, supra at 341. In explaining those guidelines and

principles the Court cited the Inkelreid Treatise on Uncharged Misconduct at least five times.

That treatise played a substantial role in informing a decision issued *en banc* without dissent.

This brief makes frequent reference to that treatise. Since common scheme is relevant to

establish motive, and motive is relevant to establish identity, a substantive discussion of motive

in non sex cases follows the below discussion of the sex cases.


<u>Cases Involving Aberrant Sexual Misconduct</u>

In *State v. Sawyer*, 279 Conn. 331 (2006), the Connecticut Supreme Court ruled that a

more liberal standard was to be applied in allowing the introduction of other acts evidence in

prosecutions where the charges arise from sexual misconduct. In *State v. Dejesus*, 288 Conn.

418 (2008), the court held that in such cases the prosecution could introduce other acts of similar

sexual misconduct in order to show a propensity on the part of the defendant to compulsive or

aberrant sexual behavior. In such cases other sexual criminal acts "tend to establish a necessary

motive or explanation for an otherwise inexplicably horrible crime." *State v. Dejesus*, 288 Conn.

418, 469 (2008). While the instant case does not squarely fall within the parameters of the more

relaxed standard regarding aberrant sexual misconduct the defendant's obsession with her lover

borders on compulsive sexual misconduct which is otherwise inexplicable and results in a

horrible crime—the murder of an innocent and unknowing rival. Therefore, some discussion of

the more liberal standard cases is in order.

This more liberal standard allowing propensity evidence in sexual assault cases has not been limited to those cases where sexual assault or misconduct is charged as a crime. Rather, it has been applied in cases where sexual compulsivity and deviance is a motivating factor in the crime. See *State v. Johnson*, 289 Conn. 437 (2008), and *State v. Snelgrove*, 288 Conn. 742 (2008). Both *Johnson* and *Snelgrove* were cases where murder was charged but sexual assault was not. However, it was clear in *Johnson* that the defendant was a serial killer who raped his victims before he murdered them. In *Snelgrove* it was not clear on the facts of the Connecticut incident why the defendant had killed a woman whom he had just met in a tavern. However, he had previously been convicted of killing one woman and attempting to kill another in New Jersey. In both instances it was established that his motive was the sexual arousement he experienced in rendering women helpless. The Court ruled that the New Jersey evidence was admissible to establish his aberrant motivation in the Connecticut homicide. See *Snelgrove*, supra.

In the case before the court the state does not argue that this recent line of cases in sex related crimes allows the state to argue propensity to commit the crime. However, it cannot be denied that the same element of irrationality and compulsiveness attendant to the aberrant crimes described above, is attendant to the behavior of a woman motivated by sexual desire to kill a rival of her lover and then attempt to kill her husband. While the absence of violent acts establishing dominance is lacking, compulsivity and irrationality are not. It is the necessity of establishing motivation in an irrational, sexually charged crime which compelled the Supreme Court of our state to allow propensity evidence. As the Court stated in Dejesus, supra at 463, "we recognize that crimes of a sexual nature are unique and distinct because they often are

### 7. State's Brief in Support of State's Use of Other Misconduct Evidence, dated January 15, 2011

'committed surreptitiously, in the absence of any neutral witnesses', and exhibit 'an unusual and pathological nature'".  As in sex cases, in this particular case there is a compelling need to explain the irrational, sexually motivated acts of the defendant, acts which were committed surreptitiously in the absence of neutral witnesses.  An example of this irrationality are the calls made by the defendant to Nelson Sessler at the time of both crimes.  This compelling necessity should at least be weighed in the balance when considering the whether an exception exists and whether the evidence's probative value outweighs any possible inflammatory effect.

<u>Grounds for Admissibility In Non Sex Cases</u>

<u>In General</u>

While in non sex cases evidence of other misconduct is not admissible to suggest that the defendant has a bad character or a propensity to criminal behavior, as our Supreme Court recently stated:

> On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of of the collateral crime tends directly to prove the commission of the principal crime, is admissible.  The rules of policy have no application whatsoever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial.
> *State v. Randolph*, 284 Conn.328, 340 (2007).

There is a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances covered by the

Case 3:17-cv-2571-VAB Document 254 Filed 11/06/17 Page 274 of 422
State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011

exceptions and, second, the probative value of the evidence must outweigh its prejudicial effect. *Randolph*, supra at 340, quoting *State v. Mackenzie-Adams*, 281 Conn. 486, 521-22 (2007).

A review of the facts described at length in this brief reveals that only the stabbing incident of March 23, 2003 can colorably be described as an "other act of misconduct" evidence. The defendant's description to her husband and others of her actions in assisting Mellissa to stalk the "love triangle" can only be described as part of the principal offense. The defendant's admission of planning, attempting and then actually stalking and eavesdropping on Sessler and Raymundo are part and parcel of the principal offense, and betray her motive to commit the crime, her knowledge of the site where the crime was to be committed, her intent to do lethal harm, and her identity as the perpetrator. To the extent that these otherwise non-violent acts preceding the crime may constitute criminal acts, the impact of these acts is minimal compared to the actual murder of Anna Lisa Raymundo, and their probative value overwhelms whatever minimal tendency they might have to inflame prejudicial passion on the part of a jury.

The same is true with regard to facts showing that, after the murder of Anna Lisa Raymundo, the defendant duped Nelson Sessler into recommencing their affair. This affair with the grieving and confounded Sessler is highly relevant to motive and identity. The same is true of the obsessive and excessive lengths to which the defendant Davalloo went to hide the affair from both Sessler and her husband. (In fact, jurors may rightly wonder why the defendant did not simply seek a divorce–a fact which may be explained by her consciousness of her guilt in the murder of Raymundo and her husband's knowledge of the fictive love triangle involving an "Anna Lisa" and a co-worker at Purdu-Pharma——knowledge which certainly formed part of the motive of the defendant to stab him) These acts, while highly probative, do not constitute criminal conduct, and are unlikely to inflame the passions of the jurors. Certainly a simple

7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011

instruction not to consider the unfortunate modern commonplace of an affair as evidence of bad criminal character would suffice to quell any such tendency.

Any objection raised by the defense should therefore focus on the stabbing by the defendant of her husband on March 23, 2003. A review of the case law as clearly enunciated by our Supreme Court over the last several years reveals that testimony regarding that incident is admissible as evidence of motive, intent, lack of accident or mistake, knowledge of the intended site of the crime, and, pursuant to *State v. Randolph*, supra, to show identity under both the signature and common scheme or plan exceptions.

The March 2003 Stabbing of Her Husband

Explains and Evidences the Defendant's Motive

To Stab Anna Lisa Raymundo

As our Supreme Court recently stated "It is not essential that the state prove a motive for a crime.... But it strengthens its case when an adequate motive can be shown." *State v. Lopez*, 280 conn. 779 (2007), citing *State v. Hoyeson*, 154 Conn. 302 (1966). In the case at bar the State would submit to the jury that the defendant's motive in killing Anna Lisa Raymundo was to eliminate her as a rival to the affections of Nelson Sessler. In *Lopez* the court upheld, on the basis of the motive exception, the admission of a prior violent threat directed at the defendant and his associates. In *State v. Stenner*, 281 Conn. 742 (2007), the defendant was charged with the murder of a criminal associate. The court upheld, on the basis of the motive exception, the admission of two uncharged prior robberies committed by the defendant with the victim. The state claimed that these armed robberies of bank trucks where the deceased was a participant with

A271

Case 3:17-cv-01257-VAB Document 25-4 Filed 11/08/17 Page 276 of 422
**State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011**

the defendant were admissible, because the defendant believed that the deceased had talked to investigators. This showed the motive for the murder.

In this case, the defendant's motive for killing Anna Lisa Raymundo is the elimination of obstacles to her affair with Nelson Sessler. The stabbing of her husband is motivated by the same emotion. Taken together with the other connecting evidence in the case one is compelled to the conclusion that the identity of the perpetrator of the murder of Anna Lisa Raymundo is the defendant (whose DNA, mixed with that of the deceased, is located in a blood sample retrieved from a sink handle in the crime scene). Both crimes evidence the same motive and on that basis are admissible. In *State v. Randolph*, in discussing common plan evidence, our Supreme Court *en banc* cited with approval the Inkelreid treatise when it stated, "Evidence of such a plan is relevant to the charged crime because it bears on the defendant's motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these are in issue." *Randolph*, supra at 342. The Court continued by citing Inkelreid and stated "proof that defendant entertained plan is logically relevant to demonstrate that the *charged and uncharged crime are the effects of the cause, the plan.*"*Randolph*, supra at 343. From this statement one might logically infer that where the charged and uncharged crime evidence the same motive, the uncharged crime is admissible on that basis. As Inkelried explains in his Treatise at Sections 3.15 through 3.18, such is the case.

As Inkelried explains in those sections motive is an independant basis for the admission of uncharged misconduct in order to prove identity. As he states at Section 3.17, page 3-114, "In homicide cases, and other violent crime prosecutions, the courts frequently admit uncharged misconduct to establish the defendant's motive." At page Section 3-15 at page 3-96 he states, "Motive qualifies as a legitimate non character theory; although motive carries a connotation of

**7. State's Brief in Support of State's Use of Other Misconduct Evidence, dated January 15, 2011**

an enduring general propensity, a motive is 'a situationally specific emotion".

Evidence of prior misconduct to prove motive may take one of two forms: in one the uncharged act supplies the motive for the charged act. Inkelreid Sec. 3-15 at page 3-98.  In the case at bar it can reasonably be inferred for the reasons stated below that one of the defendant's motives for stabbing her husband was his knowlege of the *faux* love triangle and her fear that he might discover its true participants if the defendant left him for Sessler.

In the second category "the act of uncharged misconduct evidences the motive; the motive is again the cause, the uncharged act is one effect, and the uncharged act tends to show the motive that produces the charged act, the other effect.  Both crimes are explainable as a result of the same motive.  In the case before the court, the defendant's motive is to eliminate the primary obstacles to her affair with Nelson Sessler.  Both the murder of Anna Lisa Raymundo and the attempted murder of her husband are motivated by this desire, are evidence of this motive, and  are explainable in terms of this motive.

As explained by Inkelreid the courts have consistently allowed evidence of motive in the second category of cases.  He explains as follows:

> Like the first category, this category includes cases in which the
>
> prosecutor attempts to prove motive in order to identify the defendant
>
> as the criminal.  However, the process of the proof differs radically.
>
> In the former category, the uncharged act supplies the motive for the
>
> charged crime; the uncharged act is the cause, and the charged act
>
> is the effect.  In the second category, the uncharged act evidences the
>
> existence of the motive, but the act does not supply the motive. ... the motive
>
> is the cause and both the charged and uncharged acts are the effects.

Both crimes are explainable as a result of the same motive. The prosecutor

uses the uncharged act to show the existence of the motive, and in turn

the motive strengthens the inference of the defendant's identity as the

perpetrator of the charged crime.

Inkelreid, Sec. 3.18 at pages 128-130.

Inkelreid goes on to explain that:

The courts typically invoke this theory of relevance when the motive is

in the nature of hostility, antipathy, hatred, or jealousy. When the evidence

is offered to identify the defendant, the emotion must be directed at the

victim *or a defined class which included the victim*. The prosecutor's case

for admissibility is the strongest when the sole object of the hostility is

the victim. However, the courts have also admitted evidence of acts evidencing

hostility against a class which included the victim. Thus, the courts have

accepted evidence of acts against other non union workers, persons

connected with the Yugoslav government, Jewish persons and

organizations, police officers, members of the same racial group, other

women, or daughters.

Inkelreid, Sec. 3.18 pages 3-132– 137

As Inkelreid states there is a limitation: "there must be some relationship between all the

victims. Otherwise, the evidence would show only the defendant's general violent nature."

Inkelried, Sec. 3-18 at page 3–137.

In this case that limitation has been met. Both victims are members of a specific and

limited class of two: those intimate with the defendant or her lover. One victim (Raymundo) is

**7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011**

intimate with the defendant's lover and stands in the way of the defendant's relationship. The

other victim is her husband, with whom the defendant is intimate and who stands in the way of

her relationship with Sessler. There are only two members of the class and both are victims; the

uncharged crime evidences the same motive as the charged crime, both are caused by the same

motive, both are explainable in terms of the same motive. As Inkelreid states, the purpose of the

adducing evidence concerning the uncharged act is "to show the existence of the motive, and in

turn the motive strengthens the inference of the defendant's identity as the perpetrator of the

charged crime". There is no evidence to be introduced which is not relevant to this small class of

two (Raymundo and the defendant's husband), because the motive is produced by a "situationally

specific emotion". As such, both the charged and uncharged act are admissable and relevant at

the same trial as motive evidence.

There is no authority for the proposition that a person must have only one motive for their

actions. In this particular case the uncharged act is not only evidence of the same motive, but is

an effect of the charged crime and is therefore relevant to conciousness of guilt and identity.

This is true because, in the instant case, the defendant's motive to stab and kill her husband is

more than that he stands in her way to fulfilling her ambition of continued intimacy with Nelson

Sessler. Prior to her murder of Anna Lisa Raymundo, she informed her husband of the love

triangle involving "Anna Lisa", "Melissa" and "Jack". Unfortunately for her husband, he learned

from associates in the days after the Raymundo murder that an "Anna Lisa" who had worked at

Purdu Pharma had been murdered. That prompted him to inquire of the defendant that night as

to the well being of "Anna Lisa". Such an inquiry could only have caused a guilty Davalloo to

realize that, if she divorced her husband and cohabited with her co-worker Sessler, her jilted and

highly educated husband would inevitably discover through the same grape vine that her new

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 280 of 422
7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011

spouse was the former live-in boyfriend of a murdered woman named Anna Lisa, also a co-worker. A light would have gone off in his head. Jilted and cast away, her husband would be in a well motivated position to inform the police of these facts.

It is difficult to infer that the likewise highly educated and intelligent defendant did not recognize this problem. An arrest for murder would certainly bring her affair to end, and that fear provided additional motivation for the defendant to attempt to murder her husband. In that regard, the charged crime is cause for the attempted uncharged crime, which in turn betrays the defendant's guilt for the charged crime. An attempt to eliminate a potential witness is certainly admissible misconduct. See State v. Peeler, 271 Conn. 338 (2004) (where victim of attempted murder gave statement to police, prompting same assailant to murder him, prompting same assailant to murder witnesses to the murder.) Our common law provides that "evidence of crimes subsequent to the crimes charged is admissible for the same purposes as that of crimes committed prior to the charge". Tait @ Prescott, Handbook of Conn. Evidence, Fourth Edition, at page 160. (2008), citing State v. Smith, 198 Conn. 147 (1985). The defendant's husband Christos had to be eliminated. From that need and her attempt to kill her husband one can infer the defendant's consciousness of guilt and, therefore, her identity as the perpetrator of the charged crime.

<u>The March 2003 Incident is Admissible</u>

<u>To Show Intent and Lack of Accident or</u>

<u>Mistake</u>

**7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011**

There is no eye witness to the murder of Anna Lisa Raymundo. Only the defendant knows exactly how the crime was committed. The defendant is acutely aware of this set of circumstances and has commented on the lack of eyewitness to both Nelson Sessler and Paul Christos in conversations subsequent to her learning that she was a suspect in the murder of Anna Lisa Raymundo. This lack of eyewitnesses to the crime not only makes introduction of the New York stabbing event critical to the State's case but shows, in conjunction with multiple stab wounds to the deceased, that the death of the deceased was the objective of the defendant at the time of the crime. It leads one compellingly to the common sense conclusion that when the defendant confronted Anna Lisa Raymundo on morning of November 8, 2002, she did so with malice, borne of obsessive jealousy. Her intent was lethal harm. The death of Anna Lisa Raymundo was not an accident. Nor was it self defense. Therefore, if the jury were to speculate as to self defense, the March 2003 stabbing incident dispels any tendency to so speculate as to lack of either intent or the existence of justification.

That other acts of misconduct are admissible on such a basis was reaffirmed by our Appellate Court in the recent case of *State v. Licari*, 115 Conn. App. 633 (2009). In that case the defendant was charged with arson of his home in order to obtain insurance proceeds. He did so in a manner so as to successfully make the cause of the fire appear to the fire marshalls as an accident. The trial court allowed testimony by his daughter that he had done the same thing in an unrelated fire insurance claim arising from a fire in her car sixteen months earlier. Her father, the defendant, had set that fire in order for her to avoid car payments and the fire was ruled accidental. The Appellate Court held that, while it disagreed with the trial court that both fires were part of the same common scheme, the testimony concerning the first fire was admissible to show absence of mistake, knowledge of criminal means and intent. See *Licari*, supra at 644-45.

In *State v. Tucker*, 181 Conn. 406 (1980), the Court approved the trial court's decision to allow other acts of physical abuse of a child to show the child's death resulted from intentional conduct by the defendant. The court stressed the difficulty in obtaining more proof because of the youth of the victim and the tendency of other family members not to intervene.

<u>Common Scheme and Plan</u>

Our Supreme Court has stated that other acts of misconduct are admissible "to prove the existence of a larger plan, scheme, or conspiracy of which the crime on trial is a part" *Randolph*, supra at 342. To prove the existence of a common scheme or plan, each crime must be an integral part of an overarching plan explicitly conceived and executed by the defendant or his confederates. *Randolph*, id. The misconduct must be connected to a common plan or scheme and cannot be isolated or unconnected conduct of a similar nature. *"Evidence of such a plan is relevant to the charged crime because it bears on the defendant's motive and hence on the doing of the criminal act, the identity of the actor, and his intention, where any of these are in dispute Randolph*, id. Citing 1 E. Imwinkelried, Uncharged Misconduct Evidence at page 115 The *Randolph* Court elaborated that *"proof that defendant entertained plan logically relevant to demonstrate that the charged and uncharged crime are both effects of the same cause, the plan.* (italics added) *Randolph*, supra at 343.

The court then distinguished between two types of categories of common scheme and plan cases. One involves the so-called "signature" cases bearing on identity. In those cases the charged and uncharged crimes *appear to be separate and discrete criminal acts*, but the method

## 7. State's Brief in Support of State's Use of Other
## Misconduct Evidence, dated January 15, 2011

of operation gives rise to a modus operandi, logo or signature which gives rise to the inference that the crimes were committed in furtherance of an overall scheme or plan and that the defendant is the perpetrator.  See *Randolph*, supra at 343.

The other type is the "true" common scheme or plan cases. Here "the nature of the charged and uncharged crime, combined with connecting evidence, if any, gives rise to the inference that an overall scheme existed in the defendant's mind and that the crimes were executed in furtherance of that plan." *Randolph*, supra at 343.  Once again relying on the Inkelried treatise, the Court states:

> *the nature of the uncharged misconduct and the charged crime*
> *or the existence of connecting evidence reveal a genuine connection*
> *between the crimes in the defendant's mind.*  (Italics added)

The uncharged crime and the charged crime need not be similar,  because "*the degree of similarity between the crime charged and the other crime is only at issue when the latter is an unrelated incident which, because of certain particularly distinguishing features that it shares in common with the charged offense, is probative to show that the same individual committed both. Randolph*, supra at 347 (emphasis by the Supreme Court).  As the Court clearly goes on to show, the degree of similarity test applies to the other category of common scheme cases which are referred to as signature cases, for example, the seemingly unrelated murders of a serial killer who leaves behind a distinctive logo or uses a distinctive device.  In such a case "the factual characteristics shared by the charged and the uncharged crime were sufficiently distinctive and unique as to be like a signature, and, therefore, it may be logically inferred that if the defendant is guilty of one crime he must be guilty of the other.  *Randolph*, at 347

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 284 of 422
7. State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011

Later in the opinion the Randolph court observes that the signature test has been used to establish identity under the "identity"exception independent of the common scheme exception. However, the court notes it need not be, because when a signature exists based on similarities, the crimes can be naturally explained as part of the same common scheme. See *Randolph*, supra at 352.

In either class of cases, common scheme is relevant to establish the defendant's motive, intent, and identity. This is because the evidence necessarily gives rise to the inference that the defendant had an overall plan that encompassed the commission of the charged and uncharged crimes and, therefore the *defendant,* rather than *someone else* committed the crime charged. *Randolph*, supra at 356-57.

In the case before this court the state maintains that both crimes, the charged crime and the uncharged New York crime, are part of the same common scheme and plan. Both crimes reveal a genuine connection between the crimes in the defendant's mind. Both crimes are part of the defendant's overarching goal of continuing her affair with Nelson Sessler. Both Anna Lisa Raymundo, her rival for the affections of Sessler, and her husband, who lived with her, are obvious obstacles to that goal. Further, once Anna Lisa is murdered, and the defendant's husband learns at the office that someone named Anna Lisa who worked at Purdu Pharma had been murdered and *thereafter inquiried of his wife as to Anna Lisa's* well being, his fate had been unwittingly sealed. Even if divorced, the defendant would realize that her husband would learn that the wife who rejected him has joined with a Purdu co-worker who once lived with and loved a woman named "Anna Lisa"--- an Anna Lisa whom someone murdered. He will quickly solve the puzzle and report his suspicions to the police. Without a fictive "Melissa" to blame, a new obstacle–incarceration for murder–will arise to thwart the defendant's goal of obsessed love.

## 7. State's Brief in Support of State's Use of Other Misconduct Evidence, dated January 15, 2011

The attempt on her husband's life is telling evidence of the defendant's identity as the murderer of Anna Lisa Raymundo and it is part of her scheme to eliminate all obstacles her in path to satisfy her desire. It is an attempt to not only eliminate one more obstacle to her affair with Sessler and also an attempt to cover up her murder of Raymundo. Each event is part of the same common scheme, all are related in cause and effect, and complete the story of how it is that Anna Lisa Raymundo was discovered dead in her home.

This attempt to murder her husband is also admissible under the signature test. There are many similarities and some dissimilarities between the two crimes. But the commonalities are compelling to the point of signature. Both crimes are committed during the time of the affair with Sessler. Both victims stand in the path of the defendant's desire to be with Nelson Sessler. Both victims are sexual partners of to one of the parties in the Sessler-Davalloo affair. Both crimes are committed in the home of the victim. Both crimes are stabbings. During both stabbings multiple wounds are inflicted. Both victims are alone at the time of the stabbings. From the lack of evidence of forced entry at the Raymundo residence, it is clear that both victims were initially compliant in meeting with the defendant and that proximity to both victims was achieved in all probability by ruse. *And during both crimes, Nelson Sessler is called on the phone!!! These calls are the signature of the defendant Davalloo.*

Phone records reveal that at 11:57a.m. on November 8, 2002 a call was made from the Raymundo/Sessler residence to Sessler land line phone at Purdu-Pharma. He did not pick up. However, the person reporting the possible assault of Raymundo did so from the Dutchess at 12:14 p.m. It is likely that the confrontation between Davalloo and Raymundo was in progress or finished when the call was made at 11:57 a.m.

Likewise, immediately before or after stabbing her husband, Paul Christos, the defendant

Case 3:17-cv-... State's Brief in Support of State's Use of Other ... Page 286 of 422
**Misconduct Evidence, dated January 15, 2011**

(bizarrely) called Nelson Sessler on the phone and invited him to dinner that night at their

apartment. Sessler did appear at the apartment while the police were searching the apartment.

