# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHEILA DAVALLOO,     :
  *Petitioner*,      :
           :
 v.         :    No. 3:17-cv-1257 (VAB)
           :
SABINA KAPLAN, *et al.*.    :
  *Respondents.*     :

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

On February 28, 2017, Sheila Davalloo ("Petitioner"), a state prisoner currently incarcerated at the Bedford Hills Correctional Institution ("Bedford Hills") in Bedford Hills, New York, brought a petition for writ of habeas corpus *pro se* under 28 U.S.C. § 2254 in this Court challenging her Connecticut conviction for murder, in violation of Connecticut General Statutes ("Conn. Gen. Stat.") § 53a-54a.[1]

Ms. Davalloo claims that the state trial court improperly: (1) admitted evidence of conversations she had with her husband, which were protected by Connecticut's marital privilege statute; (2) admitted evidence of uncharged misconduct, including the petitioner's attempted murder of her husband and statements to her husband about surveilling the victim; and (3) found that her decision to waive her right to counsel was valid.[2] Pet., ECF No. 1, Feb. 28, 2017.

For the following reasons, Ms. Davallo's petition for writ of habeas corpus is **DENIED**.

---

[1] Petitioner is currently serving a twenty-five year prison sentence for her New York convictions of attempted murder in the second degree, assault in the first degree, and criminal possession of a weapon in the fourth degree. *People v. Davalloo*, 833 N.Y.S.2d 576 (N.Y. App. Div. 2007). The fifty-year sentence she received in Connecticut runs consecutive to her New York sentence. Resp't Ex. M, ECF No. 25-35 at 39–40 (Sent. Tr. (Apr. 27, 2012)) ("Sent. Tr.").

[2] On February 3, 2020, Ms. Davalloo provided a notice that she had waived her unexhausted ground for habeas relief based on the trial court's failure to inquire into her competency to waive counsel and that her third ground for habeas relief was limited to whether the trial court erred in finding a knowing, intelligent, and voluntary waiver. Notice, ECF No. 29 (Feb. 3, 2020).

## I.   FACTUAL AND PROCEDURAL HISTORY

### A.  The Criminal Trial

On November 21, 2007, the State of Connecticut charged Ms. Davalloo with murder, in violation of Conn. Gen. Stat. § 53a-54a. *See* Resp't App'x C, ECF No. 25-3 at 16 (Pet'r's App. Ct. Br. (Aug. 30, 2013)) ("Pet'r's App. Ct. Br."). The jury reasonably could have found, as described by the Connecticut Appellate Court, that Ms. Davalloo was involved in a "love triangle" with two coworkers—a man who temporarily became her lover, and his girlfriend, Anna Lisa Raymundo, in 2001 and 2002.[3] The jury also could have found that Ms. Davalloo engaged in elaborate schemes of deception, including the creation of fictitious people about whom she told stories to her husband and others which were actually about herself, her former lover, and Ms. Raymundo.[4] The jury could have further found that Ms. Davalloo used this

---

[3] "This case involves a love triangle between [Petitioner] and two of her coworkers at Purdue Pharma, a pharmaceutical company in Stamford. [Petitioner] became obsessed with Nelson Sessler, one of her coworkers. The victim was Anna Lisa Raymundo, the second coworker . . . . In late 2000, Sessler met Raymundo at an after-work happy hour . . . . In the summer of 2001, [Petitioner] met Sessler for the first time at another after-work happy hour. . . . At some point, Sessler began sexual relationships with both [Petitioner] and Raymundo. . . . By the summer of 2002, Sessler's attentions focused on Raymundo and he suspended his sexual relationship with [Petitioner]. . . . Raymundo became Sessler's girlfriend and, although he continued to maintain his separate apartment in Stamford, he spent 'the majority of [his] time' at Raymundo's apartment, located at 123 Harbor Drive, ap[t.] 105, in Stamford. [Petitioner] was aware that Sessler was living with Raymundo." *State v. Davalloo*, 153 Conn. App. 419, 421 (2014), *aff'd*, 320 Conn. 123 (2016); Resp't App'x A, ECF No. 25-1 (attaching *Davalloo*, 153 Conn. App. 419).

[4] "In 2002, [Petitioner] concocted an imaginary story about a love triangle among three fictional 'coworkers' at Purdue []: 'Melissa,' 'Jack,' and 'Anna Lisa.' [Petitioner] related the ongoing saga, which she presented as true, from the perspective of her 'friend' Melissa, who supposedly was confiding in [her]. [She] said that Melissa, who was in a relationship with Jack, was sad and depressed because Jack was also in a relationship with another woman, Anna Lisa. 'Melissa,' quite clearly in retrospect, was [Petitioner]. 'Jack' was Sessler, and 'Anna Lisa' was Raymundo. [Petitioner told] Christos about the love triangle nearly every day. She included intimate details about Melissa and Jack. She told Christos that Melissa was upset when Jack rebuffed her sexual advances. She once said that Melissa had discovered Jack's travel plans and had flown to Jack's destination. She then 'conveniently' ran into him at the airport as he was boarding a plane home and sat next to him on the return flight. [She] constantly asked Christos for advice 'on behalf' of Melissa with questions such as . . . why Jack was cheating on one woman with the other. Christos listened to these stories to 'humor' [Petitioner]. . . ." *Davalloo*, 153 Conn. App. at 422–24.

deception to meet secretly with her former lover[5] and to follow him and Ms. Raymundo,[6] and

that such acts ultimately led to the November 8, 2002 murder of Ms. Raymundo in her apartment

in Stamford, Connecticut.[7] A jury also could have found that Ms. Davalloo subsequently

continued to deceive her husband and others in order to resume a secret relationship with her

former lover,[8] that her husband became suspicious that Ms. Davalloo may have been involved in

---

[5] "[Petitioner and] Sessler [ ] met periodically at the condominium unit in Pleasantville, New York, where [she] lived with Christos. Before [they] would meet . . . , [Petitioner] would tell Christos that her mentally ill brother was coming to visit and Christos had to leave the house and take his personal belongings with him. [She] told Christos that her brother might react badly if he discovered that she was married. Christos believed this story at first. He knew from [Petitioner]'s parents that [she], in fact, had a mentally ill brother." *Id.* at 421–22.