There and then he learned that Davalloo was married and that she had been arrested for stabbing

her husband. Standing alone these phone calls are "unusual and distinctive as to be like a

signature". Combined with the other similarities between the two lethal assaults, common sense

compels one to the only rational conclusion: the same person, the defendant, committed both

crimes. See, *State v. Ibraimov*, 187 Conn. 348 (1982), cited with approval by *State v. Randolph*,

supra.

The Probative Value of the Other Acts

Outweighs any Speculative Prejudicial

Effect

The second prong of the test for admission of other acts evidence is that the probative

value of the evidence outweighs its prejudicial effect. *Randolph*, supra at 340, quoting *State v.

Mackenzie-Adams*, 281 Conn. 486, 521-22 (2007). At Section 4-3 our Code of Evidence states

that "relevant evidence may be excluded if its probative value is outweighed by the danger of

unfair prejudice, or surprise, confusion of the issues, or misleading the jury, or by considerations

of waste of time or needless presentation of cumulative evidence."

The Commentary to that Section lays out the guidelines to a court's analysis and

recapitulates the common law on the topic. That Commentary states that:

> "All evidence adverse to a party is inherently prejudicial because it is damaging
>
> to that party's case. Citations omitted. For exclusion, however, the prejudice
>
> must be "unfair" in the sense that it "unduly arouses the jury's emotions of
>
> prejudice, sympathy or hostility"; *State v. Wilson*, 180 Conn. 481, 490 (1980); or

**A282**

## 7. State's Brief in Support of State's Use of Other
## Misconduct Evidence, dated January 15, 2011

"tends to have some adverse effect upon the party against whom the evidence is offered beyond tending to prove the fact or issue that justified its admission into evidence." *State v. Graham*, 200 Conn. 9, 12 (1986), quoting *United States v. Figueroa*, 618 F. 2d 934, 943 (2nd Cir. 1980).

Another factor to be considered is how necessary the evidence is to the State's case. See *State v. Licari*, 115 Conn. App. 633 (2009), and *State v. Tucker*, 181 Conn. 406 (1980) (discussed above in Lack of Mistake section of brief). In both those cases the State's case lacked witnesses to the actual crime and the misconduct evidence was critical to the issue of intent.

In the case before the Court, the evidence is critical and does not unduly arouses the jury's emotions of prejudice, sympathy or hostility. The defendant's attempt to murder her husband is not gruesome or heinous. The fact that she engaged in an affair with a co-worker is a common place bordering on pedestrian. Deceptive manipulation of a husband in such a situation is normally attendant to such an affair. The degree of manipulation is unusual, but to the extent that it is, it is extremely relevant to motive, common scheme, identity and intent. Its probative value clearly outweighs any minimal prejudice. While the evidence is adverse to the defendant's interest it is not prejudicial.

For the same reasons, the evidence does not unduly tend to have some adverse effect beyond proving the facts or issues which justified its admission. The violent acts (the crime charged is more violent in its commission and more lethal in result) are directed solely at a class of two (intimate partners of the love triangle). There is no allegation that tends to show that any violence was directed at anyone beyond that small, limited class. Therefore, the evidence does not show a general propensity to violence. The jury will have no conclusion to draw, but that this specific emotion of the defendant provoked the two assaults, not out of bad character and

Case 3:17-cv-01053-VAB Document 25-4 Filed 11/08/17 Page 288 of 422
State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011

propensity to violence, but rather, out of antipathy and hostility to a discrete class of two

individuals. The defendant's life would otherwise appear to the jury as peaceable. That

dichotomy strengthens the State's case and can give the trial court confidence that management

of the other acts evidence will not stray into the prohibited area of bad character or propensity.

A limiting instructions to the jury should suffice to ensure that the evidence does not stray onto a

prohibited "propensity"path that neither party wishes it to travel.


### Summary

For the reasons described above the State respectfully submits to the Court that

the other acts evidence is highly relevant to show motive, identity, intent, common scheme (both

true scheme and signature), lack of accident or mistake or self defense, completion of story, and

in all probability corroboration of crucial prosecution testimony. It does so in a highly unusual

case where the evidence resembles misconduct testimony in sex cases. In those cases the

defendant is driven by a motive which is an aberrant and compulsive. While a sex crime is not

charged in this matter, the aberrant compulsivity of the defendant's conduct makes the admission

of the evidence that much more critical in an otherwise circumstantial case where there is no

witness to the crime. For the same reasons, the evidence is not unduly prejudicial. The motive

of the defendant precludes any rational argument that she is violent towards those not in the

limited class of two and therefore is unlikely to violate the policy against bad character and

propensity evidence. It is that policy which provides the rationale for the exclusion of otherwise

relevant evidence of misconduct. As our Supreme Court stated:

> On the other hand, evidence of crimes so connected with the principal crime
> by circumstance, motive, design, or innate peculiarity, that the commission of

7. **State's Brief in Support of State's Use of Other
Misconduct Evidence, dated January 15, 2011**

of the collateral crime tends directly to prove the commission of the principal

crime, is admissible.  The rules of policy have no application whatsoever to

evidence of any crime which directly tends to prove that the accused is guilty

of the specific offense for which he is on trial.

*State v. Randolph*, 284 Conn.328, 340 (2007).


WHEREFORE, the State of Connecticut respectfully notifies this Honorable Court and

defense counsel of its intent to introduce evidence of the defendant's other acts of misconduct

and respectfully requests this Honorable Court to allow the same.


Respectfully submitted,


James Bernardi

Supervisory Assistant State's Attorney

8

Defendant's Motion in Limine Re Subsequent

Misconduct Evidence, filed August 16, 2011

NO.  CR08-165602T                       SUPERIOR COURT

STATE OF CONNECTICUT                    J/D OF STAMFORD-NORWALK

V                                       AT STAMFORD

SHEILA DAVALOO                          AUGUST 16, 2011

## MOTION IN LIMINE RE SUBSEQUENT MISCONDUCT EVIDENCE

## ARGUMENT

## THE COURT SHOULD NOT ADMIT THE DEFENDANT'S OUT OF STATE SUBSEQUENT MISCONDUCT

The defendant, by her counsel, moves the Court pursuant to Practice Book §§ 42-15, relevant evidentiary principles, Amendments Five, Six, Eight, and Fourteen to the United States Constitution, and Article I, Sections 8 and 9, of the Connecticut Constitution, to preclude the prosecution from offering evidence of the defendant's out of state 2004 conviction for attempted murder. The homicide for which the defendant is now being prosecuted occurred on November 8, 2002 in Stamford, CT. The misconduct the state seeks to introduce did not occur until four and a half months later on March 23, 2003 in the state of New York. Although the state in its memorandum dated January 15, 2011 refers to this as a related uncharged act, the defense argues that it is unrelated and certainly charged and prosecuted by the State of New York as defendant was convicted of Attempted Murder. Other alleged acts of so called misconduct such as alleged acts of eavesdropping or watching her lover are not charged because they are not crimes, but

1

their admission would be highly prejudicial nonetheless. The nature of the evidence, as noted by the state, and made explicit by EVIDENCE CODE § 4-5(b) and the *Commentary* thereto, "is contingent on [the proponent] satisfying the relevancy standards and balancing test set forth in Sections 4-1 and 4-3, respectively."

The misconduct will be argued as admissible under several exceptions to the rule: as "direct proof" of the defendant's identity, common scheme, intent, motive, knowledge, corroboration, and consciousness of guilt, malice and lack of mistake or accident. Admission will be error for several reasons: first, the evidence is not relevant under any of these "exceptions"; second, any relevance and probative value that does exist will be outweighed by the high degree of prejudice. This state, admittedly, has no eyewitness to this crime and has little direct evidence of the defendant's guilt in this murder case (aside from the DNA). (The defendant recognizes that there is appears to be a large amount of circumstantial evidence). The lack of, or at best negligible, relevancy and high prejudice in the admission of these past acts of subsequent misconduct/crime evidence require the court to preclude their admission.

The defense objects to all the misconduct evidence as extremely inflammatory material that would cause severe prejudice. Moreover, the absence of overwhelming direct evidence of provable facts in this case make comparisons between the misconduct(New York Attempted Murder) and this crime(Stamford Murder) difficult-to-impossible and therefore unprovable. This insufficiency also makes it probable that the evidence would be used to fill in blanks in the state's case, which is nothing more than using it for the illegal purpose of showing a propensity to commit crime. The defendant also points out that the subsequent misconduct and the crimes were different in important aspects, such as how the victim was assaulted and where that happened.

## 8. Defendant's Motion in Limine Re Subsequent
## Misconduct Evidence, filed August 16, 2011

### Law on the Admissibility of Prior Misconduct

It should be noted that this case presents the novel issue of admissibility of
subsequent as well as claimed prior misconduct yet case law on prior misconduct is
useful.  The well-known general rule is that "evidence of prior misconduct is
inadmissible to prove that a defendant is guilty of the crime of which he is accused. ... [,]
[n]or can such evidence be used to suggest that the defendant has a bad character or a
propensity for criminal behavior." (Case citations and internal quotation marks omitted)
*State v. Merriam*, 264 Conn. 617, 660-61 (2003); see also EVIDENCE CODE § 4-5 (a). "'It is
objectionable, not because it has no appreciable probative value, but because it has too
much' ([WIGMORE ON EVIDENCE] § 194); meaning, of course, that its appeal is not confined
to the intellect or to the precise issue.'" *State v. Gilligan*, 95 Conn. at 530-31. The rule
guards against "its use merely to show an evil disposition of an accused, and especially
the predisposition to commit the crime with which he is now charged." *State v. Figueroa*,
235 Conn. 145, 161 (1995). Such evidence is admissible under restricted conditions where
the crimes are "'so connected with the principal crime by circumstance, motive, design, or
innate peculiarity that the commission of the collateral crime tends directly to prove the
commission of the principal crime.'" *State v. Kulmac*, 230 Conn. 43, 60-61 (1994). See also
EVIDENCE CODE § 4-5(b). Admissibility is determined under a two-pronged test: "First, the
evidence must be relevant and material to at least one of the circumstances encompassed
by the exceptions. Second, the probative value of [the prior misconduct] evidence must
outweigh [its] prejudicial effect." *State v. Merriam*, 264 Conn. 661; see EVIDENCE CODE §4-5
Commentary, & §§4-1, 4-3., State v Randolph, 284 Conn. 328, AT 340 (2007).

**a. The standard of appellate review should the trial court rule against the
defendant concerning possible abuse of discretion**. The trial court's decision is
reviewed under the abuse of discretion standard. The standard does not simply confer

3

"leeway in decision-making," but requires a decision "in conformity with the spirit of the law and in a manner to sub serve and not to impede or defeat the ends of substantial justice." (Int. quot. marks omitted) *State v. Feliciano*, 256 Conn. 429, 453-54 (2001) (re misconduct evidence). A decision contrary to the rule and its spirit is an abuse. On the prejudice prong, this Court has explained that "the underlying policy of protecting the accused against unfair prejudice.... ought not to evaporate through the interstices of the classification" (Int. quot. marks omitted.) *Id.* The issue is one of "balancing the actual relevancy of the other crimes" against "the degree to which the jury will probably be roused." *Id.* A case will be reversed where the abuse is "manifest or when an injustice appears." *State v. Meehan*, 260 Conn. 372, 393 (2002). The defendant must also show that the error was harmful in the context of the entire trial. *State v. Sawyer*, 279 Conn. 333, 357 (2006). Wherefore the defendant asserts that admission would prejudicial error.

### b. The "more liberal" standard of admissibility for sex offense cases does not apply.

The state asserts that courts apply a more liberal standard of admissibility to sex offense cases under the common scheme exception to the rule. There are two matters here. First, the more liberal standard applies to the common scheme exception only and to no other. It does not apply to the identity, intent, motive or any other exception. *see State v. Sawyer*, 279 Conn. 349-50 (does not apply to identity exception). Second, the more liberal standard had been applied only where the crime charged was a sex offense. *See e.g., Merriam*, at 669 ("in sex crime cases generally, and in child molestation cases in particular"); *State v. Kulmac*, 230 Conn. at 62. However, *State v Snelgrove*, 288 Conn. 742(2008) and *State v Johnson*, 289 Conn. 437(2008) appear to plow new ground in loosening this rule, but only in cases where sexual deviance and sexual compulsivity was

4

**8. Defendant's Motion in Limine Re Subsequent
Misconduct Evidence, filed August 16, 2011**

a motivating factor in the crimes. Johnson was a serial killer who raped his victims before killing them. Snelgove derived sexual arousement and gratification through making his victims helpless and degrading them. The other misconduct in <u>Snelgrove</u> also referred to his own statements in his other misconduct sentencing in New Jersey where he admitted unusual sexual compulsions and driven behavior to render women helpless by strangulating or hitting them and undressing and posing them in sexual positions. While <u>Snelgrove</u> and <u>Johnson</u> stand on the outermost perimeter of this rule that sexual conduct allows a more liberal standard of admissibility even where sex offenses are not charged, no such analogy or comparisons can be made with this case. The state in its memoranda almost admits as much ("this case does not squarely fall within the parameters of the more relaxed standard regarding aberrant sexual misconduct, the defendant's conduct borders on compulsive sexual misconduct").The state makes an attempt at trying to tie in alleged irrationality and perceived compulsivity as a substitute for evidence of sexual deviant conduct. (See state's memoranda dated January 15TH, 2011, page 10-11).

Neither the crime nor the misconduct in this case was a sex offense. The misconduct was against her lawfully wedded husband and was not a sexual assault or sexual in any way shape or form and no sexual assault or intercourse was claimed in any of the events.  While the state may claim its "belief" that it was "sexually motivated," its best facts cannot not prove sexual motivation much less sexual assault, intercourse or even an attempt.  Additionally, there are no fantasy's being enacted, paraphillias performed or any sexual acts contemplated, much less carried out in some plan or common scheme with either the victim in this case or the New York case. If having an illicit affair now qualifies for sexually deviant behavior, history is replete with everyday deviants of all stripes and political affiliations. This is a leap the State of Connecticut cannot make.  Moreover, the fact that the more liberal standard has never been applied

previously to state cases where sexual assault has not been charged means that the

EVIDENCE CODE § 4-5 and its Commentary precludes an extension of the rule from "sex

crime cases" to "sexually motivated crimes." *State v. Sawyer,* 279 Conn. 333 n.1; see *Id.* at

370-74 (Borden, J., dis. & conc.), but see <u>Snelgrove</u> and <u>Johnson</u> Id. <u>State v Randolph,</u>

supra, indicates that evidence of uncharged misconduct can be admissible in non-sex

cases to show a common scheme or plan" only if it supports a permissive inference that

both crimes were related to an overall goal in the defendant's mind" citing 1 E.

Imwrinkelried, 323, p. 125

### c. Several bases of admissibility: Error in one requires reversal of the case.

Because the possibility exists that the same misconduct evidence might be admitted

under several exceptions to the rule, the issue arises whether an error in the admissibility

of any one of the exceptions would require reversal of the case or whether reversal

requires that all or even most of the exceptions be erroneous. The defendant contends the

former is the correct rule. First, as is obvious, the use of evidence for the wrong purpose is

error. If, for example, the evidence was inadmissible to prove "identity" but admissible to

prove "knowledge," the error would not be cured by the fact that the same evidence was

admitted under both theories. A jury cannot be permitted to use evidence in an illegal

manner. *See* 2 WIGMORE ON EVIDENCE (Chadbourn rev. 1979) § 300, p.237; 1 E.

Imwinkelried, UNCHARGED MISCONDUCT EVIDENCE (Rev. Ed. 1999) § 3.01. The Supreme

Court and the Appellate court have noted the importance of admissibility for different

purposes under different exceptions. *See e.g., State v. Meehan,* 260 Conn. at 391-92 (trial

court rejected common scheme theory but accepted intent); *State v. Tate,* 85 Conn. App.

365, 382-383 (2004) (noting the trial court's care in excluding other purposes/exceptions).

Indeed, the misuse of the evidence on any one of the exceptions would skew the outcome

of the case not only by enticing the jury to infer the defendant's identity from evidence

6

### 8. Defendant's Motion in Limine Re Subsequent
### Misconduct Evidence, filed August 16, 2011

that was inadmissible for that reason, but also by encouraging them to find identity based a belief that the defendant had an "evil disposition" or a "criminal propensity." is reversible error. *See State v. Sawyer*, 279 Conn. 379 (Borden, dis.and conc.).

#### Law on the Identity exception
The first, or "relevancy," prong of the test for this exception requires that "the methods used be sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other." (Int. quot. marks omitted.) *State v. Figueroa*, 235 Conn. at 163; citing *State v. Sierra*, supra, 213 Conn. 422, 430 (1990). The standard is not that "the similarities between the incidents outweigh the dissimilarities and that there are no particularly distinctive dissimilarities." *State v. Murrell*, 7 Conn. App. 75, 81 (1986). The facts of both must be "'so nearly identical in method as to earmark them as the handiwork of the accused . . . much more is demanded than the mere repeated commission of crimes of the same class, The device used must be so unusual and distinctive as to be like a signature.'" (Emp. added; int. quot. marks omitted.) *Figueroa*, at 163, *quoting* McCormick on Evidence, (2d Ed. 1972) §190, p.449; *see also* 1 McCormick on Evidence (4th Ed. 1992), §190, p.801 (same). "'There should [be no] significant differences in the context and modus operandi of the crimes.'" *Merriam*, 264 Conn. 665.

7

Case 3:17-cv-00915-VLB Document 125-4 Filed 09/17 Page 300 of 422
8. Defendant's Motion in Limine Re Subsequent
Misconduct Evidence, filed August 16, 2011

### This evidence is not relevant to identity

The evidence will be insufficient under the exception. It will not show that the defendant acted in a signature-like, unique or even consistent manner that would allow the inference that this crime was her "handiwork." Any list compiled by the state in an attempt to show similarities will be short and insufficient. The state claims that both victims are members of a class of two: those intimate with the defendant or her lover. Conspicuously absent from the claim are any real similarities at all. The husband was at one time her lover but Anna Lisa Raymundo was not. Nelson Sessler was supposedly her new lover. Nelsen Sessler was neither a victim nor a target. Anna Lisa Raymundo worked at Purdue but Paul Christos did not. One incident took place in Stamford the other in an entirely different state (New York).The similarities are to be compared victim to victim and not ancillary to non victims...

While both victims were "known to the defendant," this point is true only in a superficial sense. She knew her husband intimately well but she knew Anna Lisa Raymundo barley at all. There is much dissimilarity, and few similarities. Moreover, this point, at its best, is anything but a distinguishing factor. That an assailant knew his victim before the attack is "far from unique or distinctive." *State v. Sawyer*, 279 Conn. at 347.

Moreover, there is nothing unusual or distinctive about stabbing a victim to cause or attempt to cause death, as shown unfortunately by many recent cases. See e.g., *State v. Brunetti*, 279 Conn. 39, 44 (2006); *State v. Cancel*, 275 Conn. 1, 6 (2005); *State v. Swinton*, 268 Conn. 786; *State v. Smith*, 262 Conn. 453, 456 (2003); *State v. King*, 249 Conn. 645, 654 (1999); *State v. Ali*, 92 Conn. App. 427, 431 (2005).

1. The probative value of the evidence will NOT outweigh the prejudice.

Given that this court finds any identity relevance, the defendant claims that its probative value will be low. As described above, the similarities and parallels were

## 8. Defendant's Motion in Limine Re Subsequent
## Misconduct Evidence, filed August 16, 2011

neither striking nor distinct, and it is difficult to discern a "signature" in any of this. Regardless of any case law relied on or curative instructions given, the defendant asserts that the highly inflammatory prejudice is in surmountable. That is, the prejudice is so great that probative value cannot overcome it under any fair and balanced weighing of the same.

### COMMON PLAN OR SCHEME

The differences between the common scheme and course of criminal activity labels are important to note. Indeed, this exception has been employed under several labels, or as the court in *State v. Murrell*, 7 Conn. App. 83-84, put it, "woven of several separate but related strands." As previously noted, a strand not at issue here is the one applied to sexual assault cases. The state claims it applies because it believes this was " sexually aberrant misconduct and a compulsive crime." However, neither the express words of the EVIDENCE CODE, or the common law that it encompasses supports such as interpretation. This strand has been applied only where the crime charged has been sexual assault or risk of injury with an underlying sexual crime, and the misconduct has been a sexual offense. See *Murrell*, 85; *e.g., Merriam*, 264 Conn. 656-65; *Kulmac*, 230 Conn. 59-63. But see *Johnson* and *Snelgrove* Id. which are clearly distinguishable from this case. Here, there was no sexual offense or sexual degradation. Obsessive sex, sexual intercourse or sexual contact and aberrant sexual behavior is not part of the equation.

If this Court rejects the defendant's legal claim, she asserts that the sexual-assault sexual deviance requirements are not met. As argued *supra*, the evidence showed the misconduct and crime was (1) Subsequent in time; (2) insufficiently similar; and (3) not committed on similar victims. *See Merriam,* 264 Conn. at 662. Moreover, it is specious to apply the more liberal standard here where the crime and misconduct did not involve any sexual assault or attempts or crimes on child victims. *Id.* at 669-70. Even in *Johnson*

9

the defendant raped the victims before he murdered them and <u>Snelgrove</u> admitted to

sexual deviant arousals and a long standing sexual deviancy from his New Jersey P.S.I.

Any evidence of sexual relations in the present case involves an affair between a witness

at best, and the defendant and not either victim in the New York case or the Stamford

homicide, and nothing unusual or untoward is claimed. It is simply a fact of human

behavior throughout history that individuals have affairs. The fact that some of us are in

stable faithful marriages or relationships where cheating does not take place is of no

moment when considering if the "affair" in this case is a result of sexually deviant or

"aberrant sexual misconduct, where the defendant's conduct borders on compulsive

sexual misconduct"

     **a. The non-sexual assault standard**. Of the remaining *Murrell* strands, the one

closest to the states concerns acts of misconduct and the crime as being part of the

defendant's singular plan. Here, the misconduct supposedly "culminated in the murder

of Anna Lisa Raymundo. While *Murrell* separates this into two strands—one where the

misconduct and crime is part of an "ongoing" plan, and the other where the misconduct

is not ongoing but is part of an overall predetermined plan," *id.*, 84-85—the key to both is

that there is a plan at the beginning of the misconduct that contemplates the specific goal.

<u>Ongoing plans</u>: *State v. Carrione*, 188 Conn. 681, 690-93 (1981) (larceny of investors

included the ongoing reinvestment of the interest earned); *State v. Nardini*, 187 Conn. 518-

19 (solicited others to burn the same building); <u>Non-ongoing plans</u>: *State v. Shindell*, 199

Conn. 128, 134n.5 (1985) (re: an arson of 2 buildings: misconduct must be "coupled with

other evidence to show that Def had a plan ... to destroy these buildings in order to collect

insurance proceed" (emp. added)). The crux of this case is that the defendant in 2002 did

not have, and could not have had, a plan to kill Anna Lisa Raymundo so that the

**8. Defendant's Motion in Limine Re Subsequent
Misconduct Evidence, filed August 16, 2011**

following year, almost five months later she could attempt to kill her husband in 2003. The plan or scheme put forward by the state is nothing more than a claim that because she committed misconduct by eavesdropping and following and eventually stabbed her husband she must have been responsible for the homicide of Raymundo four and a half months earlier, which is the illegality of convicting the defendant by showing a propensity to commit crime.