[6] "[Petitioner] told Christos that she 'wanted to go on a stakeout' with Melissa in order to 'spy on Jack.' [ ] Christos thought the proposed surveillance was 'a little odd,' [but] he did not believe it would actually occur; he gave [her] a pair of night vision binoculars. [She] told Christos that she had purchased a lock pick set for Melissa because Melissa wanted to break into Anna Lisa's apartment to look at photographs . . . to 'get a sense of the relationship between Jack and Anna Lisa[,]' [and she] practiced with the lock pick set on the[ir] front door . . . . [She] also asked Christos for an eavesdropping device that she knew he owned . . . . Early one morning, [she called] Christos to [say] that she and Melissa were outside Anna Lisa's apartment and asked [him] if Melissa should confront Anna Lisa. Christos [said] that Anna Lisa had a 'right to know her boyfriend is cheating on her. . . .' In time, Christos became 'sick' of the stories of the love triangle and 'kind of got angry' with [her]." *Id.* at 423–24.

[7] "[O]n November 8, 2002, the Stamford Police Department received a 911 call in which the caller reported that a man was assaulting someone at 123 Harborview, ap[t.] 105; the caller claimed to be a neighbor. The dispatcher knew that . . . the given address had to be incorrect. . . . and discovered that [the call] had come from a pay phone at a [ ] restaurant [nearby]. . . . The dispatcher sent officers to 123 Harbor Drive, ap[t.] 105, which she knew was a residential facility near the [ ] restaurant. An officer knocked on the door of apartment 105 and received no answer. He pushed the door open and saw the deceased victim, Raymundo, on the floor of the front foyer. . . . The victim had died from multiple stab wounds and her injuries indicated a violent struggle. . . . [O]fficers found details whose relevance later became apparent. At 11:57 a.m., the victim's home telephone had been used to place a call to Sessler's office; Sessler had not answered the call and no voice message had been left. Officers discovered a bloodstain on the handle of a bathroom sink, which suggested that the assailant had tried to clean up after the crime. The bloodstain much later was determined to contain 'all of the different genetic elements that [were] present' in the DNA profiles of both [Petitioner] and the victim. The state's expert testified that due to the fact that the victim cleaned her apartment regularly, as testified to by Sessler and the victim's parents, and the fact that the sink handle was nonporous, it was 'extremely, extraordinarily unlikely' that any DNA left by [Petitioner] on the sink handle prior to November 8, 2002, would have lasted or remained 'very long . . . .'" *Id.* at 424–26.

[8] "After the victim's death, [Petitioner] pursued Sessler. She sent him a care package, consoled him, and was one of the few people willing to talk to [him] about Raymundo at a time when most people 'sort of shunned' him. In January, 2003, [Petitioner] invited Sessler to go on a group ski trip[, which] turned out to be only Sessler and [Petitioner]. Sessler again entered into a sexual relationship with [Petitioner]. [She] would invite Sessler to her residence, but, again, only after having first told Christos that her mentally ill brother was visiting." *Id.* at 426.

Ms. Raymundo's murder in Stamford,[9] and that these events led finally to the attempted murder in March 2003 of Ms. Davalloo's husband in Valhalla, New York.[10]

Ms. Davalloo's husband "lived to testify in the jury trial of [Petitioner] for the murder of" Ms. Raymundo, and Ms. Davalloo "was convicted of murder in violation of § 53a–54a. She was sentenced to fifty years imprisonment consecutive to her sentence in the New York case for the attempted murder of" her husband. *State v. Davalloo*, 153 Conn. App. 419, 429 (2014).

---

[9] "As part of his work, on November 13, 2002, Christos had a meeting with representatives from Pharmacia, where Anna Lisa had worked [after leaving Purdue]. The representatives mentioned that a colleague of theirs had been recently murdered. Although a name was not mentioned, Christos began to wonder if Melissa 'did something' to Anna Lisa. Christos mentioned to [Petitioner] that an employee at Pharmacia had been killed and asked whether Melissa was involved and if Anna Lisa was 'okay . . . .' [Petitioner] did not seem shocked or surprised and responded . . . that Anna Lisa was 'fine.' Christos testified at trial that he believed that, at that point, [Petitioner] thought that he had made that connection. In late 2002, [Petitioner] reported to Christos that Jack and Anna Lisa had 'broken up' and that Melissa and Jack were together exclusively. But also in late 2002, [Petitioner] asked Christos for information about fingerprints and DNA." *Id.* at 427.