**b. This was not a "true plan"** The issue may arise as to whether or not there is a distinction in the common scheme exception between a "true plan" and a "spurious" one. See *State v. Merriam*, 264 Conn. 664 n.39. "'[I]n a true plan case, ... the prosecutor may prove any uncharged crime by the defendant which shows that the defendant in fact and in mind formed a plan including the charged and uncharged crimes as stages in the plan's execution. ... Both crimes must be inspired by the same impulse or purpose. Both crimes must be steps toward the accomplishment of the same final goal. .... [T]he prosecution must show that the plan included the specific crime the defendant is now charged with.'" *Id.*, 681-83 (Katz, J., dis.), *quoting* 1 Imwinkelried, § 3:22. In a "spurious plan," the court allows a "series of similar acts ... on the theory that a pattern or systematic course of conduct is sufficient to establish a plan." *Id.* It is really a "plan-to-commit-a-series-of-similar-crimes theory" that is not appropriate. The case law in non-sexual assault cases, supra, follows this distinction. It should be applied here. None of this is a "true plan" or a plan of any acceptable sort that included the specific goal of Ms. Raymundo's homicide.

11

MOTIVE AND INTENT

 **All motive evidence is irrelevant**. Moreover, the entire claim about motive is that this one motive was the basis for two unconnected crimes is too far afield, having to span nearly four and one half months. Acceptable motives covering several crimes in the case law have included similar crimes or similar crime victims. See e.g., _State v. Feliciano_, 256 Conn. at 453 (larceny one month prior to robbery; both motivated by Def's need to support a drug habit); _State v. James_, 211 Conn. 555, 577-78 (1989) (Def made a sexual advance to same child three months before crime; showed he was attracted to her). _See e.g., United States v. Thomas_, 74 F.3d 701, 713-714 (6th Cir., 1996) Last, the motive in this case is no less than the proscribed "suggest [ion of] the defendant's bad character or a propensity for criminal behavior." _State v. Merriam_, 264 Conn. 661. The state argues that the defendant's motive for killing Anna Lisa Raymundo was the elimination of obstacles to her affair with Nelson Sessler or as the state argues …to eliminate her rival for the affections of Nelson Sessler. The state's theory is speculative at best and it attempts to link the New York case and ignores the obvious alternative to attempting to murder her husband four months later such as separation and divorce. It goes without saying that any taboo associated with divorce has long since evaporated in this country. Additionally, the defendant has previously been divorced. The state cites _State v Stenner_, 281 Conn, 742(2007) for the proposition that the motive exception allows two uncharged robberies to be considered as motive for murder. That case is factually different in many important distinguishing aspects such as the two robberies involved robbery of bank trucks where the victim of the murder participated in both robberies with the defendant and subsequently was believed to be cooperating with investigators. If misconduct

**8. Defendant's Motion in Limine Re Subsequent**
**Misconduct Evidence, filed August 16, 2011**

evidence cannot suggest propensity to commit crime, the desire to commit crime cannot be a proper motive. The state cannot escape the rule by circular reasoning.

## INTENT

**Not Relevant**. Two main areas of the application of case law make intent relevant. First where a defendant has committed prior crimes against the same victim of the present crime, *State v. Jacobowitz*, 194 Conn. 408, 414-15 (1984); *State v. Erhardt*, 90 Conn. App. 853, 859-60 (2005); and second, where the victims of the misconduct and crime are different but the form of the intent is elaborate or unusual; *State v. Nunes*, 260 Conn. 649, 686-87 (2002) (police officer gave victims date-rape drug). Neither situation applies here, leaving this as a plain "transplanting" of the intent from the unrelated misconduct to the crime for no particular reason other than it happened before, which of course is the illegal usage of the evidence as proof of propensity to commit crimes. See *State v. Meehan*, 260 Conn. at 394.  In addition, intent is even more subject to a strict remoteness application than motive because it exists only at the time of the crime.

State v Randolph, 284 Conn .328(2007) seemingly attempts to clarify once and for all the many variations on admissibility of prior misconduct, although in Randolph, the Connecticut Supreme Court ultimately reversed the defendant's conviction ruling that the trial court improperly allowed evidence of prior misconduct. In sex crimes, evidence of uncharged sexual misconduct offered "to establish that the defendant had a common scheme or plan to engage in sex crimes, that evidence is evaluated pursuant to a liberal standard" State v Sawyer, 279 Conn 331,332 n. 1, (2006). In cases that do not involve sex crimes a more stringent standard is applied. Randolph Id.

13

<u>Randolph</u> identifies two categories of cases applying the common scheme or plan exceptions. First are the true common scheme or plan cases where "the nature of the uncharged crimes combined with other evidence give rise to a permissive inference that an overall plan existed in the defendant's mind and the crimes were executed in furtherance of that plan" <u>Randolph</u> Id.

A second categories of cases consist of "signature" crimes where separate and discrete criminal acts are involved yet evidence exhibits a "modis operandi, logo or signature, which considered with other factors such as proximity of time and place of commission", allow inferences that there was an overall plan or common scheme. <u>Randolph</u> Id. In signature cases, modis operandi suggests that since the defendant acted in similar and unusual or distinctive manner previously, it is more likely that he, rather than someone else did the act...and identifies the defendant. <u>Randolph</u> Id. It is "not enough to show mere similarity between the charged and uncharged crimes" 1 E. Winkelried, supra at 124. A series of similar acts do not establish the existence of a true plan Id ,pp. 124-125. Therefore under the signature test a true plan that existed in the defendant's mind based solely on similarities, the state has to prove the existence of the signature or logo or modis operandi and support the inference that both crimes are related to the overall plan in the defendant's mind. Id. p.125. No argument can be supported by evidence that the attempted murder of her husband in New York in 2003 and the homicide of Anna Lisa Raymundo in Connecticut in 2002 demonstrate a signature or logo or modis operandi. <u>Randolph</u> suggests that proximity of time and place are the most decisive factors to be considered. The time, place, and method employed rule out any signature in the present case. Therefore the State's only hope of offering this misconduct evidence lies in the first category of cases noted by I .E. Winkelried and cited in <u>Randolph</u>. In this first category of cases to establish that a

14

### 8. Defendant's Motion in Limine Re Subsequent
### Misconduct Evidence, filed August 16, 2011

common scheme or plan existed, the 'admissibility does not depend on the degree of similarity shared by the charged and uncharged crimes, but, rather, on the extent to which it is probative of the existence of an overall plan in the defendant's mind " <u>Randolph</u> Id. As stated previously, the State lacks any real proof of a true plan that existed in the defendant's mind prior to the homicide in Stamford in early November of 2002 that also contemplated and planned the Attempted Murder of her husband in late March of 2003. The state can resort to speculation and conjecture as to why the defendant supposedly acted as she did but in the final analysis, it is mere possibilities and nothing more.

**FINALLY,**

The second prong on the admissibility of misconduct evidence, that the probative value of the misconduct evidence outweigh its prejudicial effect, cannot be overcome. The defense submits that the misconduct evidence at issue is so inflammatory and so highly prejudicial that it simply cannot be outweighed by probative value.

**WHEREFORE,** the defendant respectfully request that this Honorable Court to preclude the state from offering the above mentioned misconduct evidence of the attempted murder of her husband and grant this motion in Limine.

THE DEFENDANT

BY: _B A Butler_
BARRY BUTLER
PUBLIC DEFENDER

15

## O R D E R

After having heard upon the foregoing, it is hereby ordered:
GRANTED/DENIED.

BY THE COURT

_____

JUDGE  /  CLERK

This is to certify that a copy of the
Foregoing has been given to the
State's Attorney for the Judicial
District of Stamford-Norwalk on this date

*[signature]*

BARRY BUTLER
PUBLIC DEFENDER

16

9

Excerpt of August 18, 2011 pp. 1-63

(argument on state's motion to admit evidence

of defendant's misconduct)

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

1

```
1    [begins at: 3:07:48]

2         THE COURT:  Good afternoon, all.  You may be

3    seated.  All right, this is the matter of State of

4    Connecticut versus Sheila Davalloo.  Mr. Bernardi

5    represents the State of Connecticut; Mr. Butler

6    represents the defendant.

7         The matter before the court, as the court

8    understands, is a request by the State to use other

9    misconduct evidence in its case and the defendant's

10   motion in limine re: subsequent misconduct evidence.

11        Is that a fair statement of where we are today

12   and what we are considering today, gentlemen?

13        ATTY. BUTLER:  Yes, Your Honor.  Good afternoon.

14        ATTY. BERNARDI:  Yes, sir.

15        THE COURT:  Good afternoon, all.  All right,

16   since it's your request to use other conduct evidence

17   or other misconduct evidence, as you characterize it,

18   I suspect you should go first.

19        The record should reflect that the court has

20   reviewed the brief filed by the State and the brief

21   filed by the defendant in this matter.  The court is

22   familiar with the factual background statement in the

23   State's brief, (indiscernible) to the court, to some

24   degree, has heard part of that factual background as

25   part of a previous motion regarding marital privilege

26   in this case.

27        How would you like to proceed relative to the
```

9. Excerpt of August 18, 2011 pp. 1-63
Case 3:17-cv-01257-VAB Document 25-4 Filed 11/08/17 Page 312 of 422
(argument on state's motion to admit evidence of defendant's misconduct)

2

1     factual background here?  Because I don't expect this

2     -- I don't expect you're going to request any

3     evidence heard on this arguments, Mr. Butler, do you?

4          ATTY. BUTLER:  No.

5          ATTY. BERNARDI:  No, it --

6          THE COURT:  Go ahead.  One or the other of you

7     talk because --

8          ATTY. BERNARDI:  May I first?

9          ATTY. BUTLER:  Please.

10          ATTY. BERNARDI:  The record should reflect that

11     I've given voluminous discovery to the defense; as a

12     matter of fact, thousands and thousands of pages of

13     police reports as well as other documents.

14          I think that -- I don't think counsel would

15     disagree, having had the opportunity to review all of

16     those report, as I know he has since I've spoken to

17     him and he's shown a substantial knowledge of all the

18     facts as the State believes -- anticipates will be

19     shown at the trial.

20          I don't believe that he's going to disagree with

21     the State that the facts, as I outlined them in a

22     pretty long brief, are basically an accurate

23     reflection of what one may anticipate will come up at

24     the trial in light of the police reports.  So I don't

25     think that there's a disagreement on that.

26          So this is really a motion proceeding on a

27     written proffer as made by the State as to what it

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

3

```
 1      expects its evidence to be.  And that proffer is

 2      outlined in the State's brief, supplemented by

 3      whatever the State says on the record.

 4           ATTY. BUTLER:  I find myself agreeing with the

 5      State, which I sometimes want to do.  But again,

 6      we're not asking for witnesses to testify at this

 7      hearing.  For purposes of the hearing, I think the

 8      State is correct when it says it's given to me

 9      thousands of pages -- facts that they culled from the

10      reports and these statements within the disclosure

11      that both of us have are utilized by the State and

12      somewhat by the defense in our briefs.

13           So for purposes of this hearing, we're

14      comfortable with utilizing the facts that each one of

15      us has used in the briefs.

16           Does that answer the court's question?

17           THE COURT:  I think it does.  I mean what you're

18      saying to me is I can rely upon -- for purposes of

19      making my ruling here, I can rely upon the facts as

20      outlined in the State's brief.

21           ATTY. BUTLER:  That's correct.  Again, as I did

22      in our argument last month on the marital privilege,

23      I'm going to reserve my right to object to certain

24      things as they come in; make other motions as they

25      come up during the trial.

26           THE COURT:  Yes sir, I expect that to be the

27      case.  Is the state prepared to make argument?
```

Case 3:17-cv-91... Excerpt of August 15 2011 Filed 11/03/17  Page 314 of 422
(argument on state's motion to admit evidenceof defendant's misconduct)

4

1    ATTY. BERNARDI:  Yes, Your Honor.

2    THE COURT:  All right.  Go ahead.  Let me hear

3    what you got to say.

4    **Argument by Attorney Bernardi**

5    ATTY. BERNARDI:  Your Honor, both the State --

6    as Your Honor has already noted -- and the defense of

7    filed briefs in this matter, which I think are

8    probably, if you count all the pages, amount to about

9    60 pages total.  And I know Your Honor has had an

10   opportunity to review those briefs.  So I'm going to

11   try to be brief, briefer than in a brief today.  And

12   I think the best place to start out is with the

13   basics because sometimes in these briefs, where

14   everybody gets detailed about certain predicates, you

15   lose sight of the forest for the trees.

16   And the forest is basically section 4.5 of the

17   Code of Evidence, which states simply and succinctly

18   that "evidence of other crimes, wrongs, or acts of a

19   person is inadmissible to prove the bad character or

20   criminal tendencies of that person."  And that's a

21   basic restatement of common law in the case law which

22   basically says that the State can't bring in bad

23   character evidence to show how the person acted in

24   accordance with that bad character.

25   Clearly, a reading of the briefs and the facts

26   in this case would show that the purpose of the State

27   in this case in bringing in these other acts is not

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidence of defendant's misconduct)**

5

```
 1        to show a violent character or propensity to violence

 2        or some type of assaultive nature of the accused, and

 3        thereby place her in a category of a wider class of

 4        suspects who somehow or another may have committed

 5        this crime.  The State's purpose is clearly to show,

 6        at bottom primarily, her motive, and through that

 7        motive, her identity.

 8            And the defendant's motive in these crimes is to

 9        eliminate any obstacles which stand in her path to

10        rekindling an affair that she had with Nelson

11        Sessler, as was described in the brief.  And in so

12        doing, to use all means necessary, including

13        committing a violent act against her husband -- the

14        stabbing on March 23 of 2003 -- and the murder of

15        Anna Lisa Raymundo on November 8 of 2002.

16            As such, this evidence is not offered to show a

17        violent pre-disposition but rather, is offered to

18        show a specific antipathy towards a limited class of

19        two individuals: her husband and Anna Lisa Raymundo -

20        - an antipathy which drove her to commit two discrete

21        violent acts designed to achieve the same purpose in

22        her mind.

23            The evidence, in all probability, would show

24        that these events were out of character because the

25        evidence would not otherwise show any acts from which

26        one could infer --

27            THE COURT:  Keep your voice up.
```

Case 3:17-cv-01252... Excerpt of August 25 2011... Filed 11/08/17   Page 316 of 422
(argument on state's motion to admit evidenceof defendant's misconduct)

6

1          ATTY. BERNARDI:   -- because the evidence would

2      not otherwise show a violent character or a

3      propensity to commit to -- engage in violent acts.

4      In fact, the State's case is strengthened by the

5      absence of such general propensity evidence because

6      that lack of other -- that lack of a general

7      propensity to violent acts shows the depth of her

8      motivation in this particular case against these

9      particular individuals.

10         So the State's motive is not to show bad

11     character, which is what this prohibition, at bottom,

12     the policy, is all about.  And it's not, furthermore,

13     in the State's interest to argue such a thing, to

14     argue a generally violent character is responsible

15     for these acts.  Why does the class of individuals

16     who could have committed the crime -- and many such

17     individuals do exist in society.  And surely the

18     defense will make such an argument.  It is not in the

19     State's interest to make those arguments or to make

20     such an argument on behalf of the defense.

21     Therefore, the State lacks both -- well, the State

22     has both an altruistic law-abiding interest, as it

23     were, to honor the law in this case and a selfish

24     reason: to avoid the evidence -- to keep the evidence

25     from degenerating into a general discussion of

26     violent propensity in front of the jury.

27         Having said that, looking at that forest for the

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidenceof defendant's misconduct)**

7

```
 1        trees that are involved in the case, let's look at

 2        some of the facts of the case.

 3            Basically, what the State's evidence would show

 4        is that sometime, at the end of 2000, Nelson Sessler

 5        met two women.  Those women were Sheila Davalloo and

 6        Anna Lisa Raymundo.  And he met them at work at

 7        Purdue Pharma.  He would subsequently become intimate

 8        with both.  The intimacy with Raymundo blossomed into

 9        something more serious, and they commenced living

10        together sometime during the course of the year 2002.

11        The time of the murder of Anna Lisa Raymundo is

12        November 8th of 2002.

13            Now while this intimacy between him and Anna

14        Lisa was blossoming, the intimacy with Davalloo was

15        withering on the vine.  Davalloo's disappointment

16        swelled to the point of an obsession to get back

17        Nelson Sessler.

18            And in trying to get him back, there were two

19        obstacles that stood in her path: one was,

20        unbeknownst to Sessler, she was a married woman and

21        limited in what she could do to retrieve Mr.

22        Sessler's affections -- limited in time, limited in

23        the amount of time she could invest in getting him

24        back.  And of course, that gave rise to an obstacle;

25        that was her husband.  Also, during this course of

26        time, Mr. Sessler had moved in with Anna Lisa

27        Raymundo, which is a serious step in a way to a more
```

Case 3:17-cv-01257-VAB Document 85-21 Filed 11/08/17 Page 318 of 422
9.  Excerpt of August 18, 2011 pp. 1168
(argument on state's motion to admit evidence of defendant's misconduct)

8

1       permanent and exclusive intimate relationship.  Her

2       obsession ultimately drove her to violence.  And this

3       violence, which may be out of character, was directed

4       solely to her husband and Anna Lisa Raymundo.

5            Now the extraordinary lengths to which the

6       defendant went are described on the prosecution's

7       brief but briefly, the included, in the months before

8       November 8th, she described to her husband a fictive

9       love triangle which actually involved herself and

10      Nelson Sessler and a woman named Anna Lisa.  In this

11      guise, she would ask her husband and others for

12      advice; asked him what she should do.  She would

13      describe even sexual acts that the fictive person had

14      engaged in with Nelson Sessler and what actions she

15      was taking in order to determine how close Sessler

16      was becoming to Davalloo.  And these actions included

17      stalking with night vision goggles, employing

18      eavesdropping devices, access to the voicemail code

19      of Sessler so she could check on messages, obtaining

20      a lockset which she used because she told her husband

21      that she intended, at some point, to get access to

22      the condominium, hide, and see just how closely they

23      were interacting with one another.  She even talked

24      of confronting Anna Lisa Raymundo concerning the fact

25      that they were both apparently intimate with the same

26      man.

27           Now sometime after November 8th of 2002, she

A324

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)

9

1    ceased to talk about this with her husband.  And her

2    husband indicates that she talked about this just

3    about every day, and she talked about it not only

4    with him but with a Tammy and Emelio Maie [sounds

5    like], his best friend, and his parents.  She would

6    talk about this fictive affair between 'Melissa,'

7    which was in fact Ms. Davalloo -- as she admitted at

8    her trial in New York.  Another name -- I can't

9    recall it as sit her right now.  But another name

10    which she used for the Nelson Sessler --

11        THE COURT:  Was it 'Jack?'

12        ATTY. BERNARDI:  Jack.  Thank you, Your Honor.

13        THE COURT:  Okay.

14        ATTY. BERNARDI:  Your Honor's more familiar with

15    the facts of the case, at this point, than I am.

16        A 'Jack,' who, in fact, was Nelson Sessler, and

17    an Anna Lisa.  Sometime, she would talk about this

18    incessantly, as it were, and obsessively with her

19    husband.  In November, of course, she stopped talking

20    about it suddenly, and her husband, having heard that

21    a woman named Anna Lisa had been killed, murdered at

22    Purdue Pharma, asked about Anna Lisa.  And of course,

23    that obviously gave her some cause as to whether or

24    not her husband would ever figure out that Nelson

25    Sessler was a man who was living with the woman who

26    was murdered, if, in fact, down the road, she managed

27    to rekindle the affair with Nelson Sessler.

Case 3:17-cv-01257-VAB Document 25-4 Filed 11/08/17 Page 320 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

10

```
 1            But at any rate, after the death of Anna Lisa
 2       Raymundo, she did, in fact, did rekindle the affair
 3       with Mr. Sessler -- duped him back into her arms, as
 4       it were, and she -- using the rouse of having her
 5       husband tell -- using the rouse of telling her
 6       husband that her mentally-ill brother would visit for
 7       the weekend, she would ask her husband to leave for
 8       the weekend, when it in fact, her mentally-ill
 9       brother would not arrive but rather, what was
10       intended was a tryst with Nelson Sessler.  Nelson
11       Sessler did not know that she was married.
12            In recent discussion with Mr. Christos, this is
13       not -- this is something I just found out -- he
14       indicated that in the week before he was stabbed, he
15       had had a discussion with the defendant, Ms.
16       Davalloo, and told her he no longer intended to move
17       out on the weekends and found himself stabbed about a
18       week after he indicated that to her.  He was, of
19       course, stabbed on March 23rd of 2003, about four-
20       and-a-half months after the November 8th stabbing
21       death of Anna Lisa Raymundo.
22            The evidence code lists and specifically states
23       -- it's not an exhaustive list -- but they list the
24       type of categories of evidence which a State may
25       introduce and do not violate the ban on propensity
26       evidence, one of which his motive.
27            The admissi -- I bring this up because -- I
```

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidence of defendant's misconduct)**

```
 1         should say this first of all.  The defendant's --
 2         I've outlined in the brief many, many different
 3         factors which are relevant to the case and I think I
 4         indicate that things like the stalking and the night-
 5         vision goggles and things of that -- actually, are
 6         part of this case; they're not actually other acts
 7         evidence.  The other act, I believe, that the defense
 8         is objecting to is the stabbing event of --
 9             THE COURT:  Mr. Christos.
10             ATTY. BERNARDI:  -- May 23rd of 2003.
11             THE COURT:  Right.
12             ATTY. BERNARDI:  The code of evidence indicates
13         that motive is one of the enumerated types of
14         evidence that the State can introduce without
15         violating the propensity ban.  And most of the law
16         has been harmonized and explained in the decision of
17         State v. Randolf, which is from 2007.  In cases prior
18         to Randolf -- well, let me put it this way.  Randolf,
19         while not explicitly overruling many of those cases,
20         explains exactly how those cases work and how they
21         should be applied.
22             THE COURT:  He explains the principles to be
23         applied --
24             ATTY. BERNARDI:  And clarify it.
25             THE COURT:  -- and clarification of that sub B,
26         is what it does.
27             ATTY. BERNARDI:  And one of the important things
```

A327

1    that Randolf does is say expressly that motive,

2    evidence that can't be used to establish identify, an

3    issue which was apparently in some dispute prior to

4    Randolf. And of course, the issue in this case is

5    who did it? Who did the murder of Anna Lisa

6    Raymundo?

7        And with that in mind, according to -- in *State*

8    *v. Randolf*, without regurgitating everything that was

9    said there, it relies, to a large degree on the

10   treatise written by a gentleman named Imwinkelried

11   who got cited extensively. And he basically says in

12   his treatise that there's two types of motive

13   evidence when you're talking about other acts

14   evidence.

15       The first category is when one act causes

16   another act; either the misconduct causes the act on

17   trial or the act on trial caused the misconduct act.

18    And so there's causation between the two.

19       The second category is where both acts, while

20   neither one is the cause of the other, is eviden --

21   they evidence the same motive. And in this case,

22   category two has clearly been met.

23       THE COURT: So it's cause and effect in one case

24   and evidence of the same motive?

25       ATTY. BERNARDI: And evidence of the same motive

26   in the second case.