[10] "In 2003, the frequency of trysts at the Pleasantville condominium—under the guise, so far as [Petitioner] told Christos, of her mentally ill brother's visiting—increased. Christos was 'getting tired of leaving' when [Petitioner]'s 'brother' visited and told [Petitioner] that her brother 'ha[d] to be told that we're married.' On March 22, 2003, [Petitioner] described a guessing game to Christos. The game involved one person's being handcuffed and blindfolded while the other placed objects against the bound person's skin; the bound person was to guess the identity of the object. The following day, [Petitioner] asked Christos if he wanted to play the guessing game. [Petitioner] was the first to be bound and blindfolded. She guessed various household items. Then it was Christos' turn. He lay on the floor, blind-folded and handcuffed to a chair. Christos guessed various common household items. [Petitioner] then went to the kitchen to retrieve 'one last item, one more thing to guess.' She sat on Christos' midsection and touched the item to his face; Christos guessed the item was a candle. The item was a knife. [Petitioner] thrust the knife into Christos' chest, paused and then again thrust the knife into Christos' chest. [She] said, 'Oh, my God, I think I hurt you. You're bleeding.' Still blind-folded and handcuffed, Christos asked [her] what had happened. She explained that "something fell on you. I think the candle hurt you." Christos asked [Petitioner] to remove the blindfold, and she did. But when he asked her to remove the handcuffs, she stated that she could not find the key. At Christos' request, [Petitioner] helped him break the chair to which the handcuffs were attached. Christos asked [Petitioner] to call 911. He heard [Petitioner] seem to make a 911 call, but, after a significant amount of time had passed, no ambulance arrived. Christos asked [her] to call 911 again and he asked to talk to the operator. [Petitioner] told Christos that the operator did not want to talk to him, but rather wanted him to lie on the floor. [She] at this point instead telephoned Sessler and invited him over to the condominium for dinner. Eventually, Christos, still conscious, asked [Petitioner] to take him to a nearby hospital, and [she] obliged. She drove slowly, according to Christos, and parked in the rear of the Behavioral Health Center of Westchester Medical Center in Valhalla, New York. [Petitioner] got out of the car and opened the rear driver's side door. Christos thought [she] was going to help him out of the car until he saw an angry expression on her face and saw her lunge at him with the knife. Christos managed to get out of the car and attempted to wrestle the knife out of [Petitioner]'s hands. The melee moved to a grassy spot in the parking lot, while Christos visibly was bleeding through his shirt. [Petitioner] begged Christos to 'stay with me, talk to me . . . .' Christos broke free, ran about 200 feet, and yelled to a medical resident and another person, who were near the entrance to the Behavioral Health Center. The resident called 911. [Petitioner] asked the resident to let her take Christos to the emergency room. The resident refused. [Petitioner] was arrested, in New York, for attempted murder in connection with this incident." *Id.* at 427–29.

4

**B.  Direct Appeal**

Petitioner appealed her murder conviction to the Connecticut Appellate Court and raised

the following claims, the same claims she raises now:

> (1) in violation of the marital communications privilege, the [trial] court improperly permitted . . . Christos, her husband at the time of events in question, to testify as to conversations she had had with him, (2) the [trial] court improperly permitted the state to present evidence of uncharged misconduct, and (3) the [trial] court improperly found that she validly waived her right to trial counsel.

*Davalloo*, 153 Conn. App. at 420. The Appellate Court rejected all three claims and affirmed

Petitioner's conviction. *See id.* at 429–49.

### 1.  Appellate Court's Decision on Marital Privilege Claim

With respect to the first claim, Petitioner argued that the trial court's admission of the

following conversations was a violation of the marital communications privilege:

> (1) stories about Melissa, Jack and Anna Lisa, (2) fictional visits from [Petitioner's] brother, (3) [Petitioner's] informing Christos that she bought a lock pick set to get into the victim's house to look for photographs, and her attempts to use the lock pick set on the front doors of their condominium, (4) conversations about an eavesdropping device that [Petitioner] wanted to place in Jack's office to listen to his conversations, (5) [Petitioner's] questioning of Christos in late 2002 about DNA and fingerprints, (6) stories about Melissa's becoming upset when Jack rebuffed her sexual advances and Melissa's arranging to run into Jack at an airport and fly back home in the seat next to him, (7) in November, 2002, Christos' asking [Petitioner] about Anna Lisa, and [Petitioner's] reporting that Jack had ended his relationship with Anna Lisa and was dating Melissa exclusively, (8) in late November, 2002, [Petitioner's] explaining that she had cut her thumb on a can of dog food, and (9) the events of the stabbing on March 23, 2003.

*Davalloo*, 153 Conn. App. at 430–31. She argued that the trial court improperly focused its

analysis on the nature of her marriage with Mr. Christos, rather than on the nature of the

conversations and misinterpreted the meaning of Connecticut's marital privilege statute, Conn. Gen. Stat. § 54-84b. *Davalloo*, 153 Conn. App. at 433–34.

The Appellate Court rejected Petitioner's claim and held that the trial court did not abuse its discretion in admitting the statements. *Davalloo*, 153 Conn. App. at 434–36. In doing so, the Appellate Court applied Connecticut's principles of statutory construction and held that the plain language of § 54-84b provides that, in order for the privilege to apply, the statement in question must be "induced by the affection, confidence, loyalty and integrity of the marital relationship." *Id.* at 435 (quoting § 54-84b). The Appellate Court held that the trial court correctly ruled that Petitioner's statements in this case were not "induced by the affection, loyalty and integrity of the marital relationship" but, rather, were meant to "deceive" her husband and "further her obsessive relationship with Sessler," and that the trial court's conclusion that the privilege did not apply was proper. *Id.*

### 2. Appellate Court's Decision on Uncharged Misconduct Claim

Petitioner next claimed that the trial court improperly admitted evidence about her attempted murder of her husband in New York and her plan to surveil Raymundo, the murder victim, including her procurement of night vision goggles, eavesdropping devices, and a lock pick. *Davalloo*, 153 Conn. App. at 436; Pet'r's App. Ct. Br. at 37. The Appellate Court held that the testimony was admissible as evidence of her motive and her common plan or scheme to win over Sessler's affections and eliminate those who stood in her way. *Davalloo*, 153 Conn. App. at 440–42. The Appellate Court therefore held that the trial court properly admitted the testimony under Conn. Code of Evid. § 4-5(b), which permits "[e]vidence of other crimes, wrongs or acts . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime . . . ." *Id.* at 438–

39. The trial court also instructed the jury that "the misconduct evidence had not been admitted to show bad character or propensity toward violence, but only to show motive, common plan or scheme, to corroborate prosecution testimony and to complete the story of the crime." *Id.* at 438. The Appellate Court thus held that the trial court's admission of this evidence was not an abuse of discretion. *Id.* at 442.