27       THE COURT: Got it.

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidenceof defendant's misconduct)**

13

1          ATTY. BERNARDI:  With regard to the second case,

2     clearly that's been met.  Both of these discreet acts

3     of violence evidence the same motive -- an obsessive

4     desire to eliminate the obstacles to rekindling an

5     affair with Nelson Sessler, a motive which led her to

6     both stab Anna Lisa Raymundo, the direct rival for

7     her affections, and to eliminate -- attempt to

8     eliminate; she's not successful in her attempt -- her

9     husband who, of course, is providing the other human

10    obstacle to the affair once it's been rekindled.

11         With regard to number one, it can be argued that

12    indeed, the first act causes the second act in the

13    sense that she cannot merely divorce Mr. Christos,

14    having described this love triangle to him, indicated

15    that the woman, Anna Lisa, has worked at Purdue.  And

16    with him having questioned her about whatever

17    happened to Anna Lisa, her response being Melissa and

18    Jack have gotten back together and they're happy now.

19    That was her response to that, and Anna Lisa is just

20    fine.  If, indeed, she's successful in rekindling the

21    relationship with Nelson Sessler -- as indeed it

22    appeared that she was well on her way to doing that

23    at the time she stabbed her husband -- she's told him

24    too much.  An abandoned Christos, if she leaves him

25    for Mr. Sessler, at some point, would naturally

26    inquire as to who is the man that my wife has left me

27    for?  And when he does so, because he travels in the

A329

1    same circles -- they're both involved in the

2    pharmaceutical industry -- he will surely be able to

3    put two and two together.  And when he hears that her

4    new partner is the former boyfriend of a woman that

5    he was living with at the time she was murdered, and

6    that woman's name was Anna Lisa Raymundo, a jilted

7    husband is sure to go to the authorities and let them

8    know of his suspicions.  Once he inquires about Anna

9    Lisa and her health and once that affair is

10   rekindled, his days are numbered.  So in that sense,

11   number one has also been met as well as number two.

12       Now with regard to common scheme, common scheme

13   is another exception that's listed in this non-

14   exhaustive list in the evidence code and there they

15   say that the other act, taken in combination -- what

16   they say there is "the other acts evidence is

17   admissible when both acts" -- that being the

18   misconduct and the act on trial -- "are relevant to a

19   common scheme, a larger plan of which the crime on

20   trial is a part.  Such evidence bears on motive and

21   hence, on identity.  Prove that the defendant

22   entertained a plan is logically relevant to show both

23   are affects of the same plan."  And basically what

24   they say about common scheme is it's relevant to

25   motive, therefore intent.  And as you can see from

26   that quote that I just cited, proof that the

27   defendant entertained a plan logically relevant to

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)

15

```
 1        show both are affects -- both acts are affects of the
 2        same plan -- sounds a lot like what I just said about
 3        motive Imwinkelried with that point number two, which
 4        is you end up going from common scheme to motive to
 5        that second prong on the motive, which is both are
 6        affects of the same plan, and then you go to
 7        identity.
 8             THE COURT:  So let me see if I can say it simply
 9        here?  The plan bears on motive that bears on intent
10        that bears on identity.
11             ATTY. BERNARDI:  Correct.
12             THE COURT:  Is that a fair simple flow?
13             ATTY. BERNARDI:  That is exactly what I was
14        attempting to say.
15             THE COURT:  Okay, keep going.
16             ATTY. BERNARDI:  So basic -- but the law
17        requires that the two acts must be part of an
18        overarching plan revealing a genuine connection
19        between the acts in the defendant's mind.  And
20        clearly, that is here on the evidence as I've
21        described it to the court.
22             I think counsel argues, in his brief, that for
23        there to be a true plan that somehow or other, prior
24        to the murder of Anna Lisa Raymundo, it must be in
25        cement that Mr. Christos must also go.  And that is
26        too narrow a reading of the common scheme and plan
27        exception, because all plans are, by their nature,
```

(argument on state's motion to admit evidenceof defendant's misconduct)

16

1    contingent.  And some of them never survive the first

2    phase of a plan.

3         I think it's fair to say that when it's boiled

4    down to, her plan is really to do everything that's

5    necessary, including eliminating these people, if

6    that is what's required to implement her plan.

7         So for instance, Mr. Christos may never have

8    been attempt -- she may have never attempted to

9    murder Mr. Christos if she had not first rekindled

10   the relationship with Sessler, which in fact

11   happened.  Or if he had been run over by a bus or if

12   any of life's events could have come about which made

13   his murder unnecessary.

14        THE COURT:  He being Mr. Sessler?

15        ATTY. BERNARDI:  Excuse me?

16        THE COURT:  He being Mr. Sessler?

17        ATTY. BERNARDI:  No, he being Mr. Christos.

18        THE COURT:  Okay.

19        ATTY. BERNARDI:  In other words, if Mr. Christos

20   had been run over by a bus, obviously, the plan would

21   change --

22        THE COURT:  As a matter of fact, if either one

23   of them had been run over by a bus.

24        ATTY. BERNARDI:  Well, that's true.

25        THE COURT:  Okay.

26        ATTY. BERNARDI:  I guess what I'm saying is

27   that, of course, the law is not nonsensical.  It

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidenceof defendant's misconduct)**

17

```
 1          takes into account the fact that in life, every --
 2          every plan is contingent.  What the motive here is,
 3          that the purpose here is, is to do all that is
 4          necessary to make this come about, including getting
 5          rid of the two human obstacles --
 6               THE COURT:  One is to remove a rival and the
 7          other is to remove an impediment.
 8               ATTY. BERNARDI:  Exactly.
 9               THE COURT:  Correct?
10               ATTY. BERNARDI:  And that is their connection.
11          And as long as we're on that subject, that's what
12          makes this admissible because the prohibition is on
13          propensity evidence.  And the State is not arguing a
14          general assault of nature generated to whomever comes
15          into contact with her.  What the State is saying is
16          that there is a discreet class of individuals here --
17          two.  And those are the two people who were
18          assaulted.  And the State has no interest in showing
19          propensity to violence in some general nature or a
20          bad character.  As a matter of fact --
21               THE COURT:  Well you say it's altruistic.  It
22          would be self-defeating for you to try to show that.
23               ATTY. BERNARDI:  Exactly.
24               THE COURT:  I got it.
25               ATTY. BERNARDI:  And not only that, it'll
26          probably be argued by the defense that somebody else
27          with an assault of nature did this.
```

1          THE COURT:  I gotcha.

2          ATTY. BERNARDI:  So in that sense, the State

3     indicate -- that State would respectfully submit to

4     the court that this is a true plan.

5          The evidence also goes to show lack of accident,

6     mistake, or self-defense.  This is a circumstantial

7     evidence case.  There is no witness to this event.

8     And while a court may think that -- a reviewing court

9     or even a trial court might think that this is just a

10    throwaway argument, the fact of the matter is -- and

11    I don't know if I mentioned it in the brief but I'm

12    sure counsel for the defense is aware of it -- that

13    Nelson Sessler was taped -- was wired, at some point,

14    and did engage in some discussions with Ms. Davalloo,

15    post-March 23 of 2003.  And in there, she speculates

16    as to how that murder might have occurred and

17    indicates that perhaps, someone went in there;

18    perhaps there was a confrontation; and perhaps

19    somebody acted in self-defense and that's how she got

20    hurt.  In fact, outlining an argument which would be

21    not too unsimilar to the one that was made in a

22    recent case in Florida where they say since you don't

23    know exactly how it happened, you don't know what the

24    intent was of the person involved; you don't know

25    whether or not they acted in self-defense; or whether

26    or not there was an accident.

27         This evidence is relevant to show that indeed,

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

19

1     there was intent to kill.  As a matter of fact, there

2     are nine stab wounds in this particular event -- one

3     to the chest which was 10-12 centimeters deep.  But

4     it does go to show that there was no self-defense

5     here; there was a lack of accident or mistake; and

6     that there was intent to kill.

7          This evidence also corroborates the evidence

8     which the State has at the scene.  And I'm also going

9     to argue, at this point, the signature evidence.

10         I know from conversations that we've had with

11    counsel that Your Honor is not particularly impressed

12    with the signature argument that the State has made

13    in its brief.  But I would point out that both events

14    involve a stabbing; both involve multiple stabbing

15    wounds; both involve, apparently -- certainly in the

16    New York case -- a rouse in order to gain access to a

17    disarmed and -- a disarmed victim and to gain an edge

18    by surprise.  There's no evidence of forced entry or

19    anything of that nature in the Raymundo incident, and

20    the defendant gained an edge by surprise by probably

21    showing up at the door and gaining entrance but not

22    indicating what her true intent was as she crossed

23    the threshold.

24         Both events happened in the home of the victim,

25    another factor which gives rise to a sense of false

26    security when speaking to another person.  There's

27    that obvious connection between the people, and then

1      there is the phone calls.

2          There is a call from the landline in the

3      Raymundo residence to the desk of Nelson Sessler at

4      11:57 in the a.m.  Now the event was reported between

5      twelve-fourteen and twelve-eighteen in the afternoon,

6      approximately 15 to 20 minutes later.

7          The event -- photographs from the scene would

8      show that there was some cleanup involved by the

9      perpetrator, and that took some time.  That person,

10     from the evidence at the scene, in all probability,

11     they cleaned up at the sink where the DNA was left on

12     the sink handle.  That took some time.  It takes some

13     time to get to the Duchess from where that call was

14     made.  So it is probable -- as a matter of fact, it's

15     almost -- the conclusion's almost inescapable that a

16     call -- that that call at eleven-fifty-seven was made

17     during a confrontation or in the aftermath of the

18     confrontation between Davalloo and Sessler --

19     Davalloo and Raymundo.  And there's no other reason.

20      There's only two people who have a motive to make

21     that call.  And that would be Sheila Davalloo; she

22     knows his phone number at his desk, and that would be

23     Raymundo.  If it was a robbery or anything like that,

24     there is no motive to call Nelson Sessler.  The

25     motive is to call 9-1-1 and no such call was made.

26         What's important about that is that during the

27     stabbing event of Paul Christos, a call was also made

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidenceof defendant's misconduct)**

21

```
 1        to -- in the immediate aftermath of that stabbing, a
 2        call was made to Nelson Sessler, inviting him over
 3        for dinner.  And the State would respectfully submit
 4        to the court, and hopes to submit to the jury, the
 5        argument that this is the inescapable signature of
 6        Sheila Davalloo -- phone calls made during the
 7        stabbing.
 8            THE COURT:  I'm not so sure -- I'm not assured,
 9        as certain as you are, that that's indicative of
10        signature.
11            ATTY. BERNARDI:  Well it may well be --
12            THE COURT:  You certainly might argue that,
13        based upon the evidence produced at the time of
14        trial, if, in fact, it's produced in the fashion
15        that's set forth in your brief.  But I think it's
16        more of a great leap than you make it sound in your
17        argument.  I mean you and I, at this point -- I give
18        a little less weight to that argument than you do.
19        Let me put it to you that way.  All right?  I'm not
20        precluded from considering it but I give it a little
21        less weight.  And certainly, it certainly might be
22        the subject of argument at a later date before the
23        trier of fact.  Go ahead.  I didn't mean to interrupt
24        you.
25            ATTY. BERNARDI:  Thank you, Your Honor.  I'm
26        going to also make a little bit of reference to the
27        sex cases where sexual assaults are involved and
```

A337

Case 3:17-cv-01085 Excerpt of August 18, 2011 Filed 11-08/17  Page 332 of 422
(argument on state's motion to admit evidence of defendant's misconduct)

22

```
 1          those -- while I don't claim that this is admissible
 2          under the more liberal standards of the sex cases,
 3          the -- this case comes about as close to those cases
 4          as a case can come without being -- falling squarely
 5          within the parameters of those cases.  Because what
 6          you have is obsession driven by the irrationality of
 7          sexual intimacy, which has driven somebody to do
 8          something which appears to be to the eye of the
 9          beholder two totally irrational acts.  And in that
10          sense, it needs some explanation.  And so while I'm
11          not going to argue to the court that this squarely
12          falls within the more liberal standard that is
13          utilized in sex cases -- and I wouldn't ask for that
14          anyway because they allow to use propensity evidence,
15          which the  State does not want to use anyway.  But
16          the fact of the matter is, is that the irrationality
17          involved in these acts by a woman who was obsessed
18          and perhaps from evidence from evidence which may not
19          be admissible from the New York trial in the
20          Connecticut case, but any familiarity with the New
21          York trial would indicate that that obsession acted
22          on a personality that was less than psychologically
23          robust, thereby increasing a further irrationality of
24          the acts that --
25              That should be considered in the mix.  If not,
26          on whether or not this fits into one of the
27          pigeonholes of -- one of the pigeonholes of whether
```

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)

23

```
1          or not this is within an exception, but with regard
2          to whether or not there's prejudice in this.   This
3          type of evidence in this type of case is a necessity
4          for the State.   You have no witnesses to the event
5          and the acts are irrational in the sense that --
6               THE COURT:   Obsessively, compulsively-driven.
7               ATTY. BERNARDI:  They are.   And they come close
8          to aberrant.   I mean, they are definitely -- they're
9          definitely sexually motivated and compulsive.   And
10         while the cases involving the more liberal standard -
11         -
12              THE COURT:   They're a little different; Sawyer
13         and Dejesus, those kind of cases --
14              ATTY. BERNARDI:   That is correct.
15              THE COURT:   -- just a little different.   I got
16         that.
17              ATTY. BERNARDI:   -- may require some type of
18         aberrance, maybe involving dominance or something
19         like that.   But this verges -- this comes very close
20         to that in the irrationality that -- I guess I wanted
21         to say sexual intimacy is a powerful elixir when
22         combined with a less than psychologically robust
23         personality.   Some type of explanation is required
24         and that should bear on the issue.   If not on whether
25         or not this fits into a pigeonhole, it should fit in
26         on the issue of prejudice.
27              Now I would indicate to that court that these --
```

**(argument on state's motion to admit evidence of defendant's misconduct)**

24

```
 1        the introduction of this type of evidence is not
 2        prejudicial.  I think Your Honor's heard this quote
 3        many times before, and I think it's at the end of my
 4        brief, if I could just find that.  Can I have a
 5        moment here?
 6             THE COURT:  You might argue that all evidence
 7        introduced at time of trial by the State against the
 8        defendant is prejudicial.  You might argue that.  And
 9        that certainly is just common sense from the
10        perspective of the defense.
11             ATTY. BERNARDI:  Right.  I found it, Your Honor.
12        May I quote it just to --
13             THE COURT:  The issue of whether the probative
14        value outweighs the prejudicial effect.
15             ATTY. BERNARDI:  Right.  What it says here is
16        "All evidence adverse to a party is inherently
17        prejudicial because it is damaging that party's
18        case."
19             THE COURT:  Right.
20             ATTY. BERNARDI:  "For exclusion, however, the
21        prejudice must be unfair in the sense that it unduly
22        arouses the jury's emotions of prejudice, sympathy,
23        and hostility."  In other words, it tends to have
24        some adverse affect upon the party against whom the
25        evidence is offered beyond tending to prove the fact
26        or issue that justified its admission into evidence.
27             THE COURT:  That, by the way, is why the code,
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 335 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)
25

```
 1        to some degree, has subsection A in it, because the
 2        framers of the code of common law doesn't want to
 3        create a simple bad man of it, bad-person image at
 4        the time of trial -- bad-man or bad-woman image at
 5        the time of trial.  They don't want you introducing
 6        evidence just to create that in the mindset of the
 7        ultimate trier.  That is exactly right.
 8            ATTY. BERNARDI:  And that is not the State's
 9        purpose in this case --
10            THE COURT:  I understand.
11            ATTY. BERNARDI:  -- it's self-defeating.
12            THE COURT:  I understand.  It is self-defeating
13        in this particular case.
14            ATTY. BERNARDI:  Having said that, I think that
15        I just -- I would just indicate there were a couple
16        of things in the defense brief that I wanted to
17        comment on.
18            One was I think that the harmless error rule may
19        have been misstated a bit and I refer the court to
20        State v. Merriam which indicates, first of all,
21        there's a harmless error -- the defense goes through
22        the standard of review on appeal for these decisions.
23            THE COURT:  Well I asked the question at one
24        point in time, what if you admit for several
25        different reasons and one of those reasons is an
26        inappropriate reason but the others are perfectly
27        fine?  Look at subsection D.  That's what Merriam
```

1    covers.  It's an interesting decision but it's a

2    common sense decision.  It makes sense to me.

3    Because you can permit evidence of this nature under

4    two or three different exceptions, I suppose, and be

5    wrong as to one.  But if the others are fine, to

6    ultimately say that there's an abuse of discretion

7    and that it shouldn't be allowed would be a violation

8    of just common sense.  I guess?  That's where Merriam

9    is going, isn't it?

10        ATTY. BERNARDI:  And this is -- that's where I

11   was going with that quote, and also to indicate that

12   this is not a constitutional issue; it's an

13   evidentiary one.

14        THE COURT:  It is an evidentiary issue.  I

15   agree.

16        ATTY. BERNARDI:  The other thing is that

17   counsel, I think at some point in his brief,

18   indicates that this is a novel issue because this

19   other act of misconduct occurs subsequent, not prior

20   to, the event that is the charged crime.  And Tait &

21   LaPlante -- I lost my little yellow sticky -- but

22   Tait & LaPlante indicates that there's a 1985 case

23   that allows the use of subsequent misconduct.  I

24   think it's State v. Smith.  So this is neither novel

25   nor untoward nor improper to allow a subsequent act

26   of misconduct into evidence in order to prove the

27   various theories --

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

27

```
 1          THE COURT:  There's no requirement that it be a

 2     prior act of misconduct.  It can be either prior or

 3     subsequent.

 4          ATTY. BERNARDI:  Correct.

 5          THE COURT:  I agree.

 6          ATTY. BERNARDI:  And think that having said all

 7     that, I think the State will, for any further

 8     comment, rely on its brief.

 9          THE COURT:  Before you talk, let me just ask you

10     this: you've talked about motive, identity, common

11     scheme or plan, or true plan, if you will.  You've

12     talked about absence of mistake or accident.  I take

13     it the offer is made, also, with regard to an element

14     of the crime, that being intent?

15          ATTY. BERNARDI:  Intent and identity.

16          THE COURT:  And to corroborate crucial

17     prosecution testimony that completes the story of the

18     case on trial from the State's perspective.  Is that

19     true?

20          ATTY. BERNARDI:  That's correct, Your Honor.

21     All that is true.

22          THE COURT:  All right.  So you're offering it

23     for all of those purposes?

24          ATTY. BERNARDI:  I also offer it on the

25     signature -- and I can tell by Your Honor's perplexed

26     look there that you may not agree with that argument

27     but I'm also offering it on that basis.  I assume
```

1    that Your Honor, from what Your Honor's comments were

2    was that --

3         THE COURT:  I see it more clearly for other --

4         ATTY. BERNARDI:  -- it's not coming for that

5    purpose.

6         THE COURT:  I see it more clearly for other

7    purposes but not necessarily signature at this point

8    in time.  I have to, once again, look at your briefs

9    and consider your argument thereon, which I'm happy

10   to do.

11        ATTY. BERNARDI:  Whatever Your Honor's ruling is

12   on that one, I take it that it would not preclude the

13   State from arguing that that call had to be made by

14   either Anna Lisa Raymundo or Sheila Davalloo, and

15   probably Sheila Davalloo.

16        THE COURT:  I think to preclude you from that

17   argument would be ridiculous.

18        ATTY. BERNARDI:  Oh.  Thank you, Your Honor.

19   The State has nothing further.

20        THE COURT:  Would you like to make argument now

21   or do you want to take a five-minute break?

22        ATTY. BUTLER:  Please.  I'd forego the five-

23   minute break but I defer to courthouse personnel

24   other than myself.

25        THE COURT:  Does anybody need a five-minute

26   break, guys?  Are you okay?

27        THE MONITOR:  We're good.

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidenceof defendant's misconduct)**

```
 1              THE COURT:  Everybody is okay?

 2              THE CLERK:  (indiscernible), thank you.

 3              THE COURT:  Go.

 4   Argument by Attorney Butler

 5              ATTY. BUTLER:  Thank you, Your Honor.  I

 6       appreciate the State being brief in its argument.  I

 7       do -- I also would like to stand on the things that

 8       we have written in our brief as well.

 9              Briefly, Your Honor, there are so many things to

10       respond to.  The first thing I'd like to do is ask

11       the court's permission to approach the monitor and

12       supply a dozen cases that I might be citing or that

13       have been cited by the State.  Also the correct

14       spelling of E. Imwinkelried who wrote the treatise,

15       if the Court would allow that.

16              THE COURT:  That's very kind.

17              ATTY. BUTLER:  Thank you.

18              THE MONITOR:  Thank you.

19              ATTY. BUTLER:  I think -- I'll talk about a

20       false start.  I've prepared my argument in the order

21       in which I wish to address in the brief but I want to

22       just respond very quickly while the iron is hot.

23              It is the defense position that if something is

24       allowed into evidence and it's admissible for the

25       wrong reasons and it came in for the wrong reason,

26       it's still wrong.  And I understand that there are

27       cases such as Miriam, that the State cites, that says
```

Case 3:17-cv-01257-VAB   Document 35-4   Filed 11/08/17   Page 340 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

30

```
 1        well, if it comes in for one reason and then

 2        shouldn't've come in for the other reason, next time

 3        you have a trial like that don't do that again but

 4        it's okay.  And the defense position would be, heck,

 5        [if] something shouldn't come in for this reason,

 6        don't let it in for that reason.  And I don't think

 7        that curative instructions necessarily cure all of

 8        the jury.  And that's just a passing comment.  I

 9        understand what the court's position would be on that

10        particular --

11            THE COURT:  Right, but if you let it in for

12        three different reasons and two of them are correct

13        reasons and one of them is not a correct reason, I

14        would have to say that that's harmless error.  And

15        I'm sure the courts -- I'm sure our Supreme Court has

16        held that way and Merriam, I think, says that.  I

17        don't know whether it's addressed in Morrell -- I

18        don't know.  That's that strand argument that we're

19        talking about.

20            ATTY. BUTLER:  Again, I think it's important

21        that the defense, at least, stand firm on its

22        position that if something comes in for the wrong

23        reason, it shouldn't be coming in for the wrong

24        reason.  And that's my position.

25            THE COURT:  I hear ya.

26            ATTY. BUTLER:  I wish to start and I wish to

27        finish this argument, however long it takes, with the
```

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

31

```
 1          proposition that the court has to weigh the probative

 2          value to the State versus the prejudicial effect to

 3          the client -- Ms. Davalloo here in this case -- as in

 4          all cases when weighing these things.  This is what

 5          the court has to do.

 6               And I would start with the basic presumption

 7          that I'm going to make.  And I'm going to argue to

 8          the court that the probative value to the State --

 9          just because the State really needs the evidence

10          doesn't meant the evidence should come in because

11          they really need it this time, Your Honor, in this

12          particular case because it lacks an eyewitness.

13               THE COURT:  Sure.

14               ATTY. BUTLER:  Or it lacks, perhaps, a murder

15          weapon or it lacks certain things.  Now I know that

16          in sexual assault cases, the standard of

17          admissibility is more liberal and it's lessoned the

18          bar is lowered.  And this is because sexual assault

19          cases, like some crimes, are committed in secret, and

20          young people are pressured -- in child sexual assault

21          cases -- they're pressured not to reveal certain

22          things.  We know all about late disclosure in our

23          child molesting cases that come through,

24          unfortunately, every courthouse in the state.