### 3.   Appellate Court's Decision on Waiver of Counsel Claim

Petitioner's final argument challenged the validity of her waiver of counsel before trial. *Davalloo*, 153 Conn. App. at 442. The following facts are relevant to this claim:

Before trial, the trial court ordered a competency examination of Petitioner. Resp't App. M, ECF No. 25-21 at 2 (Criminal Trial Tr. (Nov. 21, 2011)) ("Trial Tr."). After hearing testimony from the medical expert who evaluated Petitioner that Petitioner demonstrated the capacity to understand the proceedings against her and to assist in her own defense, the trial court found Petitioner competent to stand trial. *Id.* at 7, 16.[11] In that same hearing, the trial court addressed Petitioner's motion to represent herself in the upcoming trial and canvassed her on her decision. *Id.* at 16–26.

During the canvass, petitioner affirmed that she was forty-two years old, had a graduate degree, had been through a criminal trial in New York, understood her constitutional right to be represented by counsel, and understood the charge of murder and its elements. Trial Tr. at 17–18, 25. She also acknowledged that she understood "that the maximum penalty for that crime [was] . . . 60 years in prison" and that "the mandatory minimum [was] 25 years." *Id.* at 18.

The trial court informed her that if it permitted her to represent herself, it "in all likelihood would give [her] some leeway in the trial process but [that she was] going to have to

---

[11] Hereinafter, the Court cites to Trial Transcript page numbers rather than ECF docket entry page numbers.

follow the rules of evidence just like a lawyer has to and have to follow the proper courtroom

procedures." *Id.* at 19.  Petitioner stated that she understood that responsibility. *Id.*

The trial court also informed her that there were "great dangers involved in self-

representation" and that, if she were to assert an affirmative defense of lack of capacity due to

mental illness or extreme emotional disturbance, she would have to prove that defense by a

preponderance of the evidence. *Id.* at 20, 22. Petitioner stated that she understood the dangers

involved, and, although she did not plan to raise any affirmative defenses, she understood her

burden of proof for them. *Id.* at 20, 22–23.

The trial court noted during the canvass Petitioner's history of mental illness and that she

had taken mental health medication in the past, but was not taking any at the time of trial. Trial

Tr. at 22. Petitioner stated that her "mental health issues in the past ha[d] been a lot related to

depression and PTSD," but that she no longer was taking any drugs, alcohol, or medication that

would affect her ability to represent herself. *Id.* at 23, 25. The court concluded the canvass by

verifying that Petitioner understood the decision she was making:

> THE COURT: Okay. And you're absolutely competent[12] . . . that
> you can educate yourself even more so that you can represent
> yourself competently and you're confident in your ability to go
> forward?
>
> [PETITIONER]:      Yes, Your Honor. I've been doing it -- I've
> been . . . educating myself and I'll continue to do so.

*Id.* at 25. The trial court then found that Petitioner "knowingly, intelligently and voluntarily

decided to represent herself," *id.* at 25-26, a decision based on both Petitioner's statements

during the canvass and the testimony of the mental health expert during the competency hearing.

*Id.* at 28. The trial court appointed standby counsel for Petitioner, and Petitioner understood that

---

[12] Based on the context of the entire statement in the Trial Transcript, the Court assumes that the trial meant to say "confident," not "competent."

the role of standby counsel was solely to "sit there mute" and answer any questions she had

throughout the trial. *Id.* at 23–24, 27.

On direct appeal, Petitioner argued that the trial court's canvass was invalid because it

did not explain to her:

> the technical problems she faced in 'proving herself innocent;' the importance of counsel for an effective defense; 'that by representing herself she substantially increased the risk that although she may be innocent, the jury may find her guilty because she d[id] not know how to establish her innocence;' that she was giving up, as a practical matter, a defense of extreme emotional disturbance and an instruction on lesser included offenses; and that the sentencing court could impose a sentence consecutive to her New York sentence.  She also argues that the court misled her to believe that the trial judge would not rigorously enforce the rules of evidence if she represented herself and did not probe her regarding the dissatisfaction with counsel that led to her determination to represent herself.

*Davalloo*, 153 Conn. App. at 445–46 (quoting Pet.'r App. Ct. Br. at 49–51.

The Appellate Court addressed each of Petitioner's challenges to the trial court's canvass

and upheld its validity in finding a knowing, intelligent, and voluntary waiver of counsel. *Id.* at

446–49. In rejecting Petitioner's challenges, the Court held that (1) Petitioner was not required to

prove her innocence as the state bears the burden of proof beyond a reasonable doubt, (2) the

trial court had adequately warned her about the "great dangers involved in self-representation[,]"

and (3) the trial court adequately advised her that she would bear the burden of proving by the

preponderance of the evidence any affirmative defense she wished to raise. *Id.* at 446–48.