25               But just because a particular item of evidence

26          really helps the State and it's probative doesn't

27          mean it necessarily gets more weight on the scale
```

A347

Case 3:17-cv-01257-VAB    Document 25-4    Filed 11/08/17    Page 342 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

32

1    weighing against the prejudice.  I can't imagine -- I

2    can't imagine standing here at trial with a jury

3    sitting in the box over there and the jury hearing

4    that she's stabbed her husband and has an attempted

5    murder of her husband.  I don't know whether the

6    jury's ever going to hear about the conviction, and

7    that's a whole other motion in limine.

8         But let's assume the court doesn't allow the

9    conviction part or the part that she's doing 25 years

10    for that.  The jury's just going to look over there

11    and say, "Oh, stabbed the husband; charged with

12    stabbing in this case; go figure."  I think that it's

13    so difficult for the defense to try to -- I think

14    it's difficult for the court or anybody to argue that

15    the probative value just outweighs that little

16    prejudicial effect.  And I think the argument has to

17    be looked at through this -- through these glasses

18    that it's going to be so difficult.  It's difficult

19    for the State if they don't have this misconduct

20    evidence because they need its probative value.  And

21    I would agree that it has some probative value.  I

22    don't think that it will ever outweigh the

23    prejudicial effect to the defense in this case, and

24    that's all I care about over at this table, Your

25    Honor, naturally.

26         Well, let's start with the evidence code,

27    sections 4-5 and its commentary.  And one of the

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidenceof defendant's misconduct)**

33

```
 1        things that we read right away is that it's not for

 2        general propensity to violence.  And the State has

 3        already said they don't want to do that.  That's not

 4        what they're offering.  Well thank goodness but I

 5        wonder if the State's announcement that they're not

 6        going to do that, the jury's actually going to get it

 7        because I think the jury's going to look over at

 8        somebody who has stabbed her husband, and her

 9        husband, if the court allows this evidence, will sit

10        in the witness stand and describe this awful event

11        where she has stabbed him.  And she's testified

12        against about that in her New York trial.  So the

13        jury's gonna look over here and gonna see a general

14        propensity to violence in my view.

15             THE COURT:  Really?

16             ATTY. BUTLER:  Well, I would hope not, Your

17        Honor.

18             THE COURT:  Okay.

19             ATTY. BUTLER:  Hope springs eternal but imagine

20        the jury sitting over in that box and you'll --

21             THE COURT:  I think that's a great leap that

22        they would make -- they would make -- reach the

23        general conclusion or make the reasonable inference

24        that she has a general propensity to violence, based

25        upon what's offered here.

26             ATTY. BUTLER:  Well, I would hope not and juries

27        aren't suppose to make that leap but --
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 344 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)
34

```
 1           THE COURT:  Don't you think it would be self-
 2      defeating for the State to go down that road --
 3           ATTY. BUTLER:  I don't think the State's gonna -
 4      -
 5           THE COURT:  -- in this case on that set of
 6      facts?
 7           ATTY. BUTLER:  Yes, of course.
 8           THE COURT:  Okay.  Go ahead.  Sorry.
 9           ATTY. BUTLER:  Of course the State would not try
10      to do that but the best intensions often go astray,
11      Your Honor --
12           THE COURT:  I hear ya.
13           ATTY. BUTLER:  -- and I worry about what the
14      jury's gonna see here.  Now we're all aware of the
15      well-known rule -- may I?
16           MS. DAVALLOO:  Yes.
17           ATTY. BUTLER:  So to get around the well-known
18      rule that we've just discussed.  First, the evidence
19      has to be relevant, and I address that, ad nauseum,
20      in my brief about relevance.  And it has to be
21      relevant to the circumstances encompassed by the
22      exception; that's State v. Braman.  And Braman is 191
23      Conn. -- that goes back to 1983, Your Honor -- 670.
24      Also there's State v. Mandrell, 199 Conn. 146 -- and
25      this is for the second prong.  The probative value
26      must outweigh its prejudicial effect, and that's
27      where the defense gets hung up on how it's ever going
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 345 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)
35

```
 1        to do that, Your Honor.  But that's -- that is our

 2        argument on probative value versus prejudicial

 3        effect.  And it is a well-known rule.

 4             This is also, in the Merriam case, brought up

 5        again -- and I state it on page three of my brief --

 6        but Merriam is 264 Conn. 661.  And it's mentioned, of

 7        course, in Randolf, which we all seem to be citing

 8        because it is Justice Borden's decision which gives

 9        us guidance on these cases.  One would hope that we

10        have guidance from Justice Borden on that case,

11        through the case of Randolf, Your Honor.

12             On page four -- if I could backtrack a little,

13        Your Honor?

14             THE COURT:  Sure.  Go ahead.

15             ATTY. BUTLER:  One of the things that I think is

16        important is that the underlying policy of protecting

17        the accused against unfair prejudice, it shouldn't

18        evaporate.  It shouldn't evaporate at all, Your

19        Honor.  I think that's the overriding thing for the

20        defense at the defense table is that there are

21        Constitutional protections that should not evaporate

22        for her just because she's been convicted of this

23        other crime in another state, Your Honor.  I think we

24        have to be very careful how the jury -- if the jury

25        hears it -- how the jury hears and the context which

26        the jury hears it.

27             Moving forward Your Honor, the more liberal
```

Case 3:17-cv-01257-VAB   Document 85-21   Filed 11/03/17   Page 346 of 422
Q. Excerpt of August 15, 2011, pp. 11-68
(argument on state's motion to admit evidence of defendant's misconduct)
36

1    standard for admissibility of this type of misconduct

2    evidence in sex offense cases, the first thing I'd

3    like to bring up is -- obviously, this is not a sex

4    assault case.  This is not -- this is a murder case;

5    this is not a sexual assault case.  There's no sexual

6    offenses alleged either in the New York case, a

7    stabbing, or this Stamford murder case, a

8    stabbing/and/or bludgeoning.  The old rule, prior to

9    Snelgrove and Johnson -- and that's *State v.*

10   *Snelgrove*, 288 Conn. 742, which was 2008; it came out

11   after Randolph, Your Honor.  And then Johnson, 289

12   Conn. 437, came out after Snelgrove and Randolf, Your

13   Honor.

14        Again, I would submit that while these two cases

15   seem to suggest --

16        THE COURT:  Johnson being a serial killer and

17   Snelgrove being the issue of a New Jersey killing

18   that took place some years before?

19        ATTY. BUTLER:  That's exactly correct.

20        THE COURT:  Okay.

21        ATTY. BUTLER:  The court is familiar with both

22   those cases --

23        THE COURT:  Okay.  I just wanted to get those

24   two straight.

25        ATTY. BUTLER:  -- gratefully.

26        THE COURT:  All right.  Go ahead.

27        ATTY. BUTLER:  Okay.  Those cases seem to plow

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)

37

```
 1        new ground in loosening this rule that we're going to

 2        not allow loosening and the lowering of the bar in

 3        non-sex cases that the (indiscernible) seem to hint

 4        at that we would.  Snelgrove and Johnson clearly

 5        allow some of this misconduct evidence to come in

 6        more loosely or the loosening of -- lowering of the

 7        bar of the admissibility standard; it's really what

 8        I'm talking about.  They seem to allow that but there

 9        were distinguishing facts in that case from this

10        case.

11            For instance, Johnson was a serial killer but he

12        raped all the women first -- clearly did that.  They

13        were in a short period of time.  The bodies -- Ford

14        and some of the other bodies -- were all found in the

15        Hartford area in a short period of time; a matter of

16        four months, a matter of eleven months -- a sweeping

17        time zone.

18            Snelgrove himself talked to a sentencing judge

19        in New Jersey about his sexual deviancies and about

20        his arousal at degrading and humiliating women and

21        how, when he used to sexually assault them before he

22        murdered them, and then how he would pose the bodies

23        in sexual positions, I would argue the court that

24        factually, this case is light years from Snelgrove

25        and Johnson in that there isn't any alleged sexual

26        assault here at all; there's alleged sexual

27        misconduct which the defense would submit -- and
```

A353

Case 3:17-cv-01257-VAB Document 85-4 Filed 11/08/17 Page 348 of 422
01 Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)
38

```
 1        these are my words, certainly not the client's --
 2        these are my words.  The defense would submit that
 3        this is someone having an affair.  Someone else, the
 4        State's witness, Nelson Sessler, is also having an
 5        affair.  This is an affair; this is not sexual
 6        misconduct, sexual deviancy.  If having an affair
 7        constitutes sexually abhorring or sexually deviant
 8        behavior or compulsive behavior, then half the
 9        politicians in this country -- and maybe I shouldn't
10        phrase it that way -- but half the people in this
11        country who have affairs could then qualify under
12        that exception and the loosening of the bar for the
13        admissibility of this evidence.
14            Now I probably said that more artfully in my
15        brief than I just did here orally, Your Honor, but I
16        think the court gets what I'm trying to say is that
17        the fact that somebody has an affair, unfortunately
18        for the married people in this country, that's pretty
19        common.  That's not unusual, distinctive; it
20        certainly isn't signature-like.  And that's a sad
21        commentary on society but it is an accurate
22        reflection of society in today's modern world, Your
23        Honor.
24            Snelgrove again, he got sexual gratification
25        about the helplessness of his victims.  We don't have
26        that here.  We don't have any of -- there are factual
27        differences that are so distinguishable between this
```

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

39

```
1       case and those cases that -- I would submit that

2       Snelgrove and Johnson offer the State no solace and

3       the court no solace in letting this evidence in under

4       the lessoned standard of proof and admissibility in

5       sex cases.  Just factually so different, Your Honor,

6       in the defense's opinion.

7            THE COURT:  I just thought the commentary that

8       the State made in that regard was more tangential

9       than it is direct.  I think you're giving more weight

10      to that argument than it deserves.  He's just

11      explaining how it comes.  It's getting closer and

12      closer to that obsessive/compulsive/aberrant

13      propensity-type of situation.  It's getting there but

14      he didn't make the argument, it is this, but he makes

15      the argument, it's kinda close, Judge.

16           ATTY. BUTLER:  Well, in the brief --

17           THE COURT:  Am I mischaracterizing what you

18      said?

19           ATTY. BERNARDI:  No, Your Honor.

20           THE COURT:  Okay.  Quiet.  Go ahead.

21           ATTY. BUTLER:  In the brief, Your Honor, they

22      talk about these are sexually motivated crimes,

23      aberrant and compulsive.  And I would submit that

24      they're simply not.

25           THE COURT:  In your brief.

26           ATTY. BUTLER:  No.  In their brief, I re -- in

27      my brief, I respond to his brief.
```

1 Excerpt of August 15, 2011 pp. 1168

(argument on state's motion to admit evidence of defendant's misconduct)

40

1      THE COURT:  Okay, go ahead.  I'm sorry --

2      ATTY. BUTLER:  No, it's all right, Your Honor.

3      THE COURT:  -- We're getting -- we're going to

4  get forest and trees here.  Keep going so I'm

5  following you.  I appreciate your argument.

6      ATTY. BUTLER:  Okay.  So I think where we stand

7  at this point in my argument is that DeJesus may have

8  opened the door to the question of whether we're

9  going to allow the lesser standard.  In non-sex

10  cases, non -- where the crime is not charged as a

11  sexual assault --

12      THE COURT:  Correct.

13      ATTY. BUTLER:  And neither crime here is.

14      THE COURT:  Correct.

15      ATTY. BUTLER:  Two crimes that can be sexually

16  compulsive or abhorrent behavior sexually.  I think

17  that's where we're at.

18      And what the case law seems to say, and Randolf

19  talks about some of this, is that the misconduct in

20  non-sex cases is allowed if it tends to show a common

21  scheme or plan.  Of course, common scheme or plan is

22  very broad, I think.  In my opinion, it's very broad.

23  The plan should be specific.  I wish to rob that

24  bank tomorrow morning.  My misconduct might be, I

25  wish to steal this car to you use as a getaway car to

26  rob this bank.  The misconduct might be the larceny

27  of the car; the robbery of the bank is the underlying

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidence of defendant's misconduct)**

41

```
 1    crime.  That would be the defendant's argument.
 2         But there has to be an overall goal in the
 3    defendant's mind, which is what --
 4         THE COURT:  Right.  Such as the elimination of a
 5    rival and an impediment to an ultimate relationship
 6    with somebody.
 7         ATTY. BUTLER:  Well, that would be the State's
 8    theory I hear the court repeating.  But that would
 9    not be the defense theory.  I would argue that --
10         THE COURT:  But that would be a true plan, would
11    it not?
12         ATTY. BUTLER:  I would like to respond in this
13    fashion: that we don't agree with that --
14         THE COURT:  Okay.
15         ATTY. BUTLER:  And if the State's entitled to
16    the theory that they're going to have to prove it up,
17    and that the court shouldn't allow this misconduct
18    evidence based on that true plan because -- just
19    think of this for a second.  It's in my brief but
20    just think of it for a second.
21         The true raw goal in the defendant's mind is
22    eliminating the rival and eliminating her husband.
23    Eliminating her husband could have been accomplished
24    by divorce; it's not that rule in our country
25    anymore.
26         THE COURT:  Maybe.  Maybe you're right about
27    that.
```

A357

Case 3:17-cv-01257-VAB of Document 85-21 Filed 11/08/17 Page 352 of 422
Excerpt of August 18, 2011 pp. 11-63
(argument on state's motion to admit evidence of defendant's misconduct)
42

1       ATTY. BUTLER:  It happens every day, sadly, on

2       floors above us here today.

3          As far as eliminating the rival, the State is

4       left to their proof on that but I don't think that

5       it's necessarily because they have a theory about

6       means it just jumps right into admissible evidence.

7       Again, we'll be objecting at the trial as the

8       witnesses testify to certain aspects.  And we reserve

9       our right to object for other grounds as well.

10       THE COURT:  I hear ya.

11       ATTY. BUTLER:  The identity exception, Your

12       Honor -- and the identity exception. First, again,

13       everything had to be relevant and then it has to

14       outweigh its prejudicial effect.  And under this

15       guise, we have to view all of this.  But the identity

16       exception requires the methods used to be

17       sufficiently unique to warrant a reasonable inference

18       that the person who performed one misdeed also did

19       the other.

20          Let's think about that for a second.  There are

21       types of signature-type cases that we can all name.

22       A serial killer always uses strangulation.  Mike Ross

23       was a serial killer who I represented and not to

24       speak ill of the dead, but Michael Ross always had a

25       signature. He would engage the women in

26       conversation.  When they repelled him, he tackled

27       them.  He got on their backs.  He disrobed them.  He

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 353 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)
43

1      always strangled them after the sexual assault,

2      according to the evidence and the State's theory in

3      this case -- in Ross's case.  And Ross wrote about

4      it, unfortunately, way too much.  But his signature

5      was he always strangled women.  He always used his

6      hands.  He always did it to such an extent that there

7      were always marks.  The igoid [sounds like] bone was

8      broken.  There was always paticulal [sounds like]

9      hemorrhaging of the eyes.  That's a true signature.

10         Someone who always robs a bank using a baseball

11     cap; a red bandana; always does it on a Thursday

12     because bank employees get paid or something; always

13     comes to the store that's being robbed at eleven

14     o'clock; always uses a gun.  We can name facts that

15     consistently underline the principle that this is a

16     signature and the person who did this must have done

17     this because they did it in this unusual way, and the

18     methods were distinctive.

19         We don't have that here.  If I can quote just

20     for a moment, Your Honor, and I appreciate the court

21     being patient with me as I argue briefly.

22         THE COURT:  You're doing very well.

23         ATTY. BUTLER:  Again, in Snelgrove -- here's the

24     part I was looking for -- "The evidence, itself,

25     established that his compulsion was not a short-term

26     phenomenon.  It was a long-standing feature of his

27     sexual psyche," and of course we don't have that

Case 3:17-cv-01257-VAB  Document 25-4  Filed 11/08/17  Page 354 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)
44

```
 1            here.  All the victims were met in a public place on

 2            a weekend night.  He always socialized with them in a

 3            public setting; always took them out; always tried to

 4            get them engaged in voluntary sexual activity; all

 5            the victims were killed in a certain way.  Again,

 6            quoting from the Snelgrove case, "To be admissible

 7            for that purpose, the factual characteristics shared

 8            by the charged and uncharged crime must be

 9            sufficiently distinct and unique, as to be like a

10            signature."  So they logically infer that "[if] the

11            defendant is guilty of one crime, he must be guilty

12            of the other."  And this is citing Randolf at page

13            347.  The methods that are used; the timing of -- the

14            device must be so unusual as to be like a signature.

15             Again, we think that's absent in this case.  And

16            it's clear that her husband was stabbed with a knife.

17             We all agree on that.  It is clear that Anna Lisa

18            Raymundo was stabbed with a knife.  She was also

19            bludgeoned with what is alleged or possibly alleged

20            to be a dumbbell weightlifting set that was in her

21            apartment, Your Honor.

22             But unfortunately -- and there are cases cited

23            in my brief -- that there is nothing unusual or

24            distinctive about stabbing a victim to cause death.

25            This is a tough argument for the defense to have to

26            make, certainly in front of the jury.  And I'm

27            grateful I'm only before a court right now making
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 355 of 422
9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)
45

1    this argument.  But heck, stabbings are too common,

2    Your Honor, in our country but they are so common,

3    they cannot be unique unless it's a certain type of

4    weapon that's used.  The defendant always used an

5    icepick.  You follow me on that argument, Your Honor,

6    that the weapon, the fact that it's a stabbing is not

7    signature in and of itself.  If I used a special kind

8    of knife or I used a Samurai sword, and I always used

9    it when I stabbed people, maybe that might be a

10   signature.  But I would submit that there's nothing

11   unusual or distinctive about stabbing a victim.  And

12   there are cases cited here.  One of them is *State v.*

13   *Brunetti,* 279 Conn. 39 [*sic*] and that's on page 44, a

14   2006 case.  Again, victims known to the defendants.

15   Unfortunately, there's absolutely nothing unusual

16   about murder victims being known to their defendants

17   or the defendants being charged with crimes.  I mean,

18   that's not unusual and it's a sad commentary on

19   society that I get to say this to you, Your Honor.

20   And that's *State v. Sawyer,* 279 Conn. 357.  And it

21   says in Sawyer, the fact that the assailant knew the

22   victim before the attack is far from unique or

23   distinctive.  Again, it's --

24        THE COURT:  Sawyer being in the sex line of

25   cases, correct?  Is that opening the door on the sex

26   side of the alleger here?  That was the beginning of

27   the opening of the door was it not?

(argument on state's motion to admit evidence of defendant's misconduct)

46

```
 1          ATTY. BUTLER:  In Sawyer?

 2          THE COURT:  On propensity?

 3          ATTY. BUTLER:  Yes.

 4          THE COURT:  Where the court all of a sudden --

 5     withdrawn.

 6          Where the court decided that in these kinds of

 7     cases, it's permissible to even show a propensity.

 8     We're not talking about that here.  This is -- he

 9     only -- the State argues that there's a tangential

10     aspect to this case that sort of can be analogized to

11     that line of cases.  I hear him.  I hear what he says

12     but let's not get lost here.  I think we're getting

13     lost over here.  Let's stay on the main argument

14     here.

15          I appreciate you what you said.

16          ATTY. BUTLER:  Sure.

17          THE COURT:  I got it.  You don't have to say any

18     more about it.  Signature crime.

19          ATTY. BUTLER:  Perhaps of I was more

20     illustrative than I needed to be but I think the

21     court gets the defense point --

22          THE COURT:  I do.

23          ATTY. BUTLER:  -- that the defense is trying to

24     make.

25          THE COURT:  I do.

26          ATTY. BUTLER:  Defense position, that if this

27     evidence comes in, any curative instruction will be
```

A362

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidenceof defendant's misconduct)**

47

1          insufficient and the highly inflammatory prejudice is

2          insurmountable, Your Honor.  And that's defense

3          position.

4               Just to finish up.  The common plan or scheme.

5          This line of cases seems to say that you know,

6          there's a plan in place, an overall plan to

7          accomplish a certain goal, and this is the goal.  For

8          instance, my hypothetical: I wish to rob that Patriot

9          Bank over there.  I wish to rob it tomorrow but I'm

10         going to need a getaway car.  I'm going to need to

11         steal a weapon.  I'm going to get a note.  These are

12         all things that I'm now doing.  It's I have my

13         overall goal in mind of robbing the bank.

14             If I do this often enough with several banks --

15         and I always do it the same way -- maybe it rises to

16         a signature but even if it doesn't, if I have a true

17         plan, a common scheme plan that here's what I'm going

18         to do: I'm going to rob this bank and I'm going to do

19         it this way.  And you know what, after I've used up

20         all that money on dope or gambling or whatever my

21         addiction is, I'm going to go out and rob another

22         bank and I'm going to do it the same way because it

23         worked last time.  And all of a sudden, I'm

24         developing a common plan or scheme to rob banks in

25         this manner.  And if the common goal -- my ultimate

26         goal might be to rob enough banks to support my drug

27         habit, then that's common scheme that would allow

1   those two bank robberies or those three bank

2   robberies to be tried together under some

3   circumstances; under some facts, Your Honor.

4       Just to touch a little bit back on the sexual

5   deviancy aspect of this.  Now when you get back to

6   common plan or scheme, Your Honor, sexual deviancy

7   requirements are back in play.  And this is on page

8   nine of my brief.  But one of the things that I think

9   is interesting to note is that if the court doesn't

10  agree with the defense; this doesn't rise to the

11  level of sexual deviancy or aberrance or sexual

12  compulsive conduct, whatever the phrase that we're

13  using to describe that, we would argue that this

14  particular misconduct was subsequent conduct.  I'm

15  not saying that misconduct, because it happened after

16  the event from which the defendant is being tried

17  can't ever some into evidence.  The defense is not

18  saying that, Your Honor.  But it's most usual

19  occurrence is, I have a prior occurrence.  Now, I'm

20  charged with doing it again.  The jury ought to get

21  to know about the prior occurrence because that's

22  probative.  And I just think that the defense pointed

23  out that just so nobody's confused and the record,

24  someday for review if it needs to be reviewed

25  someday, is that this is actually the stabbing on May

26  23, 2008 of her husband Paul Christos is subsequent

27  in time.