As for her claim regarding her knowledge of the rules of evidence, the Appellate Court

held that the trial court properly advised her that she would have to follow those rules "just like a

lawyer," and Petitioner stated that she understood that advisement. *Id.* at 447. The Appellate

Court rejected Petitioner's assertion that the trial court erred by not probing her dissatisfaction

with counsel, which led to her decision to represent herself, as factually inaccurate because the

9

trial court did, in fact, inquire about her dissatisfaction with counsel, and Petitioner stated that, although she had a good rapport with counsel, she wanted more control over trial strategy decisions.[13] *Id.*

As for Petitioner's claims regarding the presentation of affirmative defenses, the Appellate Court held that the trial adequately advised her of her responsibility to prove any such defense by a preponderance of the evidence, and Petitioner stated that she understood her responsibility and that she would continue to educate herself on the law regarding those issues. *Id.* at 447–48.

Finally, the Appellate Court rejected the claim that the trial court had to inform Petitioner about the possibility of a murder sentence being consecutive to her New York sentence. *Id.* at 448–49. The Appellate Court held that the trial court's advisement on the maximum possible sentence of sixty years and the mandatory minimum sentence of twenty-five years provided Petitioner "with a realistic picture of [her] sentencing exposure" and, because Petitioner was forty-two years old at the time of the canvass, she knew that a murder conviction could

---

[13] The Petitioner expressed her reason for waiving her right to counsel as follows:

> THE COURT: Now you indicated . . . that you wanted to represent yourself because you had ideological differences with your lawyer in this case. I don't want to know about your private discussions with your lawyer but I'm just -- I don't know what that means. Maybe you could explain that to me.

> [PETITIONER]: I think there's just differences in -- in how to go about -- like I felt that my hands were a little tied in terms of some of the decision-making process and not that it was [counsel's] -- I mean he's done a phenomenal job and we have a good rapport.

> However, I wanted a little bit more control over some of the decision-making process and just that, you know, just that the witnesses, the order of witnesses, calling -- which witnesses to call within the letter of the law; I wanted a little control of that.

Trial Tr. at 20–21.

effectively result in a life sentence. *Id.* at 449 (quoting *State v. Collins*, 299 Conn. 567, 614 (2011)).

### 4. Supreme Court's Decision on Marital Privilege Claim

Although Petitioner petitioned the Connecticut Supreme Court for certification to appeal the Appellate Court's decision on all three of her claims, the Supreme Court granted certification only on Petitioner's marital privilege claim. Specifically, the appeal was limited to the following issue:

> Did the Appellate Court properly construe . . . § 54-84b in concluding that the statements made by [petitioner] were not subject to the marital communication privilege?

Resp't App. H, ECF No. 25-9 (*State v. Davalloo*, 314 Conn. 949 (2014)).

Like the Appellate Court's decision, the Supreme Court applied its established jurisprudence on statutory construction and interpreted § 54-84b to require three elements in order for statements to be protected by marital privilege: (1) the statement must be made to a spouse during the marriage; (2) the statement must be confidential; and (3) the statement must be "induced by the affection, confidence, loyalty and integrity of the marital relationship." Resp't App. I, ECF No. 25-10 at 8 (*State v. Davalloo*, 320 Conn. 123, 142 (2016) (quoting § 54-84b))).

It upheld the trial court's and Appellate Court's conclusions that Petitioner's statements regarding her plans to surveil the victim; the stories of Melissa, Jack, and Anna Lisa; and the events of the stabbing on March 23, 2003, were not "induced by the affection, confidence, loyalty and integrity of the marital relationship" but, rather, "to further her extramarital affair with Sessler and to ultimately eliminate, by murdering, both Raymundo and Christos, who she perceived as obstacles to that affair." *Davalloo*, 320 Conn. at 143–44. The Court agreed with the Appellate Court that the trial court's analysis focused on the nature of the communications

themselves, not the nature of the marital relationship as Petitioner contested. *Id.* at 145.  The

Supreme Court affirmed the Appellate Court's judgment. *Id.*

    **5.**       **The Pending Federal Petition**

    On February 28, 2017, Petitioner, Ms. Davalloo, filed her petition for writ of

habeas corpus under 28 U.S.C. § 2254 in the Southern District of New York challenging her

Connecticut conviction for murder. Pet.

    Ms. Davalloo raises three claims in support of her petition: that (1) the trial court

improperly admitted evidence of conversations she had with her husband, which were protected

by Connecticut's marital privilege statute; (2) the trial court improperly admitted evidence of

uncharged misconduct, including her attempted murder of her husband and statements to her

husband about surveilling the victim, and (3) she "did not voluntarily and knowingly waive[] her

right to counsel." *Id.* at 5–8.

    On July 18, 2017, Ms. Davalloo's case was transferred to the District of Connecticut.

Order, ECF No. 17 (July 18, 2017).

    On November 8, 2017, Sabina Kaplan, the superintendent of the Bedford Hills facility,

and Connecticut Attorney General George Jepson (collectively, "Respondents"), submitted their

response to the petition. Resp. to Pet., ECF No. 25 (Nov. 8, 2017) ("Resp't Opp'n"). They argue

that Petitioner is not entitled to relief on her first two claims because both concern

nonconstitutional violations of state law. *Id.* at 2.