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

49

```
 1          But some of the points that need to be pointed

 2     out is that these are insufficiently similar events,

 3     Your Honor.  They're not committed on the same

 4     victims.  It's almost five months later.  There are

 5     many factual dissimilarities that are almost too

 6     numerous to argue about or to list here.  But the

 7     defense would -- the State claims that both these

 8     crimes --

 9          THE COURT:  You wouldn't argue remoteness, then.

10      Are you arguing remoteness here?

11          ATTY. BUTLER:  Well, I think we know that

12     remoteness is not really in play.

13          THE COURT:  Four or five months later?

14          ATTY. BUTLER:  Remoteness is not really in play.

15      I think it's more in play in other cases, Your

16     Honor.

17          THE COURT:  That was one of the issues in

18     Snelgrove, by the way.

19          ATTY. BUTLER:  Say again?

20          THE COURT:  That was one of the issues in

21     Snelgrove.

22          ATTY. BUTLER:  Yeah, the 14 years ago was the

23     New Jersey case and it still came in.

24          THE COURT:  Right.  All right.  Go ahead.

25          ATTY. BUTLER:  So -- can I have a moment, Your

26     Honor?  There seems to be --

27          THE COURT:  Sure.  (Whereupon there's a pause in
```

Case 3:17-cv-01257-VAB Document 85-21 Filed 11/08/17 Page 360 of 422
9. Excerpt of August 15, 2011 pp. 1-68
(argument on state's motion to admit evidence of defendant's misconduct)

50

```
 1         the proceedings)

 2              ATTY. BUTLER:  Snelgrove was serving his

 3         sentence during that period of time.

 4              THE COURT:  Understand.  That's how -- that was

 5         one of the defining factors when the court considered

 6         the issue or remoteness.

 7              ATTY. BUTLER:  All right.  The State claims that

 8         these are all similar because both victims were

 9         killed in their homes.  Obviously, Anna Lisa Raymundo

10         was killed in her home.  Paul Christos was stabbed

11         initially in his home and again on some hospital

12         grounds.  The State would argue that it all happened

13         in secret and no one but the stabber and the stabee

14         was present.  Again, in the hospital grounds in New

15         York Medical College where Paul Christos was stabbed

16         with the third stab wound, I believe, occurred in

17         front of someone else, an internist or something.

18              THE COURT:  Let me ask you something here.

19              ATTY. BUTLER:  Yes, sir.

20              THE COURT:  You're not conflating a true plan or

21         common scheme or plan with signature crime

22         necessarily, are you?  In other words, the way you

23         seem to be arguing is there must be signature crime

24         for there to be common scheme or plan.  That's what

25         I'm hearing here.

26              ATTY. BUTLER:  No.

27              THE COURT:  Or at least in part.  You're not
```

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)

51

1          doing that, are you?

2              ATTY. BUTLER:  Maybe it's because my argument

3          has become disjointed as I responded, in part, out of

4          sequence to some of the things the State's saying.

5              THE COURT:  Okay.

6              ATTY. BUTLER:  But no, that's not my plan.

7              THE COURT:  But you're not making it one in the

8          same, are you?

9              ATTY. BUTLER:  No.  But when the State does

10         bring up signature at the end of their argument, I

11         wish to respond to that and saying that two phone

12         calls.

13             THE COURT:  I hear ya.  Well I responded to

14         their argument on signature.

15             ATTY. BERNARDI:  Right, right.

16             ATTY. BUTLER:  And I just let the court know

17         that I'll state the obvious: two phone calls do not

18         make a signature make, Your Honor?

19             THE COURT:  I got it.

20             ATTY. BUTLER:  Okay.

21             THE COURT:  I hear ya.

22             ATTY. BUTLER:  Well there are some arguments,

23         Your Honor, that the defense will keep for trial, but

24         there are some responses that we would make to some

25         of the things the State has argued.

26             I've mentioned the non-sexual assault standard

27         and the sexual assault standard.

Case 3:17-cv-01257-VAB of Document 85-2011 Filed 11-03/17 Page 362 of 422
(argument on state's motion to admit evidence of defendant's misconduct)

52

1    THE COURT:  That's on page ten of your brief.

2    ATTY. BUTLER:  That's correct.  Thank you, Your

3    Honor.

4    THE COURT:  Correct.

5    ATTY. BUTLER:  And to follow up --

6    THE COURT:  We had the true plan discussion,

7    which is found on page eleven of your brief, correct?

8    ATTY. BUTLER:  It is, Your Honor.  And it is

9    that one of the things that the defense points out is

10   that what is the true plan that the State alleges?

11   That a rival needs to be eliminated or a husband

12   might find out so five months later -- I had this

13   plan five months earlier to kill the husband because

14   he might find out some day and then I'll be revealed.

15   I just think that the overall goal that Randolph

16   talks about -- the over true plan that Randolph talks

17   about cannot be that the defendant kills Anna Lisa

18   Raymundo on November 8th of 2002 with a plan that

19   she's going to have to kill Paul Christos

20   subsequently, much less March 23rd of 2003, four-and-

21   a-half months later, Your Honor.  I just don't see

22   that is a true plan, an overall goal in the

23   defendant's mind.

24   The State would -- their rebuttal might be well,

25   they don't have to have an exact date in mind; they

26   don't have to have an exact plan to that specific.

27   And it would be ludicrous for the defense to say that

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidenceof defendant's misconduct)

53

```
 1        well, they had to prove that she planned to do it
 2        with a game, and she knew that she was going to do it
 3        in a game in November and waited till March so that
 4        she could finally be able to play again.  I'm not
 5        saying the State's true plan or goal for this common
 6        plan or common scheme has to be that specific.  But
 7        has to be a goal that was in the defendant's mind at
 8        the time of the crime for which she's charged.  And
 9        that's what the case law says.  I cite it in my brief
10        but these aren't just words coming from Barry
11        Butler's mouth, Your Honor.  These are words coming
12        from the case law from our Supreme Court of
13        Connecticut, and the cases are cited in my brief.
14             It had to be an overall plan in the defendant's
15        mind at the time of the crime charged.  Those were
16        the words that the Supreme Court used, not me.  And I
17        just repeat them to the court.
18             THE COURT:  Well if you cite Merriam, it must be
19        inspired by the same impulse or purpose, as you do at
20        page 13, I think it is -- 13 of your brief.
21             ATTY. BUTLER:  Mmm-hmm.  And then I jumped ahead
22        in my argument in responding to the State so we've
23        covered signature.  I don't feel the need to cover it
24        again but in the order of my argument --
25             THE COURT:  Right.  I've heard enough on
26        signature.
27             ATTY. BUTLER:  Thank you, Your Honor.  If I may
```

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 364 of 422
9. Excerpt of August 16, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)
54

1    have a moment, Your Honor?  I'm looking for an

2    important quote that I wanted to point out the court.

3         THE COURT:  Sure.  Please go ahead.

4         ATTY. BUTLER:  And I wanted to --

5         THE COURT:  Complex issue; complex briefs. Go

6    ahead.  Take a look at what you got there.

7         ATTY. BUTLER:  Okay.  On page three of the

8    brief, Your Honor, one of the things that we mention

9    is a quote from <u>Wigmore on Evidence</u>, section 194, and

10   the quote is this, Your Honor:

11        "Misconduct evidence is not objectionable."

12   It's not -- "It's objectionable not because it has no

13   probative value but because it has too much."  And I

14   think that that's where the argument for the defense

15   falls back to the beginning of my argument, that I

16   will start and finish with the unfair prejudice that

17   if the jury hears this stuff, they're simply --

18   whether they're supposed to or not -- they're simply

19   gonna say, if she did it then, she must have done the

20   other one.  And it's because it has too much

21   probative value sometimes that these things are

22   overly and highly inflammatorily prejudicial.

23        Now I just said something that I believe can be

24   interpreted as talking out of both sides of my mouth,

25   so I wish to finish up with this.  Look, I say that

26   the balancing test the court has to do -- okay? -- is

27   say the probative value versus the prejudice.  The

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

55

```
 1        defense says the prejudice is so high; the probative

 2        value, it'd never outweigh it.  That's the position

 3        we still take as we conclude our argument.

 4           However, the quote from Wigmore basically says,

 5        we object to it because it has too much probative

 6        value.  And I think the probative value, when Wigmore

 7        talks about it, is not so much that it proves it by

 8        evidence but it proves it by innuendo.  And it would

 9        the defense position that the State can certainly put

10        on its case without this misconduct evidence and

11        avoid all this highly inflammatory and prejudicial

12        evidence.  The jury's just going to look over and see

13        this defendant.

14            If the court allows this -- and this is not

15        threatening the court.  Obviously, the court has to

16        make this decision.  We live with any decision the

17        court makes and we respect the decision, even if we

18        disagree with Your Honor.

19            THE COURT:  You were saying, if the court allows

20        this --

21            ATTY. BUTLER:  Yes.  If the court allows this,

22        it is my position, as defense counsel in this case,

23        that it's really just -- the trial's kind of like a

24        slow guilty plea that the jury's going to hear the

25        evidence and they're going to hear about she stabbed

26        her husband, which is factually correct and proved

27        already.  Whether they hear she's convicted or doing
```

Case 3:17-cv-01257-VAB Document 85-21 Filed 11/28/17 Page 366 of 422
Excerpt of August 15, 2011 pp. 1163
(argument on state's motion to admit evidenceof defendant's misconduct)

56

```
1        25 years is -- put that aside for a second.  Suppose
2        they don't hear that.  But if they hear the husband
3        come and say she stabbed me.  She acted like she was
4        calling 9-1-1 and she wasn't.  She drove me to the
5        hospital but didn't take me to the emergency room and
6        she stabbed me again there -- it's over.  The trial
7        is over in this lawyer's opinion.  Now it won't be
8        over.  The jury will still have to hear the rest of
9        the evidence.  They'll have to go back in that little
10       room and deliberate.  But my view -- and I start and
11       finish with the proposition that the prejudice is so
12       high for the defendant that no matter what law allows
13       you to let it in, or what facts you find and say it's
14       okay to let this in, or whatever the Supreme Court of
15       Connecticut has done recently in trying to clarify it
16       with Justice Borden's brilliant in Randolf that we'll
17       all use a guidance and clarification now -- and I
18       will submit to the court, I had to read that three
19       times before it was clear in my mind.  I had to do
20       that.  And I would recognize -- I would submit that
21       several people reading that opinion for the first
22       time might want to reread it again.  I'm not the only
23       one.
24            THE COURT:  I wouldn't disagree with that
25       characterization.  You're a very experienced trial
26       lawyer.  We all had a little difficulty the first
27       time through Randolf.  But it became clearer as we
```

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

57

1      read through it -- parsed through it.

2          ATTY. BUTLER:  So I could --

3          THE COURT:  It's a complicated area that Judge

4      Borden was trying to address in setting up the

5      principles that apply to these kinds of cases.  So it

6      couldn't be done in a very simplistic fashion.  It

7      took him a while to set it forth.  And if you look at

8      it carefully after a while, it becomes clearer and

9      clearer.  But it is difficult as a first-time

10     reading.

11         I might add that, perhaps unfairly, that both of

12     your briefs in this matter were very well

13     constructed, highly complex in nature because it

14     addressed a very difficult area and it took me a

15     couple of reads through to give them their due.  And

16     indeed, I'm going to read them again after our

17     argument here.  So go ahead.  Keep going.

18         ATTY. BUTLER:  Thank you, Your Honor.  It's

19     important, I think, to note that Justice Borden

20     issued the decision in Merrell and he talked about

21     the separate strands --

22         THE COURT:  The strands.

23         ATTY. BUTLER:  -- that were woven into the same

24     fabric.

25         THE COURT:  Yup.

26         ATTY. BUTLER:  And I can see Justice Borden

27     reading other cases as they occurred and watching

A373

Case 3:17-cv-01252-VAB Document 185-20 Filed 11-03/17 Page 368 of 422
(argument on state's motion to admit evidence of defendant's misconduct)

58

1       what trial courts, or perhaps Appellate Courts were

2       doing with his instructions, if you will, in *State v.*

3       *Merrell*, that when Randolf gave him the opportunity

4       to further clarify, he grabbed it and took hold of it

5       by the reigns and did his best to give us some

6       marching orders of clarification on this complicated

7       issue.

8           THE COURT:  Right.  Such are the trials and

9       tribulations of the trial court.  And we always look

10      to the guidance of the big court, and that's exactly

11      what he was trying to do in Randolf.  I appreciate

12      that.

13          ATTY. BUTLER:  Thank you.

14          THE COURT:  Is there anything else that anybody

15      would like to say?

16          ATTY. BERNARDI:  Can I just make three minutes'

17      worth of comments, Your Honor.  I understand.

18          THE COURT:  Is it possible for you to speak for

19      only three minutes?

20          ATTY. BERNARDI:  No, Your Honor.

21          THE COURT:  Go ahead.

22  **Response by Attorney Bernardi**

23          ATTY. BERNARDI:  I couldn't help but think of

24      when counsel made the comments, I think he started it

25      and he finished on it, that he has to stand there and

26      look at the jury and, at some point, admit she

27      stabbed her husband and is claiming that somehow or

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

59

```
 1        other, that is prejudicial.  I think that would be a

 2        good argument if an unrelated stabbing was coming in

 3        -- if he had to get up and say, "You know, I admit

 4        she stabbed someone else."  Because this jury is not

 5        going to be drawn to the stabbing.  That words --

 6        that picking it [indiscernible], she stabbed her

 7        husband; that's where the attention is going to go.

 8        That's relevant.  That appeals to the intellect of

 9        the jury.  That appeals to their common sense and

10        their reasoning powers.

11             The stabbing part -- this is not a gruesome

12        stabbing of her husband.  It's hardly prejudicial.

13        And it's highly probative because of who the victim

14        is and that's what makes it so probative and so non-

15        prejudicial that's it's admissible.

16             The next point I wanted to make that this is not

17        a Constitutional issue.  I know that counsel made a

18        constitutional fairness argument.  The other thing he

19        said at one point, that affairs in the modern world -

20        - an illicit marital affair in the common world -- in

21        the modern world as commonplace, which I think is

22        another factor that goes to show how unprejudicial

23        this type of evidence is.  Because if indeed in

24        affair is a pedestrian occurrence in modern society,

25        it's certainly not going to give rise to prejudice.

26        What is going to appeal to the intellect, as opposed

27        to the passion, to the jury is the unusual lengths
```

**(argument on state's motion to admit evidenceof defendant's misconduct)**

60

1    that this defendant, this woman, went to rekindle

2    this affair and to protect it once it had been

3    rekindled.  That's all highly relevant evidence and

4    non-prejudicial.

5         At one point counsel said she could have just

6    eliminated her husband by divorce, as it were --

7    eliminated the obstacle of her husband by divorce so

8    therefore, this is not relevant.  The fact of the

9    matter is she did not.  She stabbed him.  And she

10   stabbed him because it was part and parcel of her

11   over-arching plan to rekindle this relationship to

12   get the affair back going and not have any tracks as

13   to how she did it -- very much similar to the analogy

14   that counsel used about stealing the car after a bank

15   robbery.  That stealing of that car after that bank

16   robbery would be admitted in any trial, even if that

17   defendant had run out of the bank and realized

18   somebody stole his bike while he was in there.

19   Because when he committed that robbery, his plan was

20   to do everything that was necessary to do that

21   robbery and get away.

22        The dis -- I think it's my fault that there's so

23   much confusion and argument about this signature

24   exception because I have argued it and a careful

25   reading of the Borden case really reveals that in all

26   these cases where signature comes up, the victims are

27   unrelated as opposed to the case that's before the

```
 1        court now; in other words, that serial killer cases.

 2        The logo has to do (indiscernible).  The reason that

 3        there has to be a so-called rose tattoo or whatever

 4        involved is because you have a series of apparently

 5        randomly-picked victims and at that point, the device

 6        used -- the signature involved has to be so

 7        distinctive.  You can't just say some robbery was

 8        committed over here.  This man had a robbery

 9        conviction, therefore he committed this robbery.

10        There has to be some kind of distinctive apparatus

11        used in the commission and running.

12            This is not that type of case.  This is a case

13        where you have related victims.  The victims are a

14        distinct class of two and perhaps, when I argue that

15        these phone calls are so important and defense

16        counsel responds by saying, well yeah, it's just two

17        phone calls; two phone calls does not a signature

18        make.  What the State is really arguing is they do in

19        a related victim case.  Now maybe the State doesn't

20        have to have this evidence under signature theory to

21        make that argument to a jury.  But I don't know how a

22        jury could ignore the fact that while in the

23        immediate wake of stabbing her husband in New York, a

24        phone call was made to Nelson Sessler where he was

25        invited to dinner, I don't know how a jury could

26        avoid the logical inference to be drawn at 11:57 in

27        the a.m. about 15 minutes -- 20 minutes before this
```

9. Excerpt of August 18, 2011 pp. 1-63
(argument on state's motion to admit evidence of defendant's misconduct)

62

1    murder was reported, after a stabbing, after a
2    cleanup, after a wash up in the bathroom, a call is
3    made to Nelson Sessler's landline.  Who would have
4    made that call?  Well she made the same call in New
5    York and the only other person who would have a
6    motive to make that call would be Anna Lisa Raymundo
7    as she was being confronted by that woman right
8    there.
9         That's an argument that the State cannot fail to
10   make to a jury.  Now whether that argument is made
11   under a signature theory or whether it's just made --
12   the theory that's used in unrelated cases or whether
13   or not it's made in related matter under just a
14   relevancy theory, then it's of no moment to the
15   State.
16        But all the State, I guess, is saying here by
17   making this is I hope that Your Honor's ruling is if
18   that does not come in under a signature theory, the
19   State is allowed to make that argument just under a
20   simple relevancy -- the State does not want to
21   precluded from making that argument.
22        The other point was -- I forget wither Sawyer is
23   the case that was overruled by DeJesus or Sawyer is
24   the first case in the line of cases that comes up
25   with this liberal standard.  But as Your Honor
26   correctly pointed out, the State's just showing how
27   analogous the motivation is in this case in

A378

**9. Excerpt of August 18, 2011 pp. 1-63**
**(argument on state's motion to admit evidence of defendant's misconduct)**

```
 1        irrationality and a lack of psychological robustness.

 2             THE COURT:  That's what I thought you were

 3        arguing.

 4             ATTY. BERNARDI:  And I think that that -- that

 5        that is all I have to say, Your Honor.  Thank you.

 6             THE COURT:  Anything else.

 7             ATTY. BUTLER:  Well -- no, Your Honor.

 8             THE COURT:  Okay.  Let me do this: I thought

 9        your arguments were well-made, very insightful, and

10        for the most part, paralleled what was in your brief.

11             In light of your argument, I'd like to take a

12        more careful look at each of your briefs.  And I'll

13        be prepared to read into the record my decision on

14        this matter sometime next week if that's acceptable

15        to you men.

16

17

18

19

20

21                    *       *       *

22

23

24

25

26

27
```

10

Excerpt of Transcript of September 1, 2011, pp. 1-2

(court announces its ruling on motion to admit

evidence of defendant's misconduct)

**10. Excerpt of Transcript of September 1, 2011, pp. 1-2**
**(court announces its ruling on motion to admit evidence of defendant's misconduct)**

1

```
 1          ATTY. BERNARDI:  Off the JD Docket, Your Honor,

 2     I believe it's on the last page, State versus Sheila

 3     Davalloo, represented by Attorney Butler.  Your

 4     Honor, Ms. Davalloo is here.  As Your Honor recall on

 5     previous occasion, the parties submitted briefs and

 6     argued to the Court the admissibility of other acts

 7     of misconduct evidence in this case where a murder is

 8     charged.  Your Honor scheduled it for decision on

 9     today's date.

10          THE COURT:  I've reviewed the briefs of both

11     parties in the matter and I've heard argument by both

12     parties.  And for purposes of today's proceedings,

13     I've prepared a memorandum of decision that I'm

14     completing as we speak.  But the Court has reached a

15     conclusion in the matter and the record should simply

16     reflect that the state by way of proffering in this

17     case seeks to introduce at trial certain acts and

18     misconduct of the accused, the principal act being

19     the attempted killing of her husband.

20          Other misconduct surrounding said attempt in the

21     death of Anna Lisa Raymundo are also the subject of

22     that proffer.  And the defendant in the case by

23     motion in limine sought to preclude the facts and

24     circumstances surrounding the attempted murder of her

25     husband and the subsequent out-of-state conviction,

26     therefore.  After hearing argument and reviewing the

27     law, the Court finds that the other acts evidence
```

**10. Excerpt of Transcript of September 1, 2011, pp. 1-2**
**(court announces its ruling on motion to admit evidence of defendant's misconduct)**

2

```
 1        referred to in the state's proffer are highly
 2        relevant, material, and probative in this matter to
 3        show motive, intent, identity, cunning scheme, lack
 4        of accident or mistake, completion of the story on
 5        trial and in all probability corroboration of crucial
 6        prosecution testimony.
 7            I was impressed with the analysis that the state
 8        did on the applicable law in this case.  As I said
 9        both briefs were very well written, but the statement
10        of the law set forth by the state in this case was
11        exceptionally well written in terms of review of the
12        Randolph case and all the existing case law relative
13        to the issue of question here, today.  Therefore, the
14        Court is of the opinion and finds that the facts
15        proffered by the state will be permitted at the time
16        of trial subject only to other objection as may be
17        deemed appropriate by counsel.
18            As I said I've completed a memorandum of
19        decision thereon; I hope to have that in the file by
20        tomorrow morning.  I'm just working on the finishing
21        touches of that memorandum.  Is there anything else,
22        gentleman?
23            ATTY. BERNARDI:  There is not, Your Honor,
24        although we will need another date at least for the
25        purposes of a mittimus.
26            THE COURT:  We will.  As I suggested to you, my
27        target for jury selection is October 1 on the case.
```

11

Court's Memorandum of Decision

On State's Motion to Admit Defendant's Misconduct,

filed September 1, 2011

**11. Court's Memorandum of Decision on State's Motion
To Admit Defendant's Misconduct, filed September 1, 2011**

FST 165602                                    : SUPERIOR COURT

STATE OF CONNECTICUT              : JUDICIAL DISTRICT OF
                                                          STAMFORD/NORWALK

              V.                                       : AT STAMFORD

SHEILA  DAVALLO                          : AUGUST 31, 2011


<u>**MEMORANDUM OF DECISION**</u>

   The state by way of proffer seeks to introduce at trial certain acts and misconduct of the accused, the principle act being the defendant's attempted killing of her husband. Other misconduct surrounding said attempt and the death of Ana Lisa Raymundo are also the subject of the proffer. The defendant by motion in limine seeks to preclude the facts and circumstances surrounding the attempted murder of her husband and subsequent out of state conviction therefore.

   For purposes of the proffer and in limine request the court, upon stipulation of the parties, assumes the facts set forth in the states brief are capable of proof.

   The principles of law applicable to and  dispositive of the admissibility issue are found in *State* v. *Randolph*, 284 Conn. 328 (2007).  Clearly under *Randolph* the evidence which the state seeks to offer is indicative of a common scheme or plan by the defendant to eliminate a rival (Raymundo) and an impediment (Christos).

As our Supreme Court has said, citing the Inkelried Treatise :

  "Evidence of such a plan is relevant to the charged crime because it bears on the defendant's motive and hence the doing of a criminal act, the identity of the actor and his intention, where any of these are in issue." *Randolph,* supra at 342.

   While in non-sex cases evidence of other acts as misconduct is not admissible to suggest that the defendant is of bad character or possesses a propensity to commit criminal behavior, our Supreme Court recently stated:

". . . evidence of crimes so connected with the principal crime by circumstance, motive, design or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible.

Indeed, the court goes on to say that:

"The rules of policy have no application whatsoever to evidence of any crime (and presumably misconduct) which directly tends to prove that the accused is guilty of the specific offense for which he is on trial." *State* v. *Randolph*, supra at 340.

In order to be admissible, the evidence offered must be relevant and material to the exception or exceptions claimed under Sec. 4-5(b) of the Connecticut Code of Evidence and its value must outweigh its prejudicial effect. A plan, which bears on motive and thus intent and identity, is not only probative of the matters in issue but would also logically tend to assist the trier in weighing these issues.