    In support of their opposition, Respondents filed thirty-six documents, labeled as

Appendices A through N, of filings and judgments from the New York and Connecticut state

cases in which Ms. Davalloo was convicted. *See* Docket Entries, ECF Nos. 25-1 through 25-36

(Nov. 8, 2017). With respect to the third claim, Respondents argue that the Connecticut

Appellate Court, the last court to provide a reasoned decision on the issue, reasonably applied United States Supreme Court precedent in rejecting Petitioner's challenge to her waiver of counsel. *Id.*

On January 16, 2018, Petitioner filed an objection to Respondents' opposition. Pet'r Obj. to Resp't Mem. in Opp., ECF No. 27 (Jan. 16, 2018) ("Pet'r Reply"). Petitioner argues that her evidentiary claims warrant habeas relief and that the Appellate Court unreasonably applied United States Supreme Court precedent in finding a knowing, intelligent, and voluntary waiver of counsel.

On January 2, 2020, the Court issued an order, explaining that Ms. Davalloo appeared to be asserting an unexhausted ground for habeas relief based on the trial court's failure to inquire into her competency to waive counsel. *See* Order, ECF No. 28 at 2 (Jan. 2, 2020) (citing Pet. at 8-9 (describing history of mental illness and failure of mental health evaluators to opine on competency to waive counsel); Pet'r Reply at 7–8 (arguing failure of state courts to apply Connecticut Supreme Court and United States Supreme Court precedent on competency to waive counsel)).

The Court noted that this claim, if Ms. Davalloo was asserting it, was unexhausted because "Ms. Davalloo did not challenge the trial court's failure to inquire into her competency to waive counsel on direct appeal; she challenged only its finding of a knowing, intelligent, and voluntary waiver." Order at 3. Therefore, the Court instructed Ms. Davalloo "to file a notice with this Court by February 14, 2020, indicating whether she wishes to (a) exhaust the competency claim in state court before this Court rules on her federal petition; or (b) waive the competency claim and limit her third ground for habeas relief to whether the trial court erred in finding a knowing, intelligent, and voluntary waiver." *Id.* at 3.  The Court provided further that "if Ms.

Davalloo chooses to waive her competency claim, the Court will dismiss that claim with prejudice and limit its ruling on the third ground for relief to whether the trial court erred in finding a knowing, intelligent, and voluntary waiver." *Id.* at 4.

On February 3, 2020, Ms. Davalloo notified the Court that she had waived her unexhausted ground for habeas relief based on the trial court's failure to inquire into her competency to waive counsel and that her third ground for habeas relief was limited to whether the trial court erred in finding a knowing, intelligent, and voluntary waiver. Notice, ECF No. 29, (Feb. 3, 2020).

On April 4, 2020, the Court issued the following order:

> The petitioner has filed a notice requesting the court to waive the competency claim and proceed on whether the trial court erred in finding a knowing, intelligent and voluntary waiver. The petitioner is cautioned, however, that if she proceeds only as to the exhausted grounds, with the intention of presenting the unexhausted grounds to this court after they have been exhausted, she will run the risk that any such new petition will not be considered by this court because it would constitute a second or successive petition. See 28 U.S.C. § 2244(b)(2) (A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless certain circumstances apply)[.] Accordingly, by May 8, 2020, petitioner should file a second notice indicating whether she still intends to proceed on only the fully exhausted grounds despite the risk that a new petition asserting other grounds after full exhaustion could be barred.

Order, ECF No. 30 (Apr. 4, 2020). Ms. Davalloo has not filed a response to this order.

Accordingly, the Court will now consider Ms. Davallo's exhausted claims.

## II.   STANDARD OF REVIEW

A court will entertain a petition for writ of habeas corpus challenging a state Court conviction under § 2254 only if the petitioner claims that her custody violates the Constitution or federal laws. *See* 28 U.S.C. § 2255(a). A claim that a state conviction was obtained in violation

of state law is not cognizable in federal court. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991)

("In conducting habeas review, a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States.").

Section 2254(d) "imposes a highly deferential standard for evaluating state-court rulings

and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559

U.S. 766, 773 (2010) (citations and internal quotations omitted). A federal court cannot grant a

petition for writ of habeas corpus filed by a person in state custody with regard to any claim that

was rejected on the merits by the state court unless the adjudication of the claim in state court

either:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d). *See Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013) (noting that the

habeas corpus relief standard is difficult to meet as "a state prisoner must show that the

challenged state-court ruling rested on 'an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement.'" (quoting *Harrington v. Richter*, 562

U.S. 86, 101 (2011))).

Clearly established federal law is found in holdings, not dicta, of the United States

Supreme Court at the time of the state court decision. *See Howes v. Fields*, 565 U.S. 499, 505

(2012) (in the context of a state prisoner's application for writ of habeas corpus, "clearly

established law" signifies "the holdings, as opposed to the dicta, of this Court's decisions"

(internal citation and quotation marks omitted)); *Carey v. Musladin*, 549 U.S. 70, 74 (2006)

(stating same). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting 28 U.S.C. § 2254(d)(1)). A decision is "contrary to" clearly established federal law when it applies a rule different from that set forth by the Supreme Court or if it decides a case differently than the Supreme Court on essentially the same facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

A state court unreasonably applies Supreme Court law when it has correctly identified the law but unreasonably applies that law to the facts of the case or refuses to extend a legal principle clearly established by the Supreme Court to circumstances intended to be encompassed by the principle. *See Davis v. Grant*, 532 F.3d 132, 140 (2d Cir. 2008).

It is not enough that the state court decision is incorrect or erroneous. *Eze v. Senkowski*, 321 F.3d 110, 124–25 (2d Cir. 2003). Rather, the state court application of clearly established law must be objectively unreasonable, a substantially higher standard. *Id.*; *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Thus, a state prisoner must show that the challenged court ruling "was so lacking justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington*, 562 U.S. at 103; *see also Williams v. Taylor*, 529 U.S. 362, 389 (2000) ("state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated").