The second prong of the test for admission of other acts evidence is that the probative value of the evidence outweighs its prejudicial effect. *Randolph*, supra at 340, quoting *State* v. *Mackenzie-Adams*, 281 Conn. 486, 521-22 (2007). At Section 4-3 our Code of Evidence states that:

"relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, or surprise, confusion of the issues, or misleading the jury, or by considerations of waste of time or needless presentation of cumulative evidence."

The Commentary to that Section lays out the guidelines to the court's analysis and recapitulates the common law on the topic. That Commentary states that:

"All evidence adverse to a party is inherently prejudicial because it is damaging to that party's case. Citations omitted. For exclusion, however, the prejudice must be "unfair" in the sense that it "unduly arouses the jury's emotions of prejudice, sympathy or hostility"; *State* v. *Wilson*, 180 Conn. 481, 490 (1980); or "tends to have some adverse effect upon the party against whom the evidence is offered beyond tending to prove the fact or issue that justified its admission into evidence." *State* v. *Graham*, 200 Conn. 9, 12 (1986), quoting *United States*

2

**11. Court's Memorandum of Decision on State's Motion**
**To Admit Defendant's Misconduct, filed September 1, 2011**

v. *Figueroa*, 618 F. 2d 934, 943 (2nd Cir. 1980).

Another factor to be considered is how necessary the evidence is to the State's case. See *State* v. *Licari*, 115 Conn. App. 633 (2009), and *State* v. *Tucker*, 181 Conn. 406 (1980). In both those cases the State's case lacked witnesses to the actual crime and the misconduct evidence was critical to the issue of intent.

In the case before the Court, the evidence is critical and does not unduly arouses the jury's emotions of prejudice, sympathy or hostility. The defendant's attempt to murder her husband is not gruesome or heinous. The fact that she engaged in an affair with a co-worker is a common place bordering on pedestrian. Deceptive manipulation of a husband in such a situation is normally attendant to such an affair. The degree of manipulation is unusual, but to the extent that it is, it is extremely relevant to motive common scheme, identity and intent. Its probative value clearly outweighs any minimal prejudice. While the evidence is adverse to the defendant's interest it is not prejudicial to the degree of exclusion.

For the same reasons, the evidence does not unduly tend to have some adverse effect beyond proving the facts or issues which justified its admission. The violent acts (the crime charged is more violent in its commission and more lethal in result) are directed solely at a class of two (intimate partners of the love triangle). There is no allegation that tends to show that any violence was directed at anyone beyond that small, limited class. Therefore, the evidence would not show a general propensity to violence. A logical and reasonable inference is that this specific emotion of the defendant provoked the two assaults, not out of bad character and propensity to violence, but rather, out of antipathy and hostility to a discrete class of two individuals. A limiting instruction to the jury should suffice to ensure that the evidence does

3

Case 3:17-cv-01257-VAB Document 25-4 Filed 11/08/17 Page 384 of 422
**11. Court's Memorandum of Decision on State's Motion
To Admit Defendant's Misconduct, filed September 1, 2011**

not stray onto a prohibited "propensity" path.

For the reasons described above the Court finds that the other acts evidence referred to in the States' proffer are highly relevant to show motive, identify, intent, common scheme, lack of accident or mistake or self defense, completion of story, and in all probability corroboration of crucial prosecution testimony. It does so in a highly unusual case where the proffered evidence resembles misconduct testimony in sex cases. In those cases the defendant is driven by a motive which is aberrant and compulsive. While a sex crime is not charged in this matter, the aberrant compulsivity of the defendant's conduct makes the admission of the evidence that much more critical in an otherwise circumstantial case where there is no witness to the crime. For the same reasons, the evidence is not unduly prejudicial. The motive of the defendant precludes any rational argument that she is violent towards those not in the limited class of two and therefore is unlikely to violate the policy against bad character and propensity evidence. It is that policy which provides the rationale for the exclusion of otherwise relevant evidence of misconduct.

In short, the court is persuaded by the presentation and analysis of the law in the well reasoned state's brief in support of the proffer. The law and analysis therein contained are incorporated herein and made a part of this memorandum. The facts proffered by the state will be permitted at time of trial subject only to other objection as may be deemed appropriate by counsel.

BY THE COURT

COMERFORD, J.                9/1/11

4

filed in court 9/1/2011 ⬦

12

Excerpt of November 21, 2011 Transcript, pp. 1-28

(competency hearing and defendant's waiver of

counsel before Judge Gary White)

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

1

```
 1              (Case called 11:34:00)

 2        BEFORE THE HONORABLE GARY WHITE, JUDGE

 3        THE COURT:  Good morning, you can be seated.

 4        ATTY. BERNARDI:  Good morning, Your Honor.

 5   We're in the process of bringing out the defendant,

 6   Sheila Davalloo.

 7        THE COURT:  All right.

 8        ATTY. BERNARDI:  In the case of State versus

 9   Sheila Davalloo.

10        (Pause)

11        ATTY. BERNARDI:  Madam Clerk -- if I may

12   inquire, Your Honor?

13        THE COURT:  Yes.

14        (Defendant enters courtroom)

15        (Pause)

16        THE COURT:  All right.  We're here on State V.

17   Sheila Davalloo.  Defendant's here, counsel, the

18   State and the defense are here.  We're down for a

19   hearing on a competency examination.  Are you ready

20   to proceed, Mr. Bernardi?

21        ATTY. BERNARDI:  Yes, sir.

22        THE COURT:  Okay.

23        ATTY. BERNARDI:  As Your Honor indicated, on a

24   previous occasion, Your Honor ordered a competency

25   examination of this particular defendant.  And I

26   think in the background was a motion, an anticipated
```

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

2

1    motion, she was making for self-representation.  At

2    any rate, the report has been filed, it's dated

3    October 24th of 2011.

4        The matter was continued to today's date by

5    agreement of all the parties and the State's ready

6    to call its witness here which is Joann Holmes.

7        (Witness takes the stand)

8        THE COURT:  Face the Clerk and take the oath,

9    please.

10                         *  *  *

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

3

1    J O A N N   H O L M E S ,

2    Was hereby sworn and did testify under oath as follows:

3              THE CLERK:  Please state and spell your name

4         and indicate your affiliation for the record.

5              MS. HOLMES:  It's Jo-Ann Holmes, capital J-o,

6         capital A-n-n Holmes, capital H-o-l-m-e-s.

7              THE COURT:  All right.  You can be seated,

8         ma'am.

9              MS. HOLMES:  Thank you.

10   **DIRECT EXAM BY ATTY. BERNARDI:**

11       Q    And by whom are you employed, Ms. Holmes?

12       A    I'm employed with the State of Connecticut,

13   Department of Mental Health & Addiction Services.

14       Q    And do you have a specific job title, is there a

15   particular office you're in charge of --

16       A    Yes, I'm the Director --

17       Q    -- in that particular position?

18       A    -- of the Norwich Office of Forensic Evaluations

19   under DMS.

20       Q    All right.  And are you a licensed clinical social

21   worker?

22       A    Yes, I am.

23       Q    And generally what does a -- well, I think we know

24   what a licensed clinical social worker does.

25       Do your duties as a director of the Norwich Office

26   include handling forensic examinations on the competency

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

4

```
 1   issue for female inmates?

 2      A    Yes, that is one duty that it entails.

 3      Q    Okay.  Now what kind of education, training and

 4   experience do you have for that?

 5      A    I have a Masters Degree from Fordham University,

 6   I've been licensed by the State of Connecticut to practice

 7   Social Work since 2002.

 8      Q    Okay.  And before counsel stipulates to your

 9   qualifications here, let me just ask you have you appeared

10   in court on previous occasions in the State of Connecticut

11   and rendered opinions to the court on the issue of

12   competency to stand trial?

13      A    Yes, I have.

14      Q    And have you been found to be an expert on those

15   occasions?

16      A    Yes, I have been.

17      Q    And how many occasions has this occurred?

18      A    Approximately 250.

19           ATTY. BERNARDI:  All right.  Do you stipulate?

20           ATTY. BUTLER:  Good morning, Your Honor.  Barry

21      Butler for the defense.  We would stipulate to the

22      qualifications of this witness.

23           THE COURT:  All right.  I'll find her an

24      expert.

25   BY ATTY. BERNARDI:

26      Q    All right.  Did you have an opportunity to

27   examination the defendant, Sheila Davalloo?
```

A396

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

5

1      A    Yes, I was part of a team that did so.

2      Q    And approximately during what time period did this

3  occur?

4      A    The evaluation took place on October 6th of this

5  year.

6      Q    And was this pursuant to a court-ordered competency

7  exam?

8      A    Yes, it was.

9      Q    How many people participated in the examination?

10      A    A total of three interviewers.

11      Q    All right.  And of course the purpose of a

12  competency examination is a two-pronged inquiry?

13      A    Yes, it is.

14      Q    And the two prongs are?

15      A    Whether the defendant has the ability to understand

16  the proceedings against her and also whether she has the

17  ability to assist in her own defense.

18      Q    All right.  Now pursuant to that examination, that

19  inquiry, did you review certain documents?

20      A    Yes.

21      Q    All right.  And are those documents listed in your

22  report?

23      A    Yes, they are.

24      Q    All right.  And did you also have an opportunity to

25  personally interview the defendant?

26      A    Yes.

27      Q    And how long did that interview last --

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

6

```
 1      A    Approximately --

 2      Q    Well, let me ask you this.  Was it an hour and five

 3   minutes?

 4      A    Yes, it was.

 5      Q    All right.  Now I'm going to direct your attention

 6   to this document which is a one, two, three

 7   (indiscernible), eight-page document with a cover letter to

 8   the Clerk.

 9      A    Okay.

10      Q    And ask you to just take a look at that and tell me

11   if you can identify what that document is.

12      A    Yes, that is a copy of the original with all the

13   original team members' signatures.

14           ATTY. BERNARDI:  Okay.  Now I'm going to ask

15      that it be marked as State's 1.

16           ATTY. BUTLER:  Obviously no objection, Your

17      Honor.

18           THE COURT:  Okay.  Marked as a full exhibit.

19           ATTY. BERNARDI:  Okay.  Thank you.

20   BY ATTY. BERNARDI:

21      Q    And this is made out in the regular course of your

22   duties as a member of the forensic team?

23      A    Yes.

24      Q    And you also came to a unanimous conclusion,

25   correct?

26      A    Yes.

27      Q    And your -- the unanimous conclusion of the team
```

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

7

1    with regard to competency was what?

2        A    That the defendant demonstrated the capacity to

3    understand the proceedings against her.  She also

4    demonstrated the capacity to assist in her own defense.

5                ATTY. BERNARDI:  All right.  I'm going to

6                (indiscernible) -- I know Your Honor's already seen

7                a copy; just for the record I am handing this to be

8                marked as State's 1.

9                THE COURT:  All right.

10               ATTY. BERNARDI:  And I'm going to ask a few

11               questions just with regard to that report and I'll

12               be quick.

13   BY ATTY. BERNARDI:

14       Q    You had an opportunity to interview the defendant

15   and learn some of her background and at the beginning, I

16   think you indicated that she's highly educated?

17       A    Yes.

18       Q    She has a Master's degree?

19       A    Correct.

20       Q    She speaks approximately -- how many languages does

21   she speak?

22       A    She reported to us that she speaks three different

23   languages.

24       Q    All right.  And she was employed as a data manager

25   for a pharmaceutical company?

26       A    Yes, that's what she reported to us.

27       Q    She also indicated that she had been married two

Case 3:17-cv-01257-VAB  Document 25-4  Filed 11/08/17  Page 394 of 422
12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

8

1    times previously?

2        A    Yes.

3        Q    Now you had an opportunity to interview (as spoken)

4    the medical records of Doctor Lewides (phonetic)?

5        A    To review them, yes.

6        Q    And you saw what his previous diagnosis was from

7    2003, I believe?

8        A    Correct.

9        Q    All right.  And that is outlined in your report?

10       A    Yes.

11       Q    Is she currently on -- is the defendant currently

12   on medication?

13       A    According to records from York Correctional, she is

14   not on any psychiatric medications at this time.

15       Q    Okay.  And I take it that the correctional

16   institution has like a sliding scale to determine the

17   robustness, as it were, of a person's psychological status?

18       A    Correct.  The Department of Correction uses a

19   classification score on a scale of one to five with five

20   being the most acute in the psychiatric -- or experiencing

21   an acute episode of psychosis.

22       And as recorded in the document, Ms. Davalloo is

23   currently scored as a three on that scale.

24       Q    Okay.  Which means I assume that she's less than

25   psychologically robust but she's -- she's not suffering

26   from psychotic episodes or anything of that nature at the

27   present time?

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

9

1     A    I can read you the classification.

2     Q    Go ahead.

3     A    It says -- Because D.O.C. describes these as

4    individuals who are mildly or moderately impaired with a

5    latent or chronic mental illness.  Mild or moderate

6    impairment may include (indiscernible) mental illness

7    controlled on medication or character or personality

8    disorders.

9     Q    So it would appear from that that whatever

10   psychological issues may be troubling this particular woman

11   that they are under control at the present time.

12    A    They are stable, yes.

13    Q    All right.  Now your interview did not do anything

14   to contradict that conclusion, is that true?

15    A    Our interview did not, no.  It --

16    Q    You noted no abnormal conduct or speech on her

17   part?

18    A    No.

19    Q    She appeared to be coherent, alert and over -- and

20   orientated?

21    A    (Inaudible).

22    Q    Her thought processes were linear, she was not

23   suicidal, she reported no psychotic episodes and she was of

24   high to average range -- she had a high average range of

25   intelligence.  Is that all correct?

26    A    That was the team's assessment.

27    Q    All right.  Now with regard to her capacity to

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 396 of 422
12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

10

1  understand the proceedings against her.  She knew she was

2  charged with murder, is that correct?

3      A    Correct.

4      Q    She was familiar with the facts outlined in an

5  affidavit, a lengthy affidavit, supporting the warrant?

6      A    Yes.

7      Q    All right.  And you had that affidavit before you

8  and I think it included 58 bullet points or paragraphs, as

9  it were.

10     A    There were 56, correct.

11     Q    56, okay.  And she was able to describe the State's

12  case against her to you?

13     A    Yes.

14     Q    And she knew the maximum penalties?  She had an

15  excellent -- according to your report she had an excellent

16  understanding of the rules of courtroom personnel, is that

17  true?

18     A    Yes.

19     Q    It even appeared that she was familiar with jury

20  picking?

21     A    Yes, she did.

22     Q    And she described to you and you were aware of that

23  she had the prior experience of sitting through as a

24  defendant a serious trial to a verdict in New York I think

25  in 2004?

26     A    Correct.

27     Q    And she understand the plea bargaining process?

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

11

1       A    Yes, she did.

2       Q    Now with regard to her ability to assist in her own

3   defense, you were of course aware of the fact that she was

4   at least contemplating representing herself in a murder

5   trial?

6       A    Correct.  We received information prior to the

7   evaluation from the Public Defender's social worker that

8   that was -- that was something that she was considering.

9       Q    All right.  Now I'm not going to ask you with

10  regard to any of the substances of her defenses or

11  strategies or whatever but you did talk to her about her

12  decision to represent herself which she described as being

13  a result of ideological differences with her attorney.  Is

14  that correct?

15      A    Correct.

16      Q    All right.  Now as she -- as she went through this

17  decision to her, her -- she was aware of the fact that she

18  would be proceeding pro se with standby counsel?

19      A    That was what she -- her plan that she described to

20  the team.

21      Q    So she had a plan and she had a plan coupled with a

22  strategy for proceeding as a self-represented defendant

23  with standby counsel?

24      A    Correct.

25      Q    And she discussed the merits of this -- of whatever

26  the strategies were in this process with you?

27      A    In a limited fashion, yes.

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

12

1    Q    Okay.  Now her approach appeared to this -- to this

2    issue appeared to be rationale?

3    A    Yes, they did (as spoken).

4    Q    And it appeared to be somewhat sophisticated, is

5    that true?

6    A    Correct.

7    Q    Now once again, finally, your team came to the

8    conclusion ultimately that it appeared that she understood

9    the nature of the proceedings against her and that she was

10   competent to assist herself, assist her attorney in her own

11   defense,  Is that correct?

12   A    Yes.

13   Q    Now that obviously is the purpose of such an

14   examination.  Whether or not she should represent herself

15   of course is beyond the scope of all your inquiry.

16   A    Correct.

17   Q    Although it appears that at least factually you

18   touched on certain issues that would be relevant to that

19   inquiry?

20   A    We tried to touch on some of the -- her decision-

21   making capacity, her thought process.

22   Q    But the bottom line is basically this.  Because the

23   issue of self-representation was beyond the scope of your

24   inquiry, you did not come to such a conclusion.

25   A    Right.

26   Q    As to whether or not it was merited or she was

27   competent to represent herself under the circumstances?

13

```
1     A    That's right.

2          ATTY. BERNARDI:  All right.  Okay, thank you

3     very much.

4          THE COURT:  Mr. Butler.

5          ATTY. BUTLER:  Yes, Your Honor.  I may have a

6     question or two.  Good morning, Director Holmes.

7          MS. HOLMES:  Good morning.

8     CROSS EXAM BY ATTY. BUTLER:

9     Q    The normal determination is whether someone's able

10    to assist in their defense and understand the nature of the

11    charges and proceedings against them, is that correct?

12    A    Yes.

13    Q    And that's basically what you were charged with

14    doing in this case?

15    A    Yes.  That's what we were ordered to do under --

16    Q    Unanimous opinion of the team that she is

17    competent.

18    A    Yes.

19    Q    And then because you were aware through my office

20    and perhaps other sources of information that she may want

21    to represent herself you explored that a little further but

22    you did not reach any conclusions on whether she's

23    competent to represent herself.

24    A    Right.

25    Q    And that's because that's a court function and not

26    a team function?

27    A    That would be a legal finding or a different kind
```

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

14

1   of evaluation that is separate from 54-56(d).

2      Q    Okay.  And she had mentioned -- I guess you had

3   testified earlier she had mentioned ideological differences

4   between herself and I.

5      A    Yes.

6      Q    As one of the reasons why she wants to represent

7   herself?

8      A    Correct.

9      Q    That's correct.  Okay.  Did she mention that I

10  cautioned against this?  Were you aware of that?

11     A    No, she did not.

12             ATTY. BUTLER:  Okay, thank you.  Your Honor, I

13         wouldn't have anything further.  Thank you.  Thank

14         you, Director Holmes.

15             MS. HOLMES:  Thank you.

16             THE COURT:  All right, thank you.  Anything

17         else, sir?

18             ATTY. BERNARDI:  No, sir.

19             THE COURT:  Okay.  Thank you.  You can step

20         down.

21             MS. HOLMES:  Thank you.

22             (Witness steps down)

23             THE COURT:  All right.  Do you have any other

24         witnesses, Mr. Bernardi?

25             ATTY. BERNARDI:  No, sir.

26             THE COURT:  Do you have any witnesses, Mr.

27         Butler?

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

15

1        ATTY. BUTLER:  I do not.

2        THE COURT:  All right.  I'll listen to comments

3   from the State and the defense, if you wish to offer

4   any.

5        ATTY. BERNARDI:  No comment, Your Honor.

6        THE COURT:  Mr. Butler.

7        ATTY. BUTLER:  Well, it's a competency hearing.

8   I think the Court should find her competent.  I've

9   always believed she's competent, I think she's

10  competent as she sits here today; competent to stand

11  trial.  So I think the Court should make that

12  finding.

13       THE COURT:  All right.  I heard the testimony

14  of Jo-Ann Holmes, the licensed clinical social

15  worker who was a member of the team that examined

16  the defendant for competency.  I also reviewed the

17  report that was admitted into evidence; that

18  report's dated October 24th, 2011.

19       I find the testimony credible, I find the

20  information in the report credible and based on

21  everything I've heard and read the defendant is

22  competent within the standards in General Statute

23  54-56(d) and I find her competent and her cases are

24  restored to the regular docket.

25       ATTY. BUTLER:  Thank you.

26       THE COURT:  Now that leaves us with one issue

27  to deal with and that is the defendant's motion to

A407

(competency hearing and defendant's waiver of counsel before Judge Gary White)

```
1        represent herself.  She's currently represented
2        obviously by Mr. Barry Butler of the Public
3        Defender's Office.
4            And ma'am, you have a Constitutional right to
5        represent yourself provided the Court's satisfied
6        that you meet certain criteria and I'm willing to
7        listen to regarding your willingness to represent
8        yourself and I have some questions I want to ask
9        you.  Do you want to make any comments before I ask
10       you some questions?
11           MS. DAVALLOO:  No, Your Honor.
12           THE COURT:  All right.
13           THE COURT:  All right.  How old are you?
14           MS. DAVALLOO:  I'm 42 years old.
15           THE COURT:  And incidentally, I'm going to ask
16       you some of these questions, I already know the
17       answer to a lot of these.
18           And I'll preliminarily that having read the
19       competency report that I just referred to, a lot of
20       these questions are answered within the parameters
21       of that report but nevertheless I'm going to ask you
22       these questions anyway.
23           So you're 42 years old and I understand that
24       you graduated from High School.
25           MS. DAVALLOO:  That's correct.  Would you like
26       me to stand up or just stay sitting down?
27           THE COURT:  No, you can sit down.  And you
```

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

17

1          graduated from college?

2               MS. DAVALLOO:  That's correct.

3               THE COURT:  And you have a graduate degree.

4               MS. DAVALLOO:  That's correct.

5               THE COURT:  And you have been through a

6          criminal trial in the State of New York.

7               MS. DAVALLOO:  Yes, Your Honor.

8               THE COURT:  And you were represented by counsel

9          there?

10              MS. DAVALLOO:  Yes, Your Honor.

11              THE COURT:  So you are familiar with the

12         courtroom actors obviously defense attorney, State's

13         Attorney and Judge and other actors within the court

14         system?

15              MS. DAVALLOO:  Yes, Your Honor.

16              THE COURT:  And your charge here in Connecticut

17         is murder.  You understand that?

18              MS. DAVALLOO:  I do.

19              THE COURT:  And have you -- you understand that

20         the maximum penalty for that crime is 20 plus --

21         actually 60 years in prison?

22              MS. DAVALLOO:  Yes, Your Honor.

23              THE COURT:  And you understand the mandatory

24         minimum is 25 years?

25              MS. DAVALLOO:  I do.

26              THE COURT:  And have you educated yourself on

27         the elements of that offense?