When reviewing a habeas petition, a federal court presumes that the factual determinations of the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting that presumption by clear and convincing evidence. *Id.* Moreover, "review under section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III.   DISCUSSION

Petitioner claims that this Court should grant her § 2254 petition because (1) the trial court improperly admitted her conversations with Christos, which were protected under the marital privilege statute, (2) the trial court improperly admitted evidence of her uncharged misconduct, including her plans to surveil the victim and the assault on Christos, and (3) she did not knowingly, intelligently, and voluntarily waive her right to counsel. Pet. at 5–9.

Respondents argue that Petitioner's first two claims are not cognizable for review by this Court because they concern matters of pure state law and do not implicate any constitutional right. Resp't Opp'n at 2. As for the third claim, Respondents argue that the Connecticut Appellate Court reasonably applied United States Supreme Court precedent in concluding that Petitioner knowingly, intelligently, and voluntarily waived her right to counsel. *Id.*

In her reply, Petitioner argues that, even if she did not adequately present her first two claims to the state courts as denials of her federal constitutional right to due process, "the state courts' inquir[ies] would have been the same." Pet'r Reply at 2. As for the third claim, Petitioner counters that the Appellate Court did not reasonably apply United States Supreme Court precedent on her competency to waive counsel. *Id.* at 7–8.

The Court agrees with Respondents that Petitioner is not entitled to any habeas relief, will first address together her two evidentiary claims, and then her waiver claim.

### A.  Evidentiary Claims

"Federal habeas corpus relief is generally not available for errors of state law, including erroneous state court rulings on the admissibility of evidence." *Stepney v. Semple*, 3:11-cv-1782 (VAB), 2015 WL 5601841, at *4 (D. Conn. Sep. 23, 2015) (citing *Estelle*, 502 U.S. at 67–68; *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012)); *see also Crane v. Kentucky*,

476 U.S. 683, 689 (1986) (United States Supreme Court "reluctan[t] to impose constitutional restraints on ordinary evidentiary rulings by state trial courts"). In order to prevail on a collateral habeas review of a state-law evidentiary ruling, Petitioner must establish that (1) the trial court's improper evidentiary ruling was an error of constitutional magnitude and (2) the constitutional error was not harmless. *Perez v. Phillips*, 210 F. App'x 55, 57 (2d Cir. 2006).

"Whether the improper evidentiary ruling was an error of constitutional magnitude is itself a two-step analysis." *Id.* Petitioner must show that (1) the ruling was an error under state law and (2) the error deprived her of her constitutional right to a fundamentally fair trial. *Id.*; *Stepney*, 2015 WL 5601841, *4. If Petitioner fails to show that the trial court's ruling violated state law, her petition must be denied because "[a] proper application of a constitutional state law cannot be unconstitutional." *Peay v. Warden*, 3:10-cv-85 (CSH), 2014 WL 4437716, at *6 (D. Conn. Sept. 9, 2014) (citing *Brooks v. Artuz*, 97 Civ. 3300 (JGK), 2000 WL 1532918, at *6 (S.D.N.Y. Oct. 17, 2000)).

In this case, Petitioner cannot show that the trial court's decision to admit her statements to Christos over her marital privilege objection was an error of state law, much less an error of constitutional magnitude. The Connecticut Supreme Court, which issued the last reasoned decision on this issue,[14] rejected Petitioner's evidentiary challenge based on its own independent interpretation of the marital privilege statute, § 54-84b. This Court defers to the state court's interpretation of state law. *See Mannix v. Phillips*, 619 F.3d 187, 199 (2d Cir. 2010) (Second Circuit bound by state court's construction of state law); *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) ("Our federal constitution does not dictate to the state courts precisely how to

---

[14] When reviewing a federal habeas petition challenging a state court conviction under § 2254, the Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). In this case, the Connecticut Supreme Court issued the last reasoned decision on the marital privilege claim. The Connecticut Appellate Court issued the last reasoned decision on the uncharged misconduct and waiver of counsel claims.

interpret their own criminal statutes"); *St. Louis v. Erfe*, 3:12-cv-356 (DJS), 2016 WL 1465323, at *9 (D. Conn. Apr. 14, 2016) (petitioner's challenge to state court's denial of motion for acquittal based on court's interpretation of state statute not cognizable for federal review).

The Connecticut Supreme Court held that none of the communications in question— which included fictional stories about Melissa, Jack, and Anna Lisa, false reports that Petitioner's brother was visiting, questions about DNA analysis and fingerprinting, and Petitioner's statements during the stabbing incident on March 23, 2003—were "induced by the affection, confidence, loyalty and integrity of the marital relationship," as required by § 54-84b. *Davalloo*, 320 Conn. at 143–44. On the contrary, they were meant to deceive Christos and further her plan to remove Christos and the victim, both of whom stood in her way of having an extramarital relationship with Sessler. *Id.* Based on the plain language of § 54-84b and the nature of these communications, the Supreme Court's decision to affirm the trial court's ruling admitting these communications over petitioner's objection was objectively reasonable.

Because Petitioner has failed to show that the Supreme Court's decision on her marital privilege claim was a violation of state law, and she does not challenge the constitutionality of the marital privilege statute itself, this Court cannot grant her any habeas relief. *See, e.g.*, *Peay*, 2014 WL 4437716, at *6 (federal habeas court's conclusion that state court decision was proper application of state evidentiary rule necessitates denial of petition on that ground). Therefore, Petitioner's marital privilege claim must fail.

Similarly, Petitioner has failed to show that the Connecticut Appellate Court's decision affirming the trial court's admission of uncharged misconduct evidence was objectively unreasonable. Such evidence included Petitioner's attempted murder of her husband in New York and her procurement of a lock pick and eavesdropping devices to surveil Ms. Raymundo,

the murder victim. *Davalloo*, 153 Conn. App. at 436. The Appellate Court reasonably applied

Conn. Code of Evid. § 4-5(b), which permits "evidence of other crimes, wrongs or acts . . . to

prove intent, identity, malice, motive, [or] common plan or scheme," and held that the evidence

of Petitioner's attempted murder of her husband and plans to surveil the victim were probative of

her motive to eliminate those who stood in her way of her affair with Sessler. *Id.* at 442; *see also*

*Vega*, 669 F.3d at 126 (trial court reasonably applied New York law in manner that was not

contrary to or unreasonable application of federal law).

Petitioner has not cited any United States Supreme Court precedent or otherwise

explained to this Court how the Appellate Court's conclusion was objectively unreasonable.

Moreover, the Appellate Court correctly noted that the trial court gave a limiting instruction to

the jury that such evidence could not be used to show a propensity for violence. *Id.* at 437–38.

Thus, the admission of the evidence was not more prejudicial than probative. *Id.* at 441–42.

Accordingly, Petitioner is not entitled to habeas relief on her uncharged misconduct

claim.

### B.  Waiver of Counsel Claim

Unlike her evidentiary claims, Petitioner's third ground for habeas relief directly

implicates a federal constitutional right, specifically her Sixth Amendment right to counsel.

Nevertheless, this Court agrees with Respondents that Petitioner has not satisfied her burden of

showing that the Appellate Court's decision on her waiver of counsel claim was contrary to, or

an unreasonable application of, United States Supreme Court precedent or the United States

Constitution.

The Sixth Amendment guarantees the right of an accused to represent herself. *Faretta v.*

*California*, 422 U.S. 806, 821 (1975). However, "[w]hen an accused manages h[er] own defense,

[s]he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Id.* at 835. Thus, any waiver of the right to counsel must be knowing, intelligent, and voluntary. *Id.*; *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). A waiver is knowing and intelligent when the accused knows what she is doing and is aware of the dangers and disadvantages of self-representation. *Tovar*, 541 U.S. at 88–89.

Although there is no specific formula or script which must be read to an accused who elects to waive counsel, *id.* at 88, a trial court should engage in a "full and calm discussion" with the accused to ensure their awareness of the waiver and the dangers of self-representation, *United States v. Fore*, 169 F.3d 104, 108 (2d Cir. 1999) (quoting *United States v. Tracy*, 12 F.3d 1186, 1191 (2d Cir. 1993)). This discussion normally would include an inquiry into the educational, family, and employment history of the accused as well as her understanding of the nature of the charges and range of possible punishments in the event of conviction. *See id.* at 108. The extent of the discussion depends on the circumstances of each case. *Id.*

In this case, the Appellate Court carefully reviewed the trial court's canvass of Petitioner's decision to waive counsel and Petitioner's responses during that canvass, all of which supported a finding of a knowing, intelligent, and voluntary waiver. The Appellate Court held that the trial court thoroughly discussed with Petitioner the dangers of self-representation, including the fact that she would have to abide by the rules of evidence "just like a lawyer" and that she would have to prove by a preponderance of the evidence any affirmative defense she wished to raise in the case. *Davalloo*, 153 Conn. App. at 447–48. The trial court's canvass was comprehensive, delving into Petitioner's education, experience with criminal procedure, mental health issues, and her ability to understand and educate herself of the relevant legal principles involved in the case. *See* Trial Tr. at 17–26. A review of the canvass shows that Petitioner gave

coherent and informed responses to the trial court's questions and fully understood the right and advantages she was relinquishing. *See id.* The Appellate Court's judgment therefore was based on a reasonable application of United States Supreme Court precedent.

Moreover, the Appellate Court's rejection of Petitioner's technical challenges to the trial court's canvass was reasonable in light of *Faretta* and *Tovar*. It properly held that the trial court was not required to warn her about the problems associated with "proving herself innocent" because the law does not require her to do so, and, contrary to Petitioner's assertions, the record showed that the trial court fully inquired into her reason for waiving counsel and warned her about the advantages of having counsel to prove an affirmative defense. *See Davalloo*, 153 Conn. App. at 446–68.

With respect to her claim that the trial court failed to inform her that any sentence from a murder conviction could be imposed consecutive to her preexisting New York sentence, the Appellate Court reasonably concluded that such an omission does not undermine the trial court's finding of a knowing, intelligent, and voluntary waiver. *Id.* at 448–49; *see also Fore*, 169 F.3d at 108 (law does not require explicit accounting of potential punishment in *Faretta* discussion). The trial court provided Petitioner with a realistic description of her sentence exposure by informing her that a murder conviction could result in a maximum possible sentence of sixty years, which, considering petitioner's age at the time of the waiver, was effectively a life sentence on its own. *Id.*

Regardless of Petitioner's technical challenges, the Appellate Court reasonably held that her waiver was valid.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

**IV.    CONCLUSION**

For the foregoing reasons, Petitioner's petition for writ of habeas corpus is **DENIED**.

The Clerk of the Court is respectfully directed to enter judgment in favor of Respondents and close this case.

The Court further concludes Petitioner has not shown that she was denied a constitutionally or federally protected right. Thus, any appeal from this order would not be taken in good faith and a certificate of appealability will not issue.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of August, 2020.

_____/S/_____
Victor A. Bolden
United States District Judge