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

18

```
1            MS. DAVALLOO:  I -- I'm pretty well aware of

2       the elements.  And like I mentioned to the team who

3       interviewed me, I'll be relying heavily on standby

4       counsel as well.

5            THE COURT:  Okay.  And do you understand how to

6       pick a jury?  Have you educated yourself on that

7       process?

8            MS. DAVALLOO:  I have, Your Honor.

9            THE COURT:  And have you educated yourself on

10      the law of evidence?

11           MS. DAVALLOO:  Yes, Your Honor.

12           THE COURT:  And do you understand that if

13      you're permitted to represent yourself, the Court in

14      all likelihood would give you some leeway in the

15      trial process but you're going to have to follow the

16      rules of evidence just like a lawyer has to and have

17      to follow the proper courtroom procedures.  Do you

18      understand that?

19           MS. DAVALLOO:  I do understand that.  The only

20      leeway I would hope for is just maybe a little time

21      to, you know, confer with standby counsel.

22           THE COURT:  Now you understand that you have a

23      Constitutional right to be represented by a lawyer.

24           MS. DAVALLOO:  I do, Your Honor.

25           THE COURT:  In fact, you are represented by a

26      lawyer right now?

27           MS. DAVALLOO:  Yes, Your Honor.
```

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

19

```
 1        THE COURT:  And you understand that if you

 2   can't afford a lawyer, the Court would appoint one

 3   to represent you?

 4        MS. DAVALLOO:  I do.

 5        THE COURT:  And in fact, you have a court-

 6   appointed attorney right now.

 7        MS. DAVALLOO:  Yes, Your Honor.

 8        THE COURT:  Do you understand that there are

 9   great dangers involved in self-representation?

10        MS. DAVALLOO:  I do, Your Honor.  I'm very well

11   aware of the pitfalls of self --

12        THE COURT:  Okay.  And I don't know what you

13   think the pitfalls are but one of the things I would

14   say is that if you represent yourself, it's very

15   difficult to be objective about what's going on in

16   the courtroom because -- and I don't know what your

17   planned defenses are.

18        But you may -- you see things from your own

19   perspective and maybe the jury would not see them

20   from your perspective or a Judge or other people in

21   the courtroom, do you understand that?

22        MS. DAVALLOO:  I do understand.  This was

23   solely a strategic -- for strategic purposes, Your

24   Honor.  And I just wanted a little more control in

25   the strategy process so I opted for this option.

26        THE COURT:  Now you indicated to the team

27   members and your lawyer indicated I think here in
```

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

20

```
 1        court that you wanted to represent yourself because
 2        you had ideological differences with your lawyer in
 3        this case.  I don't want to know about your private
 4        discussions with your lawyer but I'm just -- I don't
 5        know what that means.  Maybe you could explain that
 6        to me.
 7             MS. DAVALLOO:  I think there's just differences
 8        in -- in how to go about -- like I felt that my
 9        hands were a little tied in terms of some of the
10        decision-making process and not that it was Mr.
11        Butler's -- I mean he's done a phenomenal job and we
12        have a good rapport.
13             However, I wanted a little bit more control
14        over some of the decision-making process and just
15        that, you know, just that the witnesses, the order
16        of witnesses, calling -- which witnesses to call
17        within the letter of the law; I wanted a little
18        control of that.
19             THE COURT:  Would it be fair to say that what
20        you're describing is a difference in strategy or
21        tactics during the course of the trial?
22             MS. DAVALLOO:  As well, Your Honor, I think Mr.
23        Butler is -- again, you know, he has my best
24        interests in mind and he was more, you know, leaning
25        towards a plea situation and I'm not in agreement
26        with that as well.
27             THE COURT:  Okay.  You understand it's not
```

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

21

```
 1        unusual for a criminal defendant and a criminal

 2        defense lawyer to disagree on strategy in a case;

 3        that doesn't mean that the lawyer's not doing a good

 4        job.  And you've indicated that your lawyer is doing

 5        a good job as far as you're concerned.

 6            MS. DAVALLOO:  Not at all, Your Honor.  I just

 7        think that there's only minimal rights that I had as

 8        a represented individual and I want a little bit

 9        more leeway in the decision-making process.

10            THE COURT:  All right.  I again read the

11        competency report, I heard Ms. Holmes testify and

12        she indicated that you have a history of mental

13        health issues.  In the past you've taken medication

14        although you're not taking any right now and that --

15        the fact that you've had a history of mental health

16        problems, I don't know, may factor into this trial.

17            I don't know whether you're planning on or

18        you're thinking on raising a defense about lack of

19        capacity due to mental disease or defect or a

20        defense of -- extreme emotional defense; both of

21        those are something called affirmative defenses.  Do

22        you understand that?

23            MS. DAVALLOO:  I do understand that very well.

24            THE COURT:  And that would mean that you have

25        to prove that defense by a preponderance of the

26        evidence.  Do you understand that?

27            MS. DAVALLOO:  I do, Your Honor.  That's not --
```

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

22

1    that's not the avenue I'm pursuing.

2         THE COURT:  Okay.

3         MS. DAVALLOO:  My mental -- my mental health

4    issues in the past have been a lot related to

5    depression and PTSD.

6         THE COURT:  Okay.  Well, I know you're saying

7    you're not planning to raise them.  I don't know

8    what -- maybe you'll change your mind, I don't know.

9         MS. DAVALLOO:  Uh-huh.

10        THE COURT:  But do you understand in those

11   areas, you'd have to educate yourself on what the

12   law is and you'd have a burden of proof going

13   forward and you might be better off having an

14   attorney helping you with that although you sound

15   like you've researched these issues.  Is that right?

16        MS. DAVALLOO:  I have done a great deal of

17   research, I'm not a neophyte, I'm not completely,

18   you know, in the dark with regards to those issues.

19   I've been in prison almost eight years and have a

20   little experience, jailhouse lawyer experience.

21        And I feel that I'm very clear with my New York

22   case, obviously.  And will be able to represent

23   myself as well.  Pretty funny.

24        THE COURT:  All right.  Well, you understand

25   that if I do permit you to represent yourself,

26   you're not going to be able just to change your mind

27   and go back to having your lawyer represent you

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

23

1    unless the Court allows you to do that.  Do you

2    understand that?

3        MS. DAVALLOO:  Yes, Your Honor.  I understand

4    that.  This is -- I believe this to be a timely

5    decision and it's unequivocal.  So I have no

6    problems with that.

7        THE COURT:  Okay.  So you're absolutely sure

8    you want to go forward and represent yourself?

9        MS. DAVALLOO:  I am certain.

10       THE COURT:  And you mentioned being able to

11   rely on Mr. Butler to some degree.  I guess you're

12   asking me to have him act as standby counsel if I

13   let you represent yourself?

14       MS. DAVALLOO:  I would very much appreciate

15   that.  Yes, Your Honor.

16       THE COURT:  Do you understand the role of

17   standby counsel?

18       MS. DAVALLOO:  I do, Your Honor.

19       THE COURT:  Do you understand he's going to be

20   there for you to ask questions so you can ask him

21   questions and get help from him.  But unless you ask

22   him, he's going to sit there mute?

23       MS. DAVALLOO:  Yes, Your Honor.  I understand.

24       THE COURT:  It's not his job to jump up and

25   object and unless you object, he can point out

26   things that are favorable to your side of the case

27   to the court but if you object he's not to say

A415

Case 3:17-cv-01257-VAB   Document 25-4   Filed 11/08/17   Page 410 of 422
12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)
24

```
1    anything.  And for the most part he's going to sit
2    there and you're going to run the show completely
3    unless you ask him for something.
4         MS. DAVALLOO:  I understand, Your Honor.  I
5    appreciate your explaining it to me, I do
6    understand.
7         THE COURT:  Okay.  Anybody force you or
8    threaten you to make this request to represent
9    yourself?
10        MS. DAVALLOO:  No, Your Honor.
11        THE COURT:  Okay.  You haven't had any drugs,
12   alcohol or medicine that would affect your ability
13   in making this request?
14        MS. DAVALLOO:  Not at all.
15        THE COURT:  Okay.  And you're absolutely
16   competent (as spoken) that you can educate yourself
17   even more so that you can represent yourself
18   competently and you're confident in your ability to
19   go forward?
20        MS. DAVALLOO:  Yes, Your Honor.  I've been
21   doing it -- I've been, you know, Mr. Butler sent me
22   the Code (sounds like) and I've been educating
23   myself and I'll continue to do so.
24        THE COURT:  Okay.  So I know we've been over
25   this but bottom line is you understand the elements
26   of the crime of murder?
27        MS. DAVALLOO:  I do, Your Honor.
```

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

25

```
1          THE COURT:  Okay.  And you understand the range
2     of penalties?
3          MS. DAVALLOO:  I -- yes, Your Honor.
4          THE COURT:  And you understand what you're
5     going to have to do to select a jury?
6          MS. DAVALLOO:  I do.
7          THE COURT:  And the number of jurors involved?
8          MS. DAVALLOO:  Yes, Your Honor.
9          THE COURT:  And the kind of questions you can
10    ask?
11         MS. DAVALLOO:  Yes, Your Honor.
12         THE COURT:  Do you understand that?
13         MS. DAVALLOO:  I do understand.
14         THE COURT:  And do you understand that you're
15    going to have to ask your questions and conduct
16    yourself within the rules of evidence.  Do you
17    understand that?
18         MS. DAVALLOO:  Yes, sir.
19         THE COURT:  And you're competent in going -- do
20    I need to ask her anything else, counsel?  State,
21    defense?
22         ATTY. BERNARDI:  I think you've covered it all,
23    Your Honor.
24         ATTY. BUTLER:  Can't think of anything, Your
25    Honor.
26         THE COURT:  Okay.  I'm going to make a finding
27    that the defendant has knowingly, intelligently and
```

**12. Excerpt of November 21, 2011 Transcript, pp. 1-28**
**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

26

```
 1        voluntarily decided to represent herself.  She does

 2        have a right to represent herself and I'm going to

 3        allow her to do so.

 4            In addition, I'm going to appoint Mr. Barry

 5        Butler as defendant's standby counsel and to the

 6        extent she wants to utilize to ask questions and

 7        help her she can do that.  And unless she asks him,

 8        he's going to stand back and she's entitled to run

 9        the case as she sees fit and make all strategic

10        decisions, etcetera.

11            And I take it, ma'am, you want to stick with

12        your request for a jury trial, is that right?

13            MS. DAVALLOO:  I do, Your Honor.  Yes.

14            THE COURT:  All right.

15            ATTY. BERNARDI:  Your Honor, my only comment

16        would be -- if I may just briefly.

17            THE COURT:  Certainly.

18            ATTY. BERNARDI:  Because obviously I think

19        these procedures are governed by 44-3 and 44-4 of

20        the Practice Book as Your Honor has clearly read

21        before we came in here.

22            And the record does adequate -- sufficiently

23        establish that she's been clearly advised of her

24        right to assistance of counsel and that includes the

25        right of assigned counsel and she's so entitled and

26        she in fact sits here with the public defender.

27            This hearing in conjunction with what we just
```

12. Excerpt of November 21, 2011 Transcript, pp. 1-28
(competency hearing and defendant's waiver of counsel before Judge Gary White)

27

1   heard from the person who testified, Ms. Holmes from

2   Norwich Forensic Services, indicates that she

3   possesses the intelligence, the capacity to

4   appreciate the consequences of the decision to

5   represent oneself and that she comprehends the

6   nature of the charges and proceedings, the range of

7   permissible punishments.

8        And as Ms. Holmes indicated the facts essential

9   to a broad understanding of the case are laid out in

10  an affidavit supporting the warrant and she was

11  aware of those.

12       And as Your Honor clearly indicates through

13  your inquiry, she's been made aware of the dangers

14  and disadvantages of self-representation.  So.

15       THE COURT:  All right.  Thank you, Mr.

16  Bernardi.  And again, I know I've said this or

17  implied this but I just want to make this abundantly

18  clear.

19       In allowing you to represent yourself, Ms.

20  Davalloo, I'm taking into account not only the

21  comments you've made in response to my questions but

22  also the testimony given by Ms. Holmes and the

23  information in that competency report.

24       Because it gives me an overall picture of --

25  taken together, all that information taken together

26  clearly shows me that you're capable of representing

27  yourself.  And you understand you have a right to

**(competency hearing and defendant's waiver of counsel before Judge Gary White)**

1    counsel, you don't want assigned counsel, you want

2    to represent yourself and you have the eloquence and

3    ability to represent yourself.  So that's that.  So

4    we need another date, I take it?



# CONSTITUTIONAL AND STATUTORY PROVISIONS

# RELIED UPON

## CONSTITUTIONAL AND STATUTORY PROVISIONS RELIED UPON

**United States Constitution, Sixth Amendment**

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

**Connecticut General Statutes**

**Conn. Gen. Stat. §53a-54a.  Murder.**

(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony committed prior to April 25, 2012, punishable in accordance with subparagraph (A) of subdivision (1) of section 53a-35a, murder with special circumstances committed on or after April 25, 2012, punishable as a class A felony in accordance with subparagraph (B) of subdivision (1) of section 53a-35a, or murder under section 53a-54d.

**Con. Gen. Stat. §54-84a.  Testimony against spouse.**

(a) Except as provided in subsection (b) of this section, in any criminal proceeding, a person may elect or refuse to testify against his or her then lawful spouse.

(b) The testimony of a spouse may be compelled, in the same manner as for any other witness, in a criminal proceeding against the other spouse for (1) joint participation with the

spouse in criminal conduct, (2) bodily injury, sexual assault or other violence attempted, committed or threatened upon the spouse, or (3) bodily injury, sexual assault, risk of injury pursuant to section 53-21, or other violence attempted, committed or threatened upon the minor child of either spouse, or any minor child in the care or custody of either spouse.

## Sec. 54-84b.  Testimony of spouse re confidential communications.

(a) For the purposes of this section, "confidential communication" means any oral or written communication made between spouses during a marriage that is intended to be confidential and is induced by the affection, confidence, loyalty and integrity of the marital relationship.

(b) Except as provided in subsection (c) of this section, in any criminal proceeding, a spouse shall not be (1) required to testify to a confidential communication made by one spouse to the other during the marriage, or (2) allowed to testify to a confidential communication made by one spouse to the other during the marriage, over the objection of the other spouse.

(c) The testimony of a spouse regarding a confidential communication may be compelled, in the same manner as for any other witness, in a criminal proceeding against the other spouse for (1) joint participation with the spouse in what was, at the time the communication was made, criminal conduct or conspiracy to commit a crime, (2) bodily injury, sexual assault or other violence attempted, committed or threatened upon the spouse, or (3) bodily injury, sexual assault, risk of injury pursuant to section 53-21, or other violence attempted, committed or threatened upon the minor child of either spouse, or any minor child in the care or custody of either spouse.

## Connecticut Practice Book

## Conn. Prac. Bk. §44-2Sec. 44-3. --Waiver of Right to Counsel

A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

(4) Has been made aware of the dangers and disadvantages of self-representation.

## Conn. Prac. Bk. § 60-5. Review by the Court; Plain Error; Preservation of Claims

The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court.

In jury trials, where there is a motion, argument, or offer of proof or evidence in the absence of the jury, whether during trial or before, pertaining to an issue that later arises in the presence of the jury, and counsel has fully complied with the requirements for preserving any objection or exception to the judge's adverse ruling thereon in the absence of the jury, the matter shall be deemed to be distinctly raised at the trial for purposes of this rule without a further objection or exception provided that the grounds for such objection or exception, and the ruling thereon as previously articulated, remain the same.

If the court deems it necessary to the proper disposition of the cause, it may remand the case for a further articulation of the basis of the trial court's factual findings or decision.

It is the responsibility of the appellant to provide an adequate record for review as provided in Section 61-10.

## Connecticut Code of Evidence

## Conn. Code of Evid. §4-1. Definition of Relevant Evidence

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence.

### COMMENTARY

Section 4-1 embodies the two separate components of relevant evidence recognized at common law: (1) probative value; and (2) materiality. State v. Jeffrey, 220 Conn. 698, 709, 601 A.2d 993 (1991); State v. Dabkowski, 199 Conn. 193, 206, 506 A.2d 118 (1986).

Section 4-1 incorporates the requirement of probative value by providing that the proffered evidence must tend "to make the existence of any fact . . . more probable or less probable than it would be without the evidence." See, e.g., State v. Prioleau, 235 Conn. 274, 305, 664 A.2d 793 (1995); State v. Briggs, 179 Conn. 328, 332, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). Section 4-1's "more probable or less probable than it would be without the evidence" standard of probative

worth is consistent with Connecticut law. See, e.g., State v. Rinaldi, 220 Conn. 345, 353, 599 A.2d 1 (1991) ("[t]o be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion, even to a slight degree" [emphasis added]); State v. Miller, 202 Conn. 463, 482, 522 A.2d 249 (1987) ("[e]vidence is not inadmissible because it is not conclusive; it is admissible if it has a tendency to support a fact relevant to the issues if only in a slight degree" [emphasis added]). Thus, it is not necessary that the evidence, by itself, conclusively establish the fact for which it is offered or render the fact more probable than not.

Section 4-1 expressly requires materiality as a condition to relevancy in providing that the factual proposition for which the evidence is offered must be "material to the determination of the proceeding . . . ." See State v. Marra, 222 Conn. 506, 521, 610 A.2d 1113 (1992); State v. Corchado, 188 Conn. 653, 668, 453 A.2d 427 (1982). The materiality of evidence turns upon what is at issue in the case, which generally will be determined by the pleadings and the applicable substantive law. See Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 570, 657 A.2d 212 (1995); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.1.2, pp. 226–27

## Conn. Code of Evid. §4-3. Exclusion of Evidence on Grounds of Prejudice, Confusion or Waste of Time

Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

### COMMENTARY

Section 4-3 establishes a balancing test under which the probative value of proffered evidence is weighed against the harm likely to result from its admission. See, e.g., State v. Rinaldi, 220 Conn. 345, 356, 599 A.2d 1 (1991); Farrell v. St. Vincent's Hospital, 203 Conn. 554, 563, 525 A.2d 954 (1987); State v. DeMatteo, 186 Conn. 696, 702–703, 443 A.2d 915 (1982). The task of striking this balance is relegated to the court's discretion. E.g., State v. Paulino, 223 Conn. 461, 477, 613 A.2d 720 (1992).

The discretion of a trial court to exclude relevant evidence on the basis of unfair prejudice is well established. E.g., State v. Higgins, 201 Conn. 462, 469, 518 A.2d 631 (1986). All evidence adverse to an opposing party is inherently prejudicial because it is damaging to that party's case. Berry v. Loiseau, 223 Conn. 786, 806, 614 A.2d 414 (1992); Chouinard v. Marjani, 21 Conn. App. 572, 576, 575 A.2d 238 (1990). For exclusion, however, the prejudice must be "unfair" in the sense that it "unduly arouse[s] the jury's emotions of prejudice, hostility or sympathy"; State v. Wilson, 180 Conn. 481, 490, 429 A.2d 931 (1980); or "tends to have some adverse effect upon [theparty against whom the evidence is offered] beyond tending to prove the fact or issue that justified its admission into evidence." State v. Graham, 200 Conn. 9, 12, 509 A.2d 493 (1986), quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).

Common law recognized unfair surprise as a factor to be weighed against the probative value of the evidence. See, e.g., State v. Higgins, supra, 201 Conn. 469; State v. DeMatteo, supra, 186 Conn. 703. When dangers of unfair surprise are claimed to outweigh

A426

probative value, nothing precludes the court from fashioning a remedy other than exclusion, e.g., continuance, when that remedy will adequately cure the harm suffered by the opposing party.

Section 4-3 also recognizes the court's authority to exclude relevant evidence when its probative value is outweighed by factors such as confusion of the issues or misleading the jury; Farrell v. St. Vincent's Hospital, supra, 203 Conn. 563; see State v. Gaynor, 182 Conn. 501, 511, 438 A.2d 749 (1980); State v. Sebastian, 81 Conn. 1, 4, 69 A. 1054 (1908); or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. See, e.g., State v. Parris, 219 Conn. 283, 293, 592 A.2d 943 (1991); State v. DeMatteo, supra, 186 Conn. 702–703; Hydro-Centrifugals, Inc. v. Crawford Laundry Co., 110 Conn. 49, 54–55, 147 A. 31 (1929).

## Conn. Code of Evid. §4-5. Evidence of Other Crimes, Wrongs or Acts Generally Inadmissible

(a) General Rule. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b).

(b) When evidence of other sexual misconduct is admissible to prove propensity. Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect.

(c) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

(d) Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct.

## COMMENTARY

(a) **Evidence of other crimes, wrongs or acts inadmissible to prove character.**
Subsection (a) is consistent with Connecticut common law. E.g., State v. Santiago, 224 Conn. 325, 338, 618 A.2d 32 (1992); State v. Ibraimov, 187 Conn. 348, 352, 446 A.2d 332 (1982). Other crimes, wrongs or acts evidence may be admissible for other purposes as specified in subsection (b). Although the issue typically arises in the context of a criminal

proceeding; see State v. McCarthy, 179 Conn. 1, 22, 425 A.2d 924 (1979); subsection (a)'s exclusion applies in both criminal and civil cases. See, e.g., Russell v. Dean Witter Reynolds, Inc., 200 Conn. 172, 191–92, 510 A.2d 972 (1986).

**(b) When evidence of other crimes, wrongs or acts is admissible.**

Subsection (a) specifically prohibits the use of other crimes, wrongs or acts evidence to prove a person's bad character or criminal tendencies. Subsection (b), however, authorizes the court, in its discretion, to admit other crimes, wrongs or acts evidence for other purposes, such as to prove:

(1) intent; e.g., State v. Lizzi, 199 Conn. 462, 468–69, 508 A.2d 16 (1986);

(2) identity; e.g., State v. Pollitt, 205 Conn. 61, 69, 530 A.2d 155 (1987); (

3) malice; e.g., State v. Barlow, 177 Conn. 391, 393, 418 A.2d 46 (1979);

(4) motive; e.g., State v. James, 211 Conn. 555, 578, 560 A.2d 426 (1989);

(5) a common plan or scheme; e.g., State v. Morowitz, 200 Conn. 440, 442–44, 512 A.2d 175 (1986);

(6) absence of mistake or accident; e.g., State v. Tucker, 181 Conn. 406, 415–16, 435 A.2d 986 (1980);

(7) knowledge; e.g., State v. Fredericks, 149 Conn. 121, 124, 176 A.2d 581 (1961);

(8) a system of criminal activity; e.g., State v. Vessichio, 197 Conn. 644, 664–65, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986);

(9) an element of the crime [charged]; e.g., State v. Jenkins, 158 Conn. 149, 152–53, 256 A.2d 223 (1969); or

(10) to corroborate crucial prosecution testimony; e.g., State v. Mooney, 218 Conn. 85, 126–27, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

Admissibility of other crimes, wrongs or acts evidence is contingent on satisfying the relevancy standards and balancing test set forth in Sections 4-1 and 4-3, respectively. For other crimes, wrongs or acts evidence to be admissible, the court must determine that the evidence is probative of one or more of the enumerated purposes for which it is offered, and that its probative value is not outweighed by its prejudicial effect. E.g., State v. Figueroa, 235 Conn. 145, 162, 665 A.2d 63 (1995); State v. Cooper, 227 Conn. 417, 425–28, 630 A.2d 1043 (1993).

The purposes enumerated in subsection (b) for which other crimes, wrongs or acts evidence may be admitted are intended to be illustrative rather than exhaustive. Neither subsection (a) nor subsection (b) precludes a court from recognizing other appropriate purposes for which other crimes, wrongs or acts evidence may be admitted, provided the evidence is not introduced to prove a person's bad character or criminal tendencies, and the probative value of its admission is not outweighed by any of the Section 4-3 balancing factors.

**(c) Specific instances of conduct when character in issue.**

Subsection (c) finds support in Connecticut case law. See State v. Miranda, 176 Conn. 107, 112, 365 A.2d 104 (1978); Norton v. Warner, 9 Conn. 172, 174 (1832